## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **JANE DOE NO. 1** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **vs.** | § | **CIVIL ACTION NO. _____** |
| | § | |
| **TEXAS CHRISTIAN UNIVERSITY,** | § | |
| **TEXAS CHRISTIAN UNIVERSITY BOARD** | § | |
| **OF TRUSTEES, DR. DIANE SNOW,** | § | |
| **DR. FREDRICK W. GOODING, DR. ROB** | § | **JURY DEMAND** |
| **GARNETT, DR. DARRON TURNER,** | § | |
| **RUSSELL MACK, J.D.,** | § | |
| **and AARON CHIMBEL** | § | |
| | § | |
| **Defendants.** | § | |

## COMPLAINT

Plaintiff Jane Doe No. 1, by and through the undersigned attorneys, files this Complaint against Texas Christian University and Texas Christian University Board of Trustees alleging as follows:

## INTRODUCTION

1.      This lawsuit is about a private university in North Texas that has historically been—and remains—bigoted, narrow-minded and hypocritical in its treatment of racial minorities and women while ostensibly advancing higher education.  Texas Christian University's ("TCU") legacy of discriminatory treatment of racial minorities and women is arresting and serves as the backdrop to the facts underlying this Complaint.  Indeed, the case at bar is the culmination of over a century of hateful campus culture gone unchecked.  TCU's most recent public and targeted displays of bigotry have claimed its latest victim in twenty-year-old

Jane Doe No. 1, an award-winning African-American young woman enrolled in TCU's Honors Program.

2.     This Complaint recounts (1) TCU's hateful legacy in its own words and actions as proudly published in its official records; (2) the fraudulent and self-serving Diversity, Equity & Inclusion ("DEI") campaign and accompanying degree program recently launched by TCU designed to induce racial minorities and women, like Jane Doe No. 1, to enroll in the university despite its hateful legacy and present conscious contempt for minorities and women; and (3) a series of acts or omissions by TCU designed to relegate Jane Doe No. 1 and other racial minorities and women to a status of second-class citizen on TCU's campus and at TCU-sanctioned activities in Washington, D.C. in violation of federal and state law.  Consistent with TCU's historical treatment of minorities and women, over the course of nearly two-years, Jane Doe No. 1 has been subjected to: (1) harassment from her professors and university staff, including unwelcomed physical contact; (2) public embarrassment in the presence of university professionals and her peers, including comments about Jane Doe No. 1's physical appearance and weight; (3) reckless disregard to Jane Doe No. 1's health decline resulting from her participation in university-sanctioned activities; (4) disparate treatment in her academic pursuits, including the unexplained revocation of a merit-based scholarship and being subjected to racially disparate grading practices, resulting in the loss of course credits; and (5) retaliation for her formal and informal complaints about TCU's treatment of herself and other similarly-situated minorities, **to name just a few of the incidents detailed herein**.  These incidents were so severe and pervasive that they created unimaginable psychological and physiological pain and harm to Jane Doe No. 1, including causing her to contemplate taking her own life on more than one documented occasion.   TCU's medical staff informed TCU's administration of Jane Doe No. 1's

distress and rather than work to ameliorate its hateful behavior towards Jane Doe No. 1, TCU doubled down.

3.      Had TCU not launched a fraudulent DEI campaign and accompanying degree program in 2016, in an apparent attempt to mask its true legacy, Jane Doe No. 1 would have seen the glaring reality of historic and systematic racial and gender inequities at TCU.  Because of these misrepresentations, however, Jane Doe No. 1 has endured unconscionable treatment.

## JURISDICTION AND VENUE

4.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1331 because this lawsuit arises under the Constitution, laws or treaties of the United States.  Specifically, this lawsuit involves conduct by TCU, which violates Title VI of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d through 2000d-6, Title IX of the Education Amendments Act of 1972, 20 U.S.C. §§ 1681 through 1687, Section 504 of the Rehabilitation Act of 1973, 29 U.S.C § 794, and Title III of the Americans with Disabilities Act, 42 U.S.C. §§ 12181 through 12189.

5.      This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332(a)(2) Plaintiff and Defendants in this case are citizens of different U.S. States and the amount in controversy exceeds $75,000.00, excluding interests and costs.

6.      This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) because the state law claims at issue are so related to the federal claims mentioned above, they form part of the same case or controversy under Article 3 of the U.S. Constitution.  Specifically, based upon the same facts associated with its violations of federal law, TCU's conduct also constitutes Texas common and statutory prohibitions against fraud, negligence, assault, intentional infliction of emotional distress, false imprisonment, violations of the Texas Deceptive Trade Practices Act, civil conspiracy and breaches of fiduciary duty and warranty.

7.      Venue is proper in the United States District Court for the Northern District of Texas pursuant to 28 U.S.C § 1931(b)(1) and (2) because all Defendants reside within this judicial district and are residents of the state of Texas and because a substantial part of the events or omissions involving TCU, which give rise to Jane Doe No. 1's claims occurred in this judicial district.  Additionally, and in the alternative, venue is also proper in this Court because each Defendant is subject to personal jurisdiction with respect to this lawsuit in this district.

## PARTIES AND KEY INDIVIDUALS

8.      Jane Doe No. 1, resides in Tarrant County, Texas during the academic year but is otherwise domiciled Oklahoma.

9.      Defendant Texas Christian University ("TCU"), is a Texas corporation and private university that receives federal financial assistance and is therefore subject to federal civil rights and educational law.  Defendant TCU may be served with process by serving its registered agent for service of process, Victor Boschini Jr., 2800 South University Drive, Fort Worth, Texas 76129, or wherever he may be found.

10.      Defendant Texas Christian University Board of Trustees ("TCU Board"), is a Texas business that does business in Tarrant County, Texas.  TCU's registered office is located in Tarrant County, Texas. Defendant TCU Board may be served with process by serving its chairman, Mark L. Johnson, at 2800 South University Drive, Fort Worth, Texas 76129, or wherever he may be found.

11.      Dr. Diane Snow is the Dean and Wassenich Family Endowed Chair of the John V. Roach Honors College at TCU. She may be served with process at 2600 West 7th Street, Apt. 1709, Fort Worth, Texas 76107, or wherever she may be found.

12.    Dr. Frederick W. Gooding is the Assistant Professor of African American Studies in the John V. Roach Honors College at TCU. He may be served with process at 4200 Bridgeview Drive, Apt. 123, Fort Worth, Texas 76109, or wherever he may be found.

13.    Dr. Rob Garnett is the Associate Dean and Honors Professor of Social Sciences of the John V. Roach Honors College at TCU.  He may be served with process at 2604 Shirley Avenue, Fort Worth, Texas 76109, or wherever he may be found.

14.    Dr. Darron Turner is the Chief Inclusion Officer and Title IX Coordinator, and the Deputy Affirmative Action/Equal Employment Opportunity Officer at TCU.  He may be served with process at 12637 Viewpoint Lane, Fort Worth, Texas 76028, or wherever he may be found.

15.    Russell Mack, J.D. is an instructor of strategic communications at TCU he may be served with process at 4706 Shadywood Lane, Colleyville, Texas 76034, or wherever he may be found.

16.    Aaron Chimbel is the Dean of the Jandoli School of Communication at St. Bonaventure University. He may be served with process at 3261 West State Road, Murphy Professional Building, Room 202, St. Bonaventure, NY 14778, or wherever he may be found.

17.    Dr. Teresa Abi-Nader Dahlberg is the Provost and Vice Chancellor for Academic Affairs.

18.    Dr. Gene Alpert is the Vice President of the Osgood Center for International Studies.

## STATEMENT OF FACTS

### I.    A legacy rooted in hatred is promoted and preserved.

19.    TCU cannot seriously contend that bigotry, hatred, and disparate treatment are anything less than part of its DNA.  TCU was founded by brothers and **Officers of the**

**Confederate Army**, Addison and Randolph Clark.[1]   When Addison Clark and his brother Randolph Clark, the cousin-in-law of  confederate General Robert E. Lee,[2]  lost their fight not only to maintain the right to own human-beings of African-descent as slaves but also to expand the practice of slavery West, the Clark bothers sought employment as professors at public Texas institutions.[3]   Because of their treasonous involvement as Officers in the Confederate Army during the Civil War, however, the Clark brothers were unable to secure employment at federally funded public schools.[4]   So, in 1873, the Clark brothers decided to open a private university where their ideologies and allegiances were accepted: TCU. Thereafter, TCU would become an incubator for precisely the brand of hatred and bigotry promoted by the high-ranking Confederate Clark brothers during their involvement in the Civil War.  Indeed, from its founding through the time of the filing of this lawsuit, TCU has remained consistent in its treatment of the racial minorities and women of its community as second-class citizens; promoting and preserving its legacy of bigotry and hatred.

## II.    Act I. Environs of T.C.U. Temple of Education, except for the "nigger."

20.    The branding of TCU as a persistently bigoted institution is no exaggeration.  In its earliest documented history, TCU regularly published racist ideologies and minstrel depictions of African Americans and promoted the racist acts and activities of its student body, faculty and staff.  An examination of TCU's earliest available publications provides context for the initial and persisting racial environment at TCU.

21.    In 1908 the *Skiff,* the university paper*,* provided commentary on a recent football game, publishing that a TCU player "waded thru [sic] [the 10-yard line] like a nigger goes thru

---

[1] Kirk Tochov, *TCU*, PERSONAL TCU, http://personal.tcu.edu/ktochov/TCU.html  (last visited Dec. 1, 2019).
[2] Addison Clark, THE INTERPRETER, February 1927, at 3.
[3] Tochkov, *supra.*
[4] *Id.*

[sic] a watermelon."[5]   In 1909 the *Skiff,* reflected fondly on a university event wherein the speaker*, "...*gave a graphic description of the horrors of the Reconstruction."[6]   How "negroes and carpet baggers ruled the country and of the final return of the white man to his own through the aid of the Ku Klux Klan and like agencies."[7]   In 1910 the *Skiff* published a biblical origin story of Adam, the first man formed by God, which in part discussed Adam's carefree existence in Eden in contrast to the concerns of the day. Specifically, the *Skiff* stated Adam,

> didn't have to anchor his smokehouse to the center of gravity with a log chain, set a double barreled bear trap in the donjon to keep off his hennery, nor tie a brace of pessimistic, pugilistic bull dogs in his melon patch, **for the nigger with his adjustable morals and omnivorous mouth had not yet arrived on the scene.**[8]

22.    The following year the *Skiff* casually noted that at a particular campus event, a TCU student "had more announcements than a nigger's dog had fleas."[9]

23.    In 1919, TCU's yearbook commemorated a well-attended TCU event in May when "the Ku Klux Klan certainly was revived" during "the finest shirt-tail parade [TCU] ever saw!"[10]

24.    TCU also regularly promoted minstrel depictions of African Americans. Again, in 1919 the *Skiff* published a "Hallowe'en" article that begins, "[l]aw, law, chile, but this nigger sure am tired."[11]   The article only becomes more damning from there, depicting an African-

---

[5] Editorial, *SOUTHWESTERN TOO! Another Addition to Varsity's Long List of Victims Bloor's Linebucking The Feature Game Somewhat Marred By Penalties*, SKIFF (North Waco), Nov. 18, 1908, at 1
[6] Herbert Bozeman, Editorial, *Tomlinson the Winner of Blind Contest—First Place Closely Contested in Both Composition and Delivery*, SKIFF (North Waco), Mar. 19, 1909, at 1.
[7] *Id.*
[8] Grundy W. Stevenson, Opinion, *Ideas of Plain Democrat*, SKIFF (North Waco), Apr. 15, 1910, at 2 (emphasis added).
[9] Howard B. Dabbs, Editorial, *Annual Shirley Program: The Yearly Open Session Was Held Last Friday Evening*, SKIFF (Fort Worth), May 25, 1911, at 1.
[10] 15 TEXAS CHRISTIAN UNIVERSITY, *The Horned Frog* 147 (1919).
[11] Beulah Bell, Editorial, *SOCIETY: Halloween Party Given*, SKIFF (Fort Worth), Oct. 5, 1919, at 3.

American simpleton cleaning behind white students and in search of a "Free Chicken Dinner."[12] TCU's 1920 yearbook even features a play titled "*A Pageant*," which "portrayed the happenings of the College Year 1919-1920."[13]  The fifty-one-page play features only two characters of color who appear in Act I. *Environs of T.C.U. Temple of Education*: the "negro bell hop" who speaks in stump speech and the other, a "kitchen scullion with ebony face."[14] **TCU's openly hateful depiction of African Americans in its earliest years was so pervasive that to catalogue them all in this lawsuit would be a physically exhausting exercise.**  Suffice it to say, however, that the bulk of TCU's publications through the 1960s detail TCU outings, including trips into the city to "witness one of the greatest Ku Klux Klan parades ever held in the South,"[15] incidents of persons defacing posters with the word "nigger" when prominent African Americans were invited to campus[16] and regularly published blatantly racist articles, poems, and illustrations, including *Hambone's Meditations[17]*, the minstrel comic strip that Judge and civil rights leader Benjamin Hooks admonished as a "total and colossal indifference to negroes and their accomplishments."[18]



Figure 1. Negro bellhop as featured in The Horned Frog 118 (1920).



Figure 2. Hambone's Meditations excerpt as featured in the SKIFF (Fort Worth), Sept., 1923.

---

[12] *Id.*
[13] 16 TEXAS CHRISTIAN UNIVERSITY, *The Horned Frog* 91 (1920).
[14] *Id.* at 118.
[15] Thos E. Dudney, Editorial, *K.K.K.*, SKIFF (Fort Worth), Feb. 20, 1922, at 4.
[16] Lonn Taylor, Opinion, *Letter to the Editor*, SKIFF (Fort Worth), Nov. 4, 1960, at 4.
[17] J.P. Alley, *Hambone's Meditations*, SKIFF (Fort Worth), Sept. 25, 1923, at 3.
[18] Michael K. Honey, *Going Down Jericho Road: The Memphis Strike, Martin Luther King's Last Campaign* 128 (W.W. Norton & Co., Inc., 2007).

25.     Minstrel depictions published by the university seemed to disappear by the time TCU fully integrated in 1964 (which in itself is reprehensible),[19] but its hateful ideologies toward, and disparate treatment of racial minorities and women only became more visible.

### III.     Admitted but not equal.

26.     In 1963, the *Skiff* published that "racial reins seemed a part of University policy…" and reported that students were "particularly concerned that racial background does restrict any scholastically qualified students from participation in some parts of [TCU's] academic program."[20]   In response to student concerns, TCU cautioned student leaders that "[TCU] ha[d] exhausted the usefulness of any campus-wide [discussions] on the topic of integration" and that the same "might be 'misconstrued' by persons off campus."[21]   In 1964, ninety-one years after its founding, and only after "feeling the heat" to comply with federal mandates, TCU totally integrated, but for years to come African Americans were not allowed to take part in general school affairs and even now African Americans are not treated equally at or by TCU.[22]

27.     By the late sixties, with the subjects of decades of its disdain now allowed on campus, TCU's culture of hate took on new life.   TCU proudly displayed its bigotry and hate for the African-American members of its own community and also towards its African-American visitors in every facet of the university experience. In one incident in 1967, Southern Methodist University star wide receiver (now Texas Sports and College Football Hall of Famer) Jerry

---

[19] Nyshicka Jordan, *Integration Now*, IMAGE, March 2004, at 16 (Chancellor Moudy on integration—"We were late in doing it. It was past time.").
[20] Mary Martin, Editorial, *Academic Restriction Target of Resolution*, SKIFF (Fort Worth), Dec. 6, 1963, at 1.
[21] Mary Martin, Editorial, *Easy Race Barriers*, *TCU Congress Asks*, SKIFF (Fort Worth), Dec. 6, 1963, at 3.
[22] Nyshicka Jordan & Kelly Morris, *Color Contrast*, IMAGE, March 2004, at 13.

---

LeVias, an African American, had death threats made against him for daring to set foot in TCU's Amon G. Carter stadium in a game against TCU.[23]   During the game LeVias was spat at by a TCU player who tackled him to the ground and "uttered a racial slur at LeVias as the two got up from the turf."[24] LeVias quit the game and retreated to the SMU sideline in tears.[25]   TCU's response to its own African-American students who dared attempt to participate in social activities as equals was—and remains—equally chilling.   In 1969, Ronnie Hurdle, a student at TCU in search of an "opportunity to be more involved in mainstream college life" tried out for the cheerleading squad and became TCU's first African American cheerleader.[26]   As his reward for attempting to spread campus glee and cheer his team to victory, the same night he celebrated making the squad Hurdle returned to his dorm room to learn of hours of harassing phone calls from persons asking to speak to "the nigger" and threatening to beat him up.[27]   Hurdle was then targeted by "long-time supporters of TCU" challenging "whether he was allowed to touch a white female cheerleader" and treated to "hurried conferences over compromises" between himself and the university Chancellor.[28] **An entire year later, in 1970, TCU finally decided to allow Hurdle to touch his fellow white female cheerleaders**.[29]

28.   Off the field, social activities and campus life were also "still somewhat segregated" as TCU's fraternities and sororities contained clauses restricting the admission of

---

[23] Jordan, *supra*, at 17.
[24] Charles H. Martin, *Benching Jim Crow: The Rise and Fall of Color Line in Southern College Sports, 1890-1980* 197 (2010); Jordan, supra, at 17.
[25] Steve Campbell, *LeVias Now Making a Difference Off Playing Field*, Houston Chronicle (Sept. 22, 2008), https://www.chron.com/sports/college/article/LeVias-now-making-a-difference-off-playing-field-1782142.php.
[26] Nyshicka Jordan & Kelly Morris, *Color Contrast,* Image, March 2004, at 13.
[27] *Id*.
[28] Margaret Downing, Editorial, *100 Years White, Only 9 Black*, Daily Skiff (Fort Worth), Jan. 18, 1973, at 8.
[29] *Id*. (emphasis added).

"Jews or Negroes."[30]  And as late as 1980, "none of [TCU's traditional fraternities and sororities] had any Negro members."[31]

29.     Dorm life for African Americans at TCU fared no better.  In 1968 Ivory Dansby, an African-American woman living on campus, complained that TCU prohibited African-American women from sharing dorms with white women.[32]  Dansby reported that "…[TCU] had white girls living three-to-a-room and, at the same time, Negroes were living alone."[33]  Dansby also recalled her dorm mother calling her "my favorite colored girl" and regularly inviting her "over to her house [to] do housework" and wash windows.[34]  Dansby's degrading experience existed beyond the dorm room as well.  Dansby recalls hearing "one of [her] prof's [sic] say Nigra N-I-G-R-A" and that to her it sounded "like a prof's[sic] been saying nigger all his life and just can't quite bring himself to say Negro."[35]  TCU carried its culture of isolation and disparate treatment of African Americans into the seventies, and that culture persists today.

### IV.   TCU's culture facilitates the adultery of an illicit intercourse between injustice and immorality.

30.     In fact, Herman Wright's first experience when he arrived on campus in 1971, was that a succession of three white roommates "bolted" from their dorm assignments, when they realized Wright was an African American.[36]  Wright "spent the rest of the year with no roommates."[37] In a 2016 interview, Wright acknowledged that there were "a ton [of obvious issues with race relations on TCU's campus]" and described his experience at TCU as very tough

---

[30] Frank Lewis, Editorial, *Greeks Proud of Unity*, SKIFF (Fort Worth), Jan. 17, 1969, at 2.
[31] *Id.*; Chris Kelley, Editorial, *TCU Turns to Racist Charges*, TCU DAILY SKIFF (Fort Worth), Sept. 3, 1980, at 1.
[32] Judy Buchholz, *On Breaking the Negro Cycle*, WAKE, May 1968, at 13.
[33] *Id.*
[34] *Id.*
[35] *Id.*
[36] Johnny Livengood et al., Editorial, *Walkout Spurs Black Outcry*, SKIFF (Fort Worth), Feb. 5, 1971, at 1.
[37] *Id.*

and very isolating.[38]   Wright was not alone.   That same year four African-American athletes voluntarily removed themselves from TCU's athletic program in a "walkout" citing "racist attitudes among general and athletic administrations," including arbitrary comments, rules and dress code targeting the physical appearance of the African-American athletes and the denial of food to one of the African-American athletes at the training table—conduct which persists today.[39]   The walkout "triggered a chain of demands" that were presented to the press by African-American students concerning the attitudes of bigotry toward racial minorities at TCU— again, attitudes that persist today.[40]

31.    In response to a list of demands produced by African-American students, TCU created a "Black Studies" minor to pacify the students in an apparent attempt to halt racial complaints; a play TCU  would recycle whenever confronted with student demands flowing from its racist and sexist treatment of its racial minorities and women.[41] It did not work then, and TCU should have known its most recent insincere attempt at solving racial issues by creating degree programs rather than confronting directly its insidious practices would not work now.[42]  By the late eighties, the "Black Studies" minor disappeared.[43] Ultimately, all of the aforementioned African-American athletes withdrew from TCU.[44]

32.    TCU's treatment of African Americans had deteriorated so far that in 1974 the TCU chapter of the National Association for the Advancement of Colored People ("NAACP") filed  two race and sex discrimination charges against TCU for its conduct in discriminating

---

[38] *Wright / Herman Wright Discusses TCU*, TCU (June 29, 2016), https://crbb.tcu.edu/clips/5262/herman-wright-discusses-tcu.
[39] *Id*.
[40] Ariana Williams, *Wall of Integration Highlights History of Campus Inclusion*, TCU 360 (Sept. 11, 2019), https://www.tcu360.com/2019/09/wall-of-integration-highlights-history-of-campus-inclusion/.
[41] *Id*.
[42] Lucy Calvert, Editorial, *Awareness Starts in Class*, TCU DAILY SKIFF (Fort Worth), Apr. 20, 1998, at 1.
[43] *Id*.
[44] Livengood et al., *supra*.

against African Americans in "employment, admissions, and certain student organizations."[45] One glaring aspect of the NAACP's charge was the complaint that TCU paid its racial minority and women employees less money for the same work as its white employees—a practice TCU continues to this day.[46]

33.    As a result of these charges, in October of 1974, the United States announced that it would send civil rights officials to investigate TCU's treatment of and practices against racial minorities.[47]  Ultimately, federal investigators substantiated the NAACP's claims of discrimination at TCU.[48]   Coincidentally—in yet another display of TCU's total lack of sensitivity towards its African-American community—in October of 1974, TCU's Forums Committee invited David Duke, Grand Dragon of the Klu Klux Klan to speak at the University.[49] African-American students and a group of African-American ministers protested that Duke's very presence was intimidating to a number of students and to the African-American students was a direct "slap in the face," especially in light of the recently filed NAACP discrimination complaints.[50]   TCU's Dean of Students approved Duke's appearance even while admitting the likelihood that "Duke's speech would reinforce the views of racists or adversely influence those who had no definite views."[51]   After weeks of continued protests from African Americans both within and outside TCU, TCU finally withdrew its invitation to Duke to speak on campus.[52]  A

---

[45] Editorial, *HEW to Probe Bias Charges*, DAILY SKIFF (Fort Worth), Oct. 24, 1974, at 1; Lisa Deeley, Editorial, *Second Discrimination Charge Filed: University Could Lose $1.5 Million*, DAILY SKIFF (Fort Worth), May 2, 1974, at 1.
[46] Editorial, *Affirmative Action reports: Minority [sic] Employees Few, Paid Little*, DAILY SKIFF (Fort Worth), May 3, 1974, at 1.
[47] Lia Deeley Smith, Editorial, *HEW to Probe Bias Charges*, DAILY SKIFF (Fort Worth), Sept. 6, 1974, at 1.
[48] Lia Deeley Smith, Editorial, *HEW to Probe Bias Charges*, DAILY SKIFF (Fort Worth), Sept. 24, 1974, at 1.
[49] Robert Bobbins, Editorial, *Forums Votes to Invite Klansman*, DAILY SKIFF (Fort Worth), Nov. 5, 1974, at 1.
[50] *Id.*; Loretta Gamble, Letter to the Editor, *Readers React to Klan Controversy*, DAILY SKIFF (Fort Worth), Nov. 6, 1974, at 2; Al Sibello, Editorial, *Klan Speaker Cancelled*, DAILY SKIFF (Fort Worth), Nov. 13, 1974, at 1.
[51] Robert Robbins, Editorial, *Speaker Panel OK's Duke's Visit*, DAILY SKIFF (Fort Worth), Nov. 8, 1974, at 1.
[52] *Id.*

---

few weeks later, however, TCU's House of Student Representatives reopened the invitation to Duke.[53]

34.     Towards the end of the seventies TCU was still—and remains—engulfed in complaints of disparate treatment from its racial minorities and women.  A university study in the spring of 1976 revealed that of the African Americans surveyed "67.5 percent were dissatisfied with the way they were treated on TCU's campus;… 42.5 percent felt their life at the University [was] generally worse than the life of the average white student;…and 15 percent said white students would not socialize with them."[54]  TCU's racist and bigoted conduct prevailed in the classroom, too.  In 1977, one nursing student complained that "she and other blacks were discriminated against in grading by faculty members of [TCU's] Nursing school" and yet another African-American student "was reportedly advised by a professor to drop out of school altogether" when they challenged the grade they received in a course, which they believed was due to disparate grading—a practice and culture that persists at TCU to this day.[55]  The Dean of the nursing school dismissed these claims as "just a rumor, coloring the truth."[56]

### V.     TCU's famous apathy makes racism in the hearts of a few a very real threat.

35.     By the eighties, TCU proved that it could take bigotry and hate to international and unimaginable heights.  In an address to student leaders in 1980, TCU's Chancellor admitted that "the full privileges of the campus" did not "appear to be available" to African-American students; specifically noting that "it seems hardly accidental for no blacks to be pledged in Greek organizations in 25 years."[57]  TCU student leaders responded that they "discriminate every time

---

[53] Editorial, *Klansman May Get Second Chance*, DAILY SKIFF (Fort Worth), Nov. 21, 1974, at 2.
[54] Cindy Cook, Editorial, *Black—White: Do Both Have Problems?*, DAILY SKIFF (Fort Worth), Feb. 4, 1977, at 4.
[55] *Id*.
[56] *Id*.
[57] Opinion, *Chancellor Discusses Discrimination at TCU*, TCU DAILY SKIFF (Fort Worth), Sept. 3, 1980, at 2.

rush rolls around," and that as a "private social organization [they] have that right," one even stated that "[i]t's always been separate but equal. Why should it change?"[58] A TCU lawyer disagreed and even called on TCU to fulfill its obligations to investigate racism on campus.[59]

36.     In the very same publication, a student reported that he had been running on the athletic field around the track preparing for a track meet when someone yelled to him, "nigger!" The student's recitation of the facts and the *Skiff's* reporting of the student response provides insight into just how persistent TCU's legacy of bigotry was and continues to this day:

> There was an uncomfortable silence as one of them related an experience to the others. He said he had been running on the athletic field around the track preparing for a track meet. He chuckled lightly as he remembered. "I was practicing for track and I had never in my life been called a nigger... I was here for two weeks and someone yells at me 'Hey, nigger!'" His listeners giggled, **some with hinted recognition**, others with discomforting embarrassment. "I didn't know if I should go home. I wondered if the Ku Klux Klan was going to get me or what. In mv upper educational life I have had to face more racism than ever in my life. I was president of a predominantly white Jewish high school class with a black principal." The room was quiet again. They realized what the popular track player was implying. They remembered the reasons they had come together to meet. "**I never experienced racism before I came here...**" [60]

Neither had Jane Doe No. 1 nor undoubtedly countless other racial minorities and women at TCU.

37.     The point conveyed here—since its founding TCU has been a breeding ground for a particular sort of hate; one that has served as an introductory to the harshest racial sentiments;

---

[58] Chris Kelley, Editorial, *Greek Problems Sprouted Early but Branched Now*, TCU DAILY SKIFF (Fort Worth), Sept. 4, 1980, at 1.
[59] *Id.*
[60] Virginia Vanderlinde, Editorial, *Book Learning Does Not Always Rule Out Bigotry*, TCU DAILY SKIFF (Fort Worth), Sept. 3, 1980, at 4 (emphasis added).

one that was present in 1873, again in 1980 and again today as evidenced by the experience and treatment of Jane Doe No. 1 in this case.

38. That same year, history seemed to repeat itself as it has been proven to do at TCU. In September of 1980, five foreign athletes quit TCU's soccer team citing disparate treatment after the long-time TCU soccer coach held "a secret practice []—just for the American players."[61]

39. The culture of isolation and white supremacy that TCU carried with it through the sixties was sustained through the eighties and continues to prevail today. For instance, in 1984, "a white athlete broke a national track record and the [track] team got the key to the city. A year later when the [track] team members were all black, they broke a world record and a national record and went undefeated in every track meet in which they participated, they got a plastic trophy from TCU."[62] A member of the all African-American team recalled, "They brought us to the athletic banquet just to humiliate us."[63] "I'll never forget how hurt I was," he said.[64]

40. And in 1988, racial minorities at TCU reported that "[w]hen you sit down next to white students, they move with a quickness as if you bite."[65] Another student of color reported that "his history professor asked him on the first day of class if he was going to do enough in his class to get a C." "That said to me that he didn't think I could do much better than a C," the student said.[66] By this time, international students also revealed that they were isolated at TCU. Indeed, Mahilet Bekele, the International Student Association President reported that TCU makes one "more aware that you are being judged by what you look like and not who you are,

[61] Editorial, *5 Soccer Players Quit*, TCU DAILY SKIFF (Fort Worth), Sept. 19, 1980, at 4.
[62] Yvonne Webb, Editorial, *Multicultural Illusions Prevail*, TCU DAILY SKIFF (Fort Worth), Apr. 19, 1988, at 1.
[63] *Id.*
[64] *Id.*
[65] *Id.*
[66] *Id.*

and it's a challenge not to be affected by it, because if you let it, it can drown you."[67]   Bekele likely could not have imagined the prediction she was making at the time.

41.     Also,  in 1988, Elena Hicks, president of TCU's Black Student Caucus, reported that "racism at TCU is more subtle than some of the overt racism of the past," but that "[i]f you are the least bit sharp you know what the hell is going…[i]t won't get by you."[68] That year racial minorities also reported that "the hostility they feel from the environment and the lack of role models causes them to question their own self-worth" and question "how can [one] do as well (in this environment) when [they] have to deal with academic pressure, social pressures and racism?"[69]  This student's question remains unanswered today.  Another student summed up the sentiments of racial minorities and women and their treatment at TCU at the time by plainly stating, "**TCU could very well be compared to a toilet. Toilets are dirty by design, and so is TCU**."[70]

42.     That same year TCU's Minority Affairs Director admitted that "the psychological barriers facing minority students are as limiting and more painful" than physical barriers.[71] Despite this admission, TCU's Minority Affairs Director dismissed racial minority students' sincere complaints of campus hostility towards them as "more perceived than real."[72]  This could not have been more untrue.   TCU's response also verified that, as the *Skiff* reported, when students report incidents of race related violence or harassment, "[o]ne of the first responses from administrators and police is to deny the problem exists"—a culture and practice which

---

[67] *Id.*
[68] *Id.*
[69] Yvonne Webb, Editorial, *Minorities Encounter Bias Racism*, TCU DAILY SKIFF (Fort Worth), Apr. 22, 1988, at 1.
[70] Kristie Aylett, Editorial, *Students Rally to End Racism*, TCU DAILY SKIFF (Fort Worth), Apr. 19, 1988, at 1 (emphasis added).
[71] Webb, *supra*.
[72] *Id.*

persist today.[73]   Regina Anderson, an African-American student, highlighted the pervasiveness of such practices in stating, "[she] could handle the racism if the school would just acknowledge that its here."  "**They need to say 'yes, we are bigots,' and deal with it**,"[74] Anderson said. Anderson was correct in 1988 and remains correct today.

43.     TCU's racist culture and the horrors associated with it in the eighties are not exclusive to its student population.  In 1987 renowned civil rights activist and minister, Reverend Jesse Truvillion, an African-American faculty member at TCU received a letter on TCU's campus that included:

> such things as a pseudo-prescription from Dr. Josef Mengele, the infamous Nazi who performed grotesque medical experiments on "racially inferior" prisoners in World War II. It also include[d] a mock boat ticket for a one-way trip to Africa.  It isn't just blacks who are meant to go on this trip "on a leaky boat shaped like a Cadillac and filled with bananas." Also invited are federal judges, communists, homosexuals…about the only type of person who would not fit into one of its many categories is an uneducated white male from the South or a submissive woman who knows her place…The message presented here is Southern white male supremacy as a way of life imposed upon all people. [75]

This remains TCU's message today.

44.     Though TCU is not a university noted for its concern for minorities—"**TCU's famous apathy makes racism in the hearts of a few a very real threat.**"[76]   This threat materialized against Truvillion in 1988 when he was approached by two white males yelling obscenities at him and yelling, "you're a dead cat, buddy."[77]   At the time, Truvillion was on

---

[73] *Id.*
[74] *Id.* (emphasis added).
[75]  Michael Hayworth, Opinion, *Ignoring Racism and Bigotry Only Helps the Disease Grow*, TCU DAILY SKIFF (Fort Worth), Apr. 22, 1987, at 2.
[76] *Id.* (emphasis added).
[77] Yvonne Webb & Kristie Aylett, Editorial, *Activity No Game to Some*, TCU DAILY SKIFF (Fort Worth), Apr. 7, 1988, at 1.

campus hosting African visitors with whom he was protesting TCU's refusal to divest from racist South African businesses supporting apartheid.[78]   Later, that day, Truvillion found a black cat with its throat slit dying on top of his vehicle.[79] According to Truvillion, "[w]hen you deliver a black cat to someone, it has a very specific meaning," "[i]f you deliver it alive, it means you are not considered human. If it's delivered dead, it means they intend to kill you."[80]   In the end, no eyewitness came forward and TCU failed to identify the individuals responsible, much less hold anyone accountable for the heinous act.[81]   Truvillion poignantly stated, that in an environment such as TCU's you "just don't get throats of cats slashed, but you get the throats of people's humanity slashed"[82]   Truvillion's sentiments still ring true today.

45.     TCU's racial minorities and women staff were also not exempt from TCU's harassing culture. In 1988 a knife and death threat card, among other bizarre items were left for Lovie Bradley, a housekeeper at TCU.  When asked who she thought left the items for her to find on her utility cart in a locked room, Bradley responded that she "think[s] it's people who…have a deep hate for [her] race."[83]  Bradley is African American.  TCU never identified the culprit.[84]

**VI.    Racism is a quiet but consistent part of life at TCU.**

46.     TCU's sordid legacy continued to materialize through the nineties as it still does today.  In 1992, Michelle Smith, an African American student at TCU reported on the complete insouciance with which members of TCU's community dished out racial epithets, without reprimand:

---

[78] *Id*.
[79] *Id*.
[80] *Id*.
[81] *Id*.
[82] Suzanne Lorton, Editorial, *Students Speak Against Racism*, TCU DAILY SKIFF (Fort Worth), Apr. 20, 1988, at 1.
[83] Leanora Minai, Editorial, *Occult Objects Found*, TCU DAILY SKIFF (Fort Worth), Apr. 22, 1988, at 1.
[84] *Id*.

> **This conversation may be heard frequently**; I heard it at one of my
> organizational meetings:
> "Gosh, did you lay out today?" one girl asked emphatically.
> "A little. Am I that tan?" she asked the other.
> "Yeah, you are dark, you nigger!"
> The girls then laughed, and I was standing right there. The girls were so
> preoccupied with themselves and their fake blackness that they failed to realize
> that someone with the attribute they were seeking was standing just behind them.
> Nigger, I thought. Hmmph! I chuckled.[85]

Smith was writing for herself as well as her "other African American sisters" who "**hear these less-than-informed comments on a daily basis**" at TCU.[86]  Smith correctly noted that such attitudes were "a very PUBLIC concern" in 1992 as they remain today.[87]

47.     In 1994, "someone scrawled the words 'Nigger #1' and 'Nigger #2' in paint on two doors in a fraternity house on TCU's campus."[88]  When the fraternity president was questioned about it he stated puzzlingly that "he didn't think the words were meant in a racist context…," that the "word nigger can be used in a casual way" and that he "really didn't care" who did it.[89]

48.     In 1997, history yet again repeated itself.  That year the *Skiff* revived TCU's legacy of racist cartoon imagery when it mocked racial minorities and their complaints about racism:[90]

---

[85] Michelle Smith, Opinion, *Historical Ethnic Notions Must Change*, TCU DAILY SKIFF (Fort Worth), Apr. 28, 1992, at 3 (emphasis added).
[86] Michelle Smith, Letter to the Editor, *Racism*, TCU DAILY SKIFF (Fort Worth), May 1, 1992, at 3 (emphasis added).
[87] *Id*.
[88] Editorial, *INTOLERANCE Racist Attitudes Have No Place at TCU*, TCU DAILY SKIFF (Fort Worth), Oct. 4, 1994, at 5.
[89] *Id*.
[90] Stacy L. Henderson, Letter to the Editor, *Racial Cartoon Misleading*, TCU DAILY SKIFF (Fort Worth), Feb. 14, 1997, at 3.



Figure 3. *"Six Degrees of Racism*
*Accusation" as featured in TCU DAILY SKIFF*

49.     Stacey Henderson, said the following of the cartoon, "as an African-American student, the sight of this cartoon shocked and troubled me. That there could be anyone who does not understand the reason why African Americans and other groups continue to protest is a dangerous situation."[91]

50.     Later that year the *Skiff* reported the obvious: that "**[r]acism is a quiet but consistent part of life at TCU**" that "manifests itself in many ways: an off-hand remark, a quickened pace, a misguided assumption;" and "often leaves portions of the campus scarred and divided."[92]   Within the report, several racial minorities and women at TCU shared their many experiences with extreme racism, racial profiling and bigotry.[93]   Illogically and laughably even, TCU responded that the racially bigoted attitudes conveyed by the students "had been brought in from the outside" to TCU.[94]   The reality, however, is that bigotry and racism are common fixtures at TCU.   That same year, Pete Radovich, a white student, spoke out against the bigotry

---

[91] *Id.*

[92] Blake Sims, Editorial, *Black & White: A Look at TCU Race Relations*, TCU DAILY SKIFF (Fort Worth), Feb. 25, 1997, at 9 (emphasis added).

[93] *Id.*

[94] *Id.*

and racism he had seen "[t]hroughout [his] time as a TCU student" in the form of casual racist attitudes on campus and "members of the community proudly sporting Confederate flags in their rooms and on their vehicles." [95] In response to condemning the very Confederate Flag bore by TCU's founders, the Clark Brothers, Radovich received five death threats, was called a "mother f—ing nigger lover!" and warned that if he spoke out again, he'd be killed.[96]

### VII.   Even TCU's Chancellor, Victor Boschini disapproves of TCU's race relations and diversity.

51.     As TCU entered the twenty-first century, its brand of racism and bigotry towards racial minorities and women evolved.  In 2000, "several white TCU students celebrated their fourth annual Martin Luther King Jr. birthday party. The group dressed in baggy jeans, wore T-shirts with the words 'talk to the hand' on them, and were adorned in shower caps with condoms tucked underneath. They proceeded to watch the film "*Menace II Society*" and ate fried chicken and watermelon."[97] When another group of white TCU students were asked how they were going to celebrate Black History Month they replied: "I'm going to KFC;" "[w]ell, I play football with a black guy;" and "I have relatives in Jasper."[98]

52.     In 2002, a group of African-American students were standing outside fixing a disabled car when a group of white students began pummeling the students with water balloons and yelling "niggers!" at them from a nearby building.  Bizarrely, despite the white students yelling "niggers," a clear racial epithet, TCU's Associate Dean of Campus Life said that "he ha[d] no basis to judge whether or not the incident was racially motivated."[99]

---

[95] *Id.*
[96] *Id.*
[97] Rusty Simmons, Editorial, *Acts of Racism, Ignorance Not Far from University*, TCU DAILY SKIFF (Fort Worth), Feb. 25, 2000, at 1.
[98] *Id.*
[99] Skiff Staff, Editorial, *Prank Under Investigation*, TCU DAILY SKIFF (Fort Worth), Feb. 22, 2002, at 1.

53.    **Even TCU's Chancellor, Victor Boschini disapproves of TCU's race relations and diversity**.  When asked directly about racial relations and diversity at TCU in a 2004 *Skiff* article titled, *Integration Now*, Chancellor Victor Boschini said "TCU has a long way to go, but that the commitment is there" and that he "would give [TCU] an 'A' for efforts and intentions and a 'C plus' for actual reality on campus."[100]   A decade later, under Chancellor Boschini's leadership, that 'C plus reality' would deteriorate to a solid 'F.'

### VIII.    TCU is an institution with layers of back and front of stage racism from students, faculty and administration.

54.    Beginning in 2010, the advent of the social media era gave members of TCU's community and particularly racial minorities and women a new and public platform from which to expose and address the persistence of TCU's legacy of hatred and bigotry.  In 2014, some TCU students began posting offensive comments about African Americans on the social media app, Yik Yak.[101] "End black entitlement.  End black privilege," and "Blacks were unable to get proper educations…but, that's more a result of their busted families and lack of morals…" and "watch the blacks," were among some of the comments made on Yik Yak.[102]  The incident once again drew national attention to the racist and bigoted culture that prevails at TCU.  A TCU spokesperson called the comments a "reality check that the university is not where it needs to be as a community."[103]   In truth, TCU has never been "where it needs to be" with respect to its

---

[100] Nyshicka Jordan & Kelly Morris, *Color Contrast*, IMAGE, March 2004, at 13.

[101] Robbie Owens, *TCU Hosts Campus Rally Against Racism*, CBS LOCAL (Apr. 30, 2015, 5:15 PM), https://dfw.cbslocal.com/2015/04/30/tcu-hosts-campus-rally-against-racism/.

[102] *Id.*; Gilma Avalos, *TCU Looks to Change Tone After Racist Comments*, CBS LOCAL (Apr. 30, 2015, 10:07 PM), https://dfw.cbslocal.com/2015/04/30/tcu-looks-to-change-tone-after-racist-comments/.

[103] Gilma Avalos, *TCU Responds to Racist Student Comments on Social Media*, CBS LOCAL (Apr. 29, 2015, 9:53 PM), https://dfw.cbslocal.com/2015/04/29/tcu-responds-to-racist-student-comments-on-social-media.

treatment of racial minorities and women. In another Yik Yak incident that same year, students at a predominately African-American fraternity pool party were called monkeys.[104]

55.    The oppressive and isolating experience of racial minorities and women became so pervasive in 2016 that the hashtag #beingaminorityatTCU went viral on popular social media platform, Twitter.[105]   Racial minorities and women shared their experiences on campus stating that "#BeingAMinorityAtTCU [is] [v]aluing the education that you receive but not feeling valued on campus" and "#BeingaMinorityatTCU is being labelled "negative" and "ungrateful" because you care about issues concerning race/White privilege/oppression" and "#BeingaminorityatTCU [is] having to make a hash tag to let our feelings out because we don't feel safe enough to do so on campus," to name a few.[106]   The #BeingaminorityatTCU hashtag and movement it inspired resulted in the "Black Students and Allies of TCU" delivering a list of demands to TCU and the media, together, with a letter calling on administrators to make the campus more inclusive.[107]   As the letter poignantly noted for the racial minorities and women on campus, "[f]eeling a sense of alienation along with trying to maintain a high grade point average and remain involved on campus creates unnecessary burdens that can hurt students in the long run."[108]

56.    After several weeks of negotiations, TCU responded by (1) creating a "Cabinet Level" position: Chief Inclusion Officer; (2) launching and publishing the creation of a Diversity, Equity & Inclusion ("DEI") committee and accompanying campaign, including an

---

[104] Garrett Podell, *Boschini Addresses Racial 'Ignorance' at TCU*, TCU 360 (Feb. 1, 2018), https://www.tcu360.com/2018/02/boschini-addresses-racial-ignorance-at-tcu/.
[105] *#Beingaminorityattcu*, TWITTER, https://twitter.com/hashtag/BeingAMinorityAtTCU?src=hashtag_click (last visited Dec. 5, 2019).
[106] *Id.*
[107] Ryan Osborne, *TCU Plans to Add Diversity Official After Students Send Demand Letter*, FORT WORTH STAR-TELEGRAM (Oct. 19, 2016, 9:17 AM), https://www.star-telegram.com/news/local/fort-worth/article109136667.html.
[108] *Id.*

---

award and fellowship; and (3) resurrected a move from its 1971 playbook, by approving a new major to pacify its racial minority students: Comparative Race & Ethnic Studies ("CRES").[109] Through these late-to the party initiatives, TCU represented that it was "a welcoming community that embraces diversity in all of its forms" and that it had "put in place measures to create a more balanced learning community."[110]   This was a material misrepresentation at an institution of higher learning specifically intended to entice racial minorities and women, like Jane Doe No. 1, to apply for admission to and enroll at TCU.[111]   Jane Doe No. 1 in this lawsuit relied on such representations to her detriment as did undoubtedly countless other racial minorities and women when they applied for admission to and/or enrolled at TCU.  In light of its legacy as extensively detailed herein, however, TCU knew or should have known that such representations were untrue.  Though convincing to gullible racial minorities, these ceremonious gestures proved empty, and even CRES—the very degree program approved in response to student outcry over racism and bigotry—is riddled with complaints of bias and disparate treatment.  In fact, upon reliable information and belief, TCU's Chief Inclusion Officer and Title IX coordinator, Dr. Darron Turner, has received multiple emotional complaints from both current and former faculty and students regarding pervasive discrimination and harassment of racial minorities and women designed to completely undermine their success in CRES and TCU.  One African American student even took to Twitter in November 2018 with the hashtags #BoycottCRES and #CallOutColonizers to express his frustrations with a CRES professor who admitted he was "a

---

[109] *Id.*

[110] Victor Boschini, Jr., *Letter from the Chancellor*, TCU, https://inclusion.tcu.edu/about/letter-from-the-chancellor/ (last visited Dec. 6, 2019); *Resources*, TCU, https://inclusion.tcu.edu/resources/ (last visited Dec. 6, 2019).

[111] *Id.*

little bit racist" and that he has "been scared before walking at night if [he] see[s] a group of black men walking in [his] direction."[112]

57.     As if TCU's insincerity in publishing the aforementioned DEI campaign and approving the CRES major was not clear enough, merely one year after starting the CRES program TCU announced that it was moving CRES out of the established AddRan (presumably named for Confederate Officers, and founders Addison and Randolph Clark) College of Liberal Arts to an "interdisciplinary unit." Included in this "interdisciplinary unit" are programs such as Women and Gender Studies, Ranch Management, as well as FrogFolio and the Idea Factory, all programs which, upon information and belief, rank low in priority at TCU.[113]  This smacks of TCU's 1971 play in creating a Black Studies minor—a promise which evaporated.  One  African American and CRES major puts it best, "[f]or them to go move us, from AddRan, which is an established, credible college within TCU, **to move [CRES] into this new interdisciplinary unit, whatever that is, is like a slap in the face**."[114]  TCU cannot seriously contend that it had any true intentions of following through with the representations it made in response to student protests, which it used to advertise and market to racial minorities and women, including Jane Doe No. 1.

## IX.     In every decade since its founding, there has been clear evidence of the pervasiveness of TCU's hatred of racial minorities and women.

58.     Predictably, nothing has changed at TCU.  Racism, hate, and bigotry remain fixtures of TCU and pervade every orifice of its existence.  TCU's conduct has caused and continues to cause real pain and physical harm to TCU's racial minorities and women.  Upon

---

[112] Elizabeth Campbell, *CRES Negotiates Move to Interdisciplinary Unit Amid Student Resistance*, TCU 360 (May 2, 2018), https://www.tcu360.com/2018/05/cres-negotiates-move-to-interdisciplinary-unit-amid-student-resistance/.
[113] *Id*.
[114] *Id*. (emphasis added).

reliable information and belief, TCU's Chief Inclusion Officer and Title IX coordinator, Dr. Turner was recently made aware that hateful classroom and campus treatment of racial minorities and/or women at TCU was so severe and pervasive it caused psychological and physiological harm to those racial minorities and women, including in at least one case the development of type 1 diabetes, which is caused by life-changing/stressful events. Jane Doe No. 1 in this lawsuit has also suffered psychological as well as physiological harm as a result of TCU's hateful treatment of racial minorities and women.

59.     In every decade since its founding, there has been clear evidence of the pervasiveness of TCU's hatred of racial minorities and women. Even TCU star athletes are not exempt from the psychological and physiological manifestations of hate toward racial minorities and women on campus. Recently, former TCU wide-receiver Kolby Listenbee, an African American, filed suit against TCU for, among other things, the harassment and humiliation he faced after an on-the-field injury.[115]  Listenbee was publicly ridiculed and humiliated by TCU athletic staff who made him switch seats and sit in the back of the plane rather than with his fellow starting seniors in first-class and was told that he would not only be dismissed from the TCU football team, but also from TCU itself if TCU were to lose a football game during his injuries.[116]  TCU even suggested he may be lying or "faking it."[117]  We now know (as we have always known) that Listenbee, like other racial minorities and women at TCU, are not lying or faking it. The hatred racial minorities and women endure and the harm that results are very real as emphasized by Jane Doe No. 1's experience made basis of this lawsuit.

---

[115] Micheal McCann, *Breaking Down Kolby Listenbee's Lawsuit Against TCU, Gary Patterson and the Big 12*, SPORTS ILLUSTRATED (Feb. 1, 2018), https://www.si.com/college/2018/02/02/kolby-listenbee-lawsuit-tcu-gary-patterson-legal-analysis.
[116] *Id.*
[117] *Id.*

X.    **TCU's legacy of hatred assails the humanity of racial minorities and women, like Jane Doe No. 1.**

60.    Jane Doe No. 1 is a twenty-year-old African-American young woman and award-winning honors student at TCU.  As the daughter of two veteran United States military officers, hard work, perseverance, truth and justice are a part of Jane Doe No. 1's DNA.

61.    Before attending TCU, Jane Doe No. 1 excelled academically while being a star high school and collegiate athlete.  While still in high school Jane Doe No. 1 pursued a rigorous academic program, which included completing college level courses and earning dual credits at her local community college while participating actively in social organizations and athletics. Upon graduation from high school Jane Doe No. 1 was offered and accepted a scholarship to a university several hundred miles from home.  By all accounts, prior to her experiences at TCU, Jane Doe No. 1 was a confident, warm, inviting, and spirited young woman who took great pride in herself, her work and her academic abilities and had no preexisting psychological malady.

62.    At her initial university Jane Doe No. 1 excelled academically and athletically. As she became more immersed in her academic courses, Jane Doe No. 1 decided she no longer wanted to remain a college athlete.  Instead, she desired an academic experience that would offer an intellectual challenge within a balanced and welcoming community. In the Fall of 2017 Jane Doe No. 1 began searching for a competitive university to which she could transfer to prepare her for a rigorous graduate study program—a goal complicated by acts and omissions of TCU.

63.    Jane Doe No. 1's search led her to TCU.  Jane Doe No. 1's research included her review of TCU's website and marketing materials, specifically, the representations made via TCU's website about its elaborate DEI initiatives and accompanying incentives. Jane Doe No. 1 applied to TCU believing it offered an egalitarian experience for all students.  Through its DEI program, TCU promoted itself as an institution committed to fostering a campus culture that

fully supports cultural exchange and diversity.[118]  **The DEI strategic plan itself touts that its objective is to attract, teach, reach, and embrace "under-represented students, especially students of color," like Jane Doe No. 1.**[119]   TCU's effective marketing, including its DEI initiative did attract Jane Doe No. 1 and undoubtedly countless other racial minorities and women. As Jane Doe No. 1 would learn soon after her enrollment, however, TCU's promises were gross misrepresentations.  Indeed, Jane Doe No. 1 has experienced none of the core values TCU publicly expressed.  Instead, Jane Doe No. 1's collegiate experience has been engulfed by TCU's legacy of bigotry and hatred and marred by a series of hateful and discriminatory acts perpetrated by TCU for over a century and designed to relegate Jane Doe No. 1 and other racial minorities and women to the status of second-class citizen.

### XI.   TCU continues to endorse relegating racial minorities and women to the status of second-class citizen in its housing practices.

64.     Jane Doe No. 1's first experience when she arrived on campus on January 15, 2018, was that her original roommate—a young white woman—had taken all available closet, desk and common space in the room to herself and relegated Jane Doe No. 1 and all of her belongings solely to a bed in the corner. Jane Doe No. 1 asked her new roommate to remove her belongings from Jane Doe No. 1's closet and make space in shared portions of the room, but her roommate refused.  When Jane Doe No. 1 complained to TCU that her white roommate had commandeered the entire room, including the closet, desk and lounge space intended for a second roommate; leaving Jane Doe No. 1 with only a place to lay her head, TCU responded, "what's wrong with that" and questioned if Jane Doe No. 1 really "had that much stuff."  Jane Doe No. 1 was shocked by this response and demanded that she be moved to a room where she

---

[118] *Strategic Plan*, TCU, https://inclusion.tcu.edu/about/strategic-plan/ (last visited Dec. 16, 2019).
[119] *Id*. (emphasis added).

would not be bullied into sharing the bed with her belongings.  TCU begrudgingly complied.

True to form, despite having a student population of approximately over 70 percent whites, Jane

Doe No. 1 was moved to a room with another racial minority.  Ironically, this incident occurred

exactly three years before the original filing date of this lawsuit and on Martin Luther King Jr.'s

birthday.

### XII.   Racial minorities and women, like Jane Doe No. 1, are admitted but not equal at TCU.

65.     Before transferring to TCU Jane Doe No. 1 had maintained a **4.0 GPA** and met

other transfer student requirements. Accordingly, she was eligible for a merit-based transfer

scholarship, which TCU notified Jane Doe No. 1 that she had been awarded in January of 2018.

Though already enticed to enroll at TCU by the numerous misrepresentations made about its

legacy, present campus culture and environment, the award of the transfer scholarship cemented

Jane Doe No. 1's belief that TCU was the place to pursue her academic and professional goals.

Because TCU's tuition and living costs are exorbitant—yet another barrier for racial minorities

and women— the merit-based transfer scholarship would cover a substantial amount of the fees

and costs associated with attending TCU and increased Jane Doe No. 1's excitement about her

pending transfer.

66.     Unfortunately, Jane Doe No. 1's excitement would be short-lived. After Jane Doe

No. 1 began her classes, TCU, without explanation, revoked Jane Doe No. 1's merit-based

transfer scholarship.  TCU's stated excuse was that at the time of application, Jane Doe No. 1

failed to meet the merit-based requirements.  By way of explanation TCU furnished, via email,

the revised requirements to Jane Doe No. 1 that differed from the requirements published on

TCU's website.[120]   Nonetheless, Jane Doe No. 1 clearly exceeded the requirements for consideration for a merit-based transfer scholarship both at the time of her application (as evidenced by her initial award) and at the time of the revocation of her scholarship award.   To date, Jane Doe No. 1 has received no clear answer as to why the merit-based transfer scholarship awarded to her was revoked.

67.    When her scholarship was revoked Jane Doe No. 1 was already attending classes at TCU.   Faced with the burden of paying for TCU without assistance, Jane Doe No. 1 was forced to apply her parents' G.I. Bill benefits (the military educational benefits her parents earned for their honorable service as United States military officers) to pay her TCU expenses. **Jane Doe No. 1 intended to utilize the G.I. Bill for her graduate studies but because TCU reneged on its merit-based transfer scholarship, Jane Doe No. 1 will no longer be able to apply this benefit to pursue her planned professional education.**   This was just the beginning of the many hateful experiences of TCU's legacy and enduring culture of bigotry and racism that Jane Doe No. 1 would experience.

68.    Despite TCU's apparent lack of concern for, and response to Jane Doe No. 1's initial dorm experience and the revocation of her scholarship, Jane Doe No. 1 remained undeterred.   In pursuit of the academic rigor and social environment promised by TCU, Jane Doe No. 1 applied to TCU's John V. Roach Honors College (the "Honors College") during her first semester.   Jane Doe No. 1 was notified that TCU's policy, in relevant part (which is stated on its website) was that transfer students must have a minimum of 12 graded hours at TCU before admission to the Honors College.   Specifically, during a phone call with Renda Williams, the Honors College's academic program specialist, Jane Doe No. 1 was informed that though she

---

[120] *Transfer Academic Scholarships*, TCU, https://financialaid.tcu.edu/types-of-aid/scholarships/transfer-academic-scholarships.php (last visited Dec. 16, 2019).

had the requisite GPA, she did not meet the graded hours requirement and therefore would not be admitted that semester.  Accordingly, Jane Doe No. 1 was made to wait an additional semester before admission to the Honors College.  The following semester, having maintained a stellar academic record, Jane Doe No. 1 was admitted to the Honors College.  To Jane Doe No. 1's surprise she learned from classmates and faculty that the Honor's College had admitted, and continues to admit, white transfer students who failed to meet the minimum 12 graded hours at TCU requirement.  Upon reliable information and belief TCU's Honors College's actual transfer student admissions practices violate its published policy and impose unnecessary barriers on racial minorities and women (more specifically, African Americans) designed to prevent or limit their enrollment.

69.     For Jane Doe No. 1 it began to sink in that at TCU "you are judged by what you look like and not who you are."   Nevertheless, Jane Doe No. 1 searched for and seized opportunities to be more involved in mainstream college life at TCU.

### XIII.   When racial minorities and women, like Jane Doe No. 1, decide to become an integral part of TCU, racism rears its head.

70.     In the Spring of 2018, Jane Doe No. 1 tried-out for and was selected to join TCU's Moot Court team.  Jane Doe No. 1 was excited at the opportunity to represent TCU in inter-collegiate competitions through the Texas Undergraduate Moot Court Association.  As a high school and collegiate athlete, Jane Doe No. 1 is experienced in working and training in diverse team settings and knows that equitable coaching and mentorship are required to ensure that each team member is competitive.  Based upon her prior experiences outside of TCU, Jane Doe No. 1 believed that she would receive equal training, development and access to Moot Court coaching faculty and staff.  Jane Doe No. 1, like many other racial minorities and women, had never experienced the brand of bigotry that permeates TCU before her arrival on campus and

could not have imagined the disparate treatment she would be subjected to on TCU's Moot Court team.  As her reward for attempting to represent TCU as an oral advocate, TCU's Moot Court coach Dr. Samuel Arnold paired Jane Doe No. 1 with the only other racial minority and segregated the two young women from the rest of the team.  Jane Doe No. 1 and her teammate were never given the same attention as their white counterparts and were regularly excluded from and denied the full benefits of training by their Moot Court coach, Dr. Arnold.  In fact, Dr. Arnold regularly provided active, detailed and individualized coaching to the white members of the Moot Court team while ignoring Jane Doe No. 1 and her teammate altogether.  When Jane Doe No. 1 and her teammate made several requests to meet with Dr. Arnold to review their arguments, he refused but regularly honored the requests of TCU's white Moot Court team members.  At competitions, Dr. Arnold would attend the oral arguments of TCU's white Moot Court team members to offer coaching and support and to generally cheer them on.  During Jane Doe No. 1 and her teammate's oral arguments, however, Dr. Arnold would not even bother to show up.  On one occasion, Jane Doe No. 1's mother attended a Moot Court competition to support Jane Doe No. 1 and her teammate and observed the disparate and isolating treatment they were subjected to and total lack of support they received, including Dr. Arnold totally ignoring the two racial minority women.  When Jane Doe No. 1's mother asked Dr. Arnold if he intended to stay for Jane Doe No. 1 and her teammate's argument to support them and help them as he had just done for TCU's white Moot Court team members, Dr. Arnold replied, "No, you are here. You can cheer them on."

71.     For Jane Doe No. 1 this experience with TCU's mainstream "brought it home" just as it did for Ronnie Hurdle in 1969.[121]  As Hurdle stated of racial minority participation in

---

[121] Yvonne Webb, Editorial, *Racism Not New at TCU*, TCU DAILY SKIFF (Fort Worth), Apr. 19, 1988, at 1.

TCU's mainstream culture and as Jane Doe No. 1 had experienced, "when [racial-minorities] decided to become an integral part of the system, that's when it (racism) reared its head."[122] This would be but one of many times racism reared its head and Jane Doe No. 1 was segregated at TCU and treated disparately from her similarly-situated white colleagues.

### XIV.   TCU isolates, discriminates and retaliates against racial minorities and women, like Jane Doe No. 1, in its employment practices.

72.      Soon after her admission into the Honors College Jane Doe No. 1 was offered and accepted a job in the Honors College as a desk assistant making $7.50 per hour.  This job was not a federal work study position but rather a TCU support staff position.  Much like her other campus experiences, Jane Doe No. 1 was the only African-American student worker in the Honors College office.  As the only African-American employee in the office, Jane Doe No. 1 quickly realized the glaring differences from the treatment she received and the treatment of her white counterparts.

73.      Jane Doe No. 1 was conveniently scheduled to work during Honors College tours and instructed to sit at or near the reception desk so that she would be visible to prospective students' and their families.  Once the tour concluded (even if it concluded while Jane Doe No. 1 still had hours left to work) Jane Doe No. 1 would be dismissed from her job for the day.  Jane Doe No. 1's white counterparts were not scheduled during tours, nor were their hours cut in the same manner as Jane Doe No. 1's.  In fact, even when Jane Doe No. 1's white counterparts arrived early or otherwise during Jane Doe No. 1's scheduled work hours, the Honors College regularly forced Jane Doe No. 1 to end her shift and leave—so long as a tour was not scheduled—resulting in Jane Doe No. 1 receiving shamefully fewer hours than her white

---

[122] *Id.*

counterparts.  Though not her expectations, Jane Doe No. 1 regularly only worked three hours per week while her white counterparts regularly worked 15 hours per week.

74.     When Jane Doe No. 1 was not serving as the Honors College showpiece during tours she was regularly scheduled to work after the conclusion of Honors College events.  This meant that when Jane Doe No. 1 arrived, she was expected to clean up after Honors College staff, including in some instances her own fellow student counterparts.  In one incident, after Spring 2019 graduation when Jane Doe No. 1 was not even scheduled to work, the Honors College called Jane Doe No. 1 into work to break down tables and tents and perform other manual labor while Jane Doe No. 1's counterparts were assigned to hand out programs. Again, Jane Doe No. 1 was the only African-American student worker in the Honors College.  Jane Doe No. 1 refused the manual labor.  Such treatment and conduct persisted while Jane Doe No. 1 worked in the Honors College, further continuing a culture that marginalizes and discriminates against racial minorities.

75.     TCU would later utilize their authority over Jane Doe No. 1 as an employee of the Honors College, among other things, to retaliate against Jane Doe No. 1 for filing formal complaints of discrimination and hostile treatment based upon her interactions with TCU faculty and staff during a month-long summer course in Washington, D.C.—the crescendo of multiple hateful encounters Jane Doe No. 1 would experience at the hands of the Honors College. Specifically, on August 16, 2019, after conducting her first video interview with TCU's Title IX coordinator Jane Doe No. 1 was informed by Renda Williams, the Honors College academic specialist, that Jane Doe No. 1's work hours had been reduced from the already low average three hours per week, to one hour per week.  Jane Doe No. 1 was in disbelief.

76.     The Honors College was not finished.   Jane Doe No. 1 would later learn that while she was being paid $7.50 per hour, her white counterparts were being paid $9.50 per hour.

77.     On Friday August 23, 2019, Jane Doe No. 1 was offered a "raise" of $2.00 per hour for the new academic year by the Honors College. Jane Doe No. 1 shared the good news that she was now making $9.50 per hour to her counterparts, who revealed to Jane Doe No. 1 that they had been making $9.50 per hour all along, including the prior year when Jane Doe No. 1 was earning $7.50 but supposedly hired to perform identical duties to her white Counterparts. Again, at the time Jane Doe No. 1 was the only African-American student worker in the Honors College.   Tellingly, Jane Doe No. 1 received news of this "raise" only after she submitted a formal statement and complaint to Title IX and the Campus Life Dean's Office.

78.     Jane Doe No. 1 had initially wondered why the Honors College offered her a job, for which she did not apply, however, it became clear that she was not an employee but rather a token.  Sadly, this would not be the only time Jane Doe No. 1 was used as window-dressing for TCU's fraudulent misrepresentation of its commitment to diversity.   TCU's treatment of Jane Doe No. 1 as an employee of the Honors College continued to deteriorate as the summer ended and the fall semester began.

### XV.   TCU endorses a separate and unequal method of educating racial minorities and women, like Jane Doe No. 1.

79.     In the Fall of 2018 Jane Doe No. 1 enrolled in Introduction to Political Theory to fulfill the requirements of the Honors College.  Given TCU's abysmally low enrollment of racial minorities and women, it was not uncommon for Jane Doe No. 1 to be the only racial minority in a course, and particularly a course that satisfies Honors College requirements. It is also not uncommon for TCU to promote an environment and culture that constructively segregates racial minorities from their white counterparts in the classroom.   On her very first day of class Jane

Doe No. 1—like racial minorities of TCU's past—observed that when she sat down next to white students, they moved with a quickness as if she had bitten them.   As instruction began Jane Doe No. 1 soon realized that she was isolated and alone sitting across the room from her white classmates who refused to interact with her.   Jane Doe No. 1 thought that her professor, Dr. Arnold—the aforementioned Coach of TCU's Moot Court team—would redistribute seating arrangements to provide all students an egalitarian learning environment.   Jane Doe No. 1 overestimated TCU's capacity for fair treatment of racial minorities and women.

80.     Dr. Arnold made no such adjustments or corrections to the seating arrangement of his classroom and instead would confirm and promote Jane Doe No. 1's segregation and isolation through his acts and omissions during the course.   In fact, just as he had done during Jane Doe No. 1's time on TCU's Moot Court team, Dr. Arnold again ignored Jane Doe No. 1 altogether.   During course instruction, Dr. Arnold only faced the direction of, and spoke to the white students enrolled in the course—leaving Jane Doe No. 1 to absorb instruction from the atmosphere.   Dr. Arnold also facilitated course discussions designed to humiliate and demean Jane Doe No. 1 and other racial minorities and women.   **In one incident, during a class discussion a white student turned to Jane Doe No. 1—on the other side of the room—and stated, "all black people are on welfare" and several other ignorant and baseless comments**. Though one would think a recipient of a Ph.D. in Politics from Princeton should know not only of the falsity of such statements, but also of his obligation as a professor to correct such baseless and racist ideologies, Dr. Arnold did nothing.   When Jane Doe No. 1 confronted Dr. Arnold about the insensitivity and incorrectness of her white colleagues' racist remarks and how isolated they made her feel, he responded that he "didn't think anything was wrong" with the comments and questioned why Jane Doe No. 1, "was making a big deal" of the incident.

81.     Unsatisfied with Dr. Arnold's response, Jane Doe No. 1 visited her Honors College academic advisor Donna Schonerstedt to report the incident.  Rather than focus on the inappropriateness of Dr. Arnold's conduct in isolating and humiliating Jane Doe No. 1, Ms. Schonerstedt suggested that Jane Doe No. 1 "maybe should just switch classes" or file a formal complaint. **On a campus as racist and bigoted as TCU, the suggestion that Jane Doe No. 1 could avoid TCU's brackish treatment by switching classes is incredible.**  At this point Jane Doe No. 1 questioned "how can [she] succeed (in this environment) when [she] ha[s] to deal with academic pressure, social pressures and racism?"[123]  Ultimately, Jane Doe No. 1, exhausted by the insults and derogatory treatment she endured and believing she was left with no other option, withdrew from Dr. Arnold's course.

82.     Jane Doe No. 1 was also subjected to hostile treatment from Honors College administration, including chiefly Dr. Diane Snow, Dean of the Honors College, multiple times during Jane Doe No. 1's academic pursuits at TCU.  In the Spring of 2019, Jane Doe No. 1 enrolled in another course to fulfill the requirements of the Honors College: Engaging Difference and Diversity; a course designed for the newly minted CRES department.  Part of the course requirement was a group research projected related to diversity in the Honors College. Jane Doe No. 1's group decided to examine TCU's efforts to address deficiencies in minority enrollment in the Honors College.  According to the Honors College, it had adopted a holistic admissions process, which as of Fall 2019 "considers not only standard indicators, e.g. test scores, GPA, and rigor of high school curriculum, but also broad evidence of curiosity, motivation, fairmindedness, and creativity through additional essays."[124]  Jane Doe No. 1's group would gather data relating to current diversity enrollment in the Honors College as well as interview

---

[123] Yvonne Webb, Editorial, *Multicultural Illusions Prevail*, TCU DAILY SKIFF (Fort Worth), Apr. 19, 1988, at 1.
[124] *Diversity & Inclusion*, TCU, https://honors.tcu.edu/about/diversity-inclusion/ (last visited Dec. 16, 2019).

key individuals in the Honors College administration to determine the method and application of the new purportedly holistic admissions criteria.  Jane Doe No. 1's group research project topic was presented and approved by the course professor, but when Jane Doe No. 1's group contacted the Honors College in attempts to obtain data they were met with aggression and hostility from Dr. Snow.  Specifically, when Jane Doe No. 1 and her group members—all racial minorities— contacted the Honors college to ask if they could conduct interviews with certain staff members for their research project, Dr. Snow personally emailed the group lambasting them and telling the students (who had never formally met her before) that she "didn't appreciate them emailing her staff without her knowledge," warning them not to attempt to contact her staff directly and that "everything goes through [her]."  Jane Doe No. 1's group was puzzled by the hostility of Dr. Snow's response, but because they needed to complete their group project, they worked to obtain data and schedule interviews with key Honors College staff.

83.     When Jane Doe No. 1's group was finally authorized to speak with Honors College staff for their research assignment Dr. Snow's hostile temperament towards racial minorities and women surfaced again.  Jane Doe No. 1's group scheduled an interview session with the Honors College's all white "Diversity Board"—made up of all white TCU staff, including Dr. Snow—and the Diversity Board proceeded to monopolize the conversation nearly the entirety of the session only leaving Jane Doe No. 1's group time to ask no more than four questions relevant to their extensive honors level research project.  When the students began to ask their questions, Dr. Snow became visibly more and more upset.  After the group's fourth question, Dr. Snow abruptly and aggressively cut the interview short and then demanded that Jane Doe No. 1 send her the entirety of the research project once completed.  Dr. Snow also warned Jane Doe No. 1's group that she would attend their presentation in an apparent act of

intimidation.  Once the project was completed, Dr. Snow aggressively approached Jane Doe No. 1 demanding a copy of the final project.  Jane Doe No. 1 informed Dr. Snow that it was her understanding that because the assignment was a group project, she could not share her group members' work without their permission.  Still, Jane Doe No. 1 sent Dr. Snow a summary of the project, conclusions and recommendations including the bulk of her contributions to the same. Dr. Snow was unsatisfied and would later continue to harass Jane Doe No. 1 about the group project before totally dehumanizing Jane Doe No. 1 over the course of four weeks during a TCU sanctioned Honors College trip to Washington, D.C.[125]  Curiously, Dr. Snow did not ask Jane Doe No. 1's professor, Snow's subordinate, for a copy of the research project or consult with her over any concerns she had regarding the same.  Only Dr. Snow knows why these racial minorities' inquiries regarding the Honors College's diversity efforts offended her so.  Dr. Snow's rank hostility toward and disparate treatment of Jane Doe No. 1, however, would later confirm that Dr. Snow's actions were driven by racial animosity and bigotry.

### XVI.   TCU denies racial minorities and women, like Jane Doe No. 1, the right to happiness and freedom on campus and beyond.

84.    Indeed, Dr. Snow and Honors College faculty and staff terrorized and dehumanized Jane Doe No. 1 through the entirety of an academic trip the following summer; placing Jane Doe No. 1's health and welfare in jeopardy and constructively denying her rights to happiness and freedom.

85.    In the Fall of 2018, Jane Doe No. 1 applied for "Honors Explorations" the Honors College's summer study "abroad" program.  That year TCU's Honors Explorations program had three one-month summer destinations for Honors College students to choose from: (1) "Cultural

---

[125] Upon reliable information and belief, it is against Honors College practice for the Dean of the Honors College to demand to personally review individual student's course work prior to and following the completion of the same.

Routes," which toured Germany, Switzerland and Italy; (2) "Disaster, Recovery, [sic] & Renewal: Lessons from Japan," which toured various cities across Japan; and (3) "How Washington, D.C. Works," which was not at all a summer abroad, but rather a trip to the nation's capital and for TCU an apparent opportunity to further fraudulently promote itself as an institution concerned with and/or committed to diversity.

86.     Though Jane Doe No. 1 ranked the Washington domestic study program last, she was assigned to attend.  When Jane Doe No. 1 expressed her disappointment in her summer assignment to Honors College staff, they offered no explanation as to how Jane Doe No. 1 was selected for the domestic program despite having ranked it last.  Jane Doe No. 1 declined the Washington summer program.

87.     In response the Honors College offered to pay for approximately 48 percent of Jane Doe No. 1's fee associated with the domestic program to entice Jane Doe No. 1 to go on the trip.  Jane Doe No. 1 accepted the Honors College's offer and paid the remaining portion of the Honors Explorations program fee.  The Honors College would later hold the financial assistance they used to entice Jane Doe No. 1 to attend the domestic program over Jane Doe No. 1's head before and during the trip; weaponizing the grant—among other threats—in order to restrict and exercise control over Jane Doe No. 1.  Jane Doe No. 1 would later learn that the Honors College made a similar grant of financial assistance to another African-American Honors College student to entice him to attend the domestic program, even though he had already completed the Japanese study abroad program that summer.  In line with TCU's legacy of and present conscious contempt for racial minorities, both of these Honors College students—the only African Americans in the program—were segregated and dehumanized for the bulk of their domestic program experience.  Upon reliable information and belief, Jane Doe No. 1 and her

African-American classmate were forced to attend the "How Washington, D.C. Works," domestic program so TCU and the Honors College could hold themselves out as a diverse institution to the public and to third parties, including the Osgood Center for International Studies and other reputable individuals and institutions they encountered in Washington. Tellingly, the Honors College and Osgood Center staff followed the two African-American students around taking pictures of just the two of them the entire trip; further tokenizing them.

88.     Jane Doe No. 1, having received a grant from the Honors College, paid the remaining program fee and began preparing to attend the Washington program.  As part of her preparation Jane Doe No. 1, a meticulous and detailed scholar, reviewed available program materials including the course agenda and syllabus to ensure that she fully understood the requirements of the program and her attendance.  Upon review, Jane Doe No. 1 noted that a White House visit was scheduled as a part of the program.  Jane Doe No. 1 was concerned about this visit given the many racist ideologies of the current President of the United States—ideologies provably shared by TCU.  So, prior to her departure for Washington Jane Doe No. 1 met with Dr. Snow (who was also facilitating the Washington program) and shared with her those concerns.  In response, Dr. Snow called Jane Doe No. 1—the daughter of two veteran United States Military officers—"unpatriotic;" told Jane Doe No. 1 that she should consider herself "lucky to go" on the trip; threatened to make her repay the partial program fee grant the Honors College used to induce Jane Doe No. 1 to attend; and threatened to dock Jane Doe No. 1's grade points before the course even began; a mantra Dr. Snow repeated and built upon in Washington to exert control over Jane Doe No. 1.

89.     Once in Washington, Jane Doe No. 1 learned TCU carried its legacy of bigotry and racism beyond campus.  When Jane Doe No. 1 arrived at her room for the summer at the

Avenue Suite's Georgetown on July 7, 2019, Jane Doe No. 1—the only African American female in the Washington program—was greeted as she had been before. Her two assigned roommates had taken all available closet space and commandeered the two available beds in the room; relegating Jane Doe No. 1, who is six feet tall and 180 pounds, to the sofa bed in the open area of the suite, with a small kitchenette. Hotel staff confirmed to Jane Doe No. 1 that the sofa beds in guestrooms were not designed for adult or long-term use. When Jane Doe No. 1 asked her roommates to make space for her in the closets the women refused and suggested that Jane Doe No. 1 purchase containers to store her belongings for the duration of the trip.

90. When Jane Doe No. 1 told Dr. Fredrick Gooding (another Washington program facilitator and Honors College professor) that she was being bullied into sharing the sofa bed with her belongings, Dr. Gooding responded that the women would rotate beds and share space with Jane Doe No. 1 during the program. Later that same week, on July 11, 2019, however, Dr. Snow informed Jane Doe No. 1 that it was optional for Jane Doe No. 1's roommates to rotate beds and share closet space and confirmed that Jane Doe No. 1 was to be relegated to the sofa bed and kitchenette combo for the entirety of the trip.

91. Unsurprisingly, the only two African Americans in the Washington program were both made to sleep on sofa beds during the trip while their white counterparts were provided with hotel quality queen beds. Both African-American students suffered physical harm associated with long-term use of a sofa bed, however, "the psychological barriers facing [these] minority students [were] as limiting and more painful."[126] TCU's conduct left the African American students knowing that "their life at the University [and university sanctioned programs] [was]

---

[126] Yvonne Webb, Editorial, *Multicultural Illusions Prevail*, TCU DAILY SKIFF (Fort Worth), Apr. 19, 1988, at 1.

generally worse than the life of the average white student"[127] and openly relegated Jane Doe No. 1 and her African-American colleague to second-class citizen status.

92.     To make matters worse, Jane Doe No. 1's roommates also regularly refused to grant Jane Doe No. 1 access to the bathroom, located in the hotel suite, through the room with the double queen beds.  Jane Doe No. 1's roommates regularly locked the door to their room, segregating Jane Doe No. 1 to the sofa bed and kitchenette.  This meant that Jane Doe No. 1 had no access to a bathtub/shower or toilet at critical times.  Jane Doe No. 1 was regularly forced to brush her teeth, wash her face, and even groom herself in the kitchenette sink.  **When Jane Doe No. 1 had to use the toilet, she was regularly made to do so in the hotel lobby restroom— seven floors below—regardless of the hour.**

93.     Jane Doe No. 1 was so visibly in distress when having to journey from her hotel room to the hotel lobby to relieve herself that hotel staff began to take notice.  Indeed, Jane Doe No. 1's trips to the hotel lobby restroom were so frequent that it prompted hotel staff to contact Jane Doe No. 1's mother (whom they had met during the first week of the program) out of concern that Jane Doe No. 1 was being abused on the trip.

94.     When Jane Doe No. 1 complained to Honors College staff including Dr. Gooding about the treatment from her roommates, true to form, Jane Doe No. 1's sincere and legitimate concerns were dismissed. Puzzlingly, Dr. Gooding even suggested that Jane Doe No. 1's treatment was her own fault.  TCU did nothing to address Jane Doe No. 1's concerns.

### XVII. TCU's disdain for racial minorities and women, like Jane Doe No. 1, endangers their health and welfare.

95.     TCU's disregard for Jane Doe No. 1's welfare during the domestic program did not stop at the hotel.  Though not disclosed in any of the provided materials, Jane Doe No. 1 was

---

[127] Cindy Cook, Editorial, *Black—White: Do Both Have Problems?*, DAILY SKIFF (Fort Worth), Feb. 4, 1977, at 4.

regularly made to walk several miles in the heat of the day to and from various program activities. It did not matter to TCU that the weather had reached the upper nineties causing a heat wave and prompting heat advisories from the National Weather Service, including a "code orange" air quality alert,[128] or that Washington has one of the more extensive public transportation systems in the Country.

96.     Within first few days of walking miles on end in the searing Washington summer heat Jane Doe No. 1 began to develop sores and blisters on her feet. After a few more days of rubbing against her shoes and socks, these sores and blisters would burst soaking Jane Doe No. 1's feet in puss and blood and oozing through her socks. Dr. Gooding was informed early on about Jane Doe No. 1's worsening condition and he was even sent the following images of Jane Doe No. 1's feet as evidence:



*Figure 4. Left hallux blistered and swollen.*



*Figure 5. Right hallux blistered, swollen and oozing puss.*

---

[128] Ian Livingston, *PM Update: Excessive Heat Alert Extending Into Saturday as the Region Roasts Through the Weekend*, THE WASHINGTON POST (July 19, 2019), https://www.washingtonpost.com/weather/2019/07/19/pm-update-excessive-heat-warning-extended-into-saturday-region-roasts-through-weekend/ (Code orange indicates air quality that is unhealthy for sensitive groups.).



*Figure 6. Left fourth phalanx blistered, swollen and full of puss and blood.*



*Figure 7. Left fourth phalanx blister/sore ruptured.*



*Figure 8. Left calcaneus blistered, swollen and full of puss and blood.*



*Figure 9. Right calcaneus blistered, swollen and full of puss and blood.*



*Figure 10. Left hallux blister/sore ruptured.*



*Figure 11. Left plantar blistered and swollen.*

97.     Once again, rather than exercising his duty to Jane Doe No. 1, individually and as an agent of TCU and at the very least reporting Jane Doe No. 1's condition to the appropriate personnel to provide Jane Doe No. 1 with some guidance and/or relief, Dr. Gooding did nothing. Jane Doe No. 1 has permanent scars and on-going pain resulting from the sores and blisters developed during the Washington program. To add insult to injury, throughout Jane Doe No. 1's podiatric health crisis, Dr. Snow would not miss an opportunity to remind Jane Doe No. 1 that she was different from her classmates and treat her with hostility and complete disdain.

98.     On Thursday July 11, 2019, during a walking excursion the entire group (except for the other African-American student in the program) left Jane Doe No. 1 when she began to slow her pace due to the sores and blisters developing on her feet.  When Dr. Snow noticed that the other African-American student had stayed back to walk closely with Jane Doe No. 1 and ensure that someone considered her welfare, Dr. Snow became unhinged.  Dr. Snow hurried back to the two African-American students and began to walk menacingly behind them; harassing Jane Doe No. 1 for walking too slowly.  Dr. Snow then aggressively shoved herself between the two African Americans to break them up.  But that was not enough, Dr. Snow again publicly assaulted Jane Doe No. 1, this time aggressively placing her hand on Jane Doe No. 1's back and driving her to the front of her peers.  Dr. Snow would assault Jane Doe No. 1 repeatedly throughout the trip; each time intentionally making contact with Jane Doe No. 1's person without Jane Doe No. 1's consent and causing injury to Jane Doe No. 1.  Dr. Snow further knew that her contact with Jane Doe No. 1 was unwelcomed and offensive and/or provocative and that Jane Doe No. 1 regarded it as such.

99.     That same day, Dr. Snow also publicly humiliated Jane Doe No. 1 by harassing Jane Doe No. 1's mother while at the hotel; indignantly and loudly asking "what [Jane Doe No.

1's mother] was doing there" and "how she could afford to be there?" Perhaps Dr. Snow, like the students in Dr. Arnold's class, truly believed that "all black people are on welfare." In reality, Jane Doe No. 1's mother, like other TCU parents who visited Washington, had paid to come to support her daughter.

100.    The very next day, at the National Museum of African American History and Culture (the "NMAAHC"), Dr. Snow targeted Jane Doe No. 1's mother again; demanding to know why she was there. At lunch, out of the blue, Drs. Snow and Gooding publicly announced to Jane Doe No. 1's mother that Honors College funds would not be used to pay for Jane Doe No. 1's mother's meal, as though Jane Doe No. 1's mother needed charity. She did not.

101.    Disturbingly, at the NMAAHC Dr. Snow also felt compelled to laughingly remind Jane Doe No. 1 alone, in front of her peers, that she could experience the feeling of being crowded into a slave cargo ship by traveling just a brief elevator ride below. Jane Doe No. 1 and her mother were shocked and puzzled by Dr. Snow's conduct, particularly because other TCU parents were present at the hotel and the NMAAHC. Dr. Snow welcomed and treated the other TCU (white) parents with excitement, warmth and respect. Jane Doe No. 1's mother was the only African-American parent present at the hotel and the NMAAHC.

102.    On Friday July 12, 2019, the students were again made to walk several miles. Jane Doe No. 1 was bleeding through her socks and again slowed her pace. This time Dr. Snow targeted Jane Doe No. 1's sex, gender, physical appearance and weight. Rather than offer some respite to Jane Doe No. 1, Dr. Snow mocked her in front of Jane Doe No. 1's peers saying, "at least [Jane Doe No. 1] would be used to walking" when the trip concluded and suggested that Jane Doe No. 1 go on a "low carb diet" and that all the walking would make Jane Doe No. 1 "much more healthier [sic]." Throughout the trip, Dr. Snow would also regularly "save" Jane

Doe No. 1 a seat next to her when the group would go eat, forcing Jane Doe No. 1 to sit next to Dr. Snow so that Dr. Snow could monitor Jane Doe No. 1's food consumption. If Jane Doe No. 1 hesitated or otherwise indicated that she did not want to sit with Dr. Snow, **Dr. Snow would begin banging on the empty seat to hurry Jane Doe No. 1—like a dog—to her place at Dr. Snow's side.** While Jane Doe No. 1 was eating Dr. Snow would stare at Jane Doe No. 1 intensely and with disgust. During each of these incidents Jane Doe No. 1 was forced to sit in a designated area at Dr. Snow's side, while other students were free to sit wherever they pleased. By her conduct, Dr. Snow detained Jane Doe No. 1 without justification and without Jane Doe No. 1's consent each time she "saved" Jane Doe No. 1 a seat.

103.    Dr. Snow was relentless. On Tuesday July 16, Jane Doe No. 1 was visibly in pain while walking and was also sweating profusely in the summer heat. Dr. Snow continued publicly harassing Jane Doe No. 1 based upon her sex, gender and physical appearance by body shaming and gibing her about her weight and sweating habits and stating (presumably because of Jane Doe No. 1's race, sex, physical appearance, weight, and height) that Jane Doe No. 1, who was still a teenager at the time, looked like Dr. Gooding—an African American man in his forties. That same day, when the group arrived at Capitol Hill, Jane Doe No. 1 was exhausted from the walk and still in pain from the broken sores and blisters on her feet. **Out of nowhere, Dr. Snow assaulted Jane Doe No. 1 for the third time**; aggressively pushing Jane Doe No. 1's back causing Jane Doe No. 1 to stumble and driving her to the front of the group "so that [Jane Doe No. 1] could see better." At six feet Jane Doe No. 1 was one of the taller group members and had no difficulty seeing.

104.    The following morning, on Wednesday July 17, 2019, Jane Doe No. 1's body began to shut down as she was experiencing the worst pain she had encountered in her life due to

the condition of her feet and her slow breathing resulting from the summer heatwave.  Still bleeding through her socks; Jane Doe No. 1 decided to plead with Dr. Snow for sympathy and reasonable accommodations.  Jane Doe No. 1 messaged Dr. Snow that morning but was ignored and received no response.  Jane Doe No. 1 then left her sofa bed to find Dr. Snow at the hotel.  Once she located Dr. Snow, Jane Doe No. 1 asked to speak with her privately.  The conversation did not go well.  When Jane Doe No. 1 explained that she was in pain; Dr. Snow responded by questioning Jane Doe No. 1 and asking why Jane Doe No. 1 had come to the domestic program if she knew she had health issues.  Apparently suggesting that because of her disabilities Jane Doe No. 1 should be excluded or otherwise denied access to the TCU-sanctioned summer program.  Dr. Snow then questioned how Jane Doe No. 1, was capable of getting around TCU.  When Jane Doe No. 1 explained that she didn't walk several miles a day at TCU; Dr. Snow responded that Jane Doe No. 1 knew there would be walking.  Despite the fact that this was untrue, Jane Doe No. 1 remained focused on the issues and attempted to offer Dr. Snow images of the sores and blisters on her feet.  Dr. Snow responded by putting her hand up to interrupt Jane Doe No. 1, and blamed Jane Doe No. 1's injuries on Jane Doe No. 1.

105.    When Jane Doe No. 1 explained that the extreme summer heatwave was only exacerbating the health complications that Jane Doe No. 1 was experiencing; Dr. Snow questioned if Jane Doe No. 1 "now had a problem with the sun." **Jane Doe No. 1 is asthmatic, a fact well- known to TCU and its agents as Jane Doe No. 1 had registered her condition with TCU's Student Disabilities Services since her enrollment at TCU.**  Moreover, Jane Doe No. 1 included this information in the health conditions and medications questionnaire TCU required her to fill out prior to her departure for the domestic program.  When Jane Doe No. 1 again tried to refocus the issues and plead for sympathy and reasonable accommodations from

Dr. Snow by explaining that she was experiencing difficulty breathing in addition to the pain of her blistered feet; Dr. Snow replied that "she wished she had a wand to wave and fix" Jane Doe No. 1.  Dr. Snow did not need a wand or to "fix" Jane Doe No. 1.  Dr. Snow only needed to respond as a decent human being and exercise her duty to Jane Doe No. 1, individually and as an agent of TCU and comport with TCU's legal obligation to provide reasonable accommodations to Jane Doe No. 1.

106.    Jane Doe No. 1 wanted to leave the program due to the pain and hostile treatment she was experiencing.  When she mentioned wanting to leave on this and other occasions, Dr. Snow reminded Jane Doe No. 1 that she was "lucky to go" on the trip;  and  threatened to (1) make her repay the partial program fee used to induce Jane Doe No. 1 to attend; (2) revoke Jane Doe No. 1's credit for the course; and (3) kick Jane Doe No. 1 out of both the Honors College and TCU.  Dr. Snow would make good on at least one of her threats, which were designed to willfully detain Jane Doe No. 1 in Washington, without justification and without Jane Doe No. 1's consent.  Even now Dr. Snow is hard at work continuing a severe and pervasive pattern of hostile treatment of Jane Doe No. 1 to bring life to her remaining threats in constructive, if not literal form.

107.    Left without recourse in Washington, Jane Doe No. 1's grievances were forwarded to Dr. Karen Bell Morgan, TCU's Associate Dean of Campus Life, on July 17, 2019. Ms. Morgan was also sent the pictures of Jane Doe No. 1's sore and blistered feet, which Ms. Morgan forwarded to TCU's Health Center professionals. TCU Health Center professionals confirmed that Jane Doe No. 1 should seek immediate medical evaluation of her feet.

108.    By now, TCU was fully aware of Jane Doe No. 1's declining physical condition, but rather than work to ameliorate Jane Doe No. 1's condition, TCU and its agents doubled

down.  On Thursday July 18, Dr. Snow tasked Jane Doe No. 1 with being the group leader for the day.  This meant that Jane Doe No. 1 was to help provide other students with directions. When Jane Doe No. 1 (who was still in pain but aware that Dr. Snow would not let her leave Washington without making good on the aforementioned threats) briefly struggled with directions, Dr. Snow, in an act of petty aggression, mocked Jane Doe No. 1—publicly calling Jane Doe No. 1 a bad leader and belittling her in front of her peers.  Jane Doe No. 1 had reached her end, but with Dr. Snow's repeated threats in mind and determined not to quit, she pressed on. Wearied from enduring miles of walking with sore and blistered feet while being demeaned along the voyage and offered no reasonable accommodations, Jane Doe No. 1 began taking Lyft car service, at her expense, when she could.  Each time Jane Doe No. 1 took Lyft rather than walk on her blistered feet Dr. Snow would scowl and shake her head with clear disgust for Jane Doe No. 1.

109.    Dr. Snow's disdain for Jane Doe No. 1 was no secret.  In addition to the clear verbal and nonverbal conduct Dr. Snow fashioned to harass Jane Doe No. 1, Dr. Snow openly revealed to other students that she "hates [Jane Doe No. 1]."  When Jane Doe No. 1 later confronted Dr. Snow about whether she told other students she hated Jane Doe No. 1, Dr. Snow smugly laughed in Jane Doe No. 1's face before coldly and indirectly dismissing the claim.   And why would Dr. Snow do otherwise? Afterall, the answer to Jane Doe No. 1's inquiry was obvious as the evidence of Dr. Snow's hatred for Jane Doe No. 1 is indisputable.  Even still, Dr. Snow's hatred for, and reckless behavior toward Jane Doe No. 1 had not yet reached its lowest point.

110.    On or about July 18, 2019 several students, including Jane Doe No. 1, began to notice bed bugs, spiders and mites in their hotel rooms. When one of Jane Doe No. 1's

colleagues—a white male—complained to Dr. Snow about the issue, Dr. Snow did not abruptly place her hand up to interrupt him.  Rather, Dr. Snow took seriously the white male student's concern and allowed the student to show her images of the bites on his arm and genuinely examined the same.  Though Dr. Snow initially incorrectly diagnosed the white male student's bed bug bites as spider bites, once the hotel confirmed that there was a bed bug infestation, immediate measures were taken to place the white male student in more suitable accommodations. The very next day, on July 19, 2019 when Jane Doe No. 1 noticed spiders falling from her ceiling and bed bugs and other mites in her hotel room, she too sought Dr. Snow's aid.   Unsurprisingly, Dr. Snow could not be bothered with Jane Doe No. 1 or her welfare.  Dr. Snow told Jane Doe No. 1 that "bugs live inside too" and to "stop talking about it" and did not bother to examine Jane Doe No. 1's pictures of the bug bites on Jane Doe No. 1's legs:




*Figure 12. Left tibia covered in bug bites.*          *Figure 13. Right tibia covered in bug bites.*

111.    The bug situation in Jane Doe No. 1's hotel room had gotten so bad that her roommates vacated the room, but not before removing all of their belongings from the closets and double queen bedroom and placing them in Jane Doe No. 1's already cramped sofa bed/kitchenette combo. Realizing once again that Dr. Snow would not help Jane Doe No. 1, Jane Doe No. 1 herself pleaded with hotel staff, who provided Jane Doe No. 1 with bug spray.  During the early morning hours of July 20, 2019, Jane Doe No. 1, shaken at the sight of bugs seemingly emerging from every crevice, began fumigating her hotel room with the bug spray provided by the hotel.  The fumes from the bug spray triggered Jane Doe No. 1's asthma (which was already agitated by miles long journeys in the summer heatwave); swelling her airways and tightening the muscles that surround them until Jane Doe No. 1 had an asthma attack.  Jane Doe No. 1 tried to reach Dr. Snow or other TCU personnel at the onset of her attack only to learn that no program facilitator was present, and that, upon reliable information and belief, Dr. Snow had taken an impromptu trip to New York for the weekend.  Jane Doe No. 1, in tears and in the midst of an asthma attack once again pleaded with hotel staff for help.  The hotel staff—not TCU personnel—stayed with Jane Doe No. 1 as she implemented the emergency action plan developed by Jane Doe No. 1, her parents and her physician.  At all relevant times TCU was aware of Jane Doe No. 1's condition and of her emergency action plan.  No TCU personnel were present at the hotel or in Washington at all during Jane Doe No. 1's life-threatening asthmatic episode.[129]  Hotel staff communicated with Jane Doe No. 1's mother yet again to inform her of Jane Doe No. 1's condition and state of her hotel room and Jane Doe No. 1's mother booked and

---

[129] Upon reliable information and belief, TCU program facilitators, namely Drs. Gooding and Snow regularly left the student's unattended during late night/early morning hours, and at times, for days during the four-week summer program.  Further, upon reliable information and belief Drs. Gooding and Snow were regularly visibly intoxicated in the presence of the students and/or upon arrival back to the hotel at any late night/ early morning hour as evidenced by hotel footage.

paid for a different hotel room for Jane Doe No. 1.  Jane Doe No. 1 received no assistance from TCU.  To the contrary, when Dr. Snow returned from New York to learn Jane Doe No. 1 had vacated her hotel room, she told Jane Doe No. 1 that it was against TCU policy for her to book her own room.  Ultimately, Jane Doe No. 1 was forced to return to the bug infested suite; the very suite already vacated by Jane Doe No. 1's roommates.

### XVIII. TCU's present conscious hatred of racial minorities and women, like Jane Doe No. 1, is insatiable and life-threatening.

112.    The harrowing extent of Jane Doe No. 1's ordeal during the first two-weeks of the program left her bloodied and bowed.  But TCU and its agents, chiefly Dr. Snow, would not rest until Jane Doe No. 1 was completely broken.  As the program entered its third week, Jane Doe No. 1 was still in pain from walking and being in the summer's heat, but alas Jane Doe No. 1, had something to look forward to.  The coming Friday, July 26, 2019 would mark the end of Jane Doe No. 1's teenage years.  Jane Doe No. 1 was excited about her twentieth birthday because when another student celebrated his birthday during the program Dr. Snow spared no expense; treating the entire group to a lavish dinner at an expensive restaurant and allowing the student to pick out his own cake without budget limitations.

113.    As Jane Doe No. 1's birthday approached, however, Dr. Snow was mum.  When one of the program participants—another racial minority female student—realized that Dr. Snow intended to ignore Jane Doe No. 1's birthday completely, the student herself set out to plan a surprise birthday dinner for Jane Doe No. 1 on Friday, July 26, 2019.  Prior to making a reservation for the planned surprise dinner for Jane Doe No. 1 earlier that week, her colleague checked the group itinerary to ensure there would be no conflict and confirmed that none existed.  When Dr. Snow learned of the surprise birthday plans for Jane Doe No. 1 on that same Friday afternoon, however, she hurriedly created an all-expense paid "family dinner" and added it to the

itinerary for Friday night in honor of Aaron Chimbel, a professor at St. Bonaventure University and Dean of its Jandoli School of Communication.  Dr. Snow knew her "family dinner" was in direct conflict with Jane Doe No. 1's surprise birthday plans.   Dr. Snow's discriminatory treatment of Jane Doe No. 1 was so pervasive and so public that another student even confronted Dr. Snow.  The student indicated that she was aware that Dr. Snow and/or the Honors College had paid for another birthday dinner in addition to paying for another celebratory dinner for a different student on a separate occasion during the program; that she had examined the itinerary to be sure that there were no conflicts on Jane Doe No. 1's birthday prior to making dinner reservations for the same; asked Dr. Snow to reschedule the "family dinner"; and asked Dr. Snow to honor her and/or the Honors College's prior practice and pay for Jane Doe No. 1's birthday dinner as well. Dr. Snow refused to reschedule the last-minute family dinner and responded that Jane Doe No. 1's birthday dinner was "not optimal" and "definitely over budget" all while simultaneously inviting everyone to attend the family dinner, for which the Honors College paid.  Dr. Snow also suggested that Jane Doe No. 1 accept being celebrated at the family dinner meant to honor Professor Chimbel or in the alternative that Jane Doe No. 1 pick a desert that she liked for everyone to share at the hotel after the family dinner.  Dr. Snow then texted Jane Doe No. 1 (who was unaware of the planned dinner) about the same, to be sure to ruin the surprise.  Due to the confusion caused by Dr. Snow's deliberate efforts to create a conflict with Jane Doe No. 1's planned surprise dinner, Jane Doe No. 1's surprise dinner was ultimately cancelled.

114.     When Jane Doe No. 1 learned of her surprise party and Dr. Snow's deliberate efforts to quash the same, Jane Doe No. 1 became deflated.  To twist the knife, Dr. Snow returned from the family dinner to the hotel visibly intoxicated, with a random cake with

sparklers—sparklers which Dr. Snow had removed from the cake and performed an erratic dance with.  When Jane Doe No. 1 (visibly distraught by the outcome of her birthday) tried to speak with Dr. Snow about the incident, she was again dismissed by Dr. Snow and lushly told "everything worked out the way it was supposed to" and that it was "no big deal."  It was a big deal!

115.    That night—when Jane Doe No. 1 should have been celebrating her life—Jane Doe No. 1 returned to her vacant hotel room in tears and considered suicide.  Her birthday would now be a reminder of the unconscionable depravity to which Dr. Snow would stoop to harm her. But make no mistake, Jane Doe No. 1's hopelessness and life-threatening despair was not about an expensive birthday dinner or a cake.  It was about TCU's public displays of hatred, bigotry and racism toward Jane Doe No. 1 from the moment she had stepped on its campus.  It was about Jane Doe No. 1's inescapable second-class status at TCU and TCU-sanctioned activities.  It was about Jane Doe No. 1's revoked merit-based scholarship.  It was about TCU endorsing Jane Doe No. 1's segregation in its dorms and at the hotel. It was about the hostility and isolation Jane Doe No. 1 experienced on TCU's Moot Court team and throughout TCU.  It was about the shame associated with being made a token by TCU's Honors College. It was about the ignorant, racist and isolating ideologies TCU endorsed in Jane Doe No. 1's classes. It was about the apparent lack of concern for Jane Doe No. 1's welfare exhibited by nearly everyone at TCU. It was about the fact that TCU sexualized, body shamed, insulted and belittled Jane Doe No. 1 in front of her peers on a daily basis. It was about Jane Doe No. 1 being summoned like a lap dog in front of her peers nearly every time she ate. It was about Jane Doe No. 1 witnessing TCU publicly insult and belittle her mother all while welcoming Jane Doe No. 1's peer's mother's with open arms. It was about TCU's subtle reminder that in the span of a short elevator ride Jane Doe No. 1 could be

transformed back to human cargo. It was about the repeated assaults Jane Doe No. 1 endured at the hands of TCU. It was about stepping over unimaginable pain each day to earn a credit only to have it ripped away by TCU's indefensible legacy and present conscious contempt of racial minorities and women. It was about the shame Jane Doe No. 1 felt for believing TCU's self-aggrandizing DEI campaign in the first place. It was that on her twentieth birthday, because of TCU's acts and omissions, Jane Doe No. 1 could no longer recognize herself.

116.    Thank God that in the midst of Jane Doe No. 1's sorrow and lamenting over who she had become at TCU, she remembered who she was before arriving on TCU's campus. Jane Doe No. 1 mustered the strength and courage to call the National Suicide Prevention Lifeline for the first time. Thereafter, Jane Doe No. 1 informed TCU of her mental state and informed TCU's "Chief Inclusion Officer" and Title IX Coordinator, Dr. Turner, that she intended to file a formal complaint but would wait until the summer program ended to avoid retaliation from Dr. Snow and other agents of TCU. Unfortunately, retaliation from Dr. Snow was unavoidable.

117.    After learning of Jane Doe No. 1's reports to TCU's Campus Life Dean's Office and Title IX coordinator, Dr. Snow became even more hostile toward Jane Doe No. 1. On Wednesday July 31, 2019, while speaking with Jane Doe No. 1, Dr. Snow violently slammed the door in Jane Doe No. 1's face mid-conversation. Later that same day while in public and in the presence of Jane Doe No. 1's peers, Dr. Snow harshly and openly berated Jane Doe No. 1 for asking a question about an assignment. Dr. Snow even had the gall to take off her jacket, fold her arms, and advance towards Jane Doe No. 1 yet again assaulting Jane Doe No. 1; threatening bodily injury of which Dr. Snow has proven herself capable. Like the other assaults Dr. Snow committed this act in the presence of other students. After weeks of hateful, disparate, and

hostile treatment at the hands of TCU and its agents, chiefly Dr. Snow, Jane Doe No. 1 was glazed and numb.

118.    Miraculously, despite the unwavering hatred visited upon Jane Doe No. 1 by TCU and its agents during the Washington program, Jane Doe No. 1 remained active and excelled academically throughout.   Jane Doe No. 1 even earned praise from program facilitators and instructors evidencing her successful participation in the summer program despite her treatment. Specifically, on July 22, 2019, Professor Russell Mack sent Jane Doe No. 1 the following message:

> **Please keep your positive attitude and your interest in government.  We need young people like you to be thoughtful and constructive.**   Now that you better understand government and how DC works, please use that knowledge to help educate others in a positive, constructive way.  That way you will be able to enjoy these priceless freedoms for all of your life.
>
> I enjoyed getting to know you and I hope your next two weeks are also interesting ones.  If I can ever offer any career advice, please always feel free to call on me….

119.    Sadly, Mack reneged on his praise of Jane Doe No. 1 in support of Dr. Snow and TCU's continuing scheme to harass and demean Jane Doe No. 1.  Upon reliable information and belief, in an act of retaliation Dr. Snow conspired with Professors Mack and Chimbel (of St. Bonaventure University), with whom she had a meeting of the minds on or about August 3, 2019 and agreed to accomplish an object or course of action designed to discriminate against Jane Doe No. 1 in violation of federal and state law as detailed herein. Jane Doe No. 1 has been proximately damaged as a result of said conspiracy, including but not limited to the psychological and physiological damage caused to Jane Doe No. 1 thereby and, importantly, the loss of credit for the program course—a threat Dr. Snow ultimately made good on.  Dr. Snow set

this conspiracy in motion prior to the conclusion of the Washington program and revealed her plans and intentions to Jane Doe No. 1 on the program's final day.

120.    On August 3, 2019, Dr. Snow summoned Jane Doe No. 1 to a "mandatory" one-on-one meeting with her at the hotel.  At this meeting Dr. Snow informed Jane Doe No. 1 that she had determined that Jane Doe No. 1 had plagiarized numerous assignments during the program and submitted them to herself and Professors Mack and Chimbel.  Dr. Snow even suggested that Jane Doe No. 1 had been plagiarizing all along; accusing Jane Doe No. 1 of plagiarizing her Honors College admissions essay—a slap in the face to Jane Doe No. 1 who is an award-winning scholar.  Jane Doe No. 1, broken by Dr. Snow's conduct including her most recent attacks against Jane Doe No. 1's character elected not to respond to Dr. Snow in the moment.  With this news Dr. Snow once again left Jane Doe No. 1 in Washington at the hotel alone.  Jane Doe No. 1 was distraught.

121.    On that day—eight days after Jane Doe No. 1's birthday, when she first contemplated suicide—because of the conduct of TCU and its agents, Jane Doe No. 1 once again questioned the value of her life and considered that she would be better off dead.  Alone in her hotel room, Jane Doe No. 1 visualized her death; she contemplated reaching for the knife in the kitchenette that had become her summer home and ending her persisting psychological and physiological pain.  Once again Jane Doe No. 1's prior instincts prevailed, and Jane Doe No. 1 summoned the young woman she was before TCU to find the courage to again call the National Suicide Prevention Lifeline.  Jane Doe No. 1's psychological and physiological pain was so great that Jane Doe No. 1 would have another suicidal episode the next day and have to summon the courage again to call the National Suicide Prevention Lifeline on August 4, 2019.  Again, Jane Doe No. 1 continues to struggle with suicidal ideations to this very day.  To this day, Jane Doe

No. 1 must keep the National Suicide Prevention Lifeline number close; calling them on several occasions and consulting with clergymen to assist her through her thoughts of self-harm developed as a result of her treatment at TCU and TCU sanctioned activities.

122.    When Jane Doe No. 1 returned home to her family prior to the start of TCU's Fall 2019 semester, Jane Doe No. 1 was noticeably changed.  The confident, warm, inviting, and spirited young woman that arrived on TCU's campus on Martin Luther King Jr. Day in 2018 had disappeared.  Only a shell of Jane Doe No. 1's former self remained; still in physical and psychological pain, replete with recurring nightmares of Dr. Snow assaulting her and publicly humiliating her and her family.  Jane Doe No. 1's family began rotating responsibilities to monitor her.  For the first time Jane Doe No. 1 was on suicide-watch; a family burden which continues to this day.  Jane Doe No. 1's TCU experience has forever altered herself and her family, including Jane Doe No. 1's (and her family's) day-to-day activities.  Indeed, Jane Doe No. 1 struggles with her mental and physical health deficiencies caused by her TCU experiences and receives treatment for the same.  Jane Doe No. 1 has difficulty focusing at school and at home and her nightmares regularly disrupt her sleep at night.  In fact, Jane Doe No. 1's hopelessness and fear caused at the hands of Dr. Snow, among other members of TCU, have caused Jane Doe No. 1 to hurry off campus when not in class and move out of her on campus housing and into a hotel room for fear that her presence on campus will inspire additional harassing treatment.

123.    Upon her return to campus, due to the severity and pervasiveness of TCU's actions (and at the advice and direction of Dr. Teresa Abi-Nader Dahlberg, TCU's Provost and Vice Chancellor of Academic Affairs, to whom Jane Doe No. 1 had reported her summer 2019 and overall TCU experience) Jane Doe No. 1 began desperately seeking help from clinicians in

TCU's Counseling and Mental Health Center ("CMHC").  Specifically, on August 22, 2019, Jane Doe No. 1 first visited TCU's CMHC.  Jane Doe No. 1 also visited TCU's CMHC several times thereafter including on August 30, 2019, and on September 4, 2019, before locating a mental health professional offsite to continue her treatment.  On each visit to TCU's CMHC, TCU's own clinicians diagnosed Jane Doe No. 1 with (1) academic issues; (2) depression; (3) anxiety; and (4) suicidal ideation or self-harm: "**onset July 26th when she was on a school trip to Washington [] with the Honors College**."  TCU is fully aware of what it has done.

124.    Upon her return to TCU's campus Jane Doe No. 1 also began working to formalize her complaints of discrimination and hostile treatment with TCU's Title IX coordinator and Campus Life Dean's Office.  Specifically, on August 16, 2019, Jane Doe No. 1 conducted a video interview with Dr. Turner.  Fighting back tears, Jane Doe No. 1 recounted her summer experience to TCU's Title IX coordinator.  Again, on or about August 26, 2019, Jane Doe No. 1 spoke with Leigh Holland, TCU's Title IX investigator and Dr. Turner and emailed them a written Title IX statement and a list of witnesses to the incidents that took place in Washington that summer.  The same correspondence was forwarded to Dr. Morgan in TCU's Campus Life Dean's Office.  At all relevant times TCU's Provost, Title IX Coordinator and Dean of Campus Life were aware of Jane Doe No. 1's Washington experience; resulting ideations of suicide; and present resulting requirement of medical treatment relating to the same. On September 23, 2019, at 9:00 a.m. over a month after initiating her formal complaint to TCU's Title IX coordinator, Jane Doe No. 1 met with Dr. Turner.  At this meeting Dr. Turner indicated that his office had already interviewed the students Jane Doe No. 1 had identified as having knowledge of Jane Doe No. 1's experience in the Washington program and would be interviewing the professors the following week. Nevertheless, Dr. Turner seemed to suggest that

Jane Doe No. 1 should have pressed criminal charges against Dr. Snow for her repeated assaults of Jane Doe No. 1 and stated that Jane Doe No. 1 "will be seeing some changes in staff." No such changes in staff occurred. In fact, Dr. Turner and TCU did nothing at all. To date, Jane Doe No. 1 has not received so much as a follow up from Dr. Turner or TCU's Title IX office. Despite their awareness of Jane Doe No. 1's plight, TCU authorities have not stopped the onslaught of retaliatory acts of Dr. Snow and other Honors College personnel.

### XIX. TCU endorses a pattern of severe and pervasive treatment of racial minorities and women, like Jane Doe No. 1, that is inherited from its disgraceful legacy and proudly punishes racial minorities and women for daring to speak out against it.

125.    While Jane Doe No. 1 was busy working desperately to rehabilitate her physical and mental state resulting from her treatment at TCU and seeking justice for herself and other racial minorities and women relating to the same, Dr. Snow and her cohorts were also busy continuing to conspire against Jane Doe No. 1 in retaliation for speaking out against her treatment. On August 27, 2019—in a conspired act of retaliation—Professor Mack emailed Jane Doe No. 1 to inform her that he had determined that she committed plagiarism and was recommending that Jane Doe No. 1 receive no credit for the summer course. On September 4, 2019 Dr. Rob Garnett, Associate Dean of the Honors College, sent a follow up email to Jane Doe No. 1 indicating that Jane Doe No. 1 "had earned a grade of 'no-credit' (NC) for the course, i.e., a grade below 70%" based on Professor Mack's recommended sanctions of "a zero for the two assignments that were [allegedly] plagiarized." Dr. Garnett's correspondence further indicated that:

> The NC grade was based on your performance in all three areas of evaluation for the course, as stated on the syllabus, and based on the assessments provided to me by all four participating instructors. In part it was the result of you earning grades of 0 on three of the four writing assignments (two due to academic

misconduct, the third due to your failure to submit a paper); but it was also due to your low scores for "class participation" (58%) and "questions and interaction with guest speakers and tour guides" (61%).

126.    Though Jane Doe No. 1 was still attempting to recover from the injuries she survived during the Washington summer program and reengage into her normal life and academic course load, Jane Doe No. 1 once again had to step over her pain to address the hateful and disparate treatment she continues to suffer at the hands of the Honors College. Jane Doe No. 1 initiated a formal appeal with Dr. Garnett to dispute the NC grade she was given for the Washington program. Besides the fact that, unsurprisingly, TCU blew nearly every protocol relating to its published academic appeal procedures, Jane Doe No. 1 focused on the facts. On September 17, 2019, Jane Doe No. 1 emailed Dr. Garnett to request a breakdown of the grades she received during the Washington summer program prior to her appeal hearing. On September 19, 2019 Dr. Garnett responded with the following:

> **Grades for [Jane Doe No. 1]**
> <u>Class participation</u> (50% of course grade)
> Dr. Gooding: 90 out of 100
> Dr. [sic] Chimbel: 70 out of 100
> Dr. Mack: 20 out of 100
> Dr. Snow: 60 out of 100
> Average score: 60 out of 100
>
> <u>Written exercises</u> (25% of course grade)
> Dr. Gooding: 90 out of 100
> Dr. [sic] Chimbel: 0 out of 100
> Dr. Mack: 0 out of 100
> Dr. Snow: 0 out of 100
> Average score: 22.5 out of 100
>
> <u>Questions and interaction with guest speakers and tour guides</u> (25% of course grade)
> Dr. Gooding: 94 out of 100
> Dr. [sic] Chimbel: 60 out of 100
> Dr. Mack: 40 out of 100
> Dr. Snow: 60 out of 100

Average score: 63.5 out of 100

Overall average for the course
(60*50%) + (22.5*25%) + (63.5*25%) = 51.5%

127.     Dr. Garnett also sent statements from each of the aforementioned Honors College faculty members/program facilitators.  Of note, Dr. Gooding, finally found his conscience and within his statement admitted the truth of Jane Doe No. 1's academic capabilities and the truth behind Jane Doe No. 1's summer program experience:

> [Jane Doe No. 1's] class participation was commensurate with that of the "Excellent Participation" rating during the first week. During our group discussions she made contributions and always answered when called upon. Of note is that after the first full day, she and three other classmates took advantage of my ability to secure free tickets for an evening performance at the Kennedy Center. The rest of the group declined, citing fatigue.
>
> [Jane Doe No. 1] readily interacted with guest speakers and tour guides during the first week, with the exception of perhaps the more structured Brazilian Embassy visit. Of note was after our group visit with Georgetown University Law Center Professor Anthony Cook, she and [another student] elected to skip the group lunch portion in order to spend additional time engaging this engaging individual. Based upon her possible future law school plans of which she disclosed to me, I thought it prudent for her to take advantage of this window of opportunity so long as she agreed to reunite with the group for the afternoon walking tour (of which, to my knowledge, she did so timely).
>
> In her daily journaling, [Jane Doe No. 1] employs a "stream of consciousness" approach where she will not employ traditional paragraph spacing and thoroughly expresses herself, flowing from one thought to another. While this style may not "answer" all of the sub-questions posed from the reflective writing prompts, they do often reveal a deeper connection to the material on a much more personal level.
>
> Overall, [Jane Doe No. 1] performed well during the first week. Towards the end of the first week I did notice an increase of personal spacing from other members of the general group, especially during transitions, but I interpreted this as a healthy means of "pacing oneself" given the unspoken dynamic of her

being the only African American female on the trip. While I personally did not witness anyone of any ill will in an impolite exchange with [Jane Doe No. 1], **I speculated that after the first few days of excitement wore off, the reality of possibly being socially isolated in subtle yet invisible ways was starting to seep in**.

128.    Jane Doe No. 1's other professors, however, could not be bothered with the truth. In fact, it seemed as though Professor Chimbel could not be bothered at all.  Chimbel provided only four short sentences in support of the failing grades he issued to Jane Doe No. 1.   In addition to accusing Jane Doe No. 1 of plagiarism and scoring Jane Doe No. 1 zero for all written assignments, Dr. Snow and Professors Chimbel and Mack also heavily docked Jane Doe No. 1 for "class participation" and "questions and interactions with tour guides" citing subjective and arbitrary bases for Jane Doe No. 1's grade determination.  Jane Doe No. 1 was shocked by the grade break down and statements because they were in direct contravention with the praise Professors Chimbel and Mack had given her during the trip.  Jane Doe No. 1 pointed out this disparity to Dr. Garnett during her appeal hearing on October 22, 2019 and even Dr. Garnett was unable to reconcile the change in his colleagues' attitudes and opinions regarding Jane Doe No. 1's performance, or justify the inadequate responses provided to Jane Doe No. 1 regarding her revoked credit.  Jane Doe No. 1 knew that the allegations of misconduct made against her were as much a sham as the appeals proceeding she had just concluded.  Jane Doe No. 1 also knew that she had been subjected to dissimilar grading practices than the rest of her colleagues that summer (in conjunction with hostile and welfare-endangering conduct from TCU staff).  The truth is that at an institution like TCU, neither Jane Doe No. 1 nor other racial minorities and women stood a chance.   Upon reliable information and belief TCU applied discriminatory

grading practices to Jane Doe No. 1 and subjected her to grading standards that other students were not subjected to resulting in the events detailed herein.

129.    On November 5, 2019, Jane Doe No. 1 was notified that the Honors College had denied Jane Doe No. 1s grade appeal continuing the retaliatory treatment against Jane Doe No. 1. Still, for a scholar as decorated as Jane Doe No. 1 the ongoing hostile treatment and now character assassination of Jane Doe No. 1 weighed heavily.  On November 6, 2019, left hopeless yet again by the acts and omissions of TCU, Jane Doe No. 1 disappeared.  When Jane Doe No. 1's family could not reach Jane Doe No. 1 for several hours, they panicked and began calling everyone they could think of, including the police to see if a report had been made.  Jane Doe No. 1's mother and uncle even began driving from their homes—each respectively hundreds of miles away—towards TCU's campus fearful of the worst.  Eventually, Jane Doe No. 1's family contacted Onstar®, Jane Doe No. 1's remote vehicle location service.  Jane Doe No. 1's family found Jane Doe No. 1 sitting alone in her car expressionless.  Jane Doe No. 1 had been sitting in her car for hours after once again calling the National Suicide Prevention Lifeline.

130.    TCU's union with racism, bigotry and hatred is disgusting and unyielding.  And TCU's present conscious disparate treatment of racial minorities and women, like Jane Doe No. 1, is life-altering and life-threatening.  In fact, another racial minority student at TCU recently confided in Jane Doe No. 1 that she too had suicidal ideations resulting from her treatment as second-class at TCU.  Jane Doe No. 1 provided said student with the phone number for the National Suicide Prevention Lifeline—1-800-273-8255—because at a place that has normalized the dehumanization of racial minorities and women, like TCU, every racial minority and woman should have it handy.

## COUNTS

### COUNT I—TCU violated Title VI of the Civil Rights Act of 1964

131.    Jane Doe No. 1 realleges and incorporates by reference the allegations contained in the previous paragraphs as if fully set forth herein.

132.    At all relevant times TCU faculty, staff, administration, and other employees and/or affiliates were acting within the scope of their employment and/or at the direction and under the control of TCU and TCU's Board.  Moreover, at all relevant times appropriate TCU faculty, staff administration, etc. were made aware of and took no action against the conduct of its agents, thereby ratifying their conduct and rendering TCU and TCU Board vicariously liable for the conduct of their agents via the doctrine of Respondeat Superior.

133.    TCU violated Title VI of the Civil Rights Act of 1964 by discriminating against Jane Doe No. 1 through a series of hateful and bigoted acts and adverse actions designed to dehumanize Jane Doe No. 1 and other racial minorities and women and derail their academic pursuit.

134.    Title VI of the Civil Rights Act of 1964 provides: "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d.

135.    Jane Doe No. 1 is an African-American young woman who was discriminated against because of her race.  Accordingly, Jane Doe No. 1 is a member of a protected class.

136.    TCU receives federal financial aid and assistance and is therefore subject to the provisions of Title VI of the Civil Rights Act of 1964.

137.     As detailed extensively herein, as a direct result of TCU's acts or omissions, Jane Doe No. 1 was intentionally made to endure hostile and harassing treatment in her educational pursuit because of TCU's and its agents' continued hatred of African Americans, including but not limited to Jane Doe No. 1's repeated segregation and dehumanization at TCU and in TCU-facilitated housing, TCU academic programs, and TCU-sanctioned actives as detailed in paragraphs 59 through 129.

138.     As a direct result of TCU's acts or omissions in promoting and endorsing the hateful conduct that Jane Doe No. 1 was intentionally made to endure because of her race, Jane Doe No. 1 suffered failing grades, academic sanctions and severe emotional distress and psychological and physical injury arising from TCU's complete and reckless indifference to Jane Doe No. 1's health and welfare, her segregation, isolation and dehumanization throughout her matriculation at TCU, including while at the Washington summer program as detailed in paragraphs 59 through 129.

139.     Based on TCU's conduct Jane Doe No. 1 was excluded from participation in and denied the benefits of and subjected to discrimination under TCU's educational programs and activities.

140.     As detailed herein Jane Doe No. 1 reported each instance of discrimination she endured.  Each time Jane Doe No. 1 reported these instances of discrimination, hostile and disparate treatment, TCU acted with indifference or hostility towards Jane Doe No. 1.  Moreover, as a direct result of Jane Doe No. 1's complaints to TCU, TCU and its agents, namely, Drs. Snow, Gooding, Garnett, and Professor Mack as well as the Honors College, retaliated against Jane Doe No. 1 as detailed in paragraphs 59 through 129.

141.    TCU's conduct as set forth herein is in violation of Title VI's strictures against racial discrimination, disparate treatment and harassment and TCU is liable to Jane Doe No. 1.

142.    As a direct and proximate result of the TCU's conduct as alleged above, Jane Doe No. 1's academic and career prospects, earning potential, and reputation have been severely harmed and she has suffered loss of educational and professional opportunities, loss of future career prospects, and other direct and consequential damages and has suffered damages including extreme emotional distress, and loss of capacity for the enjoyment of life.

143.    By reason of the aforementioned harassment Jane Doe No. 1 has suffered and continues to suffer, Jane Doe No. 1 is entitled to all legal and equitable remedies available under Title VI, including an award of punitive damages, attorneys' fees and costs and other compensation in an amount to be determined at the trial of this action.

### COUNT II—TCU violated Title IX of the Education Amendments of 1972

144.    Jane Doe No. 1 realleges and incorporates all the allegations contained in preceding paragraphs of this Complaint as though fully rewritten herein.

145.    At all relevant times TCU faculty, staff, administration, and other employees and/or affiliates were acting within the scope of their employment and/or at the direction and under the control of TCU and TCU's Board.  Moreover, at all relevant times appropriate TCU faculty, staff administration, etc. were made aware of and took no action against the conduct of its agents, thereby ratifying their conduct and rendering TCU and TCU Board vicariously liable for the conduct of their agents via the doctrine of Respondeat Superior.

146.    TCU violated Title IX of the Education Amendments of 1972 by creating a hostile educational environment for Jane Doe No. 1 and excluding her from participation in, denying her the benefits of, and subjecting her to discrimination in TCU and TCU-sanctioned

activities through a series of acts of sexualized harassment, among other hateful conduct Jane Doe No. 1 was made to endure as extensively detailed herein.

147.    Title IX of the Education Amendments of 1972 provides, in relevant part, that: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

148.    Jane Doe No. 1 is an African-American young woman.  Accordingly, Jane Doe No. 1 is a member of a protected gender.

149.    TCU receives federal financial aid and assistance and is therefore subject to the provisions of Title IX of the Education Amendments of 1972.

150.    During the events herein, Jane Doe No. 1 was enrolled at TCU and participating in and involved with TCU-sanctioned activities.  TCU discriminated against Jane Doe No. 1 by permitting a pattern or practice of sex and gender discrimination against Jane Doe No. 1 in violation of Title IX as set forth herein.

151.    Jane Doe No. 1 was subjected to severe and pervasive treatment including but not limited to a hostile educational environment and sexualized and general harassment from TCU agents including Dr. Snow, Dr. Gooding, Dr. Garrett as well as Professor Mack and visiting Professor Chimbel as detailed in paragraphs 59 through 129.

152.    Notably, Dr. Snow's repeated intentional assaults of Jane Doe No. 1 in connection with Jane Doe No. 1's physical mobility and relentless harassment of Jane Doe No. 1 including public comments about her physical appearance and body type designed to render her less attractive and sexually desirable and humiliate her in the presence of her peers and others

constitutes violations of federal sexual discrimination laws and protections under Title IX and violations of TCU's own stated policy.

153.    Jane Doe No. 1's hostile, disparate and harassing treatment was sufficiently severe and/or pervasive to alter the conditions of Jane Doe No. 1's education and created an abusive educational environment for Jane Doe No. 1 and constituted a continuing violation.

154.    Jane Doe No. 1 reported the sexualized and general harassment she endured to representatives of TCU who had authority to address the discriminatory harassment.

155.    TCU's representatives failed to adequately respond to or address the harassment. Indeed, TCU's representative acted with deliberate indifference with respect to Jane Doe No. 1.

156.    Moreover, as a direct result of Jane Doe No. 1's complaints to TCU, TCU and its agents, namely, Drs. Snow, Gooding, Garnett, and Professor Mack as well as the Honors College, retaliated against Jane Doe No. 1 as detailed in paragraphs 59 through 129.

157.    Indeed, whereas TCU has the right and does initiate Title IX disciplinary actions on behalf of victims of violations of the same, TCU did not bring an action against Dr. Snow or other agents of TCU on Jane Doe No. 1's behalf.

158.    Jane Doe No. 1 suffered failing grades, academic sanctions and severe emotional distress and psychological and physical injury resulting from her segregation, isolation and dehumanization throughout her matriculation at TCU, including while at the Washington summer program as detailed in paragraphs 59 through 129.

159.    Based on TCU's conduct Jane Doe No. 1 was excluded from participation in and denied the benefits of and subject to discrimination under TCU's educational programs and activities.

160.    TCU further retaliated against Jane Doe No. 1 for reporting the same.

161.    TCU's conduct as set forth herein is in violation of Title IX's strictures against sexual and general harassment and TCU is liable to Jane Doe No. 1.

162.    As a direct and proximate result of the TCU's conduct as alleged above, Jane Doe No. 1's academic and career prospects, earning potential, and reputation have been severely harmed and she has suffered loss of educational and professional opportunities, loss of future career prospects, and other direct and consequential damages and has suffered damages including extreme emotional distress, and loss of capacity for the enjoyment of life.

163.    By reason of the aforementioned harassment Jane Doe No. 1 has suffered and continues to suffer, Jane Doe No. 1 is entitled to all legal and equitable remedies available under Title IX, including an award of punitive damages, attorneys' fees and costs and other compensation in an amount to be determined at the trial of this action.

**COUNT III—TCU violated Section 504 of the Rehabilitation Act of 1973**

164.    Jane Doe No. 1 realleges and incorporates all the allegations contained in preceding paragraphs of this Complaint as though fully rewritten herein.

165.    At all relevant times TCU faculty, staff, administration, and other employees and/or affiliates were acting within the scope of their employment and/or at the direction and under the control of TCU and TCU's Board.  Moreover, at all relevant times appropriate TCU faculty, staff administration, etc. were made aware of and took no action against the conduct of its agents, thereby ratifying their conduct and rendering TCU and TCU Board vicariously liable for the conduct of their agents via the doctrine of Respondeat Superior.

166.    TCU violated Section 504 of the Rehabilitation Act of 1973 by excluding Jane Doe No. 1 from the participation in, denying Jane Doe No. 1 the benefit of, and subjecting Jane Doe No. 1 to harassment in a program or activity receiving financial assistance because of Jane

Doe No. 1's asthma—a qualified disability of which TCU was fully aware as detailed in paragraphs 83 through 129—and Jane Doe No. 1's resulting physical and physiological injuries.

167.    The Rehabilitation Act defines "program or activity" to "mean[] all of the operations of…a college, university, or other postsecondary institution." 29 U.S.C. § 794(b)(2)(A); 34 C.F.R. § 104.3(k). TCU is a "college, university, or other postsecondary institution." 29 U.S.C. § 794(b)(2)(A); 34 C.F.R. § 104.3(k). TCU and TCU-sanctioned activities and programs, including the Washington summer program are therefore a "program or activity" of TCU within the meaning of the Rehabilitation Act.

168.    TCU has engaged in illegal disability discrimination, as defined by the Rehabilitation Act, including without limitation (1) limiting Jane Doe No. 1 in the enjoyment of rights, privileges, advantages, and/or opportunities enjoyed by others receiving TCU's aids, benefits or services; (2) utilizing methods of administration and course instruction, etc. that have the effect of subjecting Jane Doe No. 1 and others with respiratory disabilities to discrimination on the basis of handicap, and that have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of TCU's programs and activities with respect to people with disabilities; (3) failing to provide an auxiliary aid or service where necessary to ensure that students with disabilities, like Jane Doe No. 1 are not excluded, denied services or otherwise treated differently than others; and/or (4) failing to make reasonable modifications in policies, practices or procedures where necessary to afford its services, privileges, advantages or accommodations to persons with disabilities.

169.    TCU has violated the Rehabilitation Act by, without limitation, failing to provide reasonable alternatives to Jane Doe No. 1 who as detailed in paragraphs 83 through 129 was not only visibly in distress due to her disability but also pled with Dr. Snow and other TCU

administrators to provide accommodations based on her difficulty breathing during the excessive walking and summer heatwave, thereby denying Jane Doe No. 1 the benefits of the summer program, and even retaliating against Jane Doe No. 1 for complaining about the same. Indeed, as detailed in paragraph 83 through 129, TCU not only failed to accommodate Jane Doe No. 1's disability, it even retaliated when Jane Doe No. 1 complained about her treatment and revoked an academic credit from Jane Doe No. 1 in part, because she allegedly did not "participate" fully in discussions (while struggling to breathe and walk) during the summer program.

170.   TCU further retaliated against Jane Doe No. 1 for reporting the same.

171.   TCU's violations of Section 504 have caused and continue to cause psychological and physiological harm to Jane Doe No. 1.

**COUNT IV—TCU violated Title III of the Americans with Disabilities Act of 1990**

172.   Jane Doe No. 1 realleges and incorporates all the allegations contained in preceding paragraphs of this Complaint as though fully rewritten herein.

173.   At all relevant times TCU faculty, staff, administration, and other employees and/or affiliates were acting within the scope of their employment and/or at the direction and under the control of TCU and TCU's Board. Moreover, at all relevant times appropriate TCU faculty, staff administration, etc. were made aware of and took no action against the conduct of its agents, thereby ratifying their conduct and rendering TCU and TCU Board vicariously liable for the conduct of their agents via the doctrine of Respondeat Superior.

174.   TCU's conduct also violated Title III of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12181 et seq.

175.   Title III provides that "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges,

advantages, or accommodations of any place of public accommodation by any person who owns… or operates a place of public accommodation." 42 U.S.C. § 12182(a); 28 C.F.R. § 36.201(a).

176.    TCU operates an "undergraduate, or postgraduate private school, or other place of education," which is a place of public accommodation pursuant to 42 U.S.C. § 12181(7)(J).

177.    TCU has engaged in illegal disability discrimination, as defined by Title III, including without limitation (1) limiting Jane Doe No. 1 in the enjoyment of rights, privileges, advantages, and/or opportunities enjoyed by others receiving TCU's aid, benefits or services; (2) utilizing methods of administration and course instruction, etc. that have the effect of subjecting Jane Doe No. 1 and others with respiratory disabilities to discrimination on the basis of handicap, and that have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of TCU's programs and activities with respect to people with disabilities; (3) failing to provide an auxiliary aid or service where necessary to ensure that students with disabilities, like Jane Doe No. 1 are not excluded, denied services or otherwise treated differently than others; and/or (4) failing to make reasonable modifications in policies, practices or procedures where necessary to afford its services, privileges, advantages or accommodations to persons with disabilities.

178.    TCU has violated Title III by, without limitation, failing to provide reasonable alternatives to Jane Doe No. 1 who as detailed in paragraphs 83 through 129 was not only visibly in distress due to her disability but also pled with Dr. Snow and other TCU administrators to provide accommodations based on her difficulty breathing during the excessive walking and summer heatwave, thereby denying Jane Doe No. 1 the benefits of the summer program, and even retaliating against Jane Doe No. 1 for complaining about the same.  Indeed, as detailed in

paragraph 83 through 129, TCU not only failed to accommodate Jane Doe No. 1's disability, it even retaliated when Jane Doe No. 1 complained about her treatment and revoked an academic credit from Jane Doe No. 1 in part, because she allegedly did not "participate" fully in discussions (while struggling to breathe and walk) during the summer program.

179.    TCU's violations of Title III have caused and continue to cause psychological and physiological harm to Jane Doe No. 1.

### COUNT V—TCU Committed Fraud

180.    Jane Doe No. 1 realleges and incorporates all the allegations contained in preceding paragraphs of this Complaint as though fully rewritten herein.

181.    At all relevant times TCU faculty, staff, administration, and other employees and/or affiliates were acting within the scope of their employment and/or at the direction and under the control of TCU and TCU's Board.  Moreover, at all relevant times appropriate TCU faculty, staff administration, etc. were made aware of and took no action against the conduct of its agents, thereby ratifying their conduct and rendering TCU and TCU Board vicariously liable for the conduct of their agents via the doctrine of Respondeat Superior.

182.    TCU and TCU"s Board's conduct also constitutes Texas common law fraud.

183.    As detailed extensively herein, TCU and TCU Board's self-aggrandizing DEI campaign and accompanying promotional activities were specifically designed to market to young people like Jane Doe No. 1 and represented to Jane Doe No. 1 that TCU fostered an inclusive environment and had taken necessary steps to ensure an egalitarian academic experience as detailed fully in paragraphs 56 through 129.

184.    TCU and TCU Board's continuing false representation of its academic and social environment is not only gross but also a material misrepresentation designed to induce racial

minorities and women to enroll in TCU despite its hateful legacy and present conscious contempt for racial minorities and women.

185.    Such representations are false.

186.    TCU and TCU's Board (given TCU's extensive hateful history and present as detailed herein) knew such representations were false at the time they were made.

187.    TCU and TCU's Board cannot seriously contend that they did not know such representations were false, but even if they do, TCU and TCU's Board made such representations recklessly, as a positive assertion and without knowledge of its truth.

188.    TCU and TCU's Board explicitly published that such representations were made with the intent that racial minorities and women, like Jane Doe No. 1 act on it.

189.    Jane Doe No. 1 did indeed rely on said representations and applied to TCU, where she was dehumanized, harassed and discriminated against on a continuing basis over the course of two years.

190.    Jane Doe No. 1 has suffered psychological and physiological harm as a direct result of TCU and TCU Board's misrepresentations.

### COUNT VI—TCU and Drs. Snow, Gooding, Garnett, Turner and Professors Mack and Chimbel, Individually Acted Grossly Negligent

191.    Jane Doe No. 1 realleges and incorporates all the allegations contained in preceding paragraphs of this Complaint as though fully rewritten herein.

192.    At all relevant times TCU faculty, staff, administration, and other employees and/or affiliates were acting within the scope of their employment and/or at the direction and under the control of TCU and TCU's Board.  Moreover, at all relevant times appropriate TCU faculty, staff administration, etc. were made aware of and took no action against the conduct of

its agents, thereby ratifying their conduct and rendering TCU and TCU Board vicariously liable for the conduct of their agents via the doctrine of Respondeat Superior.

193.    TCU and TCU Board's conduct also constitutes gross negligence.

194.    TCU and TCU Board owed a legal duty to Jane Doe No. 1. TCU and TCU Board owed Jane Doe No. 1 a duty as an institution of higher education to possess and apply the knowledge and to use the skill and care that is used by a reasonable and prudent educational institution.  Moreover, and in the alternative, if necessary, as detailed in paragraphs 59 through 129. TCU faculty, staff and administration, etc. were aware of Jane Doe No. 1's on-going harassment at the hands of TCU agents.  TCU had superior knowledge of the risks associated with its agent's continued conduct and the right to control the agent's conduct, which resulted in harm to Jane Doe No. 1.

195.    Despite its knowledge of Jane Doe No. 1's discriminatory, harassing and disparate treatment, TCU and TCU Board acted with conscious indifference, willfulness, recklessness and or wantonness toward Jane Doe No. 1, thereby breaching said duty.

196.    But for TCU and TCU Board's breach Jane Doe No. 1 would not have the suffered psychological and physiological injury, which was proximately caused by their breach.

197.    Additionally, and in the alternative, if necessary, Drs. Snow, Gooding, Garnett, Turner and Professors Mack and Chimbel each individually acted negligently because they had a special relationship with Jane Doe No. 1 as her university professors/administrators, and/or a duty to exercise reasonable care to avoid the foreseeable risk of injury to Jane Doe No.1, and/or a duty to protect Jane Doe No. 1 from the peril she experienced at TCU and TCU sanctioned activities, which were under their individual control.  The acts and omissions detailed herein constitute breaches of said duties and but for Drs. Snow, Gooding, Garnett and Professors Mack

and Chimbel's breach Jane Doe No. 1 would not have the suffered psychological and physiological injury, which was proximately caused by their breach.

**COUNT VII—TCU Negligently Hired, Retained, Supervised, and Trained its Employees**

198.    Jane Doe No. 1 realleges and incorporates all the allegations contained in preceding paragraphs of this Complaint as though fully rewritten herein.

199.    At all relevant times TCU faculty, staff, administration, and other employees and/or affiliates were acting within the scope of their employment and/or at the direction and under the control of TCU and TCU's Board.  Moreover, at all relevant times appropriate TCU faculty, staff administration, etc. were made aware of and took no action against the conduct of its agents, thereby ratifying their conduct and rendering TCU and TCU Board vicariously liable for the conduct of their agents via the doctrine of Respondeat Superior.

200.    TCU and TCU Board's conduct also constitutes negligent hiring, retention, supervision, training and management.

201.    TCU and TCU Board owed a legal duty to Jane Doe No. 1. TCU and TCU Board owed Jane Doe No. 1 a duty as an institution of higher education to possess and apply the knowledge and to use the skill and care that is used by a reasonable and prudent educational institution.  Moreover, and in the alternative, if necessary, as detailed in paragraphs 59 through 129.  TCU faculty, staff and administration, etc. were aware of Jane Doe No. 1's on-going harassment at the hands of TCU agents.  TCU had superior knowledge of the risks associated with its agent's continued conduct and the right to control the agent's conduct, which resulted in harm to Jane Doe No. 1.

202.    TCU and TCU Board employed Drs. Arnold, Snow, Gooding, Garnett and Turner, as well as Professor Mack during the incidents made basis of this lawsuit.  TCU and

TCU Board maintained the employment of these individuals despite their deplorable conduct as detailed herein.

203.    The aforementioned individuals were unqualified to handle their duties and responsibilities as evidenced by their conduct towards Jane Doe No. 1 detailed herein.

204.    TCU and TCU Board knew or should have known that hiring and retaining the aforementioned individuals would create an unreasonable risk of injury to students.

205.    TCU and TCU Board failed to use ordinary care in hiring, retaining, supervising, training and managing the aforementioned individuals.

206.    TCU and TCU Board's negligence in hiring, retaining, supervising, training and managing the aforementioned individuals was the proximate cause of Jane Doe No. 1's injuries and damages.

207.    TCU and TCU Board's actions and/or omissions were with conscious indifference, malicious, fraudulent, willful, reckless, and/or wonton.

208.    TCU and TCU Board's actions and/or omissions proximately caused injury to Jane Doe No. 1, which resulted and will result in Jane Doe No. 1 suffering past and future damages, including, past and future medical expenses, past and future pain and suffering, past and future mental anguish, past and future physical disfigurement, past and future physical impairment, and past and future aggravation of Jane Doe No. 1's condition.

209.    Jane Doe No. 1's injuries resulted from TCU and TCU Board's gross negligence, which entitles Jane Doe No. 1 to exemplary damages under Texas Civil Practice and Remedies Code section 41.003(a).

## COUNT VIII—TCU Negligently Misrepresented Itself

210.    Jane Doe No. 1 realleges and incorporates all the allegations contained in preceding paragraphs of this Complaint as though fully rewritten herein.

211.    At all relevant times TCU faculty, staff, administration, and other employees and/or affiliates were acting within the scope of their employment and/or at the direction and under the control of TCU and TCU's Board.  Moreover, at all relevant times appropriate TCU faculty, staff administration, etc. were made aware of and took no action against the conduct of its agents, thereby ratifying their conduct and rendering TCU and TCU Board vicariously liable for the conduct of their agents via the doctrine of Respondeat Superior.

212.    TCU and TCU Board's conduct also constitutes negligent misrepresentation.

213.    TCU and TCU Board's self-aggrandizing DEI campaign and accompanying promotional activities were specifically designed to market to young people like Jane Doe No. 1 and represented to Jane Doe No. 1 that TCU fostered an inclusive environment and had taken necessary steps to ensure an egalitarian academic experience as detailed fully in paragraphs 55-129.

214.    TCU and TCU Board made these representations in the course of TCU and TCU Board's business and in the course of a transaction in which they had interest.

215.    Through the DEI campaign TCU and TCU Board supplied false information for the guidance of others and did not exercise reasonable care or competence in obtaining or communicating the information to others.

216.    Jane Doe No. 1 justifiably relied on the representations of the DEI campaign as detailed herein.

217.    But for TCU and TCU Board's negligent misrepresentations Jane Doe No. 1 would not have enrolled at TCU and would not have endured unconscionable treatment and suffered psychological and physiological injury, which was proximately caused by TCU and TCU Board's actions and/or omissions.

### COUNT IX—TCU and Dr. Snow, Individually Committed Multiple Assaults

218.    Jane Doe No. 1 realleges and incorporates all the allegations contained in preceding paragraphs of this Complaint as though fully rewritten herein.

219.    At all relevant times TCU faculty, staff, administration, and other employees and/or affiliates were acting within the scope of their employment and/or at the direction and under the control of TCU and TCU's Board.  Moreover, at all relevant times appropriate TCU faculty, staff administration, etc. were made aware of and took no action against the conduct of its agents, thereby ratifying their conduct and rendering TCU and TCU Board vicariously liable for the conduct of their agents via the doctrine of Respondeat Superior.

220.    TCU and TCU Board's conduct also constitutes assault.

221.    As detailed in paragraphs 83 through 129, TCU and TCU Board facilitated the continuing assault of Jane Doe No. 1 by the Dean of TCU's Honors College.

222.    TCU through its agent Dr. Snow acted intentionally and knowingly in making unwanted physical contact with Jane Doe No. 1, resulting in bodily injury to Jane Doe No. 1 and further exacerbating her decline in health during the Washington summer program.

223.    Moreover, TCU and TCU Board and its agent, Dr. Snow, knew or reasonably should have believed that Jane Doe No. 1 would regard the multiple physical contacts of Dr. Snow would be regarded as offensive or provocative by Jane Doe No. 1, who informed them of the same.

224.    Further, after already assaulting Jane Doe No. 1 multiple times, TCU and TCU Board and its agent, Dr. Snow, again acted intentionally or knowingly in threatening Jane Doe No. 1 with imminent bodily injury as detailed in paragraph 83 through 129.

225.    As a result of said conduct Jane Doe No. 1 suffered psychological and physiological injury.

226.    Additionally, and in the alternative, if necessary, the conduct detailed in paragraphs 83 through 129 and incorporated in paragraphs 218 through 225 constitute assault for which Dr. Snow is liable in her individual capacity.

### COUNT X—TCU and Drs. Snow, Gooding, Garnett, Turner and Professors Mack and Chimbel Intentionally Inflicted Emotional Distress

227.    Jane Doe No. 1 realleges and incorporates all the allegations contained in preceding paragraphs of this Complaint as though fully rewritten herein.

228.    At all relevant times TCU faculty, staff, administration, and other employees and/or affiliates were acting within the scope of their employment and/or at the direction and under the control of TCU and TCU's Board.  Moreover, at all relevant times appropriate TCU faculty, staff administration, etc. were made aware of and took no action against the conduct of its agents, thereby ratifying their conduct and rendering TCU and TCU Board vicariously liable for the conduct of their agents via the doctrine of Respondeat Superior.

229.    TCU and TCU Board's conduct also constitutes intentional infliction of emotional distress.

230.    TCU and TCU Board acted intentionally or recklessly toward Jane Doe No. 1's welfare as detailed extensively herein.

231.    As a result of TCU and TCU Boards actions and/or omission Jane Doe No. 1 suffered severe emotional distress.

232.    TCU and TCU Board's conduct throughout Jane Doe No. 1's interactions with TCU was extreme and outrageous.

233.    TCU and TCU Board's conduct proximately caused Jane Doe No. 1's emotional distress and TCU and TCU Board even admitted the same via its clinicians as detailed in paragraph 59-129, which resulted and will result in Jane Doe No. 1 suffering past and future damages.

234.    Additionally, and in the alternative, if necessary, the conduct of Drs. Snow, Gooding, Garnett, Turner and Professors Mack and Chimbel, whom each individually acted intentionally or recklessly through their extreme and outrageous conduct as extensively detailed herein proximately caused Jane Doe No. 1 to suffer severe emotional distress and thus they are each individually liable for intentional infliction of emotional distress.

235.    No alternative cause of action would provide an adequate remedy for the severe emotional distressed caused by TCU and TCU Board, and Drs. Snow, Gooding, Garnett and Professors Mack and Chimbel.

**COUNT XI—TCU and Dr. Snow Falsely Imprisoned Jane Doe No. 1**

236.    Jane Doe No. 1 realleges and incorporates all the allegations contained in preceding paragraphs of this Complaint as though fully rewritten herein.

237.    At all relevant times TCU faculty, staff, administration, and other employees and/or affiliates were acting within the scope of their employment and/or at the direction and under the control of TCU and TCU's Board.  Moreover, at all relevant times appropriate TCU faculty, staff administration, etc. were made aware of and took no action against the conduct of

its agents, thereby ratifying their conduct and rendering TCU and TCU Board vicariously liable for the conduct of their agents via the doctrine of Respondeat Superior.

238.    TCU and TCU Board's conduct also constitutes false imprisonment.

239.    As detailed in paragraphs 82 through 128, TCU and TCU Board via its agent, Dr. Snow, regularly forced Jane Doe No. 1 to sit next to her during meals at the Washington summer program.  TCU and TCU Board via its agent, Dr. Snow also refused to allow Jane Doe No. 1 to leave the Washington summer program despite her health decline.

240.    In doing so, TCU and TCU Board via its agent, Dr. Snow, willfully and with malice detained Jane Doe No. 1 without Jane Doe No. 1's consent and without legal authority or justification.

241.    Additionally, and in the alternative, if necessary, the conduct detailed in paragraphs 83 through 129 and incorporated in paragraphs 236 through 240 constitute false imprisonment for which Dr. Snow is liable in her individual capacity.

242.    In addition to Jane Doe No. 1's physical injuries Jane Doe No. 1 suffered humiliation, shame, fright and mental anguish.

243.    Because TCU, TCU Board and Dr. Snow's conduct was malicious, Jane Doe No. 1 is entitled to actual and exemplary damages, including personal injury damages.

**COUNT XII—TCU Violated the Texas Deceptive Trade Practices Act**

244.    Jane Doe No. 1 realleges and incorporates all the allegations contained in preceding paragraphs of this Complaint as though fully rewritten herein.

245.    At all relevant times TCU faculty, staff, administration, and other employees and/or affiliates were acting within the scope of their employment and/or at the direction and under the control of TCU and TCU's Board.  Moreover, at all relevant times appropriate TCU

faculty, staff administration, etc. were made aware of and took no action against the conduct of its agents, thereby ratifying their conduct and rendering TCU and TCU Board vicariously liable for the conduct of their agents via the doctrine of Respondeat Superior.

246.    TCU and TCU Board's conduct also constitutes violations of the Texas Deceptive Trade Practices Act ("DTPA").

247.    Jane Doe No. 1 is a consumer under the DTPA.

248.    TCU and TCU Board may be sued under the DTPA for violations.

249.    TCU and TCU Board through its DEI campaign employed false and misleading or deceptive acts or practices in violation of the DTPA by failing to disclose (and even hiding) the truth of its hateful legacy toward racial minorities and women.  TCU and TCU Board via its agent, Chancellor Boschini, also breached its express warranty that it had put in place measures to create a more balanced learning community, among other express warranties offered by TCU to Jane Doe No. 1 and other racial minorities and women.  In doing so, TCU and TCU Board subjected Jane Doe No. 1 to unconscionable courses of action, which took advantage of Jane Doe No. 1 to Jane Doe No. 1's detriment.

250.    TCU and TCU Board's aforementioned conduct was the producing cause of Jane Doe No. 1's damages.

**COUNT XIII—TCU and Drs. Snow, Gooding, Garnett and Professors Mack and Chimbel Conspired Against Jane Doe No. 1**

251.    Jane Doe No. 1 realleges and incorporates all the allegations contained in preceding paragraphs of this Complaint as though fully rewritten herein.

252.    At all relevant times TCU faculty, staff, administration, and other employees and/or affiliates were acting within the scope of their employment and/or at the direction and

under the control of TCU and TCU's Board.  Moreover, at all relevant times appropriate TCU faculty, staff administration, etc. were made aware of and took no action against the conduct of its agents, thereby ratifying their conduct and rendering TCU and TCU Board vicariously liable for the conduct of their agents via the doctrine of Respondeat Superior.

253.    TCU and TCU Board's conduct also constitutes civil conspiracy.

254.    As detailed in paragraphs 107 through 129, TCU and TCU Board, via its agents Dr. Snow and Professor Mack were members of a combination of two or more persons comprised of TCU and Professor Chimbel, Dean of the Jandoli School of Communication at St. Bonaventure University.  Together, Drs. Snow and Garnett and Professor Mack on behalf of TCU had a meeting of the minds with Professor Chimbel to discriminate and retaliate against Jane Doe No. 1 in violation of federal and state law as detailed herein.

255.    TCU and Chimbel succeeded in their conspiracy by revoking the credits they had given to Jane Doe No. 1 based on discriminatory grading practices and causing her to receive a grade of "NC" for her participation in the summer program.

256.    As detailed herein, Jane Doe No. 1 was proximately injured as a result.

257.    Additionally, and in the alternative, if necessary, Drs. Snow, Gooding, Garnett and Professors Mack and Chimbel via the conduct detailed in paragraphs 107 through 129 and incorporated in paragraphs 251 through 256 each individually conspired against and are liable to Jane Doe No. 1.

**COUNT XIV—TCU Breached its Fiduciary Duty to Jane Doe No. 1**

258.    Jane Doe No. 1 realleges and incorporates all the allegations contained in preceding paragraphs of this Complaint as though fully rewritten herein.

259.    At all relevant times TCU faculty, staff, administration, and other employees and/or affiliates were acting within the scope of their employment and/or at the direction and under the control of TCU and TCU's Board.  Moreover, at all relevant times appropriate TCU faculty, staff administration, etc. were made aware of and took no action against the conduct of its agents, thereby ratifying their conduct and rendering TCU and TCU Board vicariously liable for the conduct of their agents via the doctrine of Respondeat Superior.

260.    TCU and TCU Board's conduct also constitutes breach of fiduciary duty.

261.    TCU and TCU Board had a fiduciary duty to Jane Doe No. 1 based on an informal relationship, arising from a moral, social, or purely personal relationship of trust and confidence.  Jane Doe No. 1 reasonably placed said trust and confidence in TCU—a university which lured her to it by indicating that it would provide an egalitarian experience for Jane Doe No. 1 as detailed herein.

262.    TCU and TCU Board breached their informal duty to Jane Doe No. 1 by subjecting her to the unconscionable acts detailed herein.

263.    TCU and TCU Board's breach resulted in injury to Jane Doe No. 1 and resulted in benefit to TCU and TCU Board.

### COUNT XV—TCU Breached its Express Warranty for Services

264.    Jane Doe No. 1 realleges and incorporates all the allegations contained in preceding paragraphs of this Complaint as though fully rewritten herein.

265.    At all relevant times TCU faculty, staff, administration, and other employees and/or affiliates were acting within the scope of their employment and/or at the direction and under the control of TCU and TCU's Board.  Moreover, at all relevant times appropriate TCU faculty, staff administration, etc. were made aware of and took no action against the conduct of

its agents, thereby ratifying their conduct and rendering TCU and TCU Board vicariously liable for the conduct of their agents via the doctrine of Respondeat Superior.

266.    TCU and TCU Board's conduct also constitutes breach of express warranty for services.

267.    TCU and TCU Board sold educational services to Jane Doe No. 1.

268.    TCU and TCU Board made representations to Jane Doe No. 1 about the quality or characteristics of the services by affirmation of fact, promise, or description as detailed in paragraphs 56-129.

269.    Said representations formed the basis of TCU and Jane Doe No. 1's bargain and Jane Doe No. 1 relied on the same.

270.    TCU and TCU Board breached their warranty by subjecting Jane Doe No. 1 to the treatment described herein.

271.    Jane Doe No. 1 has suffered psychological and physical injury as a result.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests relief against Defendants as follows:

272.    A declaration that TCU and TCU Board's conduct as alleged here has violated, and continues to violate Title VI of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d through 2000d-6, Title IX of the Education Amendments Act of 1972, 20 U.S.C. §§ 1681through 1687, Section 504 of the Rehabilitation Act of 1973, 29 U.S.C § 794, and Title III of the Americans with Disabilities Act, 42 U.S.C. §§ 12181 through 12189;

273.    Award Jane Doe No. 1 actual damages, exemplary damage, including personal injury damages, pre and post judgment interest, and court costs.

274.     Award of Jane Doe No. 1's reasonable attorneys' fees and cost as provided by law;

275.     Such other relief, in law and in equity, as the Court finds just and proper.

## JURY DEMAND

Jane Doe No. 1 demands a jury trial in this action.

Dated: January 15, 2020.

Respectfully submitted,

**WHITE & WIGGINS, LLP**

By:   */s/ Kevin B. Wiggins*

   */s/ Nnamdi M. Anozie*
      Kevin B. Wiggins
      Bar No. 21441600
      E:  kbwiggins@whitewiggins.com
      Nnamdi Anozie
      Bar No. 24087107
      E: nanozie@whitewiggins.com
      1700 Pacific Avenue, Suite 3740
      Dallas, Texas 75201
      T:  214.665.4150
      F:  214.665.4160
      **ATTORNEYS FOR JANE DOE NO. 1**