## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| **JANE DOE NO. 1, JANE DOE NO. 2,** § | |
| **JANE DOE NO. 3, JANE DOE NO. 4** § | |
| **and JANE DOE NO. 5,** § | |
|     **Plaintiffs,** § | |
| § | |
| § | |
| **vs.** § | **CIVIL ACTION NO. 3:20-cv-00106-M** |
| § | |
| **TEXAS CHRISTIAN UNIVERSITY,** § | |
| **DR. DIANE SNOW,  DR. ANDREW** § | |
| **SCHOOLMASTER, DR. ROB GARNETT,** § | **JURY DEMAND** |
| **DR. DARRON TURNER,** § | |
| **RUSSELL MACK, LEIGH HOLLAND** § | |
| **and AARON CHIMBEL,** § | |
|     **Defendants.** § | |

## PLAINTIFFS' SECOND AMENDED COMPLAINT

Plaintiffs Jane Doe No. 1, Jane Doe No. 2, Jane Doe No. 3, Jane Doe No. 4 and Jane Doe No. 5, by and through the undersigned attorneys, file this Complaint against Texas Christian University, Dr. Diane Snow, Dr. Andrew Schoolmaster, Dr. Rob Garnett, Dr. Darron Turner, Russell Mack, Leigh Holland and Aaron Chimbel alleging as follows:

## INTRODUCTION

1.    This lawsuit is about a private university in North Texas that has historically been— and remains—bigoted, narrow-minded and hypocritical in its treatment of racial minorities and women while ostensibly advancing higher education.  Texas Christian University's ("TCU") legacy of discriminatory treatment of racial minorities and women is arresting and serves as the backdrop to the facts underlying this Complaint.  Indeed, the case at bar is the culmination of over a century of hateful campus culture gone unchecked.  TCU's most recent public and targeted displays of bigotry have claimed its latest victims in twenty-year-old Jane Doe No. 1, an award-

winning African-American young woman enrolled in TCU's Honors Program; Jane Doe No. 2, an award-winning African-American woman and graduate of TCU's Honors Program; Jane Doe No. 3 an award-winning African-American woman and Chancellor's Scholar enrolled in TCU's Honors Program; Jane Doe No. 4 an award-winning African-American woman forced out of the PhD Program of TCU's Department of English; and Jane Doe No. 5 an award-winning African-American woman enrolled in the PhD Program of TCU's Department of English.

2.      This Complaint recounts (1) TCU's hateful legacy in its own words and actions as proudly published in its official records; (2) the fraudulent and self-serving Diversity, Equity & Inclusion ("DEI") campaign and accompanying degree program recently launched by TCU designed to induce racial minorities and women, to enroll in the university despite its hateful legacy and present conscious contempt for minorities and women; and (3) a series of acts or omissions by TCU designed to relegate Jane Does Nos. 1, 2, 3, 4 and 5 and other racial minorities and women to a status of second-class citizen on TCU's campus and at TCU-sanctioned activities in violation of federal and state law.  Consistent with TCU's historical treatment of minorities and women, Jane Does Nos. 1, 2, 3, 4 and 5 have been subjected to: (1) harassment from their professors and university staff, including unwelcomed physical contact; (2) public embarrassment in the presence of university professionals and their peers; (3) reckless disregard to Jane Doe Nos. 1 and 3's health decline resulting from the discriminatory environment at TCU; (4) disparate treatment in Jane Doe No. 1's academic pursuits, including the unexplained revocation of a merit-based scholarship and being subjected to racially disparate grading practices, resulting in the loss of course credits; and (5) retaliation for Jane Does Nos. 1, 4 and 5's formal and informal complaints about TCU's treatment of herself and other similarly-situated minorities, **to name just a few of the incidents detailed herein**.  These incidents were so severe and pervasive that they created unimaginable

psychological and physiological pain and harm to Jane Does Nos. 1, 2, 3, 4 and 5.   TCU officials were aware of Jane Does Nos. 1, 2, 3, 4 and 5's distress and rather than work to ameliorate its hateful behavior towards them, TCU doubled down.

## JURISDICTION AND VENUE

3.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1331 because this lawsuit arises under the Constitution, laws or treaties of the United States.  Specifically, this lawsuit involves conduct by TCU, which violates Title VI of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d through 2000d-6, Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e through 2000e-17, Title IX of the Education Amendments Act of 1972, 20 U.S.C. §§ 1681 through 1687, Section 504 of the Rehabilitation Act of 1973, 29 U.S.C § 794, and Title III of the Americans with Disabilities Act, 42 U.S.C. §§ 12181 through 12189.

4.      This Court further, and in the alternative if necessary, has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because of the diversity of the parties' citizenship and because the amount in controversy exceeds $75,000, exclusive of interest and costs.  Specifically, Jane Does Nos. 1, 2, 3, 4 and 5 are domiciled in Oklahoma; Virginia; Illinois; Louisiana; and Berlin, Germany, respectively and Defendants are residents and/or citizens of, or otherwise domiciled in Texas.

5.      This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) because the state law claims at issue are so related to the federal claims mentioned above, they form part of the same case or controversy under Article 3 of the U.S. Constitution.  Specifically, based upon the same facts associated with its violations of federal law, TCU's conduct also constitutes Texas common law and statutory prohibitions against fraud, negligence, assault, intentional infliction of

emotional distress, false imprisonment, violations of the Texas Deceptive Trade Practices Act, civil conspiracy and breaches of fiduciary duty and warranty.

6.     Venue is proper in the United States District Court for the Northern District of Texas pursuant to 28 U.S.C § 1931(b)(1) and (2) because all Defendants reside within this judicial district and are residents of the State of Texas and because a substantial part of the events or omissions involving TCU, which give rise to Jane Does Nos. 1, 2, 3, 4 and 5's claims occurred in this judicial district.  Additionally, and in the alternative if necessary, venue is also proper in this Court because each Defendant is subject to personal jurisdiction in this district with respect to this lawsuit.

## PARTIES AND KEY INDIVIDUALS

7.     Jane Doe No. 1 is domiciled in Oklahoma.

8.     Jane Doe No. 2 is domiciled in Virginia.

9.     Jane Doe No. 3 is domiciled in Illinois.

10.    Jane Doe No. 4 is domiciled in Louisiana.

11.    Jane Doe No. 5 is domiciled in Berlin, Germany.

12.    Texas Christian University ("TCU"), is a Texas corporation and private university that receives federal financial assistance and is therefore subject to federal civil rights and educational law.  TCU has been served with process via its attorney of record.

13.    Dr. Diane Snow is the former Dean and Wassenich Family Endowed Chair of the John V. Roach Honors College at TCU.[1]  She has been served with process via her attorney of record.

---

[1] On March 6, 2020, nearly two months after Jane Doe No. 1 filed her Original Complaint in this Court, Provost Dr. Teresa Abi-Nader Dahlberg announced that Dr. Snow would "temporarily step away from her role as dean" of the Honors College at TCU to work on a "special project."  Incredibly, Dr. Dahlberg stated that Dr. Snow "stepping away is not an indication of any policy violations, nor is it related to misconduct."

14.     Dr. Andrew School Master is the former Dean of the AddRan College of Liberal Arts.  He has been served with process via his attorney of record.

15.     Dr. Rob Garnett is the Associate Dean and Honors Professor of Social Sciences of the John V. Roach Honors College at TCU.  He has been served with process via his attorney of record.

16.     Dr. Darron Turner is the Chief Inclusion Officer and Title IX Coordinator, and the Deputy Affirmative Action/Equal Employment Opportunity Officer at TCU.  He has been served with process via his attorney of record.

17.     Russell Mack, J.D. is an instructor of strategic communications at TCU. He has been served with process via his attorney of record.

18.     Aaron Chimbel is the Dean of the Jandoli School of Communication at St. Bonaventure University. Aaron Chimbel's residence[2] is at 2536 Lubbock Avenue, Fort Worth, Texas 76019.  He has been served with process via his attorney of record.

19.     Leigh Holland is Title IX investigator in TCU's Title IX Office.  She has been served with process via her attorney of record.

---

[2] Aaron Chimbel owns said residence in Fort Worth, Texas, for which he had applied for and received a residence homestead exemption under the Texas Tax Code § 11.13(b) according to Tarrant Appraisal District and relevant official recordings as of the original filing date of this lawsuit.  **Pursuant to Texas Tax Code, a "residence homestead" means a structure that "is occupied as the individual's principal residence by an owner…"**  Tex. Tax Code Ann. § 11.13.  By filing for and receiving this homestead exemption Chimbel had certified to the State of Texas that the aforementioned residence was his "principal residence" and that he "does not claim an exemption on another residence homestead in or outside of Texas" at the time of the filing of this lawsuit.  *Id.*; *see also Property Tax Exemptions,* TEXAS COMPTROLLER, https://comptroller.texas.gov/taxes/property-tax/exemptions/#skip-scroll (last visited Apr. 11, 2020). Tellingly, Mr. Chimbel only removed his homestead exemption after the filing of Plaintiffs' First Amended Complaint.

## STATEMENT OF FACTS

**I.      A legacy rooted in hatred is promoted and preserved.**

20.      TCU cannot seriously contend that bigotry, hatred, and disparate treatment are anything less than part of its DNA.  TCU was founded by brothers and **Officers of the Confederate Army**, Addison and Randolph Clark.[3]  When Addison Clark and his brother Randolph Clark, the cousin-in-law of confederate General Robert E. Lee,[4] lost their fight not only to maintain the right to own human-beings of African-descent as slaves but also to expand the practice of slavery West, the Clark bothers sought employment as professors at public Texas institutions.[5]  Because of their treasonous involvement as Officers in the Confederate Army during the Civil War, however, the Clark brothers were unable to secure employment at federally funded public schools.[6]  So, in 1873, the Clark brothers decided to open a private university where their ideologies and allegiances were accepted: TCU. Thereafter, TCU would become an incubator for precisely the brand of hatred and bigotry promoted by the high-ranking Confederate Clark brothers during their involvement in the Civil War.  Indeed, from its founding through the time of the filing of this lawsuit, TCU has remained consistent in its treatment of the racial minorities and women of its community as second-class citizens; promoting and preserving its legacy of bigotry and hatred.

**II.      Act I. Environs of T.C.U. Temple of Education, except for the "nigger."**

21.      The branding of TCU as a persistently bigoted institution is no exaggeration.  In its earliest documented history, TCU regularly published racist ideologies and minstrel depictions of African Americans and promoted the racist acts and activities of its student body, faculty and staff.

---

[3] Kirk Tochov, *TCU*, PERSONAL TCU, http://personal.tcu.edu/ktochov/TCU.html  (last visited Dec. 1, 2019).
[4] Addison Clark, THE INTERPRETER, February 1927, at 3.
[5] Tochkov, *supra*.
[6] *Id*.

An examination of TCU's earliest available publications provides context for the initial and persisting racial environment at TCU.

22.     In 1908 the *Skiff,* the university paper*,* provided commentary on a recent football game, publishing that a TCU player "waded thru [sic] [the 10-yard line] like a nigger goes thru [sic] a watermelon."[7]  In 1909 the *Skiff,* reflected fondly on a university event wherein the speaker*,* *"...*gave a graphic description of the horrors of the Reconstruction."[8]  How "negroes and carpet baggers ruled the country and of the final return of the white man to his own through the aid of the Ku Klux Klan and like agencies."[9]  In 1910 the *Skiff* published a biblical origin story of Adam, the first man formed by God, which in part discussed Adam's carefree existence in Eden in contrast to the concerns of the day. Specifically, the *Skiff* stated Adam,

> didn't have to anchor his smokehouse to the center of gravity with a log chain, set a double barreled bear trap in the donjon to keep off his hennery, nor tie a brace of pessimistic, pugilistic bull dogs in his melon patch, **for the nigger with his adjustable morals and omnivorous mouth had not yet arrived on the scene.**[10]

23.     The following year the *Skiff* casually noted that at a particular campus event, a TCU student "had more announcements than a nigger's dog had fleas."[11]

24.     In 1919, TCU's yearbook commemorated a well-attended TCU event in May when "the Ku Klux Klan certainly was revived" during "the finest shirt-tail parade [TCU] ever saw!"[12]

---

[7] Editorial, *SOUTHWESTERN TOO! Another Addition to Varsity's Long List of Victims Bloor's Linebucking The Feature Game Somewhat Marred By Penalties*, SKIFF (North Waco), Nov. 18, 1908, at 1.
[8] Herbert Bozeman, Editorial, *Tomlinson the Winner of Blind Contest—First Place Closely Contested in Both Composition and Delivery*, SKIFF (North Waco), Mar. 19, 1909, at 1.
[9] *Id*.
[10] Grundy W. Stevenson, Opinion, *Ideas of Plain Democrat*, SKIFF (North Waco), Apr. 15, 1910, at 2 (emphasis added).
[11] Howard B. Dabbs, Editorial, *Annual Shirley Program: The Yearly Open Session Was Held Last Friday Evening*, SKIFF (Fort Worth), May 25, 1911, at 1.
[12] 15 TEXAS CHRISTIAN UNIVERSITY, *The Horned Frog* 147 (1919).

25.   TCU also regularly promoted minstrel depictions of African Americans. Again, in 1919 the *Skiff* published a "Hallowe'en" article that begins, "[l]aw, law, chile, but this nigger sure am tired."[13]  The article only becomes more damning from there, depicting an African-American simpleton cleaning behind white students and in search of a "Free Chicken Dinner."[14]  TCU's 1920 yearbook even features a play titled "*A Pageant*," which "portrayed the happenings of the College Year 1919-1920."[15]  The fifty-one-page play features only two characters of color who appear in Act I. *Environs of T.C.U. Temple of Education*: the "negro bell hop" who speaks in stump speech and the other, a "kitchen scullion with ebony face."[16]  **TCU's openly hateful depiction of African Americans in its earliest years was so pervasive that to catalogue them all in this lawsuit would be a physically exhausting exercise.**  Suffice it to say, however, that the bulk of TCU's publications through the 1960s detail TCU outings, including trips into the city to "witness one of the greatest Ku Klux Klan parades ever held in the South,"[17] incidents of persons defacing posters with the word "nigger" when prominent African Americans were invited to campus[18] and regularly published blatantly racist articles, poems, and illustrations, including *Hambone's Meditations[19]*, the minstrel comic strip that Judge and civil rights leader Benjamin Hooks admonished as a "total and colossal indifference to negroes and their accomplishments."[20]



Figure 1. Negro bellhop as featured in The Horned Frog 118 (1920).



Figure 2. Hambone's Meditations excerpt as featured in the SKIFF (Fort Worth), Sept., 1923.

[13] Beulah Bell, Editorial, *SOCIETY: Halloween Party Given*, SKIFF (Fort Worth), Oct. 5, 1919, at 3.
[14] *Id*.
[15] 16 TEXAS CHRISTIAN UNIVERSITY, *The Horned Frog* 91 (1920).
[16] *Id*. at 118.
[17] Thos E. Dudney, Editorial, *K.K.K.*, SKIFF (Fort Worth), Feb. 20, 1922, at 4.
[18] Lonn Taylor, Opinion, *Letter to the Editor*, SKIFF (Fort Worth), Nov. 4, 1960, at 4.
[19] J.P. Alley, *Hambone's Mediations*, SKIFF (Fort Worth), Sept. 25, 1923, at 3.
[20] Michael K. Honey, *Going Down Jericho Road: The Memphis Strike, Martin Luther King's Last Campaign* 128 (W.W. Norton & Co., Inc., 2007).

26.     Minstrel depictions published by the university seemed to disappear by the time TCU fully integrated in 1964 (which in itself is reprehensible),[21] but its hateful ideologies toward, and disparate treatment of racial minorities and women only became more visible.

### III.    Admitted but not equal.

27.     In 1963, the *Skiff* published that "racial reins seemed a part of University policy…" and reported that students were "particularly concerned that racial background does restrict any scholastically qualified students from participation in some parts of [TCU's] academic program."[22] In response to student concerns, TCU cautioned student leaders that "[TCU] ha[d] exhausted the usefulness of any campus-wide [discussions] on the topic of integration" and that the same "might be 'misconstrued' by persons off campus."[23]  In 1964, ninety-one years after its founding, and only after "feeling the heat" to comply with federal mandates, TCU totally integrated, but for years to come African Americans were not allowed to take part in general school affairs and even now African Americans and women are not treated equally at or by TCU.[24]

28.     By the late sixties, with the subjects of decades of its disdain now allowed on campus, TCU's culture of hate took on new life.  TCU proudly displayed its bigotry and hate for the African-American members of its own community and also towards its African-American visitors in every facet of the university experience. In one incident in 1967, Southern Methodist University star wide receiver (now Texas Sports and College Football Hall of Famer) Jerry LeVias, an African American, had death threats made against him for daring to set foot in TCU's Amon G. Carter stadium in a game against TCU.[25]  During the game LeVias was spat at by a TCU player

---

[21] Nyshicka Jordan, *Integration Now*, IMAGE, March 2004, at 16 (Chancellor Moudy on integration—"We were late in doing it. It was past time.").
[22] Mary Martin, Editorial, *Academic Restriction Target of Resolution*, SKIFF (Fort Worth), Dec. 6, 1963, at 1.
[23] Mary Martin, Editorial, *Easy Race Barriers*, *TCU Congress Asks*, SKIFF (Fort Worth), Dec. 6, 1963, at 3.
[24] Nyshicka Jordan & Kelly Morris, *Color Contrast,* IMAGE, March 2004, at 13.
[25] Jordan, *supra*, at 17.

who tackled him to the ground and "uttered a racial slur at LeVias as the two got up from the turf."[26] LeVias quit the game and retreated to the SMU sideline in tears.[27]  TCU's response to its own African-American students who dared attempt to participate in social activities as equals was—and remains—equally chilling.  In 1969, Ronnie Hurdle, a student at TCU in search of an "opportunity to be more involved in mainstream college life" tried out for the cheerleading squad and became TCU's first African American cheerleader.[28]  As his reward for attempting to spread campus glee and cheer his team to victory, the same night he celebrated making the squad Hurdle returned to his dorm room to learn of hours of harassing phone calls from persons asking to speak to "the nigger" and threatening to beat him up.[29]  Hurdle was then targeted by "long-time supporters of TCU" challenging "whether he was allowed to touch a white female cheerleader" and treated to "hurried conferences over compromises" between himself and the university Chancellor.[30]  **An entire year later, in 1970, TCU finally decided to allow Hurdle to touch his fellow white female cheerleaders**.[31]

29.     Off the field, social activities and campus life were also "still somewhat segregated" as TCU's fraternities and sororities contained clauses restricting the admission of "Jews or Negroes."[32]  And as late as 1980, "none of [TCU's traditional fraternities and sororities] had any Negro members."[33]

---

[26] *Id.*; Charles H. Martin, *Benching Jim Crow: The Rise and Fall of Color Line in Southern College Sports, 1890-1980* 197 (2010).

[27] Steve Campbell, *LeVias Now Making a Difference Off Playing Field*, HOUSTON CHRONICLE (Sept. 22, 2008), https://www.chron.com/sports/college/article/LeVias-now-making-a-difference-off-playing-field-1782142.php.

[28] Nyshicka Jordan & Kelly Morris, *Color Contrast*, IMAGE, March 2004, at 13.

[29] *Id.*

[30] Margaret Downing, Editorial, *100 Years White, Only 9 Black*, DAILY SKIFF (Fort Worth), Jan. 18, 1973, at 8.

[31] *Id.* (emphasis added).

[32] Frank Lewis, Editorial, *Greeks Proud of Unity*, SKIFF (Fort Worth), Jan. 17, 1969, at 2.

[33] *Id.*; Chris Kelley, Editorial, *TCU Turns to Racist Charges*, TCU DAILY SKIFF (Fort Worth), Sept. 3, 1980, at 1.

30.     Dorm life for African Americans at TCU fared no better.  In 1968 Ivory Dansby, an African-American woman living on campus, complained that TCU prohibited African-American women from sharing dorms with white women.[34]  Dansby reported that "…[TCU] had white girls living three-to-a-room and, at the same time, Negroes were living alone."[35]  Dansby also recalled her dorm mother calling her "my favorite colored girl" and regularly inviting her "over to her house [to] do housework" and wash windows.[36]  Dansby's degrading experience existed beyond the dorm room as well.  Dansby recalls hearing "one of [her] prof's [sic] say Nigra N-I-G-R-A" and that to her it sounded "like a prof's[sic] been saying nigger all his life and just can't quite bring himself to say Negro."[37]  TCU carried its culture of isolation and disparate treatment of African Americans into the seventies, and that culture persists today.

### IV.    TCU's culture facilitates the adultery of an illicit intercourse between injustice and immorality.

31.     In fact, Herman Wright's first experience when he arrived on campus in 1971, was that a succession of three white roommates "bolted" from their dorm assignments, when they realized Wright was an African American.[38]  Wright "spent the rest of the year with no roommates."[39] In a 2016 interview, Wright acknowledged that there were "a ton [of obvious issues with race relations on TCU's campus]" and described his experience at TCU as very tough and very isolating.[40]  Wright was not alone.  That same year four African-American athletes voluntarily removed themselves from TCU's athletic program in a "walkout" citing "racist attitudes among general and athletic administrations," including arbitrary comments, rules and dress code targeting

---

[34] Judy Buchholz, *On Breaking the Negro Cycle*, WAKE, May 1968, at 13.
[35] *Id*.
[36] *Id*.
[37] *Id*.
[38] Johnny Livengood et al., Editorial, *Walkout Spurs Black Outcry*, SKIFF (Fort Worth), Feb. 5, 1971, at 1.
[39] *Id*.
[40] *Wright / Herman Wright Discusses TCU*, TCU (June 29, 2016), https://crbb.tcu.edu/clips/5262/herman-wright-discusses-tcu.

the physical appearance of the African-American athletes and the denial of food to one of the African-American athletes at the training table—conduct which persists today.[41]  The walkout "triggered a chain of demands" that were presented to the press by African-American students concerning the attitudes of bigotry toward racial minorities at TCU—again, attitudes that persist today.[42]

32.    In response to a list of demands produced by African-American students, TCU created a "Black Studies" minor to pacify the students in an apparent attempt to halt racial complaints; a play TCU  would recycle whenever confronted with student demands flowing from its racist and sexist treatment of its racial minorities and women.[43] It did not work then, and TCU should have known its most recent insincere attempt at solving racial issues by creating degree programs rather than confronting directly its insidious practices would not work now.[44]  By the late eighties, the "Black Studies" minor disappeared.[45] Ultimately, all of the aforementioned African-American athletes withdrew from TCU.[46]

33.    TCU's treatment of African Americans had deteriorated so far that in 1974 the TCU chapter of the National Association for the Advancement of Colored People ("NAACP") filed two race and sex discrimination charges against TCU for its conduct in discriminating against African Americans in "employment, admissions, and certain student organizations."[47]  One glaring aspect

---

[41] *Id.*
[42] Ariana Williams, *Wall of Integration Highlights History of Campus Inclusion*, TCU 360 (Sept. 11, 2019), https://www.tcu360.com/2019/09/wall-of-integration-highlights-history-of-campus-inclusion/.
[43] *Id.*
[44] Lucy Calvert, Editorial, *Awareness Starts in Class*, TCU DAILY SKIFF (Fort Worth), Apr. 20, 1998, at 1.
[45] *Id.*
[46] Livengood et al., *supra.*
[47] Editorial, *HEW to Probe Bias Charges*, DAILY SKIFF (Fort Worth), Oct. 24, 1974, at 1; Lisa Deeley, Editorial, *Second Discrimination Charge Filed: University Could Lose $1.5 Million*, DAILY SKIFF (Fort Worth), May 2, 1974, at 1.

of the NAACP's charge was the complaint that TCU paid its racial minority and women employees less money for the same work as its white employees—a practice TCU continues to this day.[48]

34.     As a result of these charges, in October of 1974, the United States announced that it would send civil rights officials to investigate TCU's treatment of and practices against racial minorities.[49] Ultimately, federal investigators substantiated the NAACP's claims of discrimination at TCU.[50]  Coincidentally—in yet another display of TCU's total lack of sensitivity towards its African-American community—in October of 1974, TCU's Forums Committee invited David Duke, Grand Dragon of the Klu Klux Klan to speak at the University.[51]  African-American students and a group of African-American ministers protested that Duke's very presence was intimidating to a number of students and to the African-American students was a direct "slap in the face," especially in light of the recently filed NAACP discrimination complaints.[52]  TCU's Dean of Students approved Duke's appearance even while admitting the likelihood that "Duke's speech would reinforce the views of racists or adversely influence those who had no definite views."[53] After weeks of continued protests from African Americans both within and outside TCU, TCU finally withdrew its invitation to Duke to speak on campus.[54]  A few weeks later, however, TCU's House of Student Representatives reopened the invitation to Duke.[55]

35.     Towards the end of the seventies TCU was still—and remains—engulfed in complaints of disparate treatment from its racial minorities and women.  A university study in the

---

[48] Editorial, *Affirmative Action reports: Minority [sic] Employees Few, Paid Little*, DAILY SKIFF (Fort Worth), May 3, 1974, at 1.
[49] Lia Deeley Smith, Editorial, *HEW to Probe Bias Charges*, DAILY SKIFF (Fort Worth), Sept. 6, 1974, at 1.
[50] Lia Deeley Smith, Editorial, *HEW to Probe Bias Charges*, DAILY SKIFF (Fort Worth), Sept. 24, 1974, at 1.
[51] Robert Bobbins, Editorial, *Forums Votes to Invite Klansman*, DAILY SKIFF (Fort Worth), Nov. 5, 1974, at 1.
[52] *Id.*; Loretta Gamble, Letter to the Editor, *Readers React to Klan Controversy*, DAILY SKIFF (Fort Worth), Nov. 6, 1974, at 2; Al Sibello, Editorial, *Klan Speaker Cancelled*, DAILY SKIFF (Fort Worth), Nov. 13, 1974, at 1.
[53] Robert Robbins, Editorial, *Speaker Panel OK's Duke's Visit*, DAILY SKIFF (Fort Worth), Nov. 8, 1974, at 1.
[54] *Id.*
[55] Editorial, *Klansman May Get Second Chance*, DAILY SKIFF (Fort Worth), Nov. 21, 1974, at 2.

spring of 1976 revealed that of the African Americans surveyed "67.5 percent were dissatisfied with the way they were treated on TCU's campus;… 42.5 percent felt their life at the University [was] generally worse than the life of the average white student;…and 15 percent said white students would not socialize with them."[56]   TCU's racist and bigoted conduct prevailed in the classroom, too.   In 1977, one nursing student complained that "she and other blacks were discriminated against in grading by faculty members of [TCU's] Nursing school" and yet another African-American student "was reportedly advised by a professor to drop out of school altogether" when they challenged the grade they received in a course, which they believed was due to disparate grading—a practice and culture that persists at TCU to this day.[57]   The Dean of the nursing school dismissed these claims as "just a rumor, coloring the truth."[58]

### V.   TCU's famous apathy and indifference makes racism in the hearts of a few a very real threat.

36.     By the eighties, TCU proved that it could take bigotry and hate to international and unimaginable heights.   In an address to student leaders in 1980, TCU's Chancellor admitted that "the full privileges of the campus" did not "appear to be available" to African-American students; specifically noting that "it seems hardly accidental for no blacks to be pledged in Greek organizations in 25 years."[59]   TCU student leaders responded that they "discriminate every time rush rolls around," and that as a  "private social organization [they] have that right," one even stated that "[i]t's always been separate but equal. Why should it change?"[60]   A TCU lawyer disagreed and even called on TCU to fulfill its obligations to investigate racism on campus.[61]

---

[56] Cindy Cook, Editorial, *Black—White: Do Both Have Problems?*, DAILY SKIFF (Fort Worth), Feb. 4, 1977, at 4.
[57] *Id.*
[58] *Id.*
[59] Opinion, *Chancellor Discusses Discrimination at TCU*, TCU DAILY SKIFF (Fort Worth), Sept. 3, 1980, at 2.
[60] Chris Kelley, Editorial, *Greek Problems Sprouted Early but Branched Now*, TCU DAILY SKIFF (Fort Worth), Sept. 4, 1980, at 1.
[61] *Id.*

37.     In the very same publication, a student reported that he had been running on the athletic field around the track preparing for a track meet when someone yelled to him, "nigger!" The student's recitation of the facts and the *Skiff's* reporting of the student response provides insight into just how persistent TCU's legacy of bigotry was and continues to this day:

> There was an uncomfortable silence as one of them related an experience to the others. He said he had been running on the athletic field around the track preparing for a track meet. He chuckled lightly as he remembered. "I was practicing for track and I had never in my life been called a nigger... I was here for two weeks and someone yells at me 'Hey, nigger!'" His listeners giggled, **some with hinted recognition**, others with discomforting embarrassment. "I didn't know if I should go home. I wondered if the Ku Klux Klan was going to get me or what. In mv upper educational life I have had to face more racism than ever in my life. I was president of a predominantly white Jewish high school class with a black principal." The room was quiet again. They realized what the popular track player was implying. They remembered the reasons they had come together to meet. "**I never experienced racism before I came here...**" [62]

Neither had Jane Does Nos. 1, 2, 3, 4 and 5 nor undoubtedly countless other racial minorities and women at TCU.

38.     The point conveyed here—since its founding TCU has been a breeding ground for a particular sort of hate; one that has served as an introductory to the harshest racial sentiments; one that was present in 1873, again in 1980 and again today as evidenced by the experience and treatment of Jane Does Nos. 1, 2, 3, 4 and 5 in this case.

39.     That same year, history seemed to repeat itself as it has been proven to do at TCU. In September of 1980, five foreign athletes quit TCU's soccer team citing disparate treatment after the long-time TCU soccer coach held "a secret practice []—just for the American players."[63]

---

[62] Virginia Vanderlinde, Editorial, *Book Learning Does Not Always Rule Out Bigotry*, TCU DAILY SKIFF (Fort Worth), Sept. 3, 1980, at 4 (emphasis added).
[63] Editorial, *5 Soccer Players Quit*, TCU DAILY SKIFF (Fort Worth), Sept. 19, 1980, at 4.

40.     The culture of isolation and white supremacy that TCU carried with it through the sixties was sustained through the eighties and continues to prevail today.  For instance, in 1984, "a white athlete broke a national track record and the [track] team got the key to the city.  A year later when the [track] team members were all black, they broke a world record and a national record and went undefeated in every track meet in which they participated, they got a plastic trophy from TCU."[64]  A member of the all African-American team recalled, "They brought us to the athletic banquet just to humiliate us."[65] "I'll never forget how hurt I was," he said.[66]

41.     And in 1988, racial minorities at TCU reported that "[w]hen you sit down next to white students, they move with a quickness as if you bite."[67]  Another student of color reported that "his history professor asked him on the first day of class if he was going to do enough in his class to get a C." "That said to me that he didn't think I could do much better than a C," the student said.[68]  By this time, international students also revealed that they were isolated at TCU. Indeed, Mahilet Bekele, the International Student Association President reported that TCU makes one "more aware that you are being judged by what you look like and not who you are, and it's a challenge not to be affected by it, because if you let it, it can drown you."[69]  Bekele likely could not have imagined the prediction she was making at the time.

42.     Also,  in 1988, Elena Hicks, president of TCU's Black Student Caucus, reported that "racism at TCU is more subtle than some of the overt racism of the past," but that "[i]f you are the least bit sharp you **know** what the hell is going…[i]t won't get by you."[70] That year racial minorities also reported that "the hostility they feel from the environment and the lack of role

---

[64] Yvonne Webb, Editorial, *Multicultural Illusions Prevail*, TCU DAILY SKIFF (Fort Worth), Apr. 19, 1988, at 1.
[65] *Id.*
[66] *Id.*
[67] *Id.*
[68] *Id.*
[69] *Id.*
[70] *Id.*

models causes them to question their own self-worth" and question "how can [one] do as well (in this environment) when [they] have to deal with academic pressure, social pressures and racism?"[71]  This student's question remains unanswered today.  Another student summed up the sentiments of racial minorities and women and their treatment at TCU at the time by plainly stating, "**TCU could very well be compared to a toilet. Toilets are dirty by design, and so is TCU**."[72]

43.     That same year TCU's Minority Affairs Director admitted that "the psychological barriers facing minority students are as limiting and more painful" than physical barriers.[73]  Despite this admission, TCU's Minority Affairs Director dismissed racial minority students' sincere complaints of campus hostility towards them as "more perceived than real."[74]  This could not have been more untrue.  TCU's response also verified that, as the *Skiff* reported, when students report incidents of race related violence or harassment, "[o]ne of the first responses from administrators and police is to deny the problem exists"—a culture and practice which persist today.[75]  Regina Anderson, an African-American student, highlighted the pervasiveness of such practices in stating, "[she] could handle the racism if the school would just acknowledge that its here."  "**They need to say 'yes, we are bigots,' and deal with it**,"[76] Anderson said.  Anderson was correct in 1988 and remains correct today.

44.     TCU's racist culture and the horrors associated with it in the eighties are not exclusive to its student population.  In 1987 renowned civil rights activist and minister, Reverend Jesse Truvillion, an African-American faculty member at TCU received a letter on TCU's campus that included:

---

[71] Yvonne Webb, Editorial, *Minorities Encounter Bias Racism*, TCU DAILY SKIFF (Fort Worth), Apr. 22, 1988, at 1.
[72] Kristie Aylett, Editorial, *Students Rally to End Racism*, TCU DAILY SKIFF (Fort Worth), Apr. 19, 1988, at 1.
[73] Webb, *supra*.
[74] *Id*.
[75] *Id*.
[76] *Id*.

such things as a pseudo-prescription from Dr. Josef Mengele, the infamous Nazi who performed grotesque medical experiments on "racially inferior" prisoners in World War II. It also include[d] a mock boat ticket for a one-way trip to Africa.  It isn't just blacks who are meant to go on this trip "on a leaky boat shaped like a Cadillac and filled with bananas." Also invited are federal judges, communists, homosexuals…about the only type of person who would not fit into one of its many categories is an uneducated white male from the South or a submissive woman who knows her place…The message presented here is Southern white male supremacy as a way of life imposed upon all people. [77]

This remains TCU's message today.

45.     Though TCU is not a university noted for its concern for minorities—"**TCU's famous apathy makes racism in the hearts of a few a very real threat.**"[78]   This threat materialized against Truvillion in 1988 when he was approached by two white males yelling obscenities at him and yelling, "you're a dead cat, buddy."[79]  At the time, Truvillion was on campus hosting African visitors with whom he was protesting TCU's refusal to divest from racist South African businesses supporting apartheid.[80]  Later, that day, Truvillion found a black cat with its throat slit dying on top of his vehicle.[81]  According to Truvillion, "[w]hen you deliver a black cat to someone, it has a very specific meaning," "[i]f you deliver it alive, it means you are not considered human. If it's delivered dead, it means they intend to kill you."[82]   In the end, no eyewitness came forward and TCU failed to identify the individuals responsible, much less hold anyone accountable for the heinous act.[83]  Truvillion poignantly stated, that in an environment

---

[77] Michael Hayworth, Opinion, *Ignoring Racism and Bigotry Only Helps the Disease Grow*, TCU DAILY SKIFF (Fort Worth), Apr. 22, 1987, at 2.
[78] *Id.*
[79] Yvonne Webb & Kristie Aylett, Editorial, *Activity No Game to Some*, TCU DAILY SKIFF (Fort Worth), Apr. 7, 1988, at 1.
[80] *Id.*
[81] *Id.*
[82] *Id.*
[83] *Id.*

such as TCU's you "just don't get throats of cats slashed, but you get the throats of people's humanity slashed"[84]  Truvillion's sentiments still ring true today.

46.     TCU's racial minorities and women staff were also not exempt from TCU's harassing culture. In 1988 a knife and death threat card, among other bizarre items were left for Lovie Bradley, a housekeeper at TCU.  When asked who she thought left the items for her to find on her utility cart in a locked room, Bradley responded that she "think[s] it's people who…have a deep hate for [her] race."[85]  Bradley is African American.  TCU never identified the culprit.[86]

**VI.     Racism is a quiet but consistent part of life at TCU.**

47.     TCU's sordid legacy continued to materialize through the nineties as it still does today.  In 1992, Michelle Smith, an African American student at TCU reported on the complete insouciance with which members of TCU's community dished out racial epithets, without reprimand:

> **This conversation may be heard frequently**; I heard it at one of my organizational meetings:
> "Gosh, did you lay out today?" one girl asked emphatically.
> "A little. Am I that tan?" she asked the other.
> "Yeah, you are dark, you nigger!"
> The girls then laughed, and I was standing right there. The girls were so preoccupied with themselves and their fake blackness that they failed to realize that someone with the attribute they were seeking was standing just behind them. Nigger, I thought. Hmmph! I chuckled.[87]

Smith was writing for herself as well as her "other African American sisters" who "**hear these less-than-informed comments on a daily basis**" at TCU.[88]  Smith correctly noted that such attitudes were "a very PUBLIC concern" in 1992 as they remain today.[89]

---

[84] Suzanne Lorton, Editorial, *Students Speak Against Racism*, TCU DAILY SKIFF (Fort Worth), Apr. 20, 1988, at 1.
[85] Leanora Minai, Editorial, *Occult Objects Found*, TCU DAILY SKIFF (Fort Worth), Apr. 22, 1988, at 1.
[86] *Id.*
[87] Michelle Smith, Opinion, *Historical Ethnic Notions Must Change*, TCU DAILY SKIFF (Fort Worth), Apr. 28, 1992, at 3 (emphasis added).
[88] Michelle Smith, Letter to the Editor, *Racism*, TCU DAILY SKIFF (Fort Worth), May 1, 1992, at 3.
[89] *Id.*

48.     In 1994, "someone scrawled the words 'Nigger #1' and 'Nigger #2' in paint on two doors in a fraternity house on TCU's campus."[90]  When the fraternity president was questioned about it he stated puzzlingly that "he didn't think the words were meant in a racist context…," that the "word nigger can be used in a casual way" and that he "really didn't care" who did it.[91]

49.     In 1997, history yet again repeated itself.  That year the *Skiff* revived TCU's legacy of racist cartoon imagery when it mocked racial minorities and their complaints about racism:[92]



*Figure 3. "Six Degrees of Racism Accusation" as featured in TCU DAILY SKIFF*

50.     Stacey Henderson, said the following of the cartoon, "as an African-American student, the sight of this cartoon shocked and troubled me. That there could be anyone who does not understand the reason why African Americans and other groups continue to protest is a dangerous situation."[93]

51.     Later that year the *Skiff* reported the obvious: that "**[r]acism is a quiet but consistent part of life at TCU**" that "manifests itself in many ways: an off-hand remark, a

[90] Editorial, *INTOLERANCE Racist Attitudes Have No Place at TCU*, TCU DAILY SKIFF (Fort Worth), Oct. 4, 1994, at 5.
[91] *Id*.
[92] Stacy L. Henderson, Letter to the Editor, *Racial Cartoon Misleading*, TCU DAILY SKIFF (Fort Worth), Feb. 14, 1997, at 3.
[93] *Id*.

quickened pace, a misguided assumption;" and "often leaves portions of the campus scarred and divided."[94]  Within the report, several racial minorities and women at TCU shared their many experiences with extreme racism, racial profiling and bigotry.[95]  Illogically and laughably even, TCU responded that the racially bigoted attitudes conveyed by the students "had been brought in from the outside" to TCU.[96]  The reality, however, is that bigotry and racism are common fixtures at TCU.  That same year, Pete Radovich, a white student, spoke out against the bigotry and racism he had seen "[t]hroughout [his] time as a TCU student" in the form of casual racist attitudes on campus and "members of the community proudly sporting Confederate flags in their rooms and on their vehicles." [97]  In response to condemning the very Confederate Flag bore by TCU's founders, the Clark Brothers, Radovich received five death threats, was called a "mother f—ing nigger lover!" and warned that if he spoke out again, he'd be killed.[98]

### VII.  Even TCU's Chancellor, Victor Boschini disapproves of TCU's race relations and diversity.

52.     As TCU entered the twenty-first century, its brand of racism and bigotry towards racial minorities and women evolved.  In 2000, "several white TCU students celebrated their fourth annual Martin Luther King Jr. birthday party. The group dressed in baggy jeans, wore T-shirts with the words 'talk to the hand' on them, and were adorned in shower caps with condoms tucked underneath. They proceeded to watch the film "*Menace II Society*" and ate fried chicken and watermelon."[99]  When another group of white TCU students were asked how they were going to

---

[94] Blake Sims, Editorial, *Black & White: A Look at TCU Race Relations*, TCU DAILY SKIFF (Fort Worth), Feb. 25, 1997, at 9.
[95] *Id*.
[96] *Id*.
[97] *Id*.
[98] *Id*.
[99] Rusty Simmons, Editorial, *Acts of Racism, Ignorance Not Far from University*, TCU DAILY SKIFF (Fort Worth), Feb. 25, 2000, at 1.

celebrate Black History Month they replied: "I'm going to KFC;" "[w]ell, I play football with a black guy;" and "I have relatives in Jasper."[100]

53. In 2002, a group of African-American students were standing outside fixing a disabled car when a group of white students began pummeling the students with water balloons and yelling "niggers!" at them from a nearby building. Bizarrely, despite the white students yelling "niggers," a clear racial epithet, TCU's Associate Dean of Campus Life said that "he ha[d] no basis to judge whether or not the incident was racially motivated."[101]

54. **Even TCU's Chancellor, Victor Boschini disapproves of TCU's race relations and diversity**. When asked directly about racial relations and diversity at TCU in a 2004 *Skiff* article titled, *Integration Now*, Chancellor Victor Boschini said "TCU has a long way to go, but that the commitment is there" and that he "would give [TCU] an 'A' for efforts and intentions and a 'C plus' for actual reality on campus."[102] A decade later, under Chancellor Boschini's leadership, that 'C plus reality' would deteriorate to a solid 'F.'

### VIII. TCU is an institution with layers of back and front of stage racism and sexism from students, faculty and administration.

55. Beginning in 2010, the advent of the social media era gave members of TCU's community and particularly racial minorities and women a new and public platform from which to expose and address the persistence of TCU's legacy of hatred and bigotry. In 2014, some TCU students began posting offensive comments about African Americans on the social media app, Yik Yak.[103] "End black entitlement. End black privilege," and "Blacks were unable to get proper educations…but, that's more a result of their busted families and lack of morals…" and "watch

---

[100] *Id.*
[101] Skiff Staff, Editorial, *Prank Under Investigation*, TCU DAILY SKIFF (Fort Worth), Feb. 22, 2002, at 1.
[102] Nyshicka Jordan & Kelly Morris, *Color Contrast*, IMAGE, March 2004, at 13.
[103] Robbie Owens, *TCU Hosts Campus Rally Against Racism*, CBS LOCAL (Apr. 30, 2015, 5:15 PM), https://dfw.cbslocal.com/2015/04/30/tcu-hosts-campus-rally-against-racism/.

the blacks," were among some of the comments made on Yik Yak.[104]  The incident once again drew national attention to the racist and bigoted culture that prevails at TCU.  A TCU spokesperson called the comments a "reality check that the university is not where it needs to be as a community."[105]  In truth, TCU has never been "where it needs to be" with respect to its treatment of racial minorities and women. In another Yik Yak incident that same year, students at a predominately African-American fraternity pool party were called monkeys.[106]

56.     The oppressive and isolating experience of racial minorities and women became so pervasive in 2016 that the hashtag #beingaminorityatTCU went viral on popular social media platform, Twitter.[107]  Racial minorities and women shared their experiences on campus stating that "#BeingAMinorityAtTCU [is] [v]aluing the education that you receive but not feeling valued on campus" and "#BeingaMinorityatTCU is being labelled "negative" and "ungrateful" because you care about issues concerning race/White privilege/oppression" and "#BeingaminorityatTCU [is] having to make a hash tag to let our feelings out because we don't feel safe enough to do so on campus," to name a few.[108]  The #BeingaminorityatTCU hashtag and movement it inspired resulted in the "Black Students and Allies of TCU" delivering a list of demands to TCU and the media, together, with a letter calling on administrators to make the campus more inclusive.[109]  As the letter poignantly noted for the racial minorities and women on campus, "[f]eeling a sense of

---

[104] *Id*.; Gilma Avalos, *TCU Looks to Change Tone After Racist Comments*, CBS LOCAL (Apr. 30, 2015, 10:07 PM), https://dfw.cbslocal.com/2015/04/30/tcu-looks-to-change-tone-after-racist-comments/.
[105] Gilma Avalos, *TCU Responds to Racist Student Comments on Social Media*, CBS LOCAL (Apr. 29, 2015, 9:53 PM), https://dfw.cbslocal.com/2015/04/29/tcu-responds-to-racist-student-comments-on-social-media.
[106] Garrett Podell, *Boschini Addresses Racial 'Ignorance' at TCU*, TCU 360 (Feb. 1, 2018), https://www.tcu360.com/2018/02/boschini-addresses-racial-ignorance-at-tcu/.
[107] *#Beingaminorityattcu*, TWITTER, https://twitter.com/hashtag/BeingAMinorityAtTCU?src=hashtag_click (last visited Dec. 5, 2019).
[108] *Id*.
[109] Ryan Osborne, *TCU Plans to Add Diversity Official After Students Send Demand Letter*, FORT WORTH STAR-TELEGRAM (Oct. 19, 2016, 9:17 AM), https://www.star-telegram.com/news/local/fort-worth/article109136667.html.

alienation along with trying to maintain a high grade point average and remain involved on campus creates unnecessary burdens that can hurt students in the long run."[110]

57.    After several weeks of negotiations, TCU responded by (1) creating a "Cabinet Level" position: Chief Inclusion Officer; (2) launching and publishing the creation of a  Diversity, Equity & Inclusion ("DEI") committee and accompanying campaign, including an award and fellowship; and (3) resurrected a move from its 1971 playbook, by approving a new major to pacify its racial minority students: Comparative Race & Ethnic Studies ("CRES").[111]  Through these late-to the party initiatives, TCU represented that it was "a welcoming community that embraces diversity in all of its forms" and that it had "put in place measures to create a more balanced learning community."[112]  This was a material misrepresentation at an institution of higher learning specifically intended to entice racial minorities and women, like Jane Does Nos. 1 and 5, to apply for admission to and enroll at TCU.[113]  Jane Does Nos. 1 and 5 in this lawsuit relied on such representations to her detriment as did undoubtedly countless other racial minorities and women when they applied for admission to and/or enrolled at TCU.  In light of its legacy as extensively detailed herein, however, TCU knew or should have known that such representations were untrue.  Though convincing to gullible racial minorities, these ceremonious gestures proved empty, and even CRES—the very degree program approved in response to student outcry over racism and bigotry—is riddled with complaints of bias and disparate treatment.  In fact, TCU's Chief Inclusion Officer and Title IX coordinator, Dr. Darron Turner, has received multiple emotional complaints from both current and former faculty and students regarding pervasive discrimination and

---

[110] *Id.*
[111] *Id.*
[112] Victor Boschini, Jr., *Letter from the Chancellor*, TCU, https://inclusion.tcu.edu/about/letter-from-the-chancellor/ (last visited Dec. 6, 2019); *Resources*, TCU, https://inclusion.tcu.edu/resources/ (last visited Dec. 6, 2019).
[113] *Id.*

harassment of racial minorities and women designed to completely undermine their success in CRES and at TCU.  Specifically, on or about January 15, 2020, two professors and one student informed Jane Doe No. 1 that they filed complaints regarding the discrimination and harassment of racial minorities and women faced at the hands of TCU with Dr. Turner and/or TCU's Title IX office, which have gone unanswered for more than a year.  TCU's deliberate indifference has caused and continues to cause real psychological pain and physiological harm to TCU's racial minorities and women, including Jane Doe Nos. 1, 2, 3, 4 and 5.  Indeed, TCU's Chief Inclusion Officer and Title IX coordinator, Dr. Turner was recently made aware that hateful classroom and campus treatment of racial minorities and/or women at TCU was so severe and pervasive it caused the development of type 1 diabetes in Jane Doe No. 3.  **Rather than offer Jane Doe No. 3 guidance, Dr. Turner discouraged her from finalizing her Title IX complaint**.  **Dr. Turner even had the effrontery to instruct Jane Doe No. 4 that she must waive and forfeit all of her numerous and ignored Title IX complaints in order to accept an employment position at TCU.**  Jane Does Nos. 1, 2, 3, 4 and 5 in this lawsuit have suffered psychological as well as physiological harm as a result of TCU's hateful treatment of racial minorities and women, including Dr. Turner's deliberate indifference and/or discouragement of their valid claims.

58.    As if TCU's insincerity in publishing the aforementioned DEI campaign and approving the CRES major was not clear enough, merely one year after starting the CRES program TCU announced that it was moving CRES out of the established AddRan (presumably named for Confederate Officers, and founders Addison and Randolph Clark) College of Liberal Arts to an "interdisciplinary unit." Included in this "interdisciplinary unit" are programs such as Women and Gender Studies, Ranch Management, as well as FrogFolio and the Idea Factory, all programs

which, upon information and belief, rank low in priority at TCU.[114]  This smacks of TCU's 1971

play in creating a Black Studies minor—a promise which evaporated.  One  African American and

CRES major puts it best, "[f]or them to go move us, from AddRan, which is an established,

credible college within TCU, **to move [CRES] into this new interdisciplinary unit, whatever

that is, is like a slap in the face**."[115]  TCU cannot seriously contend that it had any true intentions

of following through with the representations it made in response to student protests, which it used

to advertise and market to racial minorities and women, including Jane Doe Nos. 1, 2, 3, 4 and 5.

> **IX.    TCU's historical and present deliberate indifference to the discriminatory
> treatment of racial minorities and women and its discriminatory practices in
> handling reports of the same constitute a policy of intentional discrimination
> that deprives racial minorities and women of the educational opportunities
> and benefits of TCU and substantially increases the risk of racial minorities
> and women being subjected to discriminatory treatment.**

59.    Predictably, nothing has changed at TCU.  Racism, hate, and bigotry remain

fixtures of TCU and pervade every orifice of its existence.  Indeed, recently TCU held "student

listening sessions" in response to the filing of this lawsuit.  Several hundred students attended one

such session on January 28, 2020, where "students of color and marginalized groups spoke about

the hostility and hatred they experience on campus."[116] "Many of the students who spoke…painted

a bleak picture of life at TCU."[117]  One student, an African-American woman, recounted that—

just like racial minorities of TCU's past—"she had never been called the N-word until arriving at

TCU; others spoke of having their presence in the classroom questioned by faculty,"[118] among

---

[114] Elizabeth Campbell, *CRES Negotiates Move to Interdisciplinary Unit Amid Student Resistance*, TCU 360 (May
2, 2018), https://www.tcu360.com/2018/05/cres-negotiates-move-to-interdisciplinary-unit-amid-student-resistance/.
[115] *Id*.
[116] Alexandra Lang, *Listening Sessions Follow Filing of Lawsuit*, TCU 360 (Jan. 29, 2020),
https://www.tcu360.com/2020/01/listening-sessions-follow-filing-of-lawsuit/.
[117] *Id.*
[118] *Id.*

other discriminatory incidents. "Some suggested the session itself was traumatizing, as students were being asked to share painful experiences."[119]

60.     In response, Provost Dahlberg admitted that "it is clear [TCU] ha[s] work to do."[120] Chancellor Boschini responded by sending a letter to the TCU Community on January 31, 2020 admitting that "there is a clear gap between [TCU's] intentions, [TCU's] actions and what underrepresented and underserved members of [TCU'] community experience."[121]   But the historical record is clear that TCU's historical and present deliberate indifference to the discriminatory treatment of racial minorities and women and its discriminatory practices in handling reports of the same constitute a policy of intentional discrimination that deprives racial minorities and women of the educational opportunities and benefits of TCU and substantially increases the risk of racial minorities and women being subjected to discriminatory treatment.

61.     Unsatisfied with Chancellor Boschini's response a "student-led initiative advocating for the needs of historically marginalized students" named Coalition for University Justice and Equity ("CUJE") was formed at TCU to call for change and "tell stories of racism and discrimination on campus to 'expose the truth behind the billboards.'"[122]

62.     On February 4, 2020, CUJE published a letter to Chancellor Boschini, Provost Dahlberg and TCU demanding among other things, (1) "the immediate termination of Dr. [] Snow"; (2) "the immediate demotion and replacement of Dr. Darron Turner"; (3) "the immediate investigation and removal of Drs.  [] Mack, [] Garnett, and [] Gooding"; and (4) "that a multicultural center be built and named after Fred Rouse an African American, "**to commemorate**

---

[119] *Id.*

[120] *Id.*

[121] Robbie Vaglio, *Honors Student Says Washington D.C. Trip Was Miserable; Chancellor Calls for Faculty Training*, TCU 360 (Feb. 3, 2020), https://www.tcu360.com/2020/02/honors-student-says-washington-d-c-trip-was-miserable-chancellor-calls-for-faculty-training/.

[122] Drew Mitchell, *Student Coalition Works to Implement Change at TCU*, TCU 360 (Feb. 10, 2020), https://www.tcu360.com/2020/02/student-coalition-works-to-implement-change-at-tcu/.

his life and publicly acknowledge the violent lynching in which **TCU faculty and students partook and supported in 1921**"[123] and demanding a public response from TCU by February 12, 2020. CUJE simultaneously launched a Change.org petition, which has now garnered signatures from over 700 supporters, many of whom shared their own experiences of discriminatory treatment at the hands of TCU on a popular social change platform.[124] CUJE also sparked a Twitter campaign that went viral as several hundreds of students shared their encounters with bigotry and discrimination at the hands of TCU "to counter and challenge the false narratives around student experiences portrayed by TCU's marketing" using the hashtag #TellOnTcu[125] and protests on campus. To date, TCU has not publicly responded to CUJE or its demands.

63.    On February 12, 2020 several TCU faculty also issued a letter to TCU recognizing that "**the unaddressed transgressions of TCU's past have led to this painful present**"[126] and affirming "**that students of color and students of other marginalized backgrounds HAVE and ARE being underserved and undervalued at TCU**"[127] and assuring students that "**[i]t is not just in [their] head.**" Importantly, the faculty members also admitted that they, "**too, are devastated by [racial minorities and women's] isolation, lack of social and literal physical space, and the infuriating stories [racial minorities and women] have shared with [faculty] during [] office hours and in passing about what [racial minorities and women] experience in the dorms, in class, and while trying to obtain services on campus.**"[128] The faculty admitted that they were

---

[123] *Demands.*, CENTER FOR UNIVERSITY JUSTICE AND EQUITY, https://cujenow.weebly.com/demands.html (last visited Apr. 11, 2020); *see also* Mitchell, *supra*.
[124] *Reasons for Signing - to Hold TCU Accountable to Its Commitment Diversity, Equity, & Inclusion*, CHANGE.ORG, https://www.change.org/p/texas-christian-university-administrators-and-board-of-trustees-to-hold-the-university-accountable-to-its-commitment-to-diversity-equity-inclusion/c (last visited Apr. 11, 2020).
[125] TWITTER (Feb. 6, 2020, 9:00 PM), https://twitter.com/cujenow/status/1225615199748739072.
[126] Call to Action: Stand with TCU Students, Faculty, and Staff of Color, GOOGLE DOCS, https://docs.google.com/forms/d/e/1FAIpQLSd6tiSAmjE0oMT0v6Ly3KAA4Szhyp4SbQhOGXSFGf0HmWPxjw/viewform (last visited Apr. 11, 2020).
[127] *Id.*
[128] *Id.*

"in awe of [racial minorities and women's] resilience that [they] wish [racial minorities and women] did not have to have in the face of routine micro- and macroaggressions on campus; reinforced white supremacist frameworks that [racial minorities and women] experience daily at the hands of [TCU] professors and peers."[129]  Over 100 TCU faculty and 100 TCU students signed the letter, which enclosed its own demands aimed at providing equity to racial minority and women faculty.[130]  To date, TCU has not publicly responded to the aforementioned faculty letter or its demands.

> ### X.   In every decade since its founding, there has been clear evidence of the pervasiveness of TCU's hatred of racial minorities and women.

64.      In every decade since its founding, there has been clear evidence of the pervasiveness of TCU's hatred of racial minorities and women.  Even TCU star athletes are not exempt from the psychological and physiological manifestations of hate toward racial minorities and women on campus.  Recently, former TCU wide-receiver Kolby Listenbee, an African American, filed suit against TCU for, among other things, the harassment and humiliation he faced after an on-the-field injury.[131]  Listenbee was publicly ridiculed and humiliated by TCU athletic staff who made him switch seats and sit in the back of the plane rather than with his fellow starting seniors in first-class and was told that he would not only be dismissed from the TCU football team, but also from TCU itself if TCU were to lose a football game during his injuries.[132]  TCU even suggested he may be lying or "faking it."[133]  We now know (as we have always known) that Listenbee, like other racial minorities and women at TCU, are not lying or faking it.  The hatred

---

[129] *Id.*

[130] *Id.*

[131] Micheal McCann, *Breaking Down Kolby Listenbee's Lawsuit Against TCU, Gary Patterson and the Big 12*, SPORTS ILLUSTRATED (Feb. 1, 2018), https://www.si.com/college/2018/02/02/kolby-listenbee-lawsuit-tcu-gary-patterson-legal-analysis.

[132] *Id*.

[133] *Id*.

racial minorities and women endure and the harm that results are very real as emphasized by Jane

Does Nos. 1, 2, 3, 4 and 5's experience made the basis of this lawsuit.

## XI.    TCU's legacy of hatred assails the humanity of racial minorities and women, like Jane Does Nos. 1, 2, 3, 4 and 5.

65.     Jane Doe No. 1 is a twenty-year-old African-American young woman and award-winning honors student at TCU.  As the daughter of two veteran United States military officers, hard work, perseverance, truth and justice are a part of Jane Doe No. 1's DNA.

66.     Before attending TCU, Jane Doe No. 1 excelled academically while being a star high school and collegiate athlete.  While still in high school Jane Doe No. 1 pursued a rigorous academic program, which included completing college level courses and earning dual credits at her local community college while participating actively in social organizations and athletics. Upon graduation from high school Jane Doe No. 1 was offered and accepted a scholarship to a university several hundred miles from home.  By all accounts, prior to her experiences at TCU, Jane Doe No. 1 was a confident, warm, inviting, and spirited young woman who took great pride in herself, her work and her academic abilities and had no preexisting psychological malady.

67.     At her initial university Jane Doe No. 1 excelled academically and athletically.  As she became more immersed in her academic courses, Jane Doe No. 1 decided she no longer wanted to remain a college athlete.  Instead, she desired an academic experience that would offer an intellectual challenge within a balanced and welcoming community. In the Fall of 2017 Jane Doe No. 1 began searching for a competitive university to which she could transfer to prepare her for a rigorous graduate study program—a goal complicated by acts and omissions of TCU.

68.     Jane Doe No. 1's search led her to TCU.  Jane Doe No. 1's research included her review of TCU's website and marketing materials, specifically, the representations made via TCU's website about its elaborate DEI initiatives and accompanying incentives. Jane Doe No. 1

applied to TCU believing it offered an egalitarian experience for all students.  Through its DEI program, TCU promoted itself as an institution committed to fostering a campus culture that fully supports cultural exchange and diversity.[134]  **The DEI strategic plan itself touts that its objective is to attract, teach, reach, and embrace "under-represented students, especially students of color," like Jane Doe No. 1.**[135]  TCU's effective marketing, including its DEI initiative did attract Jane Doe No. 1 and undoubtedly countless other racial minorities and women. As Jane Doe No. 1 would learn soon after her enrollment, however, TCU's promises were gross misrepresentations. Indeed, Jane Doe No. 1 has experienced none of the core values TCU publicly expressed.  Instead, Jane Doe No. 1's collegiate experience has been engulfed by TCU's legacy of bigotry and hatred and marred by a series of hateful and discriminatory acts perpetrated by TCU for over a century and designed to relegate Jane Doe No. 1 and other racial minorities and women to the status of second-class citizen.

## XII.   TCU continues to endorse relegating racial minorities and women to the status of second-class citizen in its housing practices.

69.    Jane Doe No. 1's first experience when she arrived on campus on January 15, 2018, was that her original roommate—a young white woman—had taken all available closet, desk and common space in the room to herself and relegated Jane Doe No. 1 and all of her belongings solely to a bed in the corner. Jane Doe No. 1 asked her new roommate to remove her belongings from Jane Doe No. 1's closet and make space in shared portions of the room, but her roommate refused. When Jane Doe No. 1 complained to TCU that her white roommate had commandeered the entire room, including the closet, desk and lounge space intended for a second roommate; leaving Jane Doe No. 1 with only a place to lay her head, TCU responded, "what's wrong with that" and

---

[134] *Strategic Plan*, TCU, https://inclusion.tcu.edu/about/strategic-plan/ (last visited Dec. 16, 2019).
[135] *Id*. (emphasis added).

questioned if Jane Doe No. 1 really "had that much stuff." Jane Doe No. 1 was shocked by this response and demanded that she be moved to a room where she would not be bullied into sharing the bed with her belongings. TCU begrudgingly complied. True to form, despite having a student population of approximately over 70 percent whites, Jane Doe No. 1 was moved to a room with another racial minority. Ironically, this incident occurred exactly three years before the original filing date of this lawsuit and on Martin Luther King Jr.'s birthday.

### XIII.   Racial minorities and women, like Jane Doe No. 1, are admitted but not equal at TCU.

70.   Before transferring to TCU Jane Doe No. 1 had maintained a **4.0 GPA** and met other transfer student requirements. Accordingly, she was eligible for a merit-based transfer scholarship, which TCU notified Jane Doe No. 1 that she had been awarded in January of 2018. Though already enticed to enroll at TCU by the numerous misrepresentations made about its legacy, present campus culture and environment, the award of the transfer scholarship cemented Jane Doe No. 1's belief that TCU was the place to pursue her academic and professional goals. Because TCU's tuition and living costs are exorbitant—yet another barrier for racial minorities and women— the merit-based transfer scholarship would cover a substantial amount of the fees and costs associated with attending TCU and increased Jane Doe No. 1's excitement about her pending transfer.

71.   Unfortunately, Jane Doe No. 1's excitement would be short-lived. After Jane Doe No. 1 began her classes, TCU, without explanation, revoked Jane Doe No. 1's merit-based transfer scholarship. TCU's stated excuse was that at the time of application, Jane Doe No. 1 failed to meet the merit-based requirements. By way of explanation TCU furnished, via email, the revised requirements to Jane Doe No. 1 that differed from the requirements published on TCU's

website.[136]  Nonetheless, Jane Doe No. 1 clearly exceeded the requirements for consideration for a merit-based transfer scholarship both at the time of her application (as evidenced by her initial award) and at the time of the revocation of her scholarship award.  To date, Jane Doe No. 1 has received no clear answer as to why the merit-based transfer scholarship awarded to her was revoked.

72.      When her scholarship was revoked Jane Doe No. 1 was already attending classes at TCU.  Faced with the burden of paying for TCU without assistance, Jane Doe No. 1 was forced to apply her parents' G.I. Bill benefits (the military educational benefits her parents earned for their honorable service as United States military officers) to pay her TCU expenses.  **Jane Doe No. 1 intended to utilize the G.I. Bill for her graduate studies but because TCU reneged on its merit-based transfer scholarship, Jane Doe No. 1 will no longer be able to apply this benefit to pursue her planned professional education.**  This was just the beginning of the many hateful experiences of TCU's legacy and enduring culture of bigotry and racism that Jane Doe No. 1 would experience.

73.      Despite TCU's apparent lack of concern for, and response to Jane Doe No. 1's initial dorm experience and the revocation of her scholarship, Jane Doe No. 1 remained undeterred. In pursuit of the academic rigor and social environment promised by TCU, Jane Doe No. 1 applied to TCU's John V. Roach Honors College (the "Honors College") during her first semester.  Jane Doe No. 1 was notified that TCU's policy, in relevant part (which is stated on its website) was that transfer students must have a minimum of 12 graded hours at TCU before admission to the Honors College.  Specifically, during a phone call with Renda Williams, the Honors College's academic program specialist, Jane Doe No. 1 was informed that though she had the requisite GPA, she did

---

[136] *Transfer Academic Scholarships*, TCU, https://financialaid.tcu.edu/types-of-aid/scholarships/transfer-academic-scholarships.php (last visited Dec. 16, 2019).

not meet the graded hours requirement and therefore would not be admitted that semester. Accordingly, Jane Doe No. 1 was made to wait an additional semester before admission to the Honors College.  The following semester, having maintained a stellar academic record, Jane Doe No. 1 was admitted to the Honors College.  To Jane Doe No. 1's surprise she learned from classmates and faculty that the Honor's College had admitted, and continues to admit, white transfer students who failed to meet the minimum 12 graded hours at TCU requirement.  According to Jane Doe No. 1's Honors College professor, TCU's Honors College's actual transfer student admissions practices during the time of Jane Doe No. 1's enrollment at TCU violates its published policy and imposes unnecessary barriers on racial minorities and women (more specifically, African Americans) designed to prevent or limit their enrollment.

74.     For Jane Doe No. 1 it began to sink in that at TCU "you are judged by what you look like and not who you are."   Nevertheless, Jane Doe No. 1 searched for and seized opportunities to be more involved in mainstream college life at TCU.

### XIV.     When racial minorities and women decide to become an integral part of TCU, racism rears its head.

75.     In the Spring of 2018, Jane Doe No. 1 tried-out for and was selected to join TCU's Moot Court team.  Jane Doe No. 1 was excited at the opportunity to represent TCU in inter-collegiate competitions through the Texas Undergraduate Moot Court Association.  As a high school and collegiate athlete, Jane Doe No. 1 is experienced in working and training in diverse team settings and knows that equitable coaching and mentorship are required to ensure that each team member is competitive.  Based upon her prior experiences outside of TCU, Jane Doe No. 1 believed that she would receive equal training, development and access to Moot Court coaching faculty and staff.  Jane Doe No. 1, like many other racial minorities and women, had never experienced the brand of bigotry that permeates TCU before her arrival on campus and could not

have imagined the disparate treatment she would be subjected to on TCU's Moot Court team.  As her reward for attempting to represent TCU as an oral advocate, TCU's Moot Court coach Dr. Samuel Arnold paired Jane Doe No. 1 with the only other racial minority and segregated the two young women from the rest of the team.  Jane Doe No. 1 and her teammate were never given the same attention as their white counterparts and were regularly excluded from and denied the full benefits of training by their Moot Court coach, Dr. Arnold.  In fact, Dr. Arnold regularly provided active, detailed and individualized coaching to the white members of the Moot Court team while ignoring Jane Doe No. 1 and her teammate altogether.  When Jane Doe No. 1 and her teammate made several requests to meet with Dr. Arnold to review their arguments, he refused but regularly honored the requests of TCU's white Moot Court team members.  At competitions, Dr. Arnold would attend the oral arguments of TCU's white Moot Court team members to offer coaching and support and to generally cheer them on.  During Jane Doe No. 1 and her teammate's oral arguments, however, Dr. Arnold would not even bother to show up.  On one occasion, Jane Doe No. 1's mother attended a Moot Court competition to support Jane Doe No. 1 and her teammate and observed the disparate and isolating treatment they were subjected to and total lack of support they received, including Dr. Arnold totally ignoring the two racial minority women.  When Jane Doe No. 1's mother asked Dr. Arnold if he intended to stay for Jane Doe No. 1 and her teammate's argument to support them and help them as he had just done for TCU's white Moot Court team members, Dr. Arnold replied, "No, you are here. You can cheer them on."

76.    For Jane Doe No. 1 this experience with TCU's mainstream "brought it home" just as it did for Ronnie Hurdle in 1969.[137]  As Hurdle stated of racial minority participation in TCU's mainstream culture and as Jane Doe No. 1 had experienced, "when [racial-minorities] decided to

---

[137] Yvonne Webb, Editorial, *Racism Not New at TCU*, TCU DAILY SKIFF (Fort Worth), Apr. 19, 1988, at 1.

become an integral part of the system, that's when it (racism) reared its head."[138]  This would be but one of many times racism reared its head and Jane Doe No. 1 was segregated at TCU and treated disparately from her similarly-situated white colleagues.

**XV.   TCU isolates, discriminates and retaliates against racial minorities and women, like Jane Doe No. 1, in its employment practices.**

77.     Soon after her admission into the Honors College Jane Doe No. 1 was offered and accepted a job in the Honors College as a desk assistant making $7.50 per hour.  This job was not a federal work study position but rather a TCU support staff position.  Much like her other campus experiences, Jane Doe No. 1 was the only African-American student worker in the Honors College office.  As the only African-American employee in the office, Jane Doe No. 1 quickly realized the glaring differences from the treatment she received and the treatment of her white counterparts.

78.     Jane Doe No. 1 was conveniently scheduled to work during Honors College tours and instructed to sit at or near the reception desk so that she would be visible to prospective students' and their families.  Once the tour concluded (even if it concluded while Jane Doe No. 1 still had hours left to work) Jane Doe No. 1 would be dismissed from her job for the day.  Jane Doe No. 1's white counterparts were not scheduled during tours, nor were their hours cut in the same manner as Jane Doe No. 1's.  In fact, even when Jane Doe No. 1's white counterparts arrived early or otherwise during Jane Doe No. 1's scheduled work hours, the Honors College regularly forced Jane Doe No. 1 to end her shift and leave—so long as a tour was not scheduled—resulting in Jane Doe No. 1 receiving shamefully fewer hours than her white counterparts.  Though not her expectations, Jane Doe No. 1 regularly only worked three hours per week while her white counterparts regularly worked 15 hours per week.

---

[138] *Id.*

79.     When Jane Doe No. 1 was not serving as the Honors College showpiece during tours she was regularly scheduled to work after the conclusion of Honors College events.  This meant that when Jane Doe No. 1 arrived, she was expected to clean up after Honors College staff, including in some instances her own fellow student counterparts.  In one incident, after Spring 2019 graduation when Jane Doe No. 1 was not even scheduled to work, the Honors College called Jane Doe No. 1 into work to break down tables and tents and perform other manual labor while Jane Doe No. 1's counterparts were assigned to hand out programs. Again, Jane Doe No. 1 was the only African-American student worker in the Honors College.  Jane Doe No. 1 refused the manual labor.  Such treatment and conduct persisted while Jane Doe No. 1 worked in the Honors College, further continuing a culture that marginalizes and discriminates against racial minorities.

80.     TCU would later utilize its authority over Jane Doe No. 1 as an employee of the Honors College, among other things, to retaliate against Jane Doe No. 1 for filing formal complaints of discrimination and hostile treatment based upon her interactions with TCU faculty and staff during a month-long summer course in Washington, D.C.—the crescendo of multiple hateful encounters Jane Doe No. 1 would experience at the hands of the Honors College. **Specifically, on August 16, 2019, after conducting her first video interview with TCU's Title IX coordinator Jane Doe No. 1 was informed by Renda Williams, the Honors College academic specialist, that Jane Doe No. 1's work hours had been reduced from the already low average three hours per week, to one hour per week.**

81.     The Honors College was not finished.  Jane Doe No. 1 would later learn that while she was being paid $7.50 per hour, her white counterparts were being paid $9.50 per hour.

82.     On Friday August 23, 2019, Jane Doe No. 1 was offered a "raise" of $2.00 per hour for the new academic year by the Honors College. Jane Doe No. 1 shared the good news that she

was now making $9.50 per hour to her counterparts, who revealed to Jane Doe No. 1 that they had been making $9.50 per hour all along, including the prior year when Jane Doe No. 1 was earning $7.50 but supposedly hired to perform identical duties to her white Counterparts.  Again, at the time Jane Doe No. 1 was the only African-American student worker in the Honors College. Tellingly, Jane Doe No. 1 received news of this "raise" only after she submitted a formal statement and complaint to Title IX and the Campus Life Dean's Office.

83.     Jane Doe No. 1 had initially wondered why the Honors College offered her a job, for which she did not apply, however, it became clear that she was not an employee but rather a token.  Sadly, this would not be the only time Jane Doe No. 1 was used as window-dressing for TCU's fraudulent misrepresentation of its commitment to diversity.  TCU's treatment of Jane Doe No. 1 as an employee of the Honors College continued to deteriorate as the summer ended and the fall semester began.

### XVI.   TCU endorses a separate and unequal method of educating racial minorities and women, like Jane Doe No. 1.

84.     In the Fall of 2018 Jane Doe No. 1 enrolled in Introduction to Political Theory to fulfill the requirements of the Honors College.  Given TCU's abysmally low enrollment of racial minorities and women, it was not uncommon for Jane Doe No. 1 to be the only racial minority in a course, and particularly a course that satisfies Honors College requirements. It is also not uncommon for TCU to promote an environment and culture that constructively segregates racial minorities from their white counterparts in the classroom.  On her very first day of class Jane Doe No. 1—like racial minorities of TCU's past—observed that when she sat down next to white students, they moved with a quickness as if she had bitten them.    As instruction began Jane Doe No. 1 soon realized that she was isolated and alone sitting across the room from her white classmates who refused to interact with her.  Jane Doe No. 1 thought that her professor, Dr.

Arnold—the aforementioned Coach of TCU's Moot Court team—would redistribute seating arrangements to provide all students an egalitarian learning environment.   Jane Doe No. 1 overestimated TCU's capacity for fair treatment of racial minorities and women.

85.     Dr. Arnold made no such adjustments or corrections to the seating arrangement of his classroom and instead would confirm and promote Jane Doe No. 1's segregation and isolation through his acts and omissions during the course.  In fact, just as he had done during Jane Doe No. 1's time on TCU's Moot Court team, Dr. Arnold again ignored Jane Doe No. 1 altogether.  During course instruction, Dr. Arnold only faced the direction of, and spoke to the white students enrolled in the course—leaving Jane Doe No. 1 to absorb instruction from the atmosphere.  Dr. Arnold also facilitated course discussions designed to humiliate and demean Jane Doe No. 1 and other racial minorities and women.  **In one incident, during a class discussion a white student turned to Jane Doe No. 1—on the other side of the room—and stated, "all black people are on welfare" and several other ignorant and baseless comments**.  Though one would think a recipient of a Ph.D. in Politics from Princeton should know not only of the falsity of such statements, but also of his obligation as a professor to correct such baseless and racist ideologies, Dr. Arnold did nothing.  When Jane Doe No. 1 confronted Dr. Arnold about the insensitivity and incorrectness of her white colleagues' racist remarks and how isolated they made her feel, he responded with deliberate indifference; stating that he "didn't think anything was wrong" with the comments and questioned why Jane Doe No. 1, "was making a big deal" of the incident.

86.     Unsatisfied with Dr. Arnold's response, Jane Doe No. 1 visited her Honors College academic advisor Donna Schonerstedt to report the incident.   Rather than focus on the inappropriateness of Dr. Arnold's conduct in isolating and humiliating Jane Doe No. 1, Ms. Schonerstedt also acted with deliberate indifference and suggested that Jane Doe No. 1 "maybe

should just switch classes" or file a formal complaint. **On a campus as racist and bigoted as TCU, the suggestion that Jane Doe No. 1 could avoid TCU's brackish treatment by switching classes is incredible.** At this point Jane Doe No. 1 questioned "how can [she] succeed (in this environment) when [she] ha[s] to deal with academic pressure, social pressures and racism?"[139] Ultimately, Jane Doe No. 1, exhausted by the insults and derogatory treatment she endured and believing she was left with no other option, withdrew from Dr. Arnold's course.

87.     Jane Doe No. 1 was also subjected to hostile treatment from Honors College administration, including chiefly Dr. Diane Snow, Dean of the Honors College, multiple times during Jane Doe No. 1's academic pursuits at TCU. In the Spring of 2019, Jane Doe No. 1 enrolled in another course to fulfill the requirements of the Honors College: Engaging Difference and Diversity; a course designed for the newly minted CRES department. Part of the course requirement was a group research projected related to diversity in the Honors College. Jane Doe No. 1's group decided to examine TCU's efforts to address deficiencies in minority enrollment in the Honors College. According to the Honors College, it had adopted a holistic admissions process, which as of Fall 2019 "considers not only standard indicators, e.g. test scores, GPA, and rigor of high school curriculum, but also broad evidence of curiosity, motivation, fairmindedness, and creativity through additional essays."[140] Jane Doe No. 1's group would gather data relating to current diversity enrollment in the Honors College as well as interview key individuals in the Honors College administration to determine the method and application of the new purportedly holistic admissions criteria. Jane Doe No. 1's group research project topic was presented and approved by the course professor, but when Jane Doe No. 1's group contacted the Honors College in attempts to obtain data they were met with aggression and hostility from Dr. Snow. Specifically,

---

[139] Yvonne Webb, Editorial, *Multicultural Illusions Prevail*, TCU DAILY SKIFF (Fort Worth), Apr. 19, 1988, at 1.
[140] *Diversity & Inclusion*, TCU, https://honors.tcu.edu/about/diversity-inclusion/ (last visited Dec. 16, 2019).

when Jane Doe No. 1 and her group members—all racial minorities—contacted the Honors college to ask if they could conduct interviews with certain staff members for their research project, Dr. Snow personally emailed the group lambasting them and telling the students (who had never formally met her before) that she "didn't appreciate them emailing her staff without her knowledge," warning them not to attempt to contact her staff directly and that "everything goes through [her]." Jane Doe No. 1's group was puzzled by the hostility of Dr. Snow's response, but because they needed to complete their group project, they worked to obtain data and schedule interviews with key Honors College staff.

88.     When Jane Doe No. 1's group was finally authorized to speak with Honors College staff for their research assignment Dr. Snow's hostile temperament towards racial minorities and women surfaced again. Jane Doe No. 1's group scheduled an interview session with the Honors College's all white "Diversity Board"—made up of all white TCU staff, including Dr. Snow—and the Diversity Board proceeded to monopolize the conversation nearly the entirety of the session only leaving Jane Doe No. 1's group time to ask no more than four questions relevant to their extensive honors level research project. When the students began to ask their questions, Dr. Snow became visibly more and more upset. After the group's fourth question, Dr. Snow abruptly and aggressively cut the interview short and then demanded that Jane Doe No. 1 send her the entirety of the research project once completed. Dr. Snow also warned Jane Doe No. 1's group that she would attend their presentation in an apparent act of intimidation. Once the project was completed, Dr. Snow aggressively approached Jane Doe No. 1 demanding a copy of the final project. Jane Doe No. 1 informed Dr. Snow that it was her understanding that because the assignment was a group project, she could not share her group members' work without their permission. Still, Jane Doe No. 1 sent Dr. Snow a summary of the project, conclusions and recommendations including

the bulk of her contributions to the same.  Dr. Snow was unsatisfied and would later continue to harass Jane Doe No. 1 about the group project before totally dehumanizing Jane Doe No. 1 over the course of four weeks during a TCU sanctioned Honors College trip to Washington, D.C.[141] Curiously, Dr. Snow did not ask Jane Doe No. 1's professor, Snow's subordinate, for a copy of the research project or consult with her over any concerns she had regarding the same.  Only Dr. Snow knows why these racial minorities' inquiries regarding the Honors College's diversity efforts offended her so.  Dr. Snow's rank hostility toward and disparate treatment of Jane Doe No. 1, however, would later confirm that Dr. Snow's actions were driven by racial animosity and bigotry.

### XVII.    TCU denies racial minorities and women, like Jane Doe No. 1, the right to happiness and freedom on campus and beyond.

89.    Indeed, Dr. Snow and Honors College faculty and staff terrorized and dehumanized Jane Doe No. 1 through the entirety of an academic trip the following summer; placing Jane Doe No. 1's health and welfare in jeopardy and constructively denying her rights to happiness and freedom.

90.    In the Fall of 2018, Jane Doe No. 1 applied for "Honors Explorations" the Honors College's summer study "abroad" program.  That year TCU's Honors Explorations program had three one-month summer destinations for Honors College students to choose from: (1) "Cultural Routes," which toured Germany, Switzerland and Italy; (2) "Disaster, Recovery, [sic] & Renewal: Lessons from Japan," which toured various cities across Japan; and (3) "How Washington, D.C. Works," which was not at all a summer abroad, but rather a trip to the nation's capital and for TCU an apparent opportunity to further fraudulently promote itself as an institution concerned with and/or committed to diversity.

---

[141] It is against Honors College practice for the Dean of the Honors College to demand to personally review individual student's course work prior to and following the completion of the same.

91.     Though Jane Doe No. 1 ranked the Washington domestic study program last, she was assigned to attend.  When Jane Doe No. 1 expressed her disappointment in her summer assignment to Honors College staff, they offered no explanation as to how Jane Doe No. 1 was selected for the domestic program despite having ranked it last.  Jane Doe No. 1 declined the Washington summer program.

92.     In response the Honors College offered to pay for approximately 48 percent of Jane Doe No. 1's fee associated with the domestic program to entice Jane Doe No. 1 to go on the trip. Jane Doe No. 1 accepted the Honors College's offer and paid the remaining portion of the Honors Explorations program fee.  The Honors College would later hold the financial assistance they used to entice Jane Doe No. 1 to attend the domestic program over Jane Doe No. 1's head before and during the trip; weaponizing the grant—among other threats—in order to restrict and exercise control over Jane Doe No. 1.  Jane Doe No. 1 would later learn that the Honors College made a similar grant of financial assistance to another African-American Honors College student to entice him to attend the domestic program, even though he had already completed the Japanese study abroad program that summer.  In line with TCU's legacy of and present conscious contempt for racial minorities, both of these Honors College students—the only African Americans in the program—were segregated and dehumanized for the bulk of their domestic program experience. Upon reliable information and belief, Jane Doe No. 1 and her African-American classmate were forced to attend the "How Washington, D.C. Works," domestic program so TCU and the Honors College could hold themselves out as a diverse institution to the public and to third parties, including the Osgood Center for International Studies and other reputable individuals and institutions they encountered in Washington.  Tellingly, the Honors College and Osgood Center

staff followed the two African-American students around taking pictures of just the two of them the entire trip; further tokenizing them.

93.     Jane Doe No. 1, having received a grant from the Honors College, paid the remaining program fee and began preparing to attend the Washington program.  As part of her preparation Jane Doe No. 1, a meticulous and detailed scholar, reviewed available program materials including the course agenda and syllabus to ensure that she fully understood the requirements of the program and her attendance.  Upon review, Jane Doe No. 1 noted that a White House visit was scheduled as a part of the program.  Jane Doe No. 1 was concerned about this visit given the many racist ideologies of the current President of the United States—ideologies provably shared by TCU.  So, prior to her departure for Washington Jane Doe No. 1 met with Dr. Snow (who was also facilitating the Washington program) and shared with her those concerns.   In response, Dr. Snow called Jane Doe No. 1—the daughter of two veteran United States Military officers—"unpatriotic;" told Jane Doe No. 1 that she should consider herself "lucky to go" on the trip; threatened to make her repay the partial program fee grant the Honors College used to induce Jane Doe No. 1 to attend; and threatened to dock Jane Doe No. 1's grade points before the course even began; a mantra Dr. Snow repeated and built upon in Washington to exert control over Jane Doe No. 1.

94.     Once in Washington, Jane Doe No. 1 learned TCU carried its legacy of bigotry and racism beyond campus.  When Jane Doe No. 1 arrived at her room for the summer at the Avenue Suite's Georgetown on July 7, 2019, Jane Doe No. 1—the only African American female in the Washington program—was greeted as she had been before.  Her two assigned roommates had taken all available closet space and commandeered the two available beds in the room; relegating Jane Doe No. 1, who is six feet tall and 180 pounds, to the sofa bed in the open area of the suite,

with a small kitchenette.  Hotel staff confirmed to Jane Doe No. 1 that the sofa beds in guestrooms were not designed for adult or long-term use.  When Jane Doe No. 1 asked her roommates to make space for her in the closets the women refused and suggested that Jane Doe No. 1 purchase containers to store her belongings for the duration of the trip.

95.     When Jane Doe No. 1 told Dr. Fredrick Gooding (another Washington program facilitator and Honors College professor) that she was being bullied into sharing the sofa bed with her belongings, Dr. Gooding responded that the women would rotate beds and share space with Jane Doe No. 1 during the program.  Later that same week, on July 11, 2019, however, Dr. Snow informed Jane Doe No. 1 that it was optional for Jane Doe No. 1's roommates to rotate beds and share closet space and confirmed that Jane Doe No. 1 was to be relegated to the sofa bed and kitchenette combo for the entirety of the trip.

96.     Unsurprisingly, the only two African Americans in the Washington program were both made to sleep on sofa beds during the trip while their white counterparts were provided with hotel quality queen beds.  Both African-American students suffered physical harm associated with long-term use of a sofa bed, however, "the psychological barriers facing [these] minority students [were] as limiting and more painful."[142]  TCU's conduct left the African American students knowing that "their life at the University [and university sanctioned programs] [was] generally worse than the life of the average white student"[143] and openly relegated Jane Doe No. 1 and her African-American colleague to second-class citizen status.

97.     To make matters worse, Jane Doe No. 1's roommates also regularly refused to grant Jane Doe No. 1 access to the bathroom, located in the hotel suite, through the room with the double queen beds.  Jane Doe No. 1's roommates regularly locked the door to their room, segregating

---

[142] Yvonne Webb, Editorial, *Multicultural Illusions Prevail*, TCU DAILY SKIFF (Fort Worth), Apr. 19, 1988, at 1.
[143] Cindy Cook, Editorial, *Black—White: Do Both Have Problems?*, DAILY SKIFF (Fort Worth), Feb. 4, 1977, at 4.

Jane Doe No. 1 to the sofa bed and kitchenette.  This meant that Jane Doe No. 1 had no access to

a bathtub/shower or toilet at critical times.  Jane Doe No. 1 was regularly forced to brush her teeth,

wash her face, and even groom herself in the kitchenette sink.  **When Jane Doe No. 1 had to use**

**the toilet, she was regularly made to do so in the hotel lobby restroom—seven floors below—**

**regardless of the hour.**

98.     Jane Doe No. 1 was so visibly in distress when having to journey from her hotel

room to the hotel lobby to relieve herself that hotel staff began to take notice.  Indeed, Jane Doe

No. 1's trips to the hotel lobby restroom were so frequent that it prompted hotel staff to contact

Jane Doe No. 1's mother (whom they had met during the first week of the program) out of concern

that Jane Doe No. 1 was being abused on the trip.

99.     When Jane Doe No. 1 complained to Honors College staff including Dr. Gooding

about the treatment from her roommates, true to form, Jane Doe No. 1's sincere and legitimate

concerns were dismissed. Puzzlingly, Dr. Gooding even suggested that Jane Doe No. 1's treatment

was her own fault.  TCU did nothing to address Jane Doe No. 1's concerns.

**XVIII.   TCU's disdain for racial minorities and women, like Jane Doe No. 1, endangers**
**their health and welfare.**

100.     TCU's disregard for Jane Doe No. 1's welfare during the domestic program did not

stop at the hotel.  Though not disclosed in any of the provided materials, Jane Doe No. 1 was

regularly made to walk several miles in the heat of the day to and from various program activities.

It did not matter to TCU that the weather had reached the upper nineties causing a heat wave and

prompting heat advisories from the National Weather Service, including a "code orange" air

quality alert,[144] or that Washington has one of the more extensive public transportation systems in the Country.

101.    Within first few days of walking miles on end in the searing Washington summer heat Jane Doe No. 1 began to develop sores and blisters on her feet. After a few more days of rubbing against her shoes and socks, these sores and blisters would burst soaking Jane Doe No. 1's feet in puss and blood and oozing through her socks.  Dr. Gooding was informed early on about Jane Doe No. 1's worsening condition and he was even sent the following images of Jane Doe No. 1's feet as evidence:



*Figure 4. Left hallux blistered and swollen.*



*Figure 5. Right hallux blistered, swollen and oozing puss.*

---

[144] Ian Livingston, *PM Update: Excessive Heat Alert Extending Into Saturday as the Region Roasts Through the Weekend*, THE WASHINGTON POST (July 19, 2019), https://www.washingtonpost.com/weather/2019/07/19/pm-update-excessive-heat-warning-extended-into-saturday-region-roasts-through-weekend/ (Code orange indicates air quality that is unhealthy for sensitive groups.).



*Figure 6. Left fourth phalanx blistered, swollen and full of puss and blood.*



*Figure 7. Left fourth phalanx blister/sore ruptured.*



*Figure 8. Left calcaneus blistered, swollen and full of puss and blood.*



*Figure 9. Right calcaneus blistered, swollen and full of puss and blood.*



*Figure 10. Left hallux blister/sore ruptured.*



*Figure 11. Left plantar blistered and swollen.*

102.     Once again, rather than exercising his duty to Jane Doe No. 1 as an agent of TCU and at the very least reporting Jane Doe No. 1's condition to the appropriate personnel to provide Jane Doe No. 1 with some guidance and/or relief, Dr. Gooding did nothing.  Jane Doe No. 1 has permanent scars and on-going pain resulting from the sores and blisters developed during the Washington program. To add insult to injury, throughout Jane Doe No. 1's podiatric health crisis, Dr. Snow would not miss an opportunity to remind Jane Doe No. 1 that she was different from her classmates and treat her with hostility and complete disdain.

103.     On Thursday July 11, 2019, during a walking excursion the entire group (except for the other African-American student in the program) left Jane Doe No. 1 when she began to slow her pace due to the sores and blisters developing on her feet.  When Dr. Snow noticed that the other African-American student had stayed back to walk closely with Jane Doe No. 1 and ensure that someone considered her welfare, Dr. Snow became unhinged.  Dr. Snow hurried back to the two African-American students and began to walk menacingly behind them; harassing Jane Doe No. 1 for walking too slowly.  Dr. Snow then aggressively shoved herself between the two African Americans to break them up.  But that was not enough, Dr. Snow again publicly assaulted Jane Doe No. 1, this time aggressively placing her hand on Jane Doe No. 1's back and driving her to the front of her peers.  Dr. Snow would assault Jane Doe No. 1 repeatedly throughout the trip; each time intentionally making contact with Jane Doe No. 1's person without Jane Doe No. 1's consent and causing injury to Jane Doe No. 1.  Dr. Snow further knew that her contact with Jane Doe No. 1 was unwelcomed and offensive and/or provocative and that Jane Doe No. 1 regarded it as such.

104.     That same day, Dr. Snow also publicly humiliated Jane Doe No. 1 by harassing Jane Doe No. 1's mother while at the hotel; indignantly and loudly asking "what [Jane Doe No.

1's mother] was doing there" and "how she could afford to be there?" Perhaps Dr. Snow, like the students in Dr. Arnold's class, truly believed that "all black people are on welfare." In reality, Jane Doe No. 1's mother, like other TCU parents who visited Washington, had paid to come to support her daughter.

105. The very next day, at the National Museum of African American History and Culture (the "NMAAHC"), Dr. Snow targeted Jane Doe No. 1's mother again; demanding to know why she was there. At lunch, out of the blue, Drs. Snow and Gooding publicly announced to Jane Doe No. 1's mother that Honors College funds would not be used to pay for Jane Doe No. 1's mother's meal, as though Jane Doe No. 1's mother needed charity. She did not.

106. Disturbingly, at the NMAAHC Dr. Snow also felt compelled to laughingly remind Jane Doe No. 1 alone, in front of her peers, that she could experience the feeling of being crowded into a slave cargo ship by traveling just a brief elevator ride below. Jane Doe No. 1 and her mother were shocked and puzzled by Dr. Snow's conduct, particularly because other TCU parents were present at the hotel and the NMAAHC. Dr. Snow welcomed and treated the other TCU (white) parents with excitement, warmth and respect. Jane Doe No. 1's mother was the only African-American parent present at the hotel and the NMAAHC.

107. On Friday July 12, 2019, the students were again made to walk several miles. Jane Doe No. 1 was bleeding through her socks and again slowed her pace. This time Dr. Snow targeted Jane Doe No. 1's sex, gender, physical appearance and weight. Rather than offer some respite to Jane Doe No. 1, Dr. Snow mocked her in front of Jane Doe No. 1's peers saying, "at least [Jane Doe No. 1] would be used to walking" when the trip concluded and suggested that Jane Doe No. 1 go on a "low carb diet" and that all the walking would make Jane Doe No. 1 "much more healthier [sic]." Throughout the trip, Dr. Snow would also regularly "save" Jane Doe No. 1 a seat next to

her when the group would go eat, forcing Jane Doe No. 1 to sit next to Dr. Snow so that Dr. Snow could monitor Jane Doe No. 1's food consumption.  If Jane Doe No. 1 hesitated or otherwise indicated that she did not want to sit with Dr. Snow, **Dr. Snow would begin banging on the empty seat to hurry Jane Doe No. 1—like a dog—to her place at Dr. Snow's side.**  While Jane Doe No. 1 was eating Dr. Snow would stare at Jane Doe No. 1 intensely and with disgust.  During each of these incidents Jane Doe No. 1 was forced to sit in a designated area at Dr. Snow's side, while other students were free to sit wherever they pleased.  By her conduct, Dr. Snow detained Jane Doe No. 1 without justification and without Jane Doe No. 1's consent each time she "saved" Jane Doe No. 1 a seat.

108.    Dr. Snow was relentless.  On Tuesday July 16, 2019 Jane Doe No. 1 was visibly in pain while walking and was also sweating profusely in the summer heat.  Dr. Snow continued publicly harassing Jane Doe No. 1 based upon her sex, gender and physical appearance by body shaming and gibing her about her weight and sweating habits and stating (presumably because of Jane Doe No. 1's race, sex, physical appearance, weight, and height) that Jane Doe No. 1, who was still a teenager at the time, looked like Dr. Gooding—an African-American man in his forties. That same day, when the group arrived at Capitol Hill, Jane Doe No. 1 was exhausted from the walk and still in pain from the broken sores and blisters on her feet.  **Out of nowhere, Dr. Snow assaulted Jane Doe No. 1 for the third time**; aggressively pushing Jane Doe No. 1's back causing Jane Doe No. 1 to stumble and driving her to the front of the group "so that [Jane Doe No. 1] could see better."  At six feet Jane Doe No. 1 was one of the taller group members and had no difficulty seeing.

109.    The following morning, on Wednesday July 17, 2019, Jane Doe No. 1's body began to shut down as she was experiencing the worst pain she had encountered in her life due to the

condition of her feet and her slow breathing resulting from the summer heatwave.  Still bleeding through her socks; Jane Doe No. 1 decided to plead with Dr. Snow for sympathy and reasonable accommodations.  Jane Doe No. 1 messaged Dr. Snow that morning but was ignored and received no response.  Jane Doe No. 1 then left her sofa bed to find Dr. Snow at the hotel.  Once she located Dr. Snow, Jane Doe No. 1 asked to speak with her privately.  The conversation did not go well.  When Jane Doe No. 1 explained that she was in pain; Dr. Snow responded by questioning Jane Doe No. 1 and asking why Jane Doe No. 1 had come to the domestic program if she knew she had health issues.  Apparently suggesting that because of her disabilities Jane Doe No. 1 should be excluded or otherwise denied access to the TCU-sanctioned summer program.  Dr. Snow then questioned how Jane Doe No. 1, was capable of getting around TCU.  When Jane Doe No. 1 explained that she didn't walk several miles a day at TCU; Dr. Snow responded that Jane Doe No. 1 knew there would be walking.  Despite the fact that this was untrue, Jane Doe No. 1 remained focused on the issues and attempted to offer Dr. Snow images of the sores and blisters on her feet.  Dr. Snow responded by putting her hand up to interrupt Jane Doe No. 1, and blamed Jane Doe No. 1's injuries on Jane Doe No. 1.

110.    When Jane Doe No. 1 explained that the extreme summer heatwave was only exacerbating the health complications that Jane Doe No. 1 was experiencing; Dr. Snow questioned if Jane Doe No. 1 "now had a problem with the sun."  **Jane Doe No. 1 is asthmatic, a fact well-known to TCU and its agents as Jane Doe No. 1 had registered her condition with TCU's Student Disabilities Services since her enrollment at TCU.**  Moreover, Jane Doe No. 1 included this information in the health conditions and medications questionnaire TCU required her to fill out prior to her departure for the domestic program.  When Jane Doe No. 1 again tried to refocus the issues and plead for sympathy and reasonable accommodations from Dr. Snow by explaining

that she was experiencing difficulty breathing in addition to the pain of her blistered feet; Dr. Snow replied that "she wished she had a wand to wave and fix" Jane Doe No. 1. Dr. Snow did not need a wand or to "fix" Jane Doe No. 1. Dr. Snow only needed to respond as a decent human being and exercise her duty to Jane Doe No. 1, individually and as an agent of TCU and comport with TCU's legal obligation to provide reasonable accommodations to Jane Doe No. 1.

111.   Jane Doe No. 1 wanted to leave the program due to the pain and hostile treatment she was experiencing. When she mentioned wanting to leave on this and other occasions, Dr. Snow reminded Jane Doe No. 1 that she was "lucky to go" on the trip; and threatened to (1) make her repay the partial program fee used to induce Jane Doe No. 1 to attend; (2) revoke Jane Doe No. 1's credit for the course; and (3) kick Jane Doe No. 1 out of both the Honors College and TCU. Dr. Snow would make good on at least one of her threats, which were designed to willfully detain Jane Doe No. 1 in Washington, without justification and without Jane Doe No. 1's consent. Even now Dr. Snow is hard at work continuing a severe and pervasive pattern of hostile treatment of Jane Doe No. 1 to bring life to her remaining threats in constructive, if not literal form.

112.   **Left without recourse in Washington, Jane Doe No. 1's grievances were forwarded to Dr. Karen Bell Morgan, TCU's Associate Dean of Campus Life, on July 17, 2019.** Ms. Morgan was also sent the pictures of Jane Doe No. 1's sore and blistered feet, which Ms. Morgan forwarded to TCU's Health Center professionals. TCU Health Center professionals confirmed that Jane Doe No. 1 should seek immediate medical evaluation of her feet.

113.   By now, TCU was fully aware of Jane Doe No. 1's declining physical condition, but rather than work to ameliorate Jane Doe No. 1's condition, TCU and its agents doubled down. On Thursday July 18, Dr. Snow tasked Jane Doe No. 1 with being the group leader for the day. This meant that Jane Doe No. 1 was to help provide other students with directions. When Jane

Doe No. 1 (who was still in pain but aware that Dr. Snow would not let her leave Washington without making good on the aforementioned threats) briefly struggled with directions, Dr. Snow, in an act of petty aggression, mocked Jane Doe No. 1—publicly calling Jane Doe No. 1 a bad leader and belittling her in front of her peers.  Jane Doe No. 1 had reached her end, but with Dr. Snow's repeated threats in mind and determined not to quit, she pressed on.  Wearied from enduring miles of walking with sore and blistered feet while being demeaned along the voyage and offered no reasonable accommodations, Jane Doe No. 1 began taking Lyft car service, at her expense, when she could, and sacrificed receiving academic information and course participation. Each time Jane Doe No. 1 took Lyft rather than walk on her blistered feet Dr. Snow would scowl and shake her head with clear disgust for Jane Doe No. 1.

114.    Dr. Snow's disdain for Jane Doe No. 1 was no secret.  In addition to the clear verbal and nonverbal conduct Dr. Snow fashioned to harass Jane Doe No. 1, Dr. Snow openly revealed to other students that she "hates [Jane Doe No. 1]."  When Jane Doe No. 1 later confronted Dr. Snow about whether she told other students she hated Jane Doe No. 1, Dr. Snow smugly laughed in Jane Doe No. 1's face before coldly and indirectly dismissing the claim.   And why would Dr. Snow do otherwise? Afterall, the answer to Jane Doe No. 1's inquiry was obvious as the evidence of Dr. Snow's hatred for Jane Doe No. 1 is indisputable.  Even still, Dr. Snow's hatred for, and reckless behavior toward Jane Doe No. 1 had not yet reached its lowest point.

115.    On or about July 18, 2019 several students, including Jane Doe No. 1, began to notice bed bugs, spiders and mites in their hotel rooms. When one of Jane Doe No. 1's colleagues—a white male—complained to Dr. Snow about the issue, Dr. Snow did not abruptly place her hand up to interrupt him.  Rather, Dr. Snow took seriously the white male student's concern and allowed the student to show her images of the bites on his arm and genuinely

examined the same.  Though Dr. Snow initially incorrectly diagnosed the white male student's bed

bug bites as spider bites, once the hotel confirmed that there was a bed bug infestation, immediate

measures were taken to place the white male student in more suitable accommodations. The very

next day, on July 19, 2019 when Jane Doe No. 1 noticed spiders falling from her ceiling and bed

bugs and other mites in her hotel room, she too sought Dr. Snow's aid.  Unsurprisingly, Dr. Snow

could not be bothered with Jane Doe No. 1 or her welfare.  Dr. Snow told Jane Doe No. 1 that

"bugs live inside too" and to "stop talking about it" and did not bother to examine Jane Doe No.

1's pictures of the bug bites on Jane Doe No. 1's legs:

 

*Figure 12. Left tibia covered in bug bites.*        *Figure 13. Right tibia covered in bug bites.*

116.    The bug situation in Jane Doe No. 1's hotel room had gotten so bad that her

roommates vacated the room, but not before removing all of their belongs from the infected closets

and double queen bedroom and placing them in Jane Doe No. 1's already cramped sofa

bed/kitchenette combo. Realizing once again that Dr. Snow would not help Jane Doe No. 1, Jane

Doe No. 1 herself pleaded with hotel staff, who provided Jane Doe No. 1 with bug spray.  During

the early morning hours of July 20, 2019, Jane Doe No. 1, shaken at the sight of bugs seemingly emerging from every crevice, began fumigating her hotel room with the bug spray provided by the hotel.  The fumes from the bug spray triggered Jane Doe No. 1's asthma (which was already agitated by miles long journeys in the summer heatwave); swelling her airways and tightening the muscles that surround them until Jane Doe No. 1 had an asthma attack.  Jane Doe No. 1 tried to reach Dr. Snow or other TCU personnel at the onset of her attack only to learn that no program facilitator was present, and that, upon reliable information and belief, Dr. Snow had taken an impromptu trip to New York for the weekend.  Jane Doe No. 1, in tears and in the midst of an asthma attack once again pleaded with hotel staff for help.  The hotel staff—not TCU personnel— stayed with Jane Doe No. 1 as she implemented the emergency action plan developed by Jane Doe No. 1, her parents and her physician.  At all relevant times TCU was aware of Jane Doe No. 1's condition and of her emergency action plan.  No TCU personnel were present at the hotel or in Washington at all during Jane Doe No. 1's life-threatening asthmatic episode.[145]   Hotel staff communicated with Jane Doe No. 1's mother yet again to inform her of Jane Doe No. 1's condition and state of her hotel room and Jane Doe No. 1's mother booked and paid for a different hotel room for Jane Doe No. 1.  Jane Doe No. 1 received no assistance from TCU.  To the contrary, when Dr. Snow returned from New York to learn Jane Doe No. 1 had vacated her hotel room, she told Jane Doe No. 1 that it was against TCU policy for her to book her own room.  Ultimately, Jane Doe No. 1 was forced to return to the bug infested suite; the very suite already vacated by Jane Doe No. 1's roommates.

---

[145] TCU program facilitators, namely Drs. Gooding and Snow regularly left the student's unattended during late night/early morning hours, and at times, for days during the four-week summer program.  Further, Drs. Gooding and Snow were regularly visibly intoxicated in the presence of the students and/or upon arrival back to the hotel at any late night/ early morning hour as evidenced by hotel footage.

XIX.    **TCU's present conscious hatred of racial minorities and women, like Jane Does Nos. 1, 2, 3, 4 and 5, is insatiable and life-threatening.**

117.    The harrowing extent of Jane Doe No. 1's ordeal during the first two-weeks of the program left her bloodied and bowed.  But TCU and its agents, chiefly Dr. Snow, would not rest until Jane Doe No. 1 was completely broken.  As the program entered its third week, Jane Doe No. 1 was still in pain from walking and being in the summer's heat, but alas Jane Doe No. 1, had something to look forward to.  The coming Friday, July 26, 2019 would mark the end of Jane Doe No. 1's teenage years.  Jane Doe No. 1 was excited about her twentieth birthday because when another student celebrated his birthday during the program Dr. Snow spared no expense; treating the entire group to a lavish dinner at an expensive restaurant and allowing the student to pick out his own cake without budget limitations.

118.    As Jane Doe No. 1's birthday approached, however, Dr. Snow was mum.  When one of the program participants—another racial minority female student—realized that Dr. Snow intended to ignore Jane Doe No. 1's birthday completely, the student herself set out to plan a surprise birthday dinner for Jane Doe No. 1 on Friday, July 26, 2019.  Prior to making a reservation for the planned surprise dinner for Jane Doe No. 1 earlier that week, her colleague checked the group itinerary to ensure there would be no conflict and confirmed that none existed.  When Dr. Snow learned of the surprise birthday plans for Jane Doe No. 1 on that same Friday afternoon, however, she hurriedly created an all-expense paid "family dinner" and added it to the itinerary for Friday night in honor of Aaron Chimbel, a professor at St. Bonaventure University and Dean of its Jandoli School of Communication.  Dr. Snow knew her "family dinner" was in direct conflict with Jane Doe No. 1's surprise birthday plans.  Dr. Snow's discriminatory treatment of Jane Doe No. 1 was so pervasive and so public that another student even confronted Dr. Snow.  The student indicated that she was aware that Dr. Snow and/or the Honors College had paid for another

birthday dinner in addition to paying for another celebratory dinner for a different student on a separate occasion during the program; that she had examined the itinerary to be sure that there were no conflicts on Jane Doe No. 1's birthday prior to making dinner reservations for the same; asked Dr. Snow to reschedule the "family dinner"; and asked Dr. Snow to honor her and/or the Honors College's prior practice and pay for Jane Doe No. 1's birthday dinner as well. Dr. Snow refused to reschedule the last-minute family dinner and responded that Jane Doe No. 1's birthday dinner was "not optimal" and "definitely over budget" all while simultaneously inviting everyone to attend the family dinner, for which the Honors College paid. Dr. Snow also suggested that Jane Doe No. 1 accept being celebrated at the family dinner meant to honor Professor Chimbel or in the alternative that Jane Doe No. 1 pick a desert that she liked for everyone to share at the hotel after the family dinner. Dr. Snow then texted Jane Doe No. 1 (who was unaware of the planned dinner) about the same, to be sure to ruin the surprise. Due to the confusion caused by Dr. Snow's deliberate efforts to create a conflict with Jane Doe No. 1's planned surprise dinner, Jane Doe No. 1's surprise dinner was ultimately cancelled.

119.    When Jane Doe No. 1 learned of her surprise party and Dr. Snow's deliberate efforts to quash the same, Jane Doe No. 1 became deflated. To twist the knife, Dr. Snow returned from the family dinner to the hotel visibly intoxicated, with a random cake with sparklers—sparklers which Dr. Snow had removed from the cake and performed an erratic dance with. When Jane Doe No. 1 (visibly distraught by the outcome of her birthday) tried to speak with Dr. Snow about the incident, she was again dismissed by Dr. Snow and lushly told "everything worked out the way it was supposed to" and that it was "no big deal." It was a big deal!

120.    That night—when Jane Doe No. 1 should have been celebrating her life—Jane Doe No. 1 returned to her vacant hotel room in tears and considered suicide. Her birthday would now

be a reminder of the unconscionable depravity to which Dr. Snow would stoop to harm her. But make no mistake, Jane Doe No. 1's hopelessness and life-threatening despair was not about an expensive birthday dinner or a cake. It was about TCU's public displays of hatred, bigotry and racism toward Jane Doe No. 1 from the moment she had stepped on its campus. It was about Jane Doe No. 1's inescapable second-class status at TCU and TCU-sanctioned activities. It was about Jane Doe No. 1's revoked merit-based scholarship. It was about TCU endorsing Jane Doe No. 1's segregation in its dorms and at the hotel. It was about the hostility and isolation Jane Doe No. 1 experienced on TCU's Moot Court team and throughout TCU. It was about the shame associated with being made a token by TCU's Honors College. It was about the ignorant, racist and isolating ideologies TCU endorsed in Jane Doe No. 1's classes. It was about the apparent lack of concern for Jane Doe No. 1's welfare exhibited by nearly everyone at TCU. It was about the fact that TCU sexualized, body shamed, insulted and belittled Jane Doe No. 1 in front of her peers on a daily basis. It was about Jane Doe No. 1 being summoned like a lap dog in front of her peers nearly every time she ate. It was about Jane Doe No. 1 witnessing TCU publicly insult and belittle her mother all while welcoming Jane Doe No. 1's peer's mother's with open arms. It was about TCU's subtle reminder that in the span of a short elevator ride Jane Doe No. 1 could be transformed back to human cargo. It was about the repeated assaults Jane Doe No. 1 endured at the hands of TCU. It was about stepping over unimaginable pain each day to earn a credit only to have it ripped away by TCU's indefensible legacy and present conscious contempt of racial minorities and women. It was about the shame Jane Doe No. 1 felt for believing TCU's self-aggrandizing DEI campaign in the first place. It was that on her twentieth birthday, because of TCU's acts and omissions, Jane Doe No. 1 could no longer recognize herself.

121.     Thank God that in the midst of Jane Doe No. 1's sorrow and lamenting over who she had become at TCU, she remembered who she was before arriving on TCU's campus.  Jane Doe No. 1 mustered the strength and courage to call the National Suicide Prevention Lifeline for the first time.

122.     **Thereafter, on or about July 29, 2019 Jane Doe No. 1 informed TCU of her mental state and complained to TCU's "Chief Inclusion Officer" and Title IX Coordinator, Dr. Turner, that she was being subjected to discriminatory treatment at the hands of TCU and intended to file a formal complaint but would wait until the summer program ended to avoid retaliation from Dr. Snow and other agents of TCU.**  Rather than assure Jane Doe No. 1 that retaliation was strictly prohibited and would not be tolerated by TCU, Dr. Turner—true to form—did nothing. Unfortunately, as Dr. Turner likely knew, retaliation from Dr. Snow was unavoidable.

123.     After learning of Jane Doe No. 1's reports to TCU's Campus Life Dean's Office and Title IX coordinator, Dr. Snow became even more hostile toward Jane Doe No. 1.   On Wednesday July 31, 2019, while speaking with Jane Doe No. 1, Dr. Snow violently slammed the door in Jane Doe No. 1's face mid-conversation.  Later that same day while in public and in the presence of Jane Doe No. 1's peers, Dr. Snow harshly and openly berated Jane Doe No. 1 for asking a question about an assignment.  Dr. Snow even had the gall to take off her jacket, fold her arms, and advance towards Jane Doe No. 1 yet again assaulting Jane Doe No. 1; threatening bodily injury of which Dr. Snow has proven herself capable.  Like the other assaults Dr. Snow committed this act in the presence of other students.  After weeks of hateful, disparate, and hostile treatment at the hands of TCU and its agents, chiefly Dr. Snow, Jane Doe No. 1 was glazed and numb.

124.     Miraculously, despite the unwavering hatred visited upon Jane Doe No. 1 by TCU and its agents during the Washington program, Jane Doe No. 1 remained active and excelled academically throughout.   Jane Doe No. 1 even earned praise from program facilitators and instructors evidencing her successful participation in the summer program despite her treatment. Specifically, on July 22, 2019, Professor Russell Mack sent Jane Doe No. 1 the following message:

> **Please keep your positive attitude and your interest in government.  We need young people like you to be thoughtful and constructive.**  Now that you better understand government and how DC works, please use that knowledge to help educate others in a positive, constructive way.  That way you will be able to enjoy these priceless freedoms for all of your life.
>
> I enjoyed getting to know you and I hope your next two weeks are also interesting ones.  If I can ever offer any career advice, please always feel free to call on me….

125.     Sadly, Mack reneged on his praise of Jane Doe No. 1 in support of Dr. Snow and TCU's continuing scheme to harass and demean Jane Doe No. 1.  Instead, in an act of retaliation Dr. Snow conspired with Professors Mack and Chimbel (of St. Bonaventure University), with whom she had a meeting of the minds on or about August 3, 2019 and agreed to accomplish an object or course of action designed to intentionally inflict emotional distress upon Jane Doe No. 1 as detailed herein. Jane Doe No. 1 has been proximately damaged as a result of said conspiracy, including but not limited to the psychological and physiological damage caused to Jane Doe No. 1 thereby and, importantly, the loss of credit for the program course in retaliation for her reports of her mistreatment—a threat Dr. Snow ultimately made good on.  Dr. Snow set this conspiracy in motion by committing several extreme and outrages acts designed to torment Jane Doe No. 1 in Washington, DC and on or about August 3, 2019, Dr. Snow and Professors Mack and Chimbel, had a meeting of the minds wherein Dr. Snow instructed Professors Gooding, Mack and Chimbel

to reexamine Jane Doe No. 1's work and find—though none existed—justifications for her conduct.

126.    On August 3, 2019, Dr. Snow summoned Jane Doe No. 1 to a "mandatory" one-on-one meeting with her at the hotel.  At this meeting Dr. Snow informed Jane Doe No. 1 that she had determined that Jane Doe No. 1 had plagiarized numerous assignments during the program and submitted them to herself and Professors Mack and Chimbel.  Dr. Snow even suggested that Jane Doe No. 1 had been plagiarizing all along; accusing Jane Doe No. 1 of plagiarizing her Honors College admissions essay—a slap in the face to Jane Doe No. 1 who is an award-winning scholar.  Jane Doe No. 1, broken by Dr. Snow's conduct including her most recent attacks against Jane Doe No. 1's character elected not to respond to Dr. Snow in the moment.  With this news Dr. Snow once again left Jane Doe No. 1 in Washington at the hotel alone.  Jane Doe No. 1 was distraught.

127.    On that day—eight days after Jane Doe No. 1's birthday, when she first contemplated suicide—because of the conduct of TCU and its agents, Jane Doe No. 1 once again questioned the value of her life and considered that she would be better off dead.  Alone in her hotel room, Jane Doe No. 1 visualized her death; she contemplated reaching for the knife in the kitchenette that had become her summer home and ending her persisting psychological and physiological pain.  Once again Jane Doe No. 1's prior instincts prevailed, and Jane Doe No. 1 summoned the young woman she was before TCU to find the courage to again call the National Suicide Prevention Lifeline.  Jane Doe No. 1's psychological and physiological pain was so great that Jane Doe No. 1 would have another suicidal episode the next day and have to summon the courage again to call the National Suicide Prevention Lifeline on August 4, 2019.  Again, Jane Doe No. 1 continues to struggle with suicidal ideations to this very day.  To this day, Jane Doe No. 1 must keep the National Suicide Prevention Lifeline number close; calling them on several

occasions and consulting with clergymen to assist her through her thoughts of self-harm developed as a result of her treatment at TCU and TCU sanctioned activities.

128.    When Jane Doe No. 1 returned home to her family prior to the start of TCU's Fall 2019 semester, Jane Doe No. 1 was noticeably changed.  The confident, warm, inviting, and spirited young woman that arrived on TCU's campus on Martin Luther King Jr. Day in 2018 had disappeared.  Only a shell of Jane Doe No. 1's former self remained; still in physical and psychological pain, replete with recurring nightmares of Dr. Snow assaulting her and publicly humiliating her and her family.  Jane Doe No. 1's family began rotating responsibilities to monitor her.  For the first time Jane Doe No. 1 was on suicide-watch; a family burden which continues to this day.  Jane Doe No. 1's TCU experience has forever altered herself and her family, including Jane Doe No. 1's (and her family's) day-to-day activities.  Indeed, Jane Doe No. 1 struggles with her mental and physical health deficiencies caused by her TCU experiences and receives treatment for the same.  Jane Doe No. 1 has difficulty focusing at school and at home and her nightmares regularly disrupt her sleep at night.  In fact, Jane Doe No. 1's hopelessness and fear caused at the hands of Dr. Snow, among other members of TCU, have caused Jane Doe No. 1 to hurry off campus when not in class and move out of her on campus housing and into a hotel room for fear that her presence on campus will inspire additional harassing treatment.

129.    Upon her return to campus, due to the severity and pervasiveness of TCU's actions (and at the advice and direction of Dr. Teresa Abi-Nader Dahlberg, TCU's Provost and Vice Chancellor of Academic Affairs, to whom Jane Doe No. 1 had reported her summer 2019 and overall TCU experience) Jane Doe No. 1 began desperately seeking help from clinicians in TCU's Counseling and Mental Health Center ("CMHC").  Specifically, on August 22, 2019, Jane Doe No. 1 first visited TCU's CMHC.  Jane Doe No. 1 also visited TCU's CMHC several times

thereafter including on August 30, 2019, and on September 4, 2019, before locating a mental health professional offsite to continue her treatment. On each visit to TCU's CMHC, TCU's own clinicians diagnosed Jane Doe No. 1 with (1) academic issues; (2) depression; (3) anxiety; and (4) suicidal ideation or self-harm: "**onset July 26th when she was on a school trip to Washington [] with the Honors College**." TCU is fully aware of what it has done.

130.    Upon her return to TCU's campus Jane Doe No. 1 also began working to formalize her complaints of discrimination and hostile treatment with TCU's Title IX coordinator and Campus Life Dean's Office. Specifically, on August 16, 2019, Jane Doe No. 1 conducted a video interview with Dr. Turner. Fighting back tears, Jane Doe No. 1 recounted her summer experience to TCU's Title IX coordinator. Again, on or about August 26, 2019, Jane Doe No. 1 spoke with Leigh Holland, TCU's Title IX investigator and Dr. Turner and emailed them a written Title IX statement and a list of witnesses to the incidents that took place in Washington that summer. The same correspondence was forwarded to Dr. Morgan in TCU's Campus Life Dean's Office. At all relevant times TCU's Provost, Title IX Coordinator and Dean of Campus Life were aware of Jane Doe No. 1's Washington experience; resulting ideations of suicide; and present resulting requirement of medical treatment relating to the same. On September 23, 2019, at 9:00 a.m. over a month after initiating her formal complaint to TCU's Title IX coordinator, Jane Doe No. 1 met with Dr. Turner. At this meeting Dr. Turner indicated that his office had already interviewed the students Jane Doe No. 1 had identified as having knowledge of Jane Doe No. 1's experience in the Washington program and would be interviewing the professors the following week. Nevertheless, Dr. Turner seemed to suggest that Jane Doe No. 1 should have pressed criminal charges against Dr. Snow for her repeated assaults of Jane Doe No. 1 and stated that Jane Doe No. 1 "will be seeing

some changes in staff."  No such changes in staff occurred.  In fact, Dr. Turner and TCU did nothing at all.

**XX.    TCU's IX Office ignores, discourages and undermines reports of discrimination from racial minorities and women like Jane Does Nos. 1, 2, 3, 4, and 5.**

131.    It was not until **after** the original filing of this lawsuit that Dr. Turner and/or TCU's Title IX office even bothered to follow-up with Jane Doe No. 1 regarding her official complaint. First, On January 16, 2020 Dr. Turner sent Jane Doe No. 1 an email "Invitation to Review Investigative Report."  Because Dr. Turner's email indicated that TCU had prejudged its findings and because this litigation had already begun, Jane Doe No. 1 requested that TCU forward a final copy of the Investigative Report to her attorneys.  Next, on March 23, 2020 TCU's Title IX Office—with this litigation in mind, no doubt— *finally* sent Jane Doe No. 1 a back-dated "Title IX Decision Letter," which declared that "Dr. [] Snow did not violate [TCU policy] on Prohibited Discrimination, Harassment and Related Conduct" thereby ratifying Dr. Snow's conduct described herein.  Bizarrely—and in an apparent attempt to misrepresent the facts to the Court—the "Title IX Decision Letter," authored by Leigh Holland, states that TCU's Title IX office received Jane Doe No. 1's complaint on August 26, 2019 when, **Ms. Holland contacted Jane Doe No. 1 on July 31, 2020, "concerning [Jane Doe No. 1's] incident in DC"** after Dr. Turner had already discouraged Jane Doe No. 1 from immediately "formalizing" her discrimination complaint and when Jane Doe No. 1 had conducted a formal video interview with Dr. Turner on August 16, 2019. Ms. Holland—like Dr. Turner—regularly manipulates Title IX investigations of reports of discrimination, harassment and assault by racial minorities and women either at her own volition or at the direction of TCU.  TCU regularly deploys this tactic when confronted with reports of discrimination and assault from African-American women.

132.     As previously demonstrated, TCU's response to Title IX complaints received from racial minorities and women—and particularly African-American women—exhibits deliberate indifference.  Even before Jane Doe No. 1's initial report of discriminatory treatment, including assault, TCU's practices in handling reports of discrimination and assault—discouraging victims from reporting their mistreatments and failing to investigate their claims or punish their assailants—constitutes a policy of intentional discrimination that substantially increased Jane Doe No. 1 and other racial minorities and women risk of suffering similar treatment.  Indeed, on August 13, 2018 and again on May 1, 2019 an African-American woman and professor in the Honors College filed a complaint with TCU, including Dr. Turner, reporting that she was being subjected to both racial and sexual harassment that created a hostile work environment.  As of the date of the original filing of this lawsuit, the professor had not received so much as a follow-up response from TCU.

133.     On May 22, 2019, another professor—also a racial minority and woman—filed an eleven-page detailed complaint with TCU's Title IX Office reporting that she witnessed targeted discrimination and harassment of African-American students and retaliation by TCU leadership designed to degrade African-American students enrolled in TCU's Honors College and deny them equal access to educational opportunities and undermine their success.  To date—nearly a year later—TCU  has failed to respond to the professor's report.

**a. TCU's Title IX Office acts with deliberate indifference to Jane Doe No. 2's report that she was sexually harassed and assaulted by Dr. Andrew Schoolmaster, former Dean of the AddRan College of Liberal Arts at TCU until pressured by Jane Doe No. 2 and then attempts to villainize Jane Doe No. 2 before finally admitting the assault and merely slapping Dr. Schoolmaster on the wrist.**

134.    Indeed, the sexual harassment and assault of Jane Doe No. 2—an African-American woman—highlights the truth behind TCU's response to racial minorities and women's reports of mistreatment.

135.    Jane Doe No. 2 is a graduate of TCU's Honors College. Jane Doe No. 2 was aware of TCU's insidious history and had even been called a monkey by a white male TCU student, however, as a non-traditional student who did not live on campus or frequent typical student activities, Jane Doe No. 2 largely (and intentionally) attempted to avoid falling full victim to TCU's hateful campus culture. Until Dr. Andrew Schoolmaster, then Dean of the AddRan College of Liberal Arts (the "AddRan College") took notice of Jane Doe No. 2.

136.    On or about April 16, 2018 as Jane Doe No. 2 was busy preparing for graduation, when she visited Ida Hernandez, TCU's Director of Degree Certification for AddRan College. Ms. Hernandez expressed that she was very proud of Jane Doe No. 2's accomplishments and insisted on introducing her to Dr. Schoolmaster. Ms. Hernandez called Dr. Schoolmaster out of his personal office and into the reception area of the AddRan College where she introduced Dr. Schoolmaster to the only soon-to-be graduate with a 4.0 GPA in the entire AddRan College. Jane Doe No. 2 and Dr. Schoolmaster met and briefly shook hands.

137.    About one week later, on April 23, 2018, Jane Doe No. 2 visited the Political Science Department office at TCU. While there, Jane Doe No. 2 had a seat and was conversing with Darla Scroggins, an administrative assistant at TCU when Dr. Schoolmaster entered the office

and directed Ms. Scroggins to fetch him budgetary data for the purpose of seizing the Civil Rights Bus Tour budget to "take it away and give the funds to something else."

138.     Jane Doe No. 2 verbally greeted Dr. Schoolmaster (whom she had met the week before) when he entered the Political Science Department office that day. As soon as Ms. Scroggins turned her back to look for the budgetary information, Dr. Schoolmaster advanced toward Jane Doe. No. 2 and when he reached her, Dr. Schoolmaster bent over and began caressing her bare knee and stated, "I am sorry to interrupt your conversation."  At the time, Jane Doe No. 2 was wearing a dress that stopped just before her knee and her right leg was crossed over her left. Jane Doe No. 2 was frozen in shock that Dr. Schoolmaster caressed her bare leg, but Dr. Schoolmaster was not finished dehumanizing and degrading Jane Doe No.2.  As Dr. Schoolmaster continued caressing Jane Doe No. 2's knee his fingers would trail downward, to Jane Doe No. 2's lower-inner-thigh and then to the crease where Jane Doe No. 2's legs crossed before patting and releasing Jane Doe No. 2's body (and indeed her humanity) back to her.

139.     When Jane Doe No. 2 finally swallowed her shock, humiliation and shame resulting from these actions, all she was able to say to Dr. Schoolmaster was, "Dean, it is perfectly okay to interrupt our conversation."  But Jane Doe No. 2, herself, was far from okay.

140.     According to TCU's account of the incident, Dr. Schoolmaster's visit to the Political Science Department office took approximately five minutes.  That is, for five entire minutes—300 dignity-stripping seconds—Jane Doe No. 2 shared space with and was sexually harassed and assaulted by her very own Academic Dean.

141.     Immediately following this incident Jane Doe No. 2 disclosed the occurrence to two other TCU women staff members.  Both women responded in a manner that led Jane Doe No. 2 to understand that this was Dr. Schoolmaster's common behavior.

142.    A week later Jane Doe No. 2 was still in shock and troubled about the incident, which she had now been replaying her head.  On April 30, 2018, after much deliberation, Jane Doe No. 2 reported the incident to Andrea Vircks in TCU's Title IX Department but also informed them that she was not immediately comfortable formalizing her complaint because she was aware of TCU's history and feared retaliation from Dr. Schoolmaster from which TCU would not protect her.  In an attempt to discourage her from filing her complaint, **TCU's Title IX office confirmed that Jane Doe No. 2's fears were valid**, before facetiously stating retaliation was prohibited. Unconvinced by this boilerplate response from TCU's Title IX office, Jane Doe No. 2 delayed formalizing her complaint several weeks during which time Jane Doe No. 2 lived and tried to cope with the psychological ramifications of her encounter with Dr. Schoolmaster, including her inability to focus on her schoolwork, while actively modifying her schedule so that she might avoid Dr. Schoolmaster and retaliation in the form of further harassment, including the further denial of educational opportunities.  Avoiding Dr. Schoolmaster proved to be impossible when Jane Doe No. 2 was forced to shake his hand as she received her diploma at graduation.

143.    On May 1, 2018, Jane Doe No. 2 hand delivered a typed statement recounting the incident.  The letter was post-dated to May 14, 2018—two days after graduation—when Jane Doe No. 2 could be sure that she would not have to encounter Dr. Schoolmaster.

144.    On or about May 14, 2018, Dr. Turner began his inquiry into Jane Doe No. 2's report of sexual harassment and assault by Dr. Schoolmaster by first, doubting and next attempting to villainize and discredit Jane Doe No. 2.  Specifically, rather than work to provide some recourse for the traumatic encounter suffered by Jane Doe No. 2, Dr. Turner contacted TCU staff members to question Jane Doe No. 2's character and ask if she were "believable."

145.     In late May 2018, having heard nothing from TCU except that Dr. Turner had questioned her character and believability to other TCU staff, Jane Doe No. 2 feared nothing was being done about her Title IX complaint.  So, Jane Doe No. 2 followed up with TCU's Title IX office regarding progress of her report of sexual harassment and assault by Dr. Schoolmaster.  In response, Ms. Vircks informed Jane Doe No. 2 that Dr. Turner, and Dr. Kathy Cavins-Tull, TCU's Vice Chancellor for Student Affairs, would meet with Dr. Schoolmaster regarding her report on June 5, 2018.  TCU and/or Dr. Turner failed to even contact Dr. Schoolmaster regarding Jane Doe No. 2's Title IX complaint by that date.

146.     On June 12, 2018, Jane Doe No. 2 again contacted TCU's Title IX office to check on the status of her report and was informed that TCU had still not yet notified Dr. Schoolmaster of her report of sexual harassment and assault.

147.     On the morning of June 20, 2018, still unsatisfied with TCU Title IX office's apparent and deliberate indifference toward her report of sexual harassment and assault at the hands of Dr. Schoolmaster, Jane Doe No. 2 met with then Provost Nowell Donovan and reported the incident again.  Upon learning of Dr. Schoolmaster's sexual harassment and assault of Jane Doe No. 2, in the form of caressing her knee and inner-lower-thigh Provost Nowell informed Jane Doe No. 2 that he "wouldn't touch [his] wife in that manner," asked Jane Doe No. 2 for a copy of her report (which she delivered to him next day) and assured her that he would contact the Title IX office to escalate her report.  Specifically, Provost Nowell stated that immediately after his meeting with Jane Doe No. 2 he would "call Darron and find out why [Title IX is] dragging their feet."

148.     After Jane Doe No. 2's meeting with then Provost Nowell, Dr. Kavins-Tull informed Dr. Schoolmaster of Jane Doe No. 2's Title IX report that same morning.

149.     That same afternoon—in an apparent attempt to further harass and intimidate Jane Doe No. 2—Dr. Schoolmaster crashed the party held to celebrate Jane Doe No. 2's graduation and going-away in the Political Science Department office.  Jane Doe No. 2 was already uncomfortable returning to the very place that her Academic Dean had violated her, and Dr. Schoolmaster's presence confirmed her worse fears and triggered the stress and anxiety that resulted from Dr. Schoolmaster's sexual harassment and assault.  Dr. Schoolmaster achieved his  intended result: intimidating Jane Doe No. 2.

150.     Dr.  Schoolmaster feigned ignorance of Jane Doe No. 2's party and pretended his visit was to ask a simple question.  In reality, however, Dr. Schoolmaster was visibly upset, and it was clear that Dr. Schoolmaster intended to and did intimidate Jane Doe No. 2 by showing up unannounced and with his arms folded at Jane Doe No. 2's going away party, in the very place he sexually harassed and assaulted her.

151.     Immediately after this encounter with Dr. Schoolmaster, Jane Doe No. 2 again contacted TCU's Title IX office. Specifically, Jane Doe No. 2 called TCU's Title IX office, **where Leigh Holland the so-called "Title IX Investigator" answered Jane Doe No. 2's call on speaker**.  Jane Doe No. 2 was shocked by the lack of professionalism, sensitivity and privacy exhibited by Ms. Holland's conduct in answering her call on speaker. Jane Doe No. 2 expressed her shock and disappointment with Ms. Holland, whom had no prior experience as a Title IX investigator and was apparently learning on-the-job. Thereafter, Ms. Holland—still on speaker— haughtily asked Jane Doe No. 2, "is this regarding your matter, is there something I can do for you?" Jane Doe No. 2 again pleaded with Ms. Holland to remove her from speaker so that the two might speak privately.  When Ms. Holland finally took the call off speaker, Jane Doe No. 2 informed her of her most recent and intentionally intimidating encounter with Dr. Schoolmaster.

Though she felt compelled to immediately report the incident, Jane Doe No. 2 ultimately concluded her conversation with Ms. Holland only feeling violated yet again by TCU. Indeed, Jane Doe No. 2 was apprehensive about speaking with Ms. Holland altogether due to Ms. Holland's reputation as a gossip.

152.    On June 21, 2018—nearly two months after Jane Doe No. 2 first reported her incident of sexual harassment and assault by Dr. Schoolmaster and only after constant pressure to act from Jane Doe No. 2—Ms. Holland sent Jane Doe No. 2 a Title IX e-mail across TCU's open network rather than via secure/certified mail. In this email, Ms. Holland attached a letter from Dr. Turner indicating that TCU had *finally* concluded that Jane Doe No. 2's report contained "enough information to warrant an investigation into the complaint." Worse still, this communication confirmed that Dr. Turner's mid-May conversations with staff regarding Jane Doe No. 2 were not at all a part of TCU Title IX office's investigation, but rather a failed attempt at throttling Jane Doe No. 2's report by calling into question her credibility and character.

153.    On July 19, 2018, Jane Doe No. 2 met with TCU's Title IX office via phone to review TCU's investigative report of her sexual harassment and assault by Dr. Schoolmaster. It is TCU policy not to provide copies of investigative reports to victims and reporters of incidents at TCU or TCU sanctioned events.

154.    According to the investigative report, Dr. Schoolmaster admitted that he inappropriately touched Jane Doe No. 2 but asserted that caressing and patting Jane Doe No. 2's knee and lower-inner-thigh was intended to be "respectful or courteous." Dr. Schoolmaster then contradicted himself by asserting the touching was unplanned and spontaneous. Dr. Schoolmaster also asserted that Jane Doe No. 2's report was "frivolous and ridiculous." Notwithstanding Dr. Schoolmaster's statements, they are implausible, if not laughable, when considering that Dr.

Schoolmaster, who stands over six feet tall could have accidentally caressed and then patted Jane Doe No. 2's knee and lower-inner-thigh, while she was seated.

155.    On Friday August 3, 2018, Dr. Turner e-mailed Jane Doe No. 2 (again on TCU's open network rather than via secure/certified mail) and attached a formal letter that, in relevant part, stated "[a]fter conducting a thorough and impartial investigation, it has been determined that Dr. Schoolmaster inappropriately touched your leg" and that "Dr. Schoolmaster violated TCU's 1.005 Discrimination, Harassment, and Related Conduct Policy."  As his punishment for sexually harassing and assaulting Jane Doe No. 2—the only student with a 4.0 GPA in the AddRan College of Liberal Arts—Dr. Schoolmaster was made to attend a mere one-hour, in person, one-on-one Title IX training/education and also complete an online Title IX training prior to the start of the following semester.   In reality, every professor at TCU was assigned to complete the aforementioned online Title IX training, therefore Dr. Schoolmaster's only true sanction was a mere one-hour conversation—a slap on the wrist; or better still a message to Jane Doe No. 2 and every racial minority and woman that at TCU sexual harassment and assault will be met with deliberate indifference. TCU's conduct indeed exhibits that TCU's "policies" and "protections" of racial minorities and women are just lip service to mandated federal law.

156.    Shocked and dejected that TCU and/or Dr. Turner had reduced the sexual harassment and assault she suffered to a "touch" on her leg and at the lack of punishment of Dr. Schoolmaster, Jane Doe No. 2 immediately appealed TCU's finding.  Specifically, on August 6, 2018, Jane Doe No. 2 wrote Dr. Turner expressing her disappointment with the lack of seriousness given her report as evidenced by the non-sanction(s) given to Dr. Schoolmaster and further informed TCU that its response to her report was inadequate.  Ultimately, and unsurprisingly, TCU denied Jane Doe No. 2's appeal.  To date, Jane Doe No. 2 has not even received an apology from

TCU or Drs. Turner and Schoolmaster.  Rather, by failing to appropriately reprimand his conduct TCU has ratified Dr. Schoolmaster's sexual harassment and assault.

### b. TCU's Title IX Office discourages Jane Doe No. 3 from reporting multiple incidents of discriminatory treatment at the hands of TCU, which were severe and pervasive enough to cause Jane Doe No. 3 psychological stress and anxiety and trigger type 1 diabetes and then deteriorate her diabetes control.

157.    Jane Doe No. 3 is a Chancellor Scholar at TCU, who receives a full **merit-based** scholarship and is enrolled in TCU's Honors College.  From the moment Jane Doe No. 3 arrived on campus in the Fall of 2016 she was smacked with TCU's well-preserved legacy of hate.  Shortly after she moved into TCU's Honors College dorm Jane Doe No. 3, while studying,   was approached by a white male student who announced to Jane Doe No. 3 that she "was only [at TCU and the Honors College] to fill the black girl quota."   In TCU's Honors dorm Jane Doe No. 3 would regularly encounter white students referring to Jane Doe No. 3 and other African Americans at TCU as "niggers".  Jane Doe No. 3 confronted the students, but nothing changed.  Jane Doe No. 3 was regularly subjected to racist, sexist, and bigoted remarks in the Honors College dorm.  The only space where Jane Doe No. 3 could escape such treatment was in her shared room, where TCU assigned her to room with two other racial minority women.

158.    In class, Jane Doe No. 3 was regularly treated to the same  conduct.  Her professors facilitated racist and bigoted conversation and assigned course work, not intended to educate, but rather to reinforce and/or excuse white supremacy.  In fact, Jane Doe No. 3's upper-level courses taught by the Criminal Justice Department and CRES department chairs donned topics like "Are people of color discriminated against or do they just commit more crimes?" and "Everyone is a little bit racist," respectively, to name a few.

159.    On campus Jane Doe No. 3's treatment was equally jarring. At one point she sought solace by joining a Christian small group on campus, which was facilitated by Kimber Crumrine,

a campus minister at TCU who regularly invited Jane Doe No. 3 to her home.  Jane Doe No. 3 had never visited Crumrine's home and once Ms. Crumrine disclosed to Jane Doe No. 3 that "[Crumrine's] dog is racist and does not like when [people of color] come to her home," Jane Doe No. 3 was glad she had declined the invitation.  Following this and other similar interactions with TCU's religious staff Jane Doe No. 3 stopped attending TCU programs facilitated by TCU's Religious and Spiritual Life office.

160.    When Jane Doe No. 3 attempted to find another distraction from this conduct by serving as an ambassador in her academic department, and as a faculty assistant to her Honors College professor from 2016 to 2019 she was degraded, berated and met with open hostility. Jane Doe No. 3's faculty mentor, for whom she worked  as an assistant, would regularly demand that Jane Doe No. 3 perform non-academic/TCU- related work at all hours of the day and night.  When the faculty mentor believed that Jane Doe No. 3 responded untimely, she regularly bombarded her with dozens of harassing and insulting text messages.  Jane Doe No. 3's faculty mentor even pilfered resources Jane Doe No. 3 had earned and purchased with Honors College grant money to support her own research.  Indeed, Jane Doe No. 3's faculty mentor appropriated recording supplies for focus groups, transcription services, as well as gift cards to compensate the participants in her own faculty required research from those resourced purchased via Jane Doe No. 3's grant—all without Jane Doe No. 3's consent.

161.    Despite such treatment, TCU regularly solicited  Jane Doe No. 3's participation in school activities, because as stated by TCU, as a racial minority and woman Jane Doe No, 3 "can speak eloquently about the impact of receiving a Chancellor's Scholarship."  Jane Doe No. 3 deeply resents being utilized as yet another minority show piece by TCU. Because she is a scholarship recipient, however, she feels compelled to do so.  Without fail after each event, Jane

Doe No. 3 is approached by white faculty, alumni, and donors and told that she "speaks well" or is "articulate." At one such event on April 26, 2019, after Jane Doe No. 3 spoke on behalf of the Honors College, she was approached by a white man that had been drinking heavily, who told her she "spoke well" and reminded him of Oprah.  Next, without Jane Doe No. 3's consent and in the presence of TCU faculty and staff, the same drunk white man kissed Jane Doe No. 3.  No one said a word or otherwise defended Jane Doe No. 3.

162.    The discriminatory and bigoted treatment to which Jane Doe No. 3 was subjected was so severe and pervasive that Jane Doe No. 3 found herself calling her mother in tears nearly every night as a result of the foray of hate she experienced at TCU each day.  Soon the stress and anxiety of her TCU experience had negatively impacted her mental and physical health.  So great was the stress that during her first semester Jane Doe No. 3 visited an endocrinologist who diagnosed her with type 1 diabetes, which he stated was triggered by her experiences at TCU and which Jane Doe No. 3 must manage for the rest of her life.  TCU's continued discriminatory treatment of Jane Doe No. 3 has exacerbated her condition and  required more stringent measures to control it, including both psychological and physiological treatment.

163.    On May 1, 2018, Jane Doe No. 3 met with Chancellor Boschini to share her experiences and was candid about the openly hostile racist and sexist environment within her academic department.  Chancellor Boschini did not encourage Jane Doe No. 3 to file a report with TCU's Title IX office or otherwise direct her to TCU resources.

164.    TCU's Student Disability Services was also of no assistance to Jane Doe No. 3 when she requested accommodations based upon her diabetes management/control.  In January 2019, Jane Doe No. 3 reached out to Laurel Cunningham, Interim Leader of Student Disability Services, begging for accommodations as it had become increasingly difficult for her to manage

her diabetes and schoolwork amidst the stress and trauma and treatment that goes along with being an African-American woman at TCU as described herein. Ms. Cunningham responded by asking Jane Doe No. 3 for more information, but when Jane Doe No. 3 replied providing such information, Ms. Cunningham went dark.  To date, Jane Doe No. 3 has not received any further communication from TCU's Student Disability Services.

165.    On June 6, 2019, Jane Doe No. 3 sent a detailed nine-page written report to TCU's Title IX Coordinator, Dr. Turner detailing some of her harrowing experiences and the physiological and physical injuries that resulted, including type 1 diabetes and/or worsening diabetes control.  Puzzlingly, Dr. Turner responded by asking Jane Doe No. 3 if she *really wanted* to file a formal complaint, placing emphasis on an investigation as though it would be a hassle, suggesting that she should rather just place her grievances "on record," and hurried her to discuss another unrelated topic in an attempt to discourage Jane Doe No. 3 from reporting discriminatory treatment. Other than Dr. Turner's apparent dismissal of her report upon its receipt, as of the original filing of this lawsuit, Jane Doe No. 3 has received no response from TCU regarding the hateful and discriminatory experience she has been made to endure.

166.    Returning to TCU in the Fall of 2019 was traumatic for Jane Doe No. 3 because she knew how difficult it is for an African-American woman to learn, live, and work in TCU's discriminatory environment.  Jane Doe No. 3 was spiraling emotionally, she struggled to turn assignments in on time, and even to  go to class on most days.  Jane Doe No. 3 also quit her job as a Honors College Faculty Assistant to avoid the harassment from her faculty mentor and campus altogether.  Jane Doe No. 3 also decided that she was no longer mentally capable of attending graduate school after graduation due to the stress and anxiety that she experienced at TCU so she cut the graduate application process short in late October. Today, Jane Doe No. 3 has very little

motivation for school and life. Though she thought about leaving TCU, as a recipient of a full scholarship and without the financial resources to attend college elsewhere Jane Doe No. 3 remained at TCU.  Her Chancellor's Scholarship had become a noose around her neck. Jane Doe No. 3 now seeks therapy outside of TCU as the TCU Counseling Center has a reputation for not being diverse, sympathetic or helpful to African-American women.

> **c.   TCU's Title IX Office ignores years of complaints of discrimination against racial minorities and women in TCU's Department of English and instructs Jane Doe No. 4 that she must waive and forfeit her complaints in order to accept an on-campus employment position at TCU and offers Jane Doe No. 5 an on-campus employment position in response to her direct complaints to Chancellor Boschini.**

167.    Jane Doe No. 4 is an award-winning African-American woman who was previously enrolled in the PhD program in TCU's Department of English.  As a native of Louisiana and a survivor displaced by Hurricane Katrina, who now holds undergraduate and graduate degrees, including a graduate degree from another predominantly white institution in the deep south, Jane Doe No. 4 is no stranger to hard work and perseverance in the face of adversity.   But none of the experiences Jane Doe No. 4 previously encountered could have prepared her for the unique brand of hatred and bigotry endorsed by—and to which she was subjected at—TCU.

168.    Even prior to her enrollment, Jane Doe No. 4 received a quiet warning against attending TCU. During TCU's Department of English Visit Day in Spring 2015, the only other African-American student enrolled in the PhD program in TCU's Department of English asked if Jane Doe No. 4 really wanted to attend a university that was "very white."  **Jane Doe No. 4 had not known of TCU's long history of bigotry and racism, including its failure to graduate even one African-American woman from its English PhD program, to date—and  not for want of trying.**  During that same visit then professor Dr. Cedric May, an African-American male, also curiously kneeled down to earnestly express to Jane Doe No. 4 that he would be available to help

in any way that he could if she attended TCU.  Jane Doe No. 4 did not know what to make her interactions on Visit Day, however, she had attended and received adequate education, support and encouragement and was successful at other "very white" graduate programs, so she believed TCU would be no different.  Jane Doe No. 4 was wrong.

169.    By the time Jane Doe No. 4 enrolled in the PhD program in TCU's Department of English in the Fall of 2015, the only other African-American PhD student had transferred to the University of Texas at Austin citing racially discriminatory treatment as cause for her departure. To add insult to injury, as a result of TCU's racist environment, Dr. May also resigned from the TCU's Department of English citing concerns regarding the same.  And over the next four years Jane Doe No. 4 was subjected to rank hostility and harassment at the hands of her peers and professors.

170.    Indeed, Jane Doe No. 4—like many other racial minorities and women at TCU— learned very quickly that TCU was not a welcoming environment to African-American women. In her classes, Jane Doe No. 4 was subjected to offensive and disgusting racist jokes, commentary and course materials, like "all black men hate gay people and that is why there are so many homeless black gay youths" and equally racist assignments.  When Jane Doe No. 4 participated in class discussions or made presentations, she was regularly publicly belittled and berated, if not boldly cut off mid-speech, especially in courses taught by then Chair of the Department of English, Karen Steele, who regularly demeaned Jane Doe No. 4 for simply daring to participate in class. One of Jane Doe No. 4's white classmates even violated her person by touching—without permission—Jane Doe No. 4's hair.  Jane Doe No. 4's classmates were no doubt emboldened by the behavior of their professors, who by their conduct, demonstrated that Jane Doe No. 4 was fit to be dehumanized.  When Jane Doe No. 4 attempted to address the racist environment to which

she was regularly subjected, Jane Doe No. 4's professors were often unprepared or seemingly unwilling to address her concerns about the racist conversations, text and conduct entertained in her PhD program. Not surprisingly, TCU did little, if anything at all to correct Jane Doe No. 4's professors and classmates' racist and inaccurate commentary and behavior.

171.    Jane Doe No. 4 ended her first year at TCU feeling isolated and shutdown. In fact, in Jane Doe No. 4's First Year Review—a requirement of TCU's English PhD program—she made clear her complaints and extensively detailed the anxiety, stress and trauma that resulted from her experiences at TCU. In response, in a letter dated May 7, 2016 Jane Doe No. 4's professors acknowledged "the challenges of adjusting to TCU's largely homogenous culture and, at times, racially insensitive—and at times offensive—treatment from her peers" and stated that they were "earnestly concerned about her treatment by other graduate students and attuned to the need for her coursework to include ample, and equitable, opportunities for her scholarly pursuits in a supportive professional environment." Despite commending Jane Doe No. 4 for her "forthright and thoughtfulness in addressing the need for productive spaces of learning and growth in the program", TCU and its agents did nothing to stop the onslaught of hate and racism Jane Doe No. 4 was treated to on campus and in the classroom in the form of "petty behaviors" and "unproductive interactions" by her classmates and professors designed to relegate Jane Doe No. 4 to a status of second class citizen.

172.    The anxiety and trauma resulting from Jane Doe No. 4's first year at TCU manifested itself in sleeplessness, inability to complete coursework, and a diminished sense of self-worth, **to name a few of the debilitating repercussions of simply existing as an African-American woman on TCU's campus**. Jane Doe No. 4 vowed to TCU's English Department, in writing, that her experience at TCU was not one she would wish on her worst enemy, much less

another unknowing African-American woman.  So, when Jane Doe No. 5, another award-winning African-American woman attended TCU's Visit Day in Spring 2016, Jane Doe No. 4 extended Jane Doe No. 5 the same quiet courtesy and warning given to her a year earlier.  During 2016 Visit Day, Jane Doe No. 4—the only African-American student in TCU's English PhD program— warned Jane Doe No. 5 that her experience at TCU had been very hard because of her race and gender.

173.    Armed with this warning Jane Doe No. 5 visited then Director of Graduate Studies, Dr. Mona Narian and candidly expressed her reservations about attending TCU because of its hateful legacy and its failed attempts at diversity, equity and inclusion.  Despite being fully aware of Jane Doe No. 4's ongoing distress at the hands of her professors and peers, Dr.  Narian touted TCU's recent DEI campaign as evidence that TCU had made the necessary changes to ensure a productive environment for its racial minorities and women and urged Jane Doe No. 5 to attend TCU and experience and take part in said change.  Dr. Narian was wrong.  TCU had not changed. In fact, as detailed above TCU's racist fabric has remained unchanged since its founding and throughout its history.

174.    Jane Doe No. 5 knew all too well of TCU's history.  Indeed, though she had been married and living in Berlin, Germany for years at the time she applied to TCU, Jane Doe No. 5's grandmother was from and lived in Fort Worth's "Stop Six" neighborhood.  Jane Doe No. 5 had learned of TCU and its racist history in Fort Worth through stories of the racist conduct of TCU's students, faculty and staff, which her grandmother and other African-American residents directly experienced.  **Jane Doe No. 5 even recalled vividly that as a child visiting her grandmother, there was a clear line of demarcation where African-Americans were safe or allowed on Berry Street—the street leading directly to TCU from Stop Six**.  These stories would become

the basis of Jane Doe No. 5's research and sadly forecast her own plight at TCU.  Having attended predominately white institutions for undergraduate and graduate school and having received adequate support and fair treatment from those institutions, (which facilitated her successful completion of the same) however, Jane Doe No. 5 assumed that TCU too was capable of overcoming its past and promoting an equitable learning environment.  Jane Doe No. 5 soon learned that she had incorrectly assumed that TCU was capable of fair and equitable treatment of African-American women.

175.    Almost immediately after enrolling in the PhD program in TCU's Department of English, Jane Doe No. 5 experienced the same racist and isolating treatment Jane Does Nos. 1, 2, 3 and 4 and other racial minorities and women received at TCU.  In class, Jane Doe No. 5 was treated to insensitive remarks and condescending directives from her professors who regularly casually berated Jane Doe No. 5 and questioned her intelligence, ability and creativity during class discussions and presentations, especially at the hands of then Chair of the Department of English, Dr. Steele.  Jane Doe No. 5's treatment by Dr. Steele was so jarring that even her fellow non-African-American classmates took notice of Steele's hostile behavior.  By the end of her first year in TCU's English PhD Program, Jane Doe No. 5—like Jane Doe No. 4—was left feeling dejected, isolated and questioned her self-worth because of her experiences at TCU.

176.    On the afternoon of December 1, 2016, Jane Doe No. 5 reached her tipping point.  That day—feeling alone and openly attacked solely because of her race—Jane Doe No. 5 skipped class to visit TCU's Title IX Office to see what recourse she had in making a formal complaint against Dr. Steele for the harassing treatment she was receiving in her Introduction to Graduate Studies course, among other hostile experiences she had encountered in her first semester at TCU.  While there, Jane Doe No. 5 met with Leigh Holland and detailed her experience fully.  While Ms.

Holland performed what appeared to be empathy towards Jane Doe No. 5 at the time, she ultimately discouraged Jane Doe No. 5 from formalizing her complaint and even explicitly instructed Jane Doe No. 5 to hold off on filing a complaint until grades were issued as that would be the measure of whether Jane Doe No. 5 was adversely impacted by the obvious racist behavior from Dr. Steele. Jane Doe No. 5 was shocked by this response because her reason for visiting the Title IX Office was to report the racist and dehumanizing treatment she had been subject to and not concern for her grades.  Apparently, Ms. Holland, and/or TCU believes that discriminatory treatment or impact towards a student may only occur if that student's grades fall below a certain standard.  That is, Ms. Holland and/or TCU have determined that complaints of African-American women students to TCU's Title IX Office, regardless of their nature, are not valid or ripe unless said students' grades have been negatively impacted as a result.  Ms. Holland and/or TCU could not be more incorrect.

177.    Jane Doe No. 5 left her meeting with Ms. Holland feeling more physically and emotionally drained and let-down than when she had arrived.   Ms. Holland was successful in fielding Jane Doe No. 5's valid Title IX complaint.  Of course, neither Ms. Holland nor anyone from the Title IX office or TCU at all ever followed up with Jane Doe No. 5.  And of course, Jane Doe No. 5's racist encounters worsened.

178.    In Spring of 2017, Jane Does Nos. 4 and 5 enrolled in a rhetoric and composition course titled Protest and Violence taught by Dr. Brad Lucas.  Jane Does Nos. 4 and 5 purposefully enrolled in this class because the topic was civil rights, thus they assumed that the course work might shield them from the racist undertones of the Department.  Jane Does Nos. 4 and 5 were wrong.  In fact, said class would become one of the most contentious and hostile environments the pair would experience at TCU.

179.    Throughout the course Dr. Lucas not only assigned racist rhetoric but also facilitated racist discussions and presentations.  When Jane Does Nos. 4 and 5 spoke against the course readings and conduct they were immediately slapped-down.  Instead—in a PhD level civil rights course—the onus was on Jane Does Nos. 4 and 5 to not make their white classmates uneasy or uncomfortable by discussing race.  Where Jane Does Nos. 4 and 5's white classmates did take comfort, however, was in berating and belittling the work that Jane Does Nos. 4 and 5 conducted in the course.  On occasion, in this course, Jane Does Nos. 4 and 5 found themselves—with no help from Dr. Lucas—explaining and arguing the most basic tenants of how the ramifications of slavery and systematic oppression still impact African Americans today.  In another instance, when Jane Doe No. 4 expressed interest in researching and writing about the connection between civil rights and African-American health, Dr. Lucas became irate and berated Jane Doe No. 4; simultaneously ushering in racist commentary from Jane Does Nos. 4 and 5's classmates, who questioned the value and validity of such a project.  At a point, Jane Doe No. 5 began fielding the onslaught of derogatory questions and remarks from her classmates in order to offer Jane Doe No 4, who was becoming visibly shrunken, some reprieve.  Dr. Lucas did nothing to stop Jane Does Nos. 4 and 5's classmates from belittling and demeaning Jane Does Nos. 4 and 5's work.  During that same class, however, Dr. Lucas shielded and even stopped aggressive discussions of a white student's work in order to defend said student against the commentary.

180.    Ultimately, Jane Does Nos. 4 and 5 emailed Dr. Lucas expressing concern over their experience in his course, including the overwhelming feeling of having to defend themselves (and indeed the African-American race) in order to contradict the intensely racist course materials featured in class.  In response, Dr. Lucas admitted that his course was not doing a good job of

engaging with racism in the works assigned, but did nothing to change his or the behavior of Jane Does Nos. 4 and 5's classmates.

181.    Later that semester Jane Doe No. 4 visited then Director of Graduate Studies, Dr. Narian to complain about her experience in Dr. Lucas's class and express her concerns that Dr. Lucas was on her exam committee given the experiences she had encountered with him.  Dr. Narian warned Jane Doe No. 4 that removing Dr. Lucas from her exam committee would likely result in retaliation from Dr. Lucas, who was the incoming Director of Graduate Studies for the following academic year.

182.    That same semester, Jane Doe No. 5 also made Dr. Narian aware of the discriminatory treatment she had experience in her first year at TCU.  At no time did Dr. Narian or anyone else from TCU direct Jane Does Nos. 4 and 5 to Title IX to formalize their many complaints.

183.    Jane Does Nos. 4 and 5 were also discriminated against for daring to participate in co-curricular activities.  In one instance, Jane Doe No. 5 was unable to attend a Women of Color in the Academy conference because the only way TCU's English PhD program would fund the trip was if she agreed to recruit for TCU.  Given the hostile and discriminatory experiences she had survived, Jane Doe No. 5's conscience would not allow her to knowingly participate in subjecting another African-American woman to her experience.  In another instance, then Chair Dr. Steele, allocated funding for Jane Doe No. 5 to attend a conference, but not before publicly announcing that "[Jane Doe No. 5] doesn't have a credit card that she can put this on" so as to demean Jane Doe No. 5 in the presence of persons with whom she had to interact with in the Department.

184.    When Jane Does Nos. 4 and 5 attempted to introduce their colleagues to diverse perspectives in a manner sanctioned by TCU, they were shunned and discriminated against by TCU's Department of English and her students.  Specifically, in Fall 2017, Jane Does Nos. 4 and 5 co-founded a Reading Group for American and African-American literature.  Reading Groups are a required form of participation for PhD students in TCU's Department of English, which students regularly and robustly attend.  In fact, as a required exercise, TCU Department of English staff closely monitor the attendance and equitable sharing of ideas that take place in Reading Groups.

185.    Prior to Jane Does Nos. 4 and 5 Reading Group, all such groups primarily focused on white and Eurocentric topics.  Not surprisingly, despite providing seemingly unlimited funding to the other reading groups for lunch, snacks and other items for attendees, Jane Doe Nos. 4 and 5's Reading Group was given a $75.00 budget to cover the cost of lunch, snacks and other items for attendees for the entire year, leaving Jane Does Nos. 4 and 5 to self-fund their Group.  Along with being given less funding for the Afrocentric Reading Group, despite the fact that Jane Does Nos. 4 and 5 regularly attended other Reading Groups, only two faculty members and few students attended any of the Afrocentric Read Group's meetings the entire year.

186.    Jane Does Nos. 4 and 5 were discouraged and dismayed but remained committed to promoting accurate depictions of the African and African-American experience to their professors and colleagues to combat the negative, stereotypical, insensitive and inaccurate representations of African Americans promoted by TCU.  Jane Does Nos. 4 and 5 also continued to report and complain of their experiences with racism and lack of diversity to Dr. Narian.

187.    At the end of Fall 2017, rather than sincerely address Jane Does Nos. 4 and 5's concerns, or refer their complaints to TCU's Title IX Office or investigate the same, Jane Does

Nos. 4 and 5 were instructed to include their complaints on course evaluations and treated to a series of hurried conferences on diversity, which were placating, unproductive and did little more than advance the flawed logic that racial minorities and women, like Jane Does Nos. 4 and 5 should change themselves in order to peacefully coexist within TCU's racist environment.

188.    Indeed, on December 8, 2017, at one such conference Professor David Colon yelled at Jane Doe No. 4 for asserting that the racial minority faculty had not done enough to address the anti-African-American racism endured by African-American students within the department. Though several members of TCU faculty and staff were present and openly agreed with Jane Doe No. 4's sentiment, it was not until after said conference that Jane Doe No. 4 was apologized to and told that Dr. Colon was out-of-line.  Dr. Colon's conduct in yelling at Jane Doe No. 4 and the tone of the meeting generally was so oppressive and jarring that many of the racial minority students in attendance, including Jane Does Nos. 4 and 5, left said meeting feeling more isolated than before and psychologically and physiologically unable to return to class and/or complete assignments.

189.    At that very meeting, for the first time, a TCU professor informed Jane Does Nos. 4 and 5 that they should contact TCU's Title IX Office with their many complaints.  Jane Doe No. 5 recalled her conversation with Ms. Holland two years prior and thus had little hope that doing so would make any difference at all.  Jane Doe No. 5 was right, as was confirmed by Dr. Narian when she informed Jane Doe No. 4 that the reason she had not previously recommended that Jane Does Nos. 4 and 5 forward their complaints to TCU's Title IX Office was because she "knew that Title IX would not do anything."

190.    But when Jane Doe No. 5 followed Dr. Narian's instruction to include complaints of discrimination in course evaluations, that too backfired.  Specifically, in December of 2017,

Jane Doe No. 5 complained about the unfair treatment she experienced in her Teaching College Composition course taught by Dr. Carrie Leverenz.

191.    Upon her return from winter break in January of 2018, Jane Doe No. 5 learned that Dr. Leverenz had embarked on a witch hunt to publicly identify which racial minority student had given her a negative review.  Dr. Leverenz had even tearfully talked to other racial minorities in TCU's Department of English about the review to ask if they agreed.  Jane Doe No. 5 believed, as Dr. Narian had told her, that course evaluations were anonymous and would not be publicly discussed.  As a result, Jane Doe No. 5 was left knowing that there was no real recourse for her treatment at TCU and yet again felt alone, rejected, and as though her life was of little value at TCU.  Jane Doe No. 5 was psychologically drained by her experience at TCU and developed a sense of ambivalence towards her decision to attend TCU in the first place.  Soon, Jane Doe No. 5's psychological state manifested physiologically as she began to experience tension headaches and general health decline.  To tend to her health, Jane Doe No. 5 began limiting her participation in, and attendance at TCU, including required program activities.

192.    On January 18, 2018, Jane Doe No. 5 reached her breaking point.  On that day, Jane Doe No. 5 was tired of feeling empty and spurned by the constant onslaught of hate visited upon her at the hands of TCU, and so—in search of some semblance of peace for the first time since her enrollment at TCU—she penned a farewell note for her husband and visualized her own death. Fortunately, this visualization did not materialize.

193.    Ironically, on that very same day—January 18, 2018—after submitting a formal complaint, and against the advice of Dr. Narian, Jane Doe No. 4 met with Dr. Turner in TCU's Title IX office to inform him of her and other African-American women's experience at TCU and to plead with him to take seriously the real harm that resulted from the hateful and bigoted practices

and disparate racial treatment and impact at TCU.  True to form, Dr. Turner did not open an investigation into Jane Doe No. 4's complaints.

194.    Instead, nearly four months later, and after continued complaints, on April 6, 2018, Dr. Turner and Ms. Holland treated Jane Does Nos. 4 and 5 and other racial minorities in the PhD program in TCU's Department of English to lunch, where they again recounted the same hateful experiences and racist classroom and campus environment of which that they first informed his office in Fall 2016.  Dr. Turner and Ms. Holland assured Jane Does Nos. 4 and 5 they had been heard and that TCU would "work to help rectify the problems" they faced.  But again, Dr. Turner and Ms. Holland and/or TCU did nothing.

195.    Predictably, Jane Does Nos. 4 and 5 experience only continued to worsen.  In fact, Jane Does Nos. 4 and 5 were also openly and blatantly discriminated against as professors in the TCU's Department of English.  **Specifically, Jane Does Nos. 4 and 5 were required to hold office hours in shared space in Reed Hall, where their white colleagues would berate, demean and bully them out of the office.  Ultimately, both Jane Does Nos. 4 and 5 were forced to hold office hours with their students in the TCU Library, Bookstore or even the hallway outside of classrooms.  TCU was aware of this conduct and again did nothing.**

196.    On October 4, 2018, when Jane Doe No. 4 was interviewing for an employment position in TCU's Title IX Office, yet another professor in TCU's Department of English joined in on the parade of hatred that encapsulated Jane Does Nos. 4 and 5's experience.  That day, Dr. Richard Enos sent an email to the entire English Department belittling Jane Doe No. 4 and—ironically—calling her unprofessional.  Jane Doe No. 4 showed the email exchange to personnel in TCU's Title IX office during her employment interview.  Ultimately, Dr. Enos begrudgingly

apologized for his behavior, but again nothing was done to change the environment of hate and bigotry to which Jane Does Nos. 4 and 5 were subjected to daily.

197.    On November 8, 2018, after learning of the numerous unanswered complaints of discrimination reported by Jane Does Nos. 4 and 5, Dr. Joddy Murray, the newly appointed Chair of TCU's Department of English tellingly sent an email apology to the Department explaining that:

> **When longstanding injustices have been part of an institutional culture, acknowledging the truth and apologizing for the impact on individuals in the community can be an important step for moving forward**.  With that in mind, I write to you all today. Individuals in the department of English, both faculty and students, have behaved in a racist, homophobic, misogynistic, and disrespectful manner both in public and semi-public spaces on campus —TCU compliance officers are aware of these reported complaints.  Faculty and students of underrepresented groups have had the burden of first experiencing these behaviors and conversations as microaggressions and outright aggressions, and then, in the reporting or retelling of these behaviors, had to perform these traumas and aggressions again.  Even now, it is likely that some continue to experience these traumatic events repeatedly, affecting their mental and physical health and, consequently, resulting in having to try and learn and teach in what becomes, for them, a toxic climate in our department.
> **As Chair of the Department of English, I apologize that this happened**.  We cannot allow the learning and working environment to continue to be toxic.  We must do better, together.  **We need to educate ourselves, listen to others, and collectively do the work to both acknowledge these problems and take additional concrete steps to make constructive change.  We need to check our own behavior and be aware of our prejudices, our biases, our microaggressions.  No one person can do this.  We all must do this together**.

198.    Dr. Murray was correct and as he poignantly noted; the centuries of racial animosity nurtured at TCU requires immediate and intentional action.  Unfortunately, however, Drs. Turner and Boschini do not see the problem as clearly as Dr. Murray.

199.    On December 5, 2018, during her final employment interview with TCU's Title IX Office, Ms. Aisha Torrey Sawyer informed Jane Doe No. 4 that **if she accepted the position, she "would have to forfeit all of her prior Title IX complaints of discrimination at TCU."**  Jane Doe No. 4 was in disbelief and declined the position.  By now, the unyielding racist conduct of TCU and its agents had taken its toll on Jane Doe No. 4, and she experienced psychological and physiological pain and injuries as a result.

200.    Now battling constant bouts of anxiety and stress stemming from the harassment and humiliation being perpetrated against her, and at the advice of her physician, Jane Doe No. 4 decided that she could no longer allow her mind and body to continue to be destroyed as a result of TCU's collective racial immaturity.  On January 16, 2019, Jane Doe No. 4 quit TCU's PhD program in the Department of English.

201.    With Jane Doe No. 4's departure, Jane Doe No. 5 was left to decide how much more of TCU's racism she could reasonably endure, especially knowing that all African-American women students before her were constructively removed from the PhD program in the Department of English.  Jane Doe No. 5's physiological and psychological state also continued to decline as she experienced the stress and resulting emotional breakdowns and panic attacks associated therewith.

202.    On March 26, 2019, Jane Doe No. 5 again visited TCU's Title IX Office and spoke with Ms. Holland to report the onslaught of issues she continued to face in her years at TCU.  Ms. Holland again focused on whether or not Jane Doe No. 5's grades were impacted, rather than the treatment Jane Doe No. 5 was experiencing.  When Jane Doe No. 5 noticed that Ms. Holland was recording her latest complaint in pencil and on scrap paper, while seemingly dismissing her complaints, Jane Doe No. 5 asked directly, "**are they going to have to call me 'nigger' before**

**y'all will do anything."**  Ms. Holland responded by telling Jane Doe No. 5 that she would need to submit yet another complaint in writing to formalize her complaint.  Again, no investigation into Jane Doe No. 5's complaints was opened.

203.    Instead, on May 3, 2019, Dr. Turner held a meeting with the entire Department of English where he had the effrontery to—without investigation—announce to Jane Doe No. 5 and other racial minorities that their civil rights had not been violated.  At that same meeting Dr. Turner also announced that an external investigation of the racist climate in TCU's Department of English would soon commence.  Per usual, this too was a lie.

204.    Jane Doe No. 5 was so frustrated with Dr. Turner's empty promises that on November 1, 2019, she met with Chancellor Boschini to detail her complaints.  Bizarrely, rather than work to ameliorate Jane Doe No. 5's experience, Chancellor Boschini asked Jane Doe No. 5 "if there were a job at TCU for you, would you take it?"  Jane Doe No. 5—like Jane Doe No. 4— declined the apparent offer to waive her complaints in exchange for a job and presumably compensation.

205.    On January 13, 2020—after having been notified of this impending lawsuit—TCU finally commenced its external investigation of the complaints first made by Jane Does Nos. 4 and 5 as early as Fall 2016.

206.    Jane Doe No. 5 did not mince any words when challenging Ms. Holland and TCU's failure to address the issues that they were aware of for several years and even correctly informed Ms. Holland that some of the psychological and physiological damage that had been caused by enduring the overt and covert racism and racial oppression at TCU could have likely been quelled by Ms. Holland, Dr. Turner and others at TCU had they taken the complaints of African-American women seriously years ago, when such incidents were initially reported.

207.    Even Department of English professors Dr. Narian, Linda Hughes, Charlotte Hogg, Alex Lemon, Jason Helms, Stacie McCormick, Rima Abunasser, Ariane Balizet and Theresa Gaul finally summoned the courage to stand up for their racial minority and women students that were met with deliberate indifference when they submitted their complaints to TCU's Title IX office. On May 29, 2020, the aforementioned professors sent the following collective message to Dr. Turner:

> We are writing as members of the English Department Advisory Committee and department leadership about the delay in concluding the inquiry conducted by Segal Consulting into the English Department's climate and culture regarding bias and discrimination along lines of race, ethnicity, gender, sexuality, age, and ability. This inquiry, which was announced in April of 2019, was deferred until January of 2020. Our understanding was that the consultants' report was to be delivered after spring break. With the upheaval brought about by COVID-19, we have not received that report, and thus the academic year has ended without resolution on this matter. Because we are invested in ensuring a working environment that supports everyone in our department, we urge you to bring this inquiry to a conclusion and move forward towards resolving any open Title IX complains within the English Department as speedily as possible. We understand that the global pandemic has made all processes challenging and difficult in the latter half of the spring semester. However, prolonging resolution on matters at the heart of the inquiry only exacerbates collective anxieties and concerns. As members of the department's leadership, we recognize the urgent need to provide an equitable and inclusive departmental climate and culture to sustain a positive learning and working environment for students and faculty. Without resolution of any outstanding complaints, we are substantially hampered in moving forward to take action and make change. Because of confidentiality, we are not informed as to the number, content, or individuals named in any complaints to your office. Based on the fact that the Segal inquiry was initiated, however, we presume that there are students and faculty members who have made complaints and we believe it is possible that some complaints were made as early as 2016. The lack of resolution to any complaints has exacerbated feelings of distrust and disillusionment within our department. The deferral of the inquiry from April to December further heightened concerns among students and faculty in the department. As we conclude this year and move into a new year in August, we urgently need your office

> to move the process of investigating and resolving these complaints
> to conclusion.  We have undertaken substantial efforts within the
> department in the last year to address areas of concern.  However,
> students and faculty members who have made complaints deserve
> to have a definitive response to these complaints and the department
> needs to be able to either take action based on the complaints or
> move on from them in order to ensure equitable working and
> learning conditions and to heal.  Ongoing confidentiality constraints
> related to legality in regards to complaints severely hamper our
> ability to do this important work in line with the university's
> Diversity, Equity, and Inclusion goals and mission.

208.    Had TCU taken seriously the reports of discrimination and assault it received from other racial minorities and women like Jane Doe Nos. 1, 2, 3, 4 and 5, perhaps they would never have been subjected to the treatment detailed herein. Indeed, had TCU ever responded adequately at all to reports of discrimination and assault of racial minorities and women, Jane Doe Nos. 1, 2, 3, 4 and 5 would not have had to resort to litigation to remedy TCU's deprivation of educational opportunities and benefits and TCU's policy of intentional discrimination that substantially increased their risk of and exposure to discrimination and assault.

209.    Instead, TCU endorses a policy and practice that discourages racial minorities and women from reporting racial and sexual harassment and assault and retaliates against them for daring to speak out against it as it did with Jane Doe No. 1 during the 2019-2020 school year.

### XXI.    TCU retaliates against Jane Doe No. 1 for daring to report mistreatment.

210.    While Jane Doe No. 1 was busy working desperately to rehabilitate her physical and mental state resulting from her treatment at TCU and seeking justice for herself and other racial minorities and women relating to the same, Drs. Snow, Mack, Chimbel and Garnett—who were all aware of Jane Doe No. 1's complaints regarding discrimination—were also busy continuing to conspire against Jane Doe No. 1, and  directing allegations  to TCU administrators in retaliation for speaking out against her treatment. On August 27, 2019—in a conspired act of

retaliation—Professor Mack emailed Jane Doe No. 1 to inform her that he had determined that she committed plagiarism and was recommending that Jane Doe No. 1 receive no credit for the summer course.  On September 4, 2019 Dr. Rob Garnett, Associate Dean of the Honors College, sent a follow up email to Jane Doe No. 1 indicating that Jane Doe No. 1 "had earned a grade of 'no-credit' (NC) for the course, i.e., a grade below 70%" based on Professor Mack's recommended sanctions of "a zero for the two assignments that were [allegedly] plagiarized."  Dr. Garnett's correspondence further indicated that:

> The NC grade was based on your performance in all three areas of evaluation for the course, as stated on the syllabus, and based on the assessments provided to me by all four participating instructors. In part it was the result of you earning grades of 0 on three of the four writing assignments (two due to academic misconduct, the third due to your failure to submit a paper); but it was also due to your low scores for "class participation" (58%) and "questions and interaction with guest speakers and tour guides" (61%).

211.    Though Jane Doe No. 1 was still attempting to recover from the injuries she survived during the Washington summer program and reengage into her normal life and academic course load, Jane Doe No. 1 once again had to step over her pain to address the hateful and disparate treatment she continues to suffer at the hands of the Honors College.  Jane Doe No. 1 initiated a formal appeal with Dr. Garnett to dispute the NC grade she was given for the Washington program.  Besides the fact that, unsurprisingly, TCU blew nearly every protocol relating to its published academic appeal procedures, Jane Doe No. 1 focused on the facts.  On September 17, 2019, Jane Doe No. 1 emailed Dr. Garnett to request a breakdown of the grades she received during the Washington summer program prior to her appeal hearing.  On September 19, 2019 Dr. Garnett responded with the following:

> **Grades for [Jane Doe No. 1]**
> <u>Class participation</u> (50% of course grade)
> Dr. Gooding: 90 out of 100

Dr. [sic] Chimbel: 70 out of 100
Dr. Mack: 20 out of 100
Dr. Snow: 60 out of 100
Average score: 60 out of 100

Written exercises (25% of course grade)
Dr. Gooding: 90 out of 100
Dr. [sic] Chimbel: 0 out of 100
Dr. Mack: 0 out of 100
Dr. Snow: 0 out of 100
Average score: 22.5 out of 100

Questions and interaction with guest speakers and tour
guides (25% of course grade)
Dr. Gooding: 94 out of 100
Dr. [sic] Chimbel: 60 out of 100
Dr. Mack: 40 out of 100
Dr. Snow: 60 out of 100
Average score: 63.5 out of 100

Overall average for the course
(60*50%) + (22.5*25%) + (63.5*25%) = 51.5%

212.    Dr. Garnett also sent statements from each of the aforementioned Honors College

faculty members/program facilitators.  Of note, Dr. Gooding, finally found his conscience and

within his statement admitted the truth of Jane Doe No. 1's academic capabilities and the truth

behind Jane Doe No. 1's summer program experience:

> [Jane Doe No. 1's] class participation was commensurate with that
> of the "Excellent Participation" rating during the first week. During
> our group discussions she made contributions and always answered
> when called upon. Of note is that after the first full day, she and three
> other classmates took advantage of my ability to secure free tickets
> for an evening performance at the Kennedy Center. The rest of the
> group declined, citing fatigue.
>
> [Jane Doe No. 1] readily interacted with guest speakers and tour
> guides during the first week, with the exception of perhaps the more
> structured Brazilian Embassy visit. Of note was after our group visit
> with Georgetown University Law Center Professor Anthony Cook,
> she and [another student] elected to skip the group lunch portion in
> order to spend additional time engaging this engaging individual.
> Based upon her possible future law school plans of which she

disclosed to me, I thought it prudent for her to take advantage of this window of opportunity so long as she agreed to reunite with the group for the afternoon walking tour (of which, to my knowledge, she did so timely).

In her daily journaling, [Jane Doe No. 1] employs a "stream of consciousness" approach where she will not employ traditional paragraph spacing and thoroughly expresses herself, flowing from one thought to another. While this style may not "answer" all of the sub-questions posed from the reflective writing prompts, they do often reveal a deeper connection to the material on a much more personal level.

Overall, [Jane Doe No. 1] performed well during the first week. Towards the end of the first week I did notice an increase of personal spacing from other members of the general group, especially during transitions, but I interpreted this as a healthy means of "pacing oneself" given the unspoken dynamic of her being the only African American female on the trip. While I personally did not witness anyone of any ill will in an impolite exchange with [Jane Doe No. 1], **I speculated that after the first few days of excitement wore off, the reality of possibly being socially isolated in subtle yet invisible ways was starting to seep in**.

213.     Jane Doe No. 1's other professors, however, could not be bothered with the truth. Chimbel provided only four short sentences in support of the failing grades he issued to Jane Doe No. 1.  In addition to accusing Jane Doe No. 1 of plagiarism and scoring Jane Doe No. 1 zero for all written assignments, Dr. Snow and Professors Chimbel and Mack also heavily docked Jane Doe No. 1 for "class participation" and "questions and interactions with tour guides" citing subjective and arbitrary bases for Jane Doe No. 1's grade determination.  Jane Doe No. 1 was shocked by the grade break down and statements because they were in direct contravention with the praise Professors Chimbel and Mack had given her during the trip.  Jane Doe No. 1 pointed out this disparity to Dr. Garnett during her appeal hearing on October 22, 2019 and even Dr. Garnett was unable to reconcile the change in his colleagues' attitudes and opinions regarding Jane Doe No. 1's performance, or justify the inadequate responses provided to Jane Doe No. 1 regarding

her revoked credit.  Jane Doe No. 1 believed that the allegations of misconduct made against her were as much a sham as the appeals proceeding she had just concluded.  In addition, based on conversations with other students, Jane Doe No. 1 learned that she had been subjected to discriminatory grading standards that other students were not subjected to that summer and resulting in the events detailed herein. (in conjunction with hostile and welfare-endangering conduct from TCU staff).  In fact, shortly after filing this lawsuit another student enrolled in the course informed Jane Doe No. 1 that she had submitted pages with incomprehensible doodles—not words—for her written assignments and received credit for the course.

214.    On November 5, 2019, Jane Doe No. 1 was notified that the Honors College had denied Jane Doe No. 1's grade appeal continuing the retaliatory treatment against her.  Still, for a scholar as decorated as Jane Doe No. 1 the ongoing hostile treatment and now character assassination of Jane Doe No. 1 weighed heavily.  On November 6, 2019, left hopeless yet again by the acts and omissions of TCU, Jane Doe No. 1 disappeared.  When Jane Doe No. 1's family could not reach her for several hours, they panicked and began calling everyone they could think of, including the police to see if a report had been made.  Jane Doe No. 1's mother and uncle even began driving from their homes—each respectively hundreds of miles away—towards TCU's campus fearful of the worst.  Eventually, Jane Doe No. 1's family contacted Onstar®, Jane Doe No. 1's remote vehicle location service.  Jane Doe No. 1's family found Jane Doe No. 1 sitting alone in her car expressionless.  Jane Doe No. 1 had been sitting in her car for hours after once again calling the National Suicide Prevention Lifeline.

215.    TCU's discriminatory conduct is unyielding.   And TCU's present conscious disparate treatment of racial minorities and women, like Jane Doe Nos. 1, 2 and 3, is life-altering and life-threatening.  In fact, another racial minority student at TCU recently confided in Jane Doe

No. 1 that she too had suicidal ideations resulting from her treatment as second-class at TCU.  Jane Doe No. 1 provided said student with the phone number for the National Suicide Prevention Lifeline.

## COUNTS

### COUNT I—TCU violated Title VI of the Civil Rights Act of 1964

216.    Jane Does Nos. 1, 2, 3, 4 and 5 reallege and incorporate by reference the allegations contained in the previous paragraphs as if fully set forth herein.

217.    At all relevant times TCU faculty, staff, administration, and other employees and/or affiliates ("TCU agents") were acting within the scope of their employment and/or at the direction and under the control of TCU.  Moreover, at all relevant times appropriate TCU agents were made aware of and took no action against the conduct of its agents, thereby ratifying their conduct and rendering TCU vicariously liable for the conduct of their agents via the doctrine of Respondeat Superior.

218.    TCU violated Title VI of the Civil Rights Act of 1964 by subjecting Jane Does Nos. 1, 2, 3, 4 and 5 to a series of intentional hostile acts and adverse actions designed to deprive them of the benefits of education at TCU and derail their academic pursuit because of their race.

219.    Title VI of the Civil Rights Act of 1964 provides: "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d.

220.    Jane Does Nos. 1, 2, 3, 4 and 5 are African-American young women who were discriminated against because of their race.  Accordingly, Jane Does Nos. 1, 2, 3, 4 and 5 are members of a protected class.

221.    TCU receives federal financial aid and assistance and is therefore subject to the provisions of Title VI of the Civil Rights Act of 1964.

222.    As detailed extensively herein, as a direct result of TCU's acts or omissions, Jane Does Nos. 1, 2, 3, 4 and 5 were intentionally made to endure hostile and harassing treatment in their educational pursuit, including but not limited to: Jane Doe No. 1's repeated segregation, discrimination and disparate treatment at or in TCU and in TCU-facilitated housing, TCU academic programs, and TCU-sanctioned activities as detailed in paragraphs 59 through 133 and 169 through 174; TCU's deliberate indifference and/or inadequate investigation and response to Jane Doe No. 2's reports of sexual harassment and assault as detailed in paragraphs 134 through 156; TCU's deliberate indifference and/or inadequate investigation and response to Jane Doe No. 3's reports of racially hostile treatment at TCU as detailed in paragraphs 157 through 166; and TCU's deliberate indifference and/or inadequate investigation and response to Jane Does Nos. 4 and 5's complaints of discrimination at TCU as detailed in paragraphs 167 through 207. Jane Doe Nos. 1, 2, 3, 4 and 5 were subjected to a racially hostile educational environment created by TCU's lack of appropriate policies and procedures to remedy the same and its failure to properly investigate and/or address reports of discrimination from racial minorities and women.

223.    Additionally, TCU and its officials had actual knowledge of the discrimination faced by Jane Does Nos. 1, 2, 3, 4 and 5 because of their race and the resulting harm created by TCU's failure to investigate and discipline their attackers and harassers in a timely manner and consistent with federal and state law.

224.    TCU's failure to promptly and appropriately respond to the discrimination reported by Jane Does Nos. 1, 2, 3, 4 and 5 resulted in their exclusion from participation in, denial of the benefits of, and further discrimination in TCU's education program in violation of Title VI.

225.    TCU failed to take immediate, effective remedial steps to resolve the complaints of racial discrimination and instead acted with deliberate indifference toward Jane Does Nos. 1, 2, 3, 4 and 5.

226.    TCU persisted in its actions and inaction even after it had actual knowledge of the harm suffered by Jane Does Nos. 1, 2, 3, 4 and 5.

227.    TCU engaged in a pattern and practice of behavior designed to discourage and dissuade students who have been racially discriminated against from seeking prosecution and protection and from seeking to have discrimination reports fully investigated.

228.    This policy and/or practice constituted disparate treatment of racial minorities, and specifically African-Americans, and had a disparate impact on African-American students.

229.    Jane Does Nos. 1, 2, 3, 4 and 5  have suffered, and continue to suffer emotional distress and psychological damage as well as physiological harm as a direct and proximate result of TCU's conduct, including the facts detailed herein, and namely TCU's deliberate indifference to their rights under Title VI.

**COUNT II—TCU violated Title VII of the Civil Rights Act of 1964**

230.    Jane Doe No. 1 reallege and incorporate by reference the allegations contained in the previous paragraphs as if fully set forth herein.

231.    At all relevant times TCU faculty, staff, administration, and other employees and/or affiliates ("TCU agents") were acting within the scope of their employment and/or at the direction and under the control of TCU.  Moreover, at all relevant times appropriate TCU agents were made aware of and took no action against the conduct of its agents, thereby ratifying their conduct and rendering TCU vicariously liable for the conduct of their agents via the doctrine of Respondeat Superior.

232.     TCU violated Title VII of the Civil Rights Act of 1964 by subjecting Jane Doe No. 1 to a series of intentional hostile acts and adverse actions designed to derail equal opportunities and equal pay because of her race.

233.     Title VII of the Civil Rights Act of 1964 provides: " It shall be an unlawful employment practice for an employer  to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2.

234.     Jane Doe No. 1 is African-American young woman who was discriminated against because of her race.  Accordingly, Jane Doe No. 1 is members of a protected class.

235.     As detailed extensively herein, TCU discriminated against Jane Doe No. 1 by: (1) failing or refusing to pay that were equal to white female student worker performing the same assignments because of her race and (2) treating her less favorably than her white counterparts. All such actions are in direct violation of Section 703(a)(1) of Title VII, 42 U.S.C. § 2000e-2.  Jane Doe No. 1 was intentionally made to endure discriminatory behavior in her working environment, including but not limited to: Jane Doe No. 1's being subjected to overly strenuous physical labor and specifically used to gain African-American students as detailed in paragraphs 77 through  83.

236.     The effect of the practice of TCU and TCU agents complained of above has been to deprive Jane Doe No. 1 of equal opportunities and equal pay and others adversely affected her status as a student worker.

237.     The unlawful employment practices complained of herein were intentional or done with malice or reckless indifference to federal protected rights of Jane Doe No. 1.

**COUNT III—TCU violated Title IX of the Education Amendments of 1972**

238.    Jane Does Nos. 1, 2, 3, 4 and 5  reallege and incorporate by reference the allegations contained in the previous paragraphs as if fully set forth herein.

239.    At all relevant times TCU and TCU agents were acting within the scope of their employment and/or at the direction and under the control of TCU.  Moreover, at all relevant times appropriate TCU agents were made aware of and took no action against the conduct of its agents, thereby ratifying their conduct and rendering TCU vicariously liable for the conduct of their agents via the doctrine of Respondeat Superior.

240.    TCU violated Title IX of the Education Amendments of 1972 by subjecting Jane Does Nos. 1, 2, 3, 4 and 5 to a series of intentional hostile acts and adverse actions designed to derail their academic pursuit based upon their sex.

241.    Title IX of the Education Amendments of 1972 provides, in relevant part, that: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

242.    Jane Does Nos. 1, 2, 3, 4 and 5  are African-American young women who were discriminated against because of their sex.  Accordingly, Jane Does Nos. 1, 2, 3, 4 and 5  are members of a protected class.

243.    TCU receives federal financial aid and assistance and is therefore subject to the provisions of Title IX of the Education Amendments of 1972.

244.    As detailed extensively herein, as a direct result of TCU's acts or omissions, Jane Does Nos. 1, 2, 3, 4 and 5 were intentionally made to endure hostile and harassing treatment in their educational pursuit, including but not limited to: Jane Doe No. 1's repeated segregation,

discrimination and disparate treatment at or in TCU and in TCU-facilitated housing, TCU academic programs, and TCU-sanctioned actives as detailed in paragraphs 59 through 133 and 169 through 174; TCU's deliberate indifference and/or inadequate investigation and response to Jane Doe No. 2's reports of sexual harassment and assault as detailed in paragraphs 134 through 156; and TCU's deliberate indifference and/or inadequate investigation and response to Jane Doe No. 3's reports of racially hostile treatment at TCU as detailed in paragraphs 157 through 166; and TCU's deliberate indifference and/or inadequate investigation and response to Jane Does Nos. 4 and 5's complaints of discrimination at TCU as detailed in paragraphs 167 through 207.    Jane Doe Nos. 1, 2, 3, 4 and 5 were subjected to an educational environment that was hostile toward women, and specifically African-American women created by TCU's lack of appropriate policies and procedures to remedy the same and its failure to properly investigate and/or address reports of assault and harassment from African-American women.

245.    Additionally, TCU and its officials had actual knowledge of the harassment and/or assault faced by Jane Does Nos. 1, 2, 3, 4 and 5 because of their gender and the resulting harm created by TCU's failure to investigate and discipline their attackers and harassers in a timely manner and consistent with federal and state law.

246.    TCU's failure to promptly and appropriately respond to the harassment and/or sexual assault reported by Jane Does Nos. 1, 2, 3, 4 and 5 resulted in their exclusion from participation in, denial of the benefits of, and further discrimination in TCU's education program in violation of Title IX.

247.    TCU failed to take immediate, effective remedial steps to resolve the complaints of gender-based discrimination and instead acted with deliberate indifference toward Jane Does Nos. 1, 2, 3, 4 and 5.

248.    TCU persisted in its actions and inaction even after it had actual knowledge of the harm suffered by Jane Does Nos. 1, 2, 3, 4 and 5.

249.    TCU engaged in a pattern and practice of behavior designed to discourage and dissuade students who have been sexually discriminated against or assaulted from seeking prosecution and protection and from seeking to have reports of sexual discrimination and assault fully investigated.

250.    This policy and/or practice constituted disparate treatment of racial minorities, and specifically African-Americans, and had a disparate impact on African-American students.

251.    Jane Does Nos. 1, 2, 3, 4 and 5 have suffered, and continue to suffer emotional distress and psychological damage as well as physiological harm as a direct and proximate result of TCU's conduct, including the facts detailed herein, and namely TCU's deliberate indifference to their rights under Title IX.

### COUNT IV—TCU violated Section 504 of the Rehabilitation Act of 1973

252.    Jane Does Nos. 1 and 3 reallege and incorporate by reference the allegations contained in the previous paragraphs as if fully set forth herein.

253.    At all relevant times TCU and TCU agents were acting within the scope of their employment and/or at the direction and under the control of TCU.  Moreover, at all relevant times appropriate TCU agents were made aware of and took no action against the conduct of its agents, thereby ratifying their conduct and rendering TCU vicariously liable for the conduct of their agents via the doctrine of Respondeat Superior.

254.    TCU violated Section 504 of the Rehabilitation Act of 1973 by excluding Jane Does Nos. 1 and 3 from the participation in, denying them the benefit of, and subjecting them to harassment in a program or activity receiving financial assistance because of Jane Doe No. 1's

asthma—a qualified disability of which TCU was fully aware as detailed in paragraphs 100 through 113 and Jane Doe No. 1's resulting psychological and physiological injuries; and Jane Doe No. 3's type 1 diabetes which she reported to TCU and for which she sought and was denied accommodations as detailed in paragraphs 157 through 168.

255.    The Rehabilitation Act defines "program or activity" to "mean[] all of the operations of…a college, university, or other postsecondary institution." 29 U.S.C. § 794(b)(2)(A); 34 C.F.R. § 104.3(k). TCU is a "college, university, or other postsecondary institution." 29 U.S.C. § 794(b)(2)(A); 34 C.F.R. § 104.3(k). TCU and TCU-sanctioned activities and programs, including the Washington summer program are therefore a "program or activity" of TCU within the meaning of the Rehabilitation Act.

256.    TCU has engaged in illegal disability discrimination, as defined by the Rehabilitation Act, including without limitation (1) limiting Jane Does Nos. 1 and 3 in the enjoyment of rights, privileges, advantages, and/or opportunities enjoyed by others receiving TCU's aids, benefits or services; (2) utilizing methods of administration and course instruction, etc. that have the effect of subjecting Jane Does Nos. 1 and 3 to discrimination on the basis of handicap, and that have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of TCU's programs and activities with respect to people with disabilities; (3) failing to provide an auxiliary aid or service where necessary to ensure that students with disabilities, like Jane Does Nos. 1 and 3 are not excluded, denied services or otherwise treated differently than others; and/or (4) failing to make reasonable modifications in policies, practices or procedures where necessary to afford its services, privileges, advantages or accommodations to persons with disabilities.

257.     TCU has violated the Rehabilitation Act by, without limitation, failing to provide reasonable alternatives to Jane Does Nos. 1 and 3 who each reported their disability and requested accommodations for the same.  TCU failed to accommodate Jane Does Nos. 1 and 3's disability.

258.     TCU further retaliated against Jane Doe No. 1 for reporting the lack of concern with which her reports and request were met.

259.     TCU's violations of Section 504 have caused and continue to cause psychological and physiological harm to Jane Does Nos. 1 and 3.

**COUNT V—TCU violated Title III of the Americans with Disabilities Act of 1990**

260.     Jane Does Nos. 1 and 3 reallege and incorporate all the allegations contained in preceding paragraphs of this Complaint as though fully rewritten herein.

261.     At all relevant times TCU and TCU agents were acting within the scope of their employment and/or at the direction and under the control of TCU.  Moreover, at all relevant times appropriate TCU agents were made aware of and took no action against the conduct of its agents, thereby ratifying their conduct and rendering TCU vicariously liable for the conduct of their agents via the doctrine of Respondeat Superior.

262.     TCU's conduct also violated Title III of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12181 et seq.

263.     Title III provides that "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns… or operates a place of public accommodation." 42 U.S.C. § 12182(a); 28 C.F.R. § 36.201(a).

264.     TCU operates an "undergraduate, or postgraduate private school, or other place of education," which is a place of public accommodation pursuant to 42 U.S.C. § 12181(7)(J).

265. TCU has engaged in illegal disability discrimination, as defined by the Rehabilitation Act, including without limitation (1) limiting Jane Does Nos. 1 and 3 in the enjoyment of rights, privileges, advantages, and/or opportunities enjoyed by others receiving TCU's aids, benefits or services; (2) utilizing methods of administration and course instruction, etc. that have the effect of subjecting Jane Doe Nos. 1 and 3 to discrimination on the basis of handicap, and that have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of TCU's programs and activities with respect to people with disabilities; (3) failing to provide an auxiliary aid or service where necessary to ensure that students with disabilities, like Jane Does Nos. 1 and 3 are not excluded, denied services or otherwise treated differently than others; and/or (4) failing to make reasonable modifications in policies, practices or procedures where necessary to afford its services, privileges, advantages or accommodations to persons with disabilities.

266. TCU has violated Title III by, without limitation, failing to provide reasonable alternatives to Jane Does Nos. 1 and 3 who each reported their disability and requested accommodations for the same.  TCU failed to accommodate Jane Does Nos. 1 and 3's disability.

267. TCU's violations of Title III have caused and continue to cause psychological and physiological harm to Jane Doe Nos. 1 and 3.

### COUNT VI—TCU Committed Fraud

268. Jane Does No. 1 and 4 realleges and incorporates all the allegations contained in preceding paragraphs of this Complaint as though fully rewritten herein.

269. At all relevant times TCU and TCU agents were acting within the scope of their employment and/or at the direction and under the control of TCU.  Moreover, at all relevant times appropriate TCU agents were made aware of and took no action against the conduct of its agents,

thereby ratifying their conduct and rendering TCU vicariously liable for the conduct of their agents via the doctrine of Respondeat Superior.

270.    TCU's conduct also constitutes Texas common law fraud.

271.    As detailed extensively herein, TCU's self-aggrandizing DEI campaign and accompanying promotional activities were specifically designed to market to young people like Jane Does Nos. 1 and 4 and represented to Jane Does Nos. 1 and 4 that TCU fostered an inclusive environment and had taken necessary steps to ensure an egalitarian academic experience as detailed fully in paragraphs 58 through 59, 69 through 70 and 167 through 207.

272.    TCU continuing false representation of its academic and social environment is not only gross but also an intentional material misrepresentation designed to induce racial minorities and women to enroll in TCU despite its hateful legacy and present conscious contempt for racial minorities and women.

273.    Such representations are false.

274.    TCU—given its extensive discriminatory history and present as detailed herein— knew such representations were false at the time they were made.

275.    TCU cannot seriously contend that they did not know such representations were false, but even if they do, TCU made such representations recklessly, as a positive assertion and without knowledge of its truth.

276.    TCU explicitly published that such representations were made with the intent that racial minorities and women, like Jane Does Nos. 1 and 4 would act on it.

277.    Jane Does Nos. 1 and 4 did indeed rely on said representations and applied to and enrolled in TCU, where she was harassed and discriminated against on a continuing basis over the course of two years.

278.     Jane Does Nos. 1 and 4 has suffered psychological and physiological harm as a direct result of TCU's misrepresentations.

**COUNT VII—TCU Acted Negligently.  Further and in the Alternative if Necessary, Drs. Snow, Garnett, Turner and Professors Mack and Chimbel, Individually Acted Negligently.**

279.     Jane Does Nos. 1, 2, 3, 4 and 5 reallege and incorporate all the allegations contained in preceding paragraphs of this Complaint as though fully rewritten herein.

280.     At all relevant times TCU and TCU agents were acting within the scope of their employment and/or at the direction and under the control of TCU.  Moreover, at all relevant times appropriate TCU faculty, staff administration, etc. were made aware of and took no action against the conduct of its agents, thereby ratifying their conduct and rendering TCU vicariously liable for the conduct of their agents via the doctrine of Respondeat Superior.

281.     TCU's conduct also constitutes gross negligence.

282.     TCU owed Jane Does Nos. 1, 2, 3, 4 and 5 a duty of reasonable care.  Moreover, and in the alternative, if necessary, as detailed in paragraphs 59 through 207.  TCU faculty, staff and administration, etc. were aware of Jane Does Nos. 1, 2, 3, 4 and 5's on-going harassment at the hands of TCU agents.  TCU had superior knowledge of the risks associated with its agent's continued conduct and the right to control the agent's conduct, which resulted in harm to Jane Does Nos. 1, 2, 3, 4 and 5.

283.     Despite its knowledge of Jane Does Nos. 1, 2, 3, 4 and 5's discriminatory, harassing and disparate treatment, TCU acted with conscious indifference, willfulness, recklessness and or wantonness toward  them as extensively detailed herein, thereby breaching said duty.

284.     But for TCU's breach, Jane Does Nos. 1, 2, 3, 4 and 5 would not have suffered psychological and physiological injuries, which were proximately caused by TCU's conduct.

285.     Additionally, and in the alternative, if necessary, Drs. Snow, Garnett and Professors Mack and Chimbel each individually acted negligently towards Jane Doe No. 1 because they owed Jane Doe No. 1 a duty of reasonable care and because they had a special relationship with Jane Doe No. 1 as her university professors, and/or a duty to exercise reasonable care to avoid the foreseeable risk of injury to Jane Doe No.1, and/or a duty to protect Jane Doe No. 1 from the peril she experienced at TCU and TCU sanctioned activities, which were under their individual control. The acts and omissions detailed herein constitute breaches of said duties and but for Drs. Snow, Gooding, Garnett and Professors Mack and Chimbel's breach Jane Doe No. 1 would not have the suffered psychological and physiological injury, which was proximately caused by their breach.

286.     Further, additionally and in the alternative, if necessary, Dr. Turner and Leigh Holland acted negligently because they owed Jane Does Nos. 1, 2, 3, 4 and 5 a duty of reasonable care and because they had a special relationship with Jane Does Nos. 1, 2, 3, 4 and 5 as designated point-persons for discrimination complaints and/or a duty to exercise reasonable care to avoid the foreseeable risk of injury to Jane Does Nos. 1, 2, 3, 4 and 5 and/or a duty to protect Jane Does Nos. 1, 2, 3, 4 and 5 from the discrimination and harassment they experienced at TCU, including but not limited to in the pursuit of recourse by reporting incidents of racial and sexual harassment, which were under their individual control.  The acts and omissions detailed herein constitute breaches of said duties and but for Dr. Turner and Leigh Holland's breach Jane Does Nos. 1, 2, 3, 4 and 5 would not have the suffered psychological and physiological injury, which was proximately caused by their breach.

**COUNT VIII—TCU Negligently Hired, Retained, Supervised, and Trained its Employees**

287.     Jane Does Nos. 1, 2, 3, 4 and 5 reallege and incorporate all the allegations contained in preceding paragraphs of this Complaint as though fully rewritten herein.

288.     At all relevant times TCU and TCU agents were acting within the scope of their employment and/or at the direction and under the control of TCU.  Moreover, at all relevant times appropriate TCU agents were made aware of and took no action against the conduct of its agents, thereby ratifying their conduct and rendering TCU vicariously liable for the conduct of their agents via the doctrine of Respondeat Superior.

289.     TCU's conduct also constitutes negligent hiring, retention, supervision, training and management.

290.     TCU and owed a legal duty to Jane Does Nos. 1, 2, 3, 4 and 5. TCU and owed them a duty as an institution of higher education to possess and apply the knowledge and to use the skill and care that is used by a reasonable and prudent educational institution.  Moreover, and in the alternative, if necessary, as detailed in paragraphs 59 through 207.  TCU agents were aware of Jane Does Nos. 1, 2, 3, 4 and 5's on-going harassment at the hands of TCU agents.  TCU had superior knowledge of the risks associated with its agent's continued conduct and the right to control the agent's conduct, which resulted in harm to Jane Does Nos. 1, 2, 3, 4 and 5.

291.     TCU employed Drs. Schoolmaster, Arnold, Snow, Gooding, Garnett and Turner, as well as Professor Mack and Title IX investigator, Leigh Holland during the incidents made basis of this lawsuit.  TCU maintained the employment of these individuals despite their deplorable conduct as detailed herein.  The aforementioned individuals were unqualified to handle their duties and responsibilities as evidenced by their conduct towards Jane Does Nos. 1, 2, 3, 4 and 5 detailed herein.

292.     TCU knew or should have known that hiring and retaining the aforementioned individuals would create an unreasonable risk of injury to students.

293.   TCU failed to use ordinary care in hiring, retaining, supervising, training and managing the aforementioned individuals.

294.   TCU's negligence in hiring, retaining, supervising, training and managing the aforementioned individuals was the proximate cause of Jane Does Nos. 1, 2, 3, 4 and 5's injuries and damages.

295.   TCU's actions and/or omissions were with conscious indifference, malicious, fraudulent, willful, reckless, and/or wonton.

296.   TCU's actions and/or omissions proximately caused injury to Jane Does Nos. 1, 2, 3, 4 and 5, which resulted and will result in Jane Does Nos. 1, 2, 3, 4 and 5 suffering past and future damages, including, past and future medical expenses, past and future pain and suffering, past and future mental anguish, past and future physical disfigurement, past and future physical impairment, and past and future aggravation of conditions.

297.   Jane Does Nos. 1, 2, 3, 4 and 5's injuries resulted from TCU's gross negligence, which entitles Jane Doe No. 1 to exemplary damages under Texas Civil Practice and Remedies Code section 41.003(a).

### COUNT IX—TCU Negligently Misrepresented Itself

298.   Jane Does Nos. 1 and 4 realleges and incorporates all the allegations contained in preceding paragraphs of this Complaint as though fully rewritten herein.

299.   At all relevant times TCU and TCU agents were acting within the scope of their employment and/or at the direction and under the control of TCU.  Moreover, at all relevant times appropriate TCU agents were made aware of and took no action against the conduct of its agents, thereby ratifying their conduct and rendering TCU vicariously liable for the conduct of their agents via the doctrine of Respondeat Superior.

300.    TCU's conduct also constitutes negligent misrepresentation.

301.    TCU's self-aggrandizing DEI campaign and accompanying promotional activities were specifically designed to market to young people like Jane Does Nos. 1 and 4 and represented to Jane Does Nos. 1 and 4 that TCU fostered an inclusive environment and had taken necessary steps to ensure an egalitarian academic experience as detailed fully in paragraphs 58  through  59, 69 through 70 and 167 through 207.

302.    TCU made these representations in the course of TCU's business and in the course of a transaction in which they had interest.

303.    Through the DEI campaign TCU supplied false information for the guidance of others and did not exercise reasonable care or competence in obtaining or communicating the information to others.

304.    Jane Does Nos. 1 and 4 justifiably relied on the representations of the DEI campaign as detailed herein.

305.    But for TCU's negligent misrepresentations Jane Does Nos. 1 and 4 would not have enrolled at TCU and would not have endured unconscionable treatment and suffered psychological and physiological injury, which was proximately caused by TCU actions and/or omissions.

**COUNT X—Drs. Snow and Schoolmaster, Individually Assaulted Jane Doe Nos. 1 and 2, respectively.  TCU is also liable because it ratified Drs. Snow and Schoolmaster's assaults.**

306.    Jane Doe No. 1 realleges and incorporates all the allegations contained in preceding paragraphs of this Complaint as though fully rewritten herein.

307.    Dr. Snow and Schoolmaster's conduct also constitutes assault.

308.     As detailed in paragraphs 104 through 157, Drs. Snow and Schoolmaster acted intentionally and knowingly in making unwanted physical contact with Jane Doe Nos. 1 and 2, resulting in bodily injury to Jane Doe Nos. 1 and 2 as detailed herein.

309.     Drs. Snow and Schoolmaster knew or reasonably should have believed that Jane Doe Nos. 1 and 2 would regard the physical contacts as offensive or provocative by Jane Doe Nos. 1 and 2, who informed them and TCU of the same.

310.     As a result of said conduct Jane Doe Nos. 1 and 2 suffered psychological and physiological injury.

311.     Additionally, and in the alternative, if necessary, the conduct of Drs. Snow and Schoolmaster were ratified by TCU when it failed to take appropriate or any action at all against Drs. Snow and Schoolmaster rendering TCU vicariously liable for Jane Doe Nos. 1 and 2's assault.

**COUNT XI—TCU and Drs. Turner, Snow, Garnett and Professors Mack and Chimbel and Ms. Holland Intentionally Inflicted Emotional Distress**

312.     Jane Does Nos. 1, 2, 3, 4 and 5 reallege and incorporate all the allegations contained in preceding paragraphs of this Complaint as though fully rewritten herein.

313.     At all relevant times TCU and TCU agents were acting within the scope of their employment and/or at the direction and under the control of TCU.  Moreover, at all relevant times appropriate TCU agents were made aware of and took no action against the conduct of its agents, thereby ratifying their conduct and rendering TCU vicariously liable for the conduct of their agents via the doctrine of Respondeat Superior.

314.     TCU's conduct also constitutes intentional infliction of emotional distress.

315.     TCU acted intentionally or recklessly toward Jane Does Nos. 1, 2, 3, 4 and 5's welfare as detailed extensively herein.

316.    As a result of TCU actions and/or omission Jane Does Nos. 1, 2, 3, 4 and 5 suffered severe emotional distress.

317.    TCU conduct throughout Jane Does Nos. 1, 2, 3, 4 and 5 interactions with TCU, were extreme and outrageous.

318.    TCU's conduct proximately caused Jane Does Nos. 1, 2, 3, 4 and 5 emotional distress and TCU and even admitted the same via its clinicians as detailed in paragraph 59 through 133, which resulted and will result in Jane Does Nos. 1, 2, 3, 4 and 5 suffering past and future damages.

319.    Additionally, and in the alternative, if necessary, the conduct of Drs. Turner, Snow, Garnett and Professors Mack and Chimbel and Ms. Holland, whom each individually acted intentionally or recklessly through their extreme and outrageous conduct as extensively detailed herein proximately caused Jane Does Nos. 1, 2, 3, 4 and 5 to suffer severe emotional distress and thus they are each individually liable for intentional infliction of emotional distress, which together they conspired to commit against Jane Doe No. 1.

320.    No alternative cause of action would provide an adequate remedy for the severe emotional distressed caused by TCU and/or Drs. Turner, Snow, Garnett and Professors Mack and Chimbel and Ms. Holland.

**COUNT XI—TCU and Dr. Snow Falsely Imprisoned Jane Doe No. 1**

321.    Jane Doe No. 1 realleges and incorporates all the allegations contained in preceding paragraphs of this Complaint as though fully rewritten herein.

322.    At all relevant times TCU and TCU agents were acting within the scope of their employment and/or at the direction and under the control of TCU.  Moreover, at all relevant times appropriate TCU agents were made aware of and took no action against the conduct of its agents,

thereby ratifying their conduct and rendering TCU vicariously liable for the conduct of their agents via the doctrine of Respondeat Superior.

323.   TCU's conduct also constitutes false imprisonment.

324.   As detailed in paragraphs 90 through 127, TCU via its agent, Dr. Snow, regularly forced Jane Doe No. 1 to sit next to her during meals at the Washington summer program.  TCU via its agent, Dr. Snow also refused to allow Jane Doe No. 1 to leave the Washington summer program despite her health decline.

325.   In doing so, TCU via its agent, Dr. Snow, willfully and with malice detained Jane Doe No. 1 without Jane Doe No. 1's consent and without legal authority or justification.

326.   Additionally, and in the alternative, if necessary, the conduct detailed herein constitute false imprisonment for which Dr. Snow is liable in her individual capacity.

327.   In addition to Jane Doe No. 1's physical injuries Jane Doe No. 1 suffered humiliation, shame, fright and mental anguish.

328.   Because TCU and Dr. Snow's conduct was malicious, Jane Doe No. 1 is entitled to actual and exemplary damages.

**COUNT XII—TCU Violated the Texas Deceptive Trade Practices Act**

329.   Jane Does Nos. 1 and 4 realleges and incorporates all the allegations contained in preceding paragraphs of this Complaint as though fully rewritten herein.

330.   At all relevant times TCU and TCU agents were acting within the scope of their employment and/or at the direction and under the control of TCU.  Moreover, at all relevant times appropriate TCU agents were made aware of and took no action against the conduct of its agents, thereby ratifying their conduct and rendering TCU vicariously liable for the conduct of their agents via the doctrine of Respondeat Superior.

331.    TCU's conduct also constitutes violations of the Texas Deceptive Trade Practices Act ("DTPA").

332.    Jane Does Nos. 1 and 4 are consumers under the DTPA.

333.    TCU may be sued under the DTPA for violations.

334.    TCU through its DEI campaign employed false and misleading or deceptive acts or practices in violation of the DTPA by failing to disclose (and even hiding) the truth of its hateful legacy toward racial minorities and women.  TCU via its agent, Chancellor Boschini, also breached its express warranty that it had put in place measures to create a more balanced learning community, among other express warranties offered by TCU to Jane Does Nos. 1 and 4 and other racial minorities and women.   In doing so, TCU subjected Jane Does Nos. 1 and 4 to unconscionable courses of action, which took advantage of Jane Does Nos. 1 and 4 to her detriment.

335.    TCU's aforementioned conduct was the producing cause of Jane Does Nos. 1 and 4's damages.

**COUNT XIII—TCU and Drs. Snow, Garnett and Professors Mack and Chimbel Conspired Against Jane Doe No. 1**

336.    Jane Doe No. 1 realleges and incorporates all the allegations contained in preceding paragraphs of this Complaint as though fully rewritten herein.

337.    At all relevant times TCU and TCU agents were acting within the scope of their employment and/or at the direction and under the control of TCU.  Moreover, at all relevant times appropriate TCU agents were made aware of and took no action against the conduct of its agents, thereby ratifying their conduct and rendering TCU vicariously liable for the conduct of their agents via the doctrine of Respondeat Superior.

338.    TCU's conduct also constitutes civil conspiracy.

339.    As detailed in paragraphs 125 through 127, TCU, via its agents Dr. Snow and Professor Mack were members of a combination of two or more persons comprised of TCU and Professor Chimbel, Dean of the Jandoli School of Communication at St. Bonaventure University. Together, Drs. Snow and Garnett and Professor Mack on behalf of TCU had a meeting of the minds with Professor Chimbel to discriminate and retaliate against Jane Doe No. 1 in violation of federal and state law as detailed herein.

340.    TCU and Chimbel succeeded in their conspiracy by revoking the credits Jane Doe No. 1 earned in the summer program based on discriminatory grading practices, of which she was informed by her classmates who received credit despite having completed insufficient work. Additionally, and in the alternative, if necessary, Drs. Snow, Garnett and Professors Mack and Chimbel via the conduct detailed herein as each conspired against and are liable to Jane Doe No. 1.

341.    As detailed herein, the revocation of this credit as part of a continuing scheme to intentionally inflict emotional distress on Jane Doe No. 1 by one or all of the aforementioned parties was committed at TCU, which is in this judicial district.  Such conduct proximately injured Jane Doe No. 1 as a result.

**COUNT XIV—TCU Breached its Fiduciary Duty**

342.    Jane Does Nos. 1, 2, 3, 4 and 5 reallege and incorporate all the allegations contained in preceding paragraphs of this Complaint as though fully rewritten herein.

343.    At all relevant times TCU and TCU agents were acting within the scope of their employment and/or at the direction and under the control of TCU.  Moreover, at all relevant times appropriate TCU agents were made aware of and took no action against the conduct of its agents,

thereby ratifying their conduct and rendering TCU vicariously liable for the conduct of their agents via the doctrine of Respondeat Superior.

344.    TCU's conduct also constitutes breach of fiduciary duty.

345.    TCU had a fiduciary duty to Jane Does Nos. 1, 2, 3, 4 and 5 based on an informal relationship, arising from a moral, social, or purely personal relationship of trust and confidence. Jane Does Nos. 1, 2, 3, 4 and 5 reasonably placed said trust and confidence in TCU—a university which lured them to it by indicating that it would provide an egalitarian experience for Jane Does Nos. 1, 2, 3, 4 and 5 as detailed herein.

346.    TCU breached their informal duty to Jane Does Nos. 1, 2, 3, 4 and 5 by subjecting them to the unconscionable acts detailed herein.

347.    TCU's breach resulted in injury to Jane Does Nos. 1, 2, 3, 4 and 5 and resulted in benefit to TCU.

**COUNT XV—TCU Breached its Express Warranty for Services**

348.    Jane Does Nos. 1, 2, 3, 4 and 5 reallege and incorporate all the allegations contained in preceding paragraphs of this Complaint as though fully rewritten herein.

349.    At all relevant times TCU and TCU agents were acting within the scope of their employment and/or at the direction and under the control of TCU.  Moreover, at all relevant times appropriate TCU agents were made aware of and took no action against the conduct of its agents, thereby ratifying their conduct and rendering TCU vicariously liable for the conduct of their agents via the doctrine of Respondeat Superior.

350.    TCU's conduct also constitutes breach of express warranty for services.

351.    TCU sold educational services to Jane Does Nos. 1, 2, 3, 4 and 5.

352.     TCU made representations to Jane Does Nos. 1, 2, 3, 4 and 5 about the quality or characteristics of the services by affirmation of fact, promise, or description as detailed herein.

353.     Said representations formed the basis of TCU and Jane Does Nos. 1, 2, 3, 4 and 5's bargain and Jane Does Nos. 1, 2, 3, 4 and 5 relied on the same.

354.     TCU breached its warranty by subjecting Jane Does Nos. 1, 2, 3, 4 and 5 to the treatment described herein.

355.     Jane Does Nos. 1, 2, 3, 4 and 5 have suffered psychological and physical injury as a result.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests relief against Defendants as follows:

356.     A declaration that TCU's conduct as alleged here has violated, and continues to violate Title VI of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d through 2000d-6, Title IX of the Education Amendments Act of 1972, 20 U.S.C. §§ 1681through 1687, Section 504 of the Rehabilitation Act of 1973, 29 U.S.C § 794, and Title III of the Americans with Disabilities Act, 42 U.S.C. §§ 12181 through 12189;

357.     Award Jane Doe Nos. 1, 2, 3, 4 and 5 actual damages, exemplary damage, pre and post judgment interest, and court costs.

358.     Award of Jane Doe Nos. 1, 2, 3, 4 and 5's reasonable attorneys' fees and cost as provided by law;

359.     Such other relief, in law and in equity, as the Court finds just and proper.

## JURY DEMAND

Jane Doe Nos. 1, 2, 3, 4 and 5 demand a jury trial in this action.

Dated: June 10, 2020.

Respectfully submitted,
**WHITE & WIGGINS, LLP**

By:   */s/ Kevin B. Wiggins*

   */s/ Nnamdi M. Anozie*
      Kevin B. Wiggins
      Bar No. 21441600
      E:  kbwiggins@whitewiggins.com
      Nnamdi Anozie
      Bar No. 24087107
      E: nanozie@whitewiggins.com
      1700 Pacific Avenue, Suite 3740
      Dallas, Texas 75201
      T:  214.665.4150
      F:  214.665.4160
      **ATTORNEYS FOR JANE DOE NO. 1,
      JANE DOE NO. 2, JANE DOE NO. 3,
      JANE DOE NO. 4 & JANE DOE NO. 5.**