**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **DESTINEE WILSON, KIANA DAW, TYMERRA COLEMAN, ASHLEY SYLVESTER and TOYA. OKONKWO,** | § | |
| **Plaintiffs,** | § | |
| **vs.** | § | **CIVIL ACTION NO. 3:20-cv-00106-M** |
| **TEXAS CHRISTIAN UNIVERSITY, DR. DIANE SNOW, and DR. ANDREW SCHOOLMASTER,** | § | **JURY DEMAND** |
| **Defendants.** | § | |

## PLAINTIFFS' FOURTH AMENDED COMPLAINT

Plaintiffs Destinee Wilson, Kiana Daw, Tymerra Coleman, Ashley Sylvester and Toya Okonkwo, by and through the undersigned attorneys, file this Complaint against Texas Christian University, Dr. Diane Snow, and Dr. Andrew Schoolmaster alleging as follows:

## INTRODUCTION

1. This lawsuit is about a private university in North Texas that has historically been—and remains—bigoted, narrow-minded and hypocritical in its treatment of racial minorities and women while ostensibly advancing higher education.

2. Texas Christian University's ("TCU") legacy of discriminatory treatment of racial minorities and women is arresting and serves as the backdrop to the facts underlying this Complaint. Indeed, the case at bar is the culmination of over a century of hateful campus culture gone unchecked.

3. TCU's most recent public and targeted displays of bigotry have claimed its latest victims in twenty-year-old Wilson, an award-winning African-American young woman enrolled in TCU's Honors Program; Daw, an award-winning African-American woman and graduate of TCU's Honors Program; Coleman an award-winning African-American woman and Chancellor's Scholar enrolled in TCU's Honors Program; Sylvester an award-winning African-American woman forced out of the PhD Program of TCU's Department of English; and Okonkwo an award-winning African-American woman enrolled in the PhD Program of TCU's Department of English.

4. This Complaint recounts (1) TCU's hateful legacy in its own words and actions as proudly published in its official records; (2) the self-serving Diversity, Equity & Inclusion ("DEI") campaign and accompanying degree program recently launched by TCU designed to induce racial minorities and women, to enroll in the university despite its hateful legacy and present conscious contempt for minorities and women; and (3) a series of acts or omissions by TCU designed to relegate Plaintiffs and other racial minorities and women to a status of second-class citizen on TCU's campus and at TCU-sanctioned activities in violation of federal and state law.

5. Consistent with TCU's historical treatment of minorities and women, Plaintiffs have been subjected to: (1) harassment from their professors and university staff, including unwelcomed physical contact; (2) public embarrassment in the presence of university professionals and their peers; (3) reckless disregard to Wilson and Coleman's health decline resulting from the discriminatory environment at TCU; (4) disparate treatment in Wilson's academic pursuits, including the unexplained revocation of a merit-based scholarship and being subjected to racially disparate grading practices, resulting in the loss of course credits; and (5) retaliation for Wilson's formal and informal complaints about TCU's treatment of herself and other similarly-situated minorities, **to name just a few of the incidents detailed herein**.

6. These incidents were so severe and pervasive that they created unimaginable psychological and physiological pain and harm to Plaintiff. TCU officials were aware of Plaintiffs' distress and rather than work to ameliorate its hateful behavior towards them, TCU doubled down.

## JURISDICTION AND VENUE

7. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1331 because this lawsuit arises under the Constitution, laws or treaties of the United States. Specifically, this lawsuit involves conduct by TCU, which violates Title VI of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d through 2000d-6, Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e through 2000e-17, Title IX of the Education Amendments Act of 1972, 20 U.S.C. §§ 1681 through 1687, Section 504 of the Rehabilitation Act of 1973, 29 U.S.C § 794, and Title III of the Americans with Disabilities Act, 42 U.S.C. §§ 12181 through 12189.

8. This Court further, and in the alternative if necessary, has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because of the diversity of the parties' citizenship and because the amount in controversy exceeds $75,000, exclusive of interest and costs. Specifically, Plaintiffs Wilson, Daw, Coleman, Sylvester and Okonkwo are domiciled in Oklahoma; Virginia; Illinois; Louisiana; and Berlin, Germany, respectively and Defendants are residents and/or citizens of, or otherwise domiciled in Texas.

9. This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) because the state law claims at issue are so related to the federal claims mentioned above, they form part of the same case or controversy under Article 3 of the U.S. Constitution. Specifically, based upon the same facts associated with its violations of federal law, TCU's conduct also constitutes Texas common law and statutory prohibitions against assault.

10. Venue is proper in the United States District Court for the Northern District of Texas pursuant to 28 U.S.C § 1931(b)(1) and (2) because all Defendants reside within this judicial district and are residents of the State of Texas and because a substantial part of the events or omissions involving TCU, which give rise to Plaintiff's claims occurred in this judicial district. Additionally, and in the alternative if necessary, venue is also proper in this Court because each Defendant is subject to personal jurisdiction in this district with respect to this lawsuit.

## PARTIES AND KEY INDIVIDUALS

11. Wilson is domiciled in Oklahoma.

12. Daw is domiciled in Virginia.

13. Coleman is domiciled in Illinois.

14. Sylvester is domiciled in Louisiana.

15. Okonkwo is domiciled in Berlin, Germany.

16. Texas Christian University ("TCU"), is a Texas corporation and private university that receives federal financial assistance and is therefore subject to federal civil rights and educational law. TCU has been served with process via its attorney of record.

17. Dr. Diane Snow is the former Dean and Wassenich Family Endowed Chair of the John V. Roach Honors College at TCU.[1] She has been served with process via her attorney of record.

18. Dr. Andrew Schoolmaster is the former Dean of the AddRan College of Liberal Arts. He has been served with process via his attorney of record.

---

[1] On March 6, 2020, nearly two months after Wilson filed her Original Complaint in this Court, Provost Dr. Teresa Abi-Nader Dahlberg announced that Dr. Snow would "temporarily step away from her role as dean" of the Honors College at TCU to work on a "special project." Incredibly, Dr. Dahlberg stated that Dr. Snow "stepping away is not an indication of any policy violations, nor is it related to misconduct."

## STATEMENT OF FACTS

### I. A legacy rooted in hatred is promoted and preserved.

19. TCU cannot seriously contend that bigotry, hatred, and disparate treatment are anything less than part of its DNA.

20. TCU was founded by brothers and **Officers of the Confederate Army**, Addison and Randolph Clark.[2]

21. When Addison Clark and his brother Randolph Clark, the cousin-in-law of confederate General Robert E. Lee,[3] lost their fight not only to maintain the right to own human-beings of African-descent as slaves but also to expand the practice of slavery West, the Clark bothers sought employment as professors at public Texas institutions.[4]

22. Because of their treasonous involvement as Officers in the Confederate Army during the Civil War, however, the Clark brothers were unable to secure employment at federally funded public schools.[5]

23. So, in 1873, the Clark brothers decided to open a private university where their ideologies and allegiances were accepted: TCU.

24. Thereafter, TCU would become an incubator for precisely the brand of hatred and bigotry promoted by the high-ranking Confederate Clark brothers during their involvement in the Civil War. Indeed, from its founding through the time of the filing of this lawsuit, TCU has remained consistent in its treatment of the racial minorities and women of its community as second-class citizens; promoting and preserving its legacy of bigotry and hatred.

### II. Act I. Environs of T.C.U. Temple of Education, except for the "nigger."

---

[2] Kirk Tochov, *TCU*, PERSONAL TCU, http://personal.tcu.edu/ktochov/TCU.html (last visited Dec. 1, 2019).
[3] Addison Clark, THE INTERPRETER, February 1927, at 3.
[4] Tochkov, *supra*.
[5] *Id*.

25. The branding of TCU as a persistently bigoted institution is no exaggeration.

26. In its earliest documented history, TCU regularly published racist ideologies and minstrel depictions of African Americans and promoted the racist acts and activities of its student body, faculty and staff. An examination of TCU's earliest available publications provides context for the initial and persisting racial environment at TCU.

27. In 1908 the *Skiff,* the university paper, provided commentary on a recent football game, publishing that a TCU player "waded thru [sic] [the 10-yard line] like a nigger goes thru [sic] a watermelon."[6]

28. In 1909 the *Skiff,* reflected fondly on a university event wherein the speaker, "...gave a graphic description of the horrors of the Reconstruction."[7] How "negroes and carpet baggers ruled the country and of the final return of the white man to his own through the aid of the Ku Klux Klan and like agencies."[8]

29. In 1910 the *Skiff* published a biblical origin story of Adam, the first man formed by God, which in part discussed Adam's carefree existence in Eden in contrast to the concerns of the day. Specifically, the *Skiff* stated Adam,

> didn't have to anchor his smokehouse to the center of gravity with a log chain, set a double barreled bear trap in the donjon to keep off his hennery, nor tie a brace of pessimistic, pugilistic bull dogs in his melon patch, **for the nigger with his adjustable morals and omnivorous mouth had not yet arrived on the scene.**[9]

---

[6] Editorial, *SOUTHWESTERN TOO! Another Addition to Varsity's Long List of Victims Bloor's Linebucking The Feature Game Somewhat Marred By Penalties*, SKIFF (North Waco), Nov. 18, 1908, at 1.

[7] Herbert Bozeman, Editorial, *Tomlinson the Winner of Blind Contest—First Place Closely Contested in Both Composition and Delivery*, SKIFF (North Waco), Mar. 19, 1909, at 1.

[8] *Id.*

[9] Grundy W. Stevenson, Opinion, *Ideas of Plain Democrat*, SKIFF (North Waco), Apr. 15, 1910, at 2 (emphasis added).

30. The following year the *Skiff* casually noted that at a particular campus event, a TCU student "had more announcements than a nigger's dog had fleas."[10]

31. In 1919, TCU's yearbook commemorated a well-attended TCU event in May when "the Ku Klux Klan certainly was revived" during "the finest shirt-tail parade [TCU] ever saw!"[11]

32. TCU also regularly promoted minstrel depictions of African Americans. Again, in 1919 the *Skiff* published a "Hallowe'en" article that begins, "[l]aw, law, chile, but this nigger sure am tired."[12] The article only becomes more damning from there, depicting an African-American simpleton cleaning behind white students and in search of a "Free Chicken Dinner."[13]

33. TCU's 1920 yearbook even features a play titled "*A Pageant*," which "portrayed the happenings of the College Year 1919-1920."[14] The fifty-one-page play features only two characters of color who appear in Act I. *Environs of T.C.U. Temple of Education*: the "negro bell hop" who speaks in stump speech and the other, a "kitchen scullion with ebony face."[15]

34. **TCU's openly hateful depiction of African Americans in its earliest years was so pervasive that to catalogue them all in this lawsuit would be a physically exhausting exercise.**

35. Suffice it to say, however, that the bulk of TCU's publications through the 1960s detail TCU outings, including trips into the city to "witness one of the greatest Ku Klux Klan parades ever held in the South,"[16] incidents of persons defacing posters with the word "nigger" when prominent African Americans were invited to campus[17] and regularly published blatantly

---

[10] Howard B. Dabbs, Editorial, *Annual Shirley Program: The Yearly Open Session Was Held Last Friday Evening*, SKIFF (Fort Worth), May 25, 1911, at 1.
[11] 15 TEXAS CHRISTIAN UNIVERSITY, *The Horned Frog* 147 (1919).
[12] Beulah Bell, Editorial, *SOCIETY: Halloween Party Given*, SKIFF (Fort Worth), Oct. 5, 1919, at 3.
[13] *Id*.
[14] 16 TEXAS CHRISTIAN UNIVERSITY, *The Horned Frog* 91 (1920).
[15] *Id*. at 118.
[16] Thos E. Dudney, Editorial, *K.K.K.*, SKIFF (Fort Worth), Feb. 20, 1922, at 4.
[17] Lonn Taylor, Opinion, *Letter to the Editor*, SKIFF (Fort Worth), Nov. 4, 1960, at 4.

racist articles, poems, and illustrations, including *Hambone's Meditations*[18], the minstrel comic strip that Judge and civil rights leader Benjamin Hooks admonished as a "total and colossal indifference to negroes and their accomplishments."[19]




*Figure 1. Negro bellhop as featured in The Horned Frog 118 (1920).*




*Figure 2. Hambone's Meditations excerpt as featured in the* SKIFF *(Fort Worth), Sept., 1923.*

36. Minstrel depictions published by the university seemed to disappear by the time TCU fully integrated in 1964 (which in itself is reprehensible),[20] but its hateful ideologies toward, and disparate treatment of racial minorities and women only became more visible.

### III. Admitted but not equal.

37. In 1963, the *Skiff* published that "racial reins seemed a part of University policy…" and reported that students were "particularly concerned that racial background does restrict any scholastically qualified students from participation in some parts of [TCU's] academic program."[21] In response to student concerns, TCU cautioned student leaders that "[TCU] ha[d] exhausted the usefulness of any campus-wide [discussions] on the topic of integration" and that the same "might be 'misconstrued' by persons off campus."[22]

38. In 1964, ninety-one years after its founding, and only after "feeling the heat" to comply with federal mandates, TCU totally integrated, but for years to come African Americans

---

[18] J.P. Alley, *Hambone's Mediations*, SKIFF (Fort Worth), Sept. 25, 1923, at 3.
[19] Michael K. Honey, *Going Down Jericho Road: The Memphis Strike, Martin Luther King's Last Campaign* 128 (W.W. Norton & Co., Inc., 2007).
[20] Nyshicka Jordan, *Integration Now*, IMAGE, March 2004, at 16 (Chancellor Moudy on integration—"We were late in doing it. It was past time.").
[21] Mary Martin, Editorial, *Academic Restriction Target of Resolution*, SKIFF (Fort Worth), Dec. 6, 1963, at 1.
[22] Mary Martin, Editorial, *Easy Race Barriers*, *TCU Congress Asks*, SKIFF (Fort Worth), Dec. 6, 1963, at 3.

were not allowed to take part in general school affairs and even now African Americans and women are not treated equally at or by TCU.[23]

39. By the late sixties, with the subjects of decades of its disdain now allowed on campus, TCU's culture of hate took on new life. TCU proudly displayed its bigotry and hate for the African-American members of its own community and also towards its African-American visitors in every facet of the university experience.

40. In one incident in 1967, Southern Methodist University star wide receiver (now Texas Sports and College Football Hall of Famer) Jerry LeVias, an African American, had death threats made against him for daring to set foot in TCU's Amon G. Carter stadium in a game against TCU.[24]

41. During the game LeVias was spat at by a TCU player who tackled him to the ground and "uttered a racial slur at LeVias as the two got up from the turf."[25] LeVias quit the game and retreated to the SMU sideline in tears.[26]

42. TCU's response to its own African-American students who dared attempt to participate in social activities as equals was—and remains—equally chilling.

43. In 1969, Ronnie Hurdle, a student at TCU in search of an "opportunity to be more involved in mainstream college life" tried out for the cheerleading squad and became TCU's first African American cheerleader.[27]

44. As his reward for attempting to spread campus glee and cheer his team to victory; the same night he celebrated making the squad, Hurdle returned to his dorm room to learn of hours

[23] Nyshicka Jordan & Kelly Morris, *Color Contrast,* IMAGE, March 2004, at 13.
[24] Jordan, *supra*, at 17.
[25] *Id*.; Charles H. Martin, *Benching Jim Crow: The Rise and Fall of Color Line in Southern College Sports, 1890-1980* 197 (2010).
[26] Steve Campbell, *LeVias Now Making a Difference Off Playing Field*, HOUSTON CHRONICLE (Sept. 22, 2008), https://www.chron.com/sports/college/article/LeVias-now-making-a-difference-off-playing-field-1782142.php.
[27] Nyshicka Jordan & Kelly Morris, *Color Contrast,* IMAGE, March 2004, at 13.

of harassing phone calls from persons asking to speak to "the nigger" and threatening to beat him up.[28]

45. Hurdle was then targeted by "long-time supporters of TCU" challenging "whether he was allowed to touch a white female cheerleader" and treated to "hurried conferences over compromises" between himself and the university Chancellor.[29]

46. **An entire year later, in 1970, TCU finally decided to allow Hurdle to touch his fellow white female cheerleaders**.[30]

47. Off the field, social activities and campus life were also "still somewhat segregated" as TCU's fraternities and sororities contained clauses restricting the admission of "Jews or Negroes."[31]

48. And as late as 1980, "none of [TCU's traditional fraternities and sororities] had any Negro members."[32]

49. Dorm life for African Americans at TCU fared no better.

50. In 1968 Ivory Dansby, an African-American woman living on campus, complained that TCU prohibited African-American women from sharing dorms with white women.[33]

51. Dansby reported that "…[TCU] had white girls living three-to-a-room and, at the same time, Negroes were living alone."[34] Dansby also recalled her dorm mother calling her "my favorite colored girl" and regularly inviting her "over to her house [to] do housework" and wash windows.[35] Dansby's degrading experience existed beyond the dorm room as well. Dansby recalls

[28] *Id*.
[29] Margaret Downing, Editorial, *100 Years White, Only 9 Black*, DAILY SKIFF (Fort Worth), Jan. 18, 1973, at 8.
[30] *Id*. (emphasis added).
[31] Frank Lewis, Editorial, *Greeks Proud of Unity*, SKIFF (Fort Worth), Jan. 17, 1969, at 2.
[32] *Id*.; Chris Kelley, Editorial, *TCU Turns to Racist Charges*, TCU DAILY SKIFF (Fort Worth), Sept. 3, 1980, at 1.
[33] Judy Buchholz, *On Breaking the Negro Cycle*, WAKE, May 1968, at 13.
[34] *Id*.
[35] *Id*.

hearing "one of [her] prof's [sic] say Nigra N-I-G-R-A" and that to her it sounded "like a prof's[sic] been saying nigger all his life and just can't quite bring himself to say Negro."[36]

52. TCU carried its culture of isolation and disparate treatment of African Americans into the seventies, and that culture persists today.

**IV. TCU's culture facilitates the adultery of an illicit intercourse between injustice and immorality.**

53. In fact, Herman Wright's first experience when he arrived on campus in 1971, was that a succession of three white roommates "bolted" from their dorm assignments, when they realized Wright was an African American.[37]

54. Wright "spent the rest of the year with no roommates."[38]

55. In a 2016 interview, Wright acknowledged that there were "a ton [of obvious issues with race relations on TCU's campus]" and described his experience at TCU as very tough and very isolating.[39]

56. Wright was not alone. That same year four African-American athletes voluntarily removed themselves from TCU's athletic program in a "walkout" citing "racist attitudes among general and athletic administrations," including arbitrary comments, rules and dress code targeting the physical appearance of the African-American athletes and the denial of food to one of the African-American athletes at the training table—conduct which persists today.[40]

---

[36] *Id*.
[37] Johnny Livengood et al., Editorial, *Walkout Spurs Black Outcry*, SKIFF (Fort Worth), Feb. 5, 1971, at 1.
[38] *Id*.
[39] *Wright / Herman Wright Discusses TCU*, TCU (June 29, 2016), https://crbb.tcu.edu/clips/5262/herman-wright-discusses-tcu.
[40] *Id*.

57. The walkout "triggered a chain of demands" that were presented to the press by African-American students concerning the attitudes of bigotry toward racial minorities at TCU—again, attitudes that persist today.[41]

58. In response to a list of demands produced by African-American students, TCU created a "Black Studies" minor to pacify the students in an apparent attempt to halt racial complaints.

59. TCU would recycle this play whenever confronted with student demands flowing from its racist and sexist treatment of its racial minorities and women.[42]

60. It did not work then, and TCU should have known its most recent insincere attempt at solving racial issues by creating degree programs rather than confronting directly its insidious practices would not work now.[43]

61. By the late eighties, the "Black Studies" minor disappeared.[44] Ultimately, all of the aforementioned African-American athletes withdrew from TCU.[45]

62. TCU's treatment of African Americans had deteriorated so far that in 1974 the TCU chapter of the National Association for the Advancement of Colored People ("NAACP") filed two race and sex discrimination charges against TCU for its conduct in discriminating against African Americans in "employment, admissions, and certain student organizations."[46]

---

[41] Ariana Williams, *Wall of Integration Highlights History of Campus Inclusion*, TCU 360 (Sept. 11, 2019), https://www.tcu360.com/2019/09/wall-of-integration-highlights-history-of-campus-inclusion/.
[42] *Id.*
[43] Lucy Calvert, Editorial, *Awareness Starts in Class*, TCU DAILY SKIFF (Fort Worth), Apr. 20, 1998, at 1.
[44] *Id.*
[45] Livengood et al., *supra*.
[46] Editorial, *HEW to Probe Bias Charges*, DAILY SKIFF (Fort Worth), Oct. 24, 1974, at 1; Lisa Deeley, Editorial, *Second Discrimination Charge Filed: University Could Lose $1.5 Million*, DAILY SKIFF (Fort Worth), May 2, 1974, at 1.

63. One glaring aspect of the NAACP's charge was the complaint that TCU paid its racial minority and women employees less money for the same work as its white employees. [47]

64. TCU continues this practice of paying racial minorities less for the same work today.

65. As a result of these charges, in October of 1974, the United States announced that it would send civil rights officials to investigate TCU's treatment of and practices against racial minorities.[48]

66. Ultimately, federal investigators substantiated the NAACP's claims of discrimination at TCU.[49]

67. Coincidentally—in yet another display of TCU's total lack of sensitivity towards its African-American community—in October of 1974, TCU's Forums Committee invited David Duke, Grand Dragon of the Klu Klux Klan to speak at the University.[50]

68. African-American students and a group of African-American ministers protested that Duke's very presence was intimidating to a number of students and to the African-American students was a direct "slap in the face," especially in light of the recently filed NAACP discrimination complaints.[51]

69. TCU's Dean of Students approved Duke's appearance even while admitting the likelihood that "Duke's speech would reinforce the views of racists or adversely influence those who had no definite views."[52]

---

[47] Editorial, *Affirmative Action reports: Minority [sic] Employees Few, Paid Little*, DAILY SKIFF (Fort Worth), May 3, 1974, at 1.
[48] Lia Deeley Smith, Editorial, *HEW to Probe Bias Charges*, DAILY SKIFF (Fort Worth), Sept. 6, 1974, at 1.
[49] Lia Deeley Smith, Editorial, *HEW to Probe Bias Charges*, DAILY SKIFF (Fort Worth), Sept. 24, 1974, at 1.
[50] Robert Bobbins, Editorial, *Forums Votes to Invite Klansman*, DAILY SKIFF (Fort Worth), Nov. 5, 1974, at 1.
[51] *Id.*; Loretta Gamble, Letter to the Editor, *Readers React to Klan Controversy*, DAILY SKIFF (Fort Worth), Nov. 6, 1974, at 2; Al Sibello, Editorial, *Klan Speaker Cancelled*, DAILY SKIFF (Fort Worth), Nov. 13, 1974, at 1.
[52] Robert Robbins, Editorial, *Speaker Panel OK's Duke's Visit*, DAILY SKIFF (Fort Worth), Nov. 8, 1974, at 1.

70. After weeks of continued protests from African Americans both within and outside TCU, TCU finally withdrew its invitation to Duke to speak on campus.[53] A few weeks later, however, TCU's House of Student Representatives reopened the invitation to Duke.[54]

71. Towards the end of the seventies TCU was still—and remains—engulfed in complaints of disparate treatment from its racial minorities and women.

72. A university study in the spring of 1976 revealed that of the African Americans surveyed "67.5 percent were dissatisfied with the way they were treated on TCU's campus;… 42.5 percent felt their life at the University [was] generally worse than the life of the average white student;…and 15 percent said white students would not socialize with them."[55]

73. TCU's racist and bigoted conduct prevailed in the classroom, too. In 1977, one nursing student complained that "she and other blacks were discriminated against in grading by faculty members of [TCU's] Nursing school" and yet another African-American student "was reportedly advised by a professor to drop out of school altogether" when they challenged the grade they received in a course, which they believed was due to disparate grading—a practice and culture that persists at TCU to this day.[56]

74. The Dean of the nursing school dismissed these claims as "just a rumor, coloring the truth."[57]

## V. TCU's famous apathy and indifference makes racism in the hearts of a few a very real threat.

75. By the eighties, TCU proved that it could take bigotry and hate to international and unimaginable heights.

[53] *Id.*
[54] Editorial, *Klansman May Get Second Chance*, DAILY SKIFF (Fort Worth), Nov. 21, 1974, at 2.
[55] Cindy Cook, Editorial, *Black—White: Do Both Have Problems?*, DAILY SKIFF (Fort Worth), Feb. 4, 1977, at 4.
[56] *Id.*
[57] *Id.*

76. In an address to student leaders in 1980, TCU's Chancellor admitted that "the full privileges of the campus" did not "appear to be available" to African-American students; specifically noting that "it seems hardly accidental for no blacks to be pledged in Greek organizations in 25 years."[58]

77. TCU student leaders responded that they "discriminate every time rush rolls around," and that as a "private social organization [they] have that right," one even stated that "[i]t's always been separate but equal. Why should it change?"[59] A TCU lawyer disagreed and even called on TCU to fulfill its obligations to investigate racism on campus.[60]

78. In the very same publication, a student reported that he had been running on the athletic field around the track preparing for a track meet when someone yelled to him, "nigger!" The student's recitation of the facts and the *Skiff's* reporting of the student response provides insight into just how persistent TCU's legacy of bigotry was and continues to this day:

> There was an uncomfortable silence as one of them related an experience to the others. He said he had been running on the athletic field around the track preparing for a track meet. He chuckled lightly as he remembered. "I was practicing for track and I had never in my life been called a nigger... I was here for two weeks and someone yells at me 'Hey, nigger!'" His listeners giggled, **some with hinted recognition**, others with discomforting embarrassment. "I didn't know if I should go home. I wondered if the Ku Klux Klan was going to get me or what. In mv upper educational life I have had to face more racism than ever in my life. I was president of a predominantly white Jewish high school class with a black principal." The room was quiet again. They realized what the popular track player was implying. They remembered the reasons they had come together to meet. **"I never experienced racism before I came here..."** [61]

[58] Opinion, *Chancellor Discusses Discrimination at TCU*, TCU DAILY SKIFF (Fort Worth), Sept. 3, 1980, at 2.
[59] Chris Kelley, Editorial, *Greek Problems Sprouted Early but Branched Now*, TCU DAILY SKIFF (Fort Worth), Sept. 4, 1980, at 1.
[60] *Id*.
[61] Virginia Vanderlinde, Editorial, *Book Learning Does Not Always Rule Out Bigotry*, TCU DAILY SKIFF (Fort Worth), Sept. 3, 1980, at 4 (emphasis added).

Neither had Plaintiffs nor undoubtedly countless other racial minorities and women at TCU.

79. The point conveyed here—since its founding TCU has been a breeding ground for a particular sort of hate; one that has served as an introductory to the harshest racial sentiments; one that was present in 1873, again in 1980 and again today as evidenced by the experience and treatment of Plaintiffs in this case.

80. That same year, history seemed to repeat itself as it has been proven to do at TCU. In September of 1980, five foreign athletes quit TCU's soccer team citing disparate treatment after the long-time TCU soccer coach held "a secret practice []—just for the American players."[62]

81. The culture of isolation and white supremacy that TCU carried with it through the sixties was sustained through the eighties and continues to prevail today.

82. For instance, in 1984, "a white athlete broke a national track record and the [track] team got the key to the city.

83. A year later when the [track] team members were all black, they broke a world record and a national record and went undefeated in every track meet in which they participated, they got a plastic trophy from TCU."[63]

84. A member of the all African-American team recalled, "They brought us to the athletic banquet just to humiliate us."[64] "I'll never forget how hurt I was," he said.[65]

85. And in 1988, racial minorities at TCU reported that "[w]hen you sit down next to white students, they move with a quickness as if you bite."[66] Another student of color reported

[62] Editorial, *5 Soccer Players Quit*, TCU DAILY SKIFF (Fort Worth), Sept. 19, 1980, at 4.
[63] Yvonne Webb, Editorial, *Multicultural Illusions Prevail*, TCU DAILY SKIFF (Fort Worth), Apr. 19, 1988, at 1.
[64] *Id*.
[65] *Id*.
[66] *Id*.

that "his history professor asked him on the first day of class if he was going to do enough in his class to get a C." "That said to me that he didn't think I could do much better than a C," the student said.[67]

86. By this time, international students also revealed that they were isolated at TCU. Indeed, Mahilet Bekele, the International Student Association President reported that TCU makes one "more aware that you are being judged by what you look like and not who you are, and it's a challenge not to be affected by it, because if you let it, it can drown you."[68]

87. Bekele likely could not have imagined the prediction she was making at the time.

88. Also, in 1988, Elena Hicks, president of TCU's Black Student Caucus, reported that "racism at TCU is more subtle than some of the overt racism of the past," but that "[i]f you are the least bit sharp you **know** what the hell is going…[i]t won't get by you."[69]

89. That year racial minorities also reported that "the hostility they feel from the environment and the lack of role models causes them to question their own self-worth" and question "how can [one] do as well (in this environment) when [they] have to deal with academic pressure, social pressures and racism?"[70]

90. This student's question remains unanswered today.

91. Another student summed up the sentiments of racial minorities and women and their treatment at TCU at the time by plainly stating, "**TCU could very well be compared to a toilet. Toilets are dirty by design, and so is TCU**."[71]

---

[67] *Id.*
[68] *Id.*
[69] *Id.*
[70] Yvonne Webb, Editorial, *Minorities Encounter Bias Racism*, TCU DAILY SKIFF (Fort Worth), Apr. 22, 1988, at 1.
[71] Kristie Aylett, Editorial, *Students Rally to End Racism*, TCU DAILY SKIFF (Fort Worth), Apr. 19, 1988, at 1.

92. That same year TCU's Minority Affairs Director admitted that "the psychological barriers facing minority students are as limiting and more painful" than physical barriers.[72]

93. Despite this admission, TCU's Minority Affairs Director dismissed racial minority students' sincere complaints of campus hostility towards them as "more perceived than real."[73]

94. This could not have been more untrue. TCU's response also verified that, as the *Skiff* reported, when students report incidents of race related violence or harassment, "[o]ne of the first responses from administrators and police is to deny the problem exists"—a culture and practice which persist today.[74]

95. Regina Anderson, an African-American student, highlighted the pervasiveness of such practices in stating, "[she] could handle the racism if the school would just acknowledge that its here." "**They need to say 'yes, we are bigots,' and deal with it**,"[75] Anderson said.

96. Anderson was correct in 1988 and remains correct today.

97. TCU's racist culture and the horrors associated with it in the eighties are not exclusive to its student population. In 1987 renowned civil rights activist and minister, Reverend Jesse Truvillion, an African-American faculty member at TCU received a letter on TCU's campus that included:

> such things as a pseudo-prescription from Dr. Josef Mengele, the infamous Nazi who performed grotesque medical experiments on "racially inferior" prisoners in World War II. It also include[d] a mock boat ticket for a one-way trip to Africa. It isn't just blacks who are meant to go on this trip "on a leaky boat shaped like a Cadillac and filled with bananas." Also invited are federal judges, communists, homosexuals…about the only type of person who would not fit into one of its many categories is an uneducated white male from the South or a submissive woman who knows her

[72] Webb, *supra*.
[73] *Id*.
[74] *Id*.
[75] *Id*.

> place…The message presented here is Southern white male supremacy as a way of life imposed upon all people. [76]

This remains TCU's message today.

98. Though TCU is not a university noted for its concern for minorities—"**TCU's famous apathy makes racism in the hearts of a few a very real threat.**"[77]

99. This threat materialized against Truvillion in 1988 when he was approached by two white males yelling obscenities at him and yelling, "you're a dead cat, buddy."[78]

100. At the time, Truvillion was on campus hosting African visitors with whom he was protesting TCU's refusal to divest from racist South African businesses supporting apartheid.[79] Later, that day, Truvillion found a black cat with its throat slit dying on top of his vehicle.[80]

101. According to Truvillion, "[w]hen you deliver a black cat to someone, it has a very specific meaning," "[i]f you deliver it alive, it means you are not considered human. If it's delivered dead, it means they intend to kill you."[81]

102. In the end, no eyewitness came forward and TCU failed to identify the individuals responsible, much less hold anyone accountable for the heinous act.[82]

103. Truvillion poignantly stated, that in an environment such as TCU's you "just don't get throats of cats slashed, but you get the throats of people's humanity slashed."[83]

104. Truvillion's sentiments still ring true today.

---

[76] Michael Hayworth, Opinion, *Ignoring Racism and Bigotry Only Helps the Disease Grow*, TCU DAILY SKIFF (Fort Worth), Apr. 22, 1987, at 2.
[77] *Id.*
[78] Yvonne Webb & Kristie Aylett, Editorial, *Activity No Game to Some*, TCU DAILY SKIFF (Fort Worth), Apr. 7, 1988, at 1.
[79] *Id.*
[80] *Id.*
[81] *Id.*
[82] *Id.*
[83] Suzanne Lorton, Editorial, *Students Speak Against Racism*, TCU DAILY SKIFF (Fort Worth), Apr. 20, 1988, at 1.

105. TCU's racial minorities and women staff were also not exempt from TCU's harassing culture.

106. In 1988 a knife and death threat card, among other bizarre items were left for Lovie Bradley, a housekeeper at TCU. When asked who she thought left the items for her to find on her utility cart in a locked room, Bradley responded that she "think[s] it's people who…have a deep hate for [her] race."[84]

107. Bradley is African American. TCU never identified the culprit.[85]

## VI. Racism is a quiet but consistent part of life at TCU.

108. TCU's sordid legacy continued to materialize through the nineties as it still does today. In 1992, Michelle Smith, an African American student at TCU reported on the complete insouciance with which members of TCU's community dished out racial epithets, without reprimand:

> **This conversation may be heard frequently**; I heard it at one of my organizational meetings:
> "Gosh, did you lay out today?" one girl asked emphatically.
> "A little. Am I that tan?" she asked the other.
> "Yeah, you are dark, you nigger!"
> The girls then laughed, and I was standing right there. The girls were so preoccupied with themselves and their fake blackness that they failed to realize that someone with the attribute they were seeking was standing just behind them. Nigger, I thought. Hmmph! I chuckled.[86]

Smith was writing for herself as well as her "other African American sisters" who "**hear these less-than-informed comments on a daily basis**" at TCU.[87] Smith correctly noted that such attitudes were "a very PUBLIC concern" in 1992 as they remain today.[88]

---

[84] Leanora Minai, Editorial, *Occult Objects Found*, TCU DAILY SKIFF (Fort Worth), Apr. 22, 1988, at 1.
[85] *Id*.
[86] Michelle Smith, Opinion, *Historical Ethnic Notions Must Change*, TCU DAILY SKIFF (Fort Worth), Apr. 28, 1992, at 3 (emphasis added).
[87] Michelle Smith, Letter to the Editor, *Racism*, TCU DAILY SKIFF (Fort Worth), May 1, 1992, at 3.
[88] *Id*.

109. In 1994, "someone scrawled the words 'Nigger #1' and 'Nigger #2' in paint on two doors in a fraternity house on TCU's campus."[89] When the fraternity president was questioned about it he stated puzzlingly that "he didn't think the words were meant in a racist context…," that the "word nigger can be used in a casual way" and that he "really didn't care" who did it.[90]

110. In 1997, history yet again repeated itself. That year the *Skiff* revived TCU's legacy of racist cartoon imagery when it mocked racial minorities and their complaints about racism:[91]




*Figure 3. "Six Degrees of Racism Accusation" as featured in TCU* DAILY SKIFF

111. Stacey Henderson, said the following of the cartoon, "as an African-American student, the sight of this cartoon shocked and troubled me. That there could be anyone who does not understand the reason why African Americans and other groups continue to protest is a dangerous situation."[92]

112. Later that year the *Skiff* reported the obvious: that "**[r]acism is a quiet but consistent part of life at TCU**" that "manifests itself in many ways: an off-hand remark, a

---

[89] Editorial, *INTOLERANCE Racist Attitudes Have No Place at TCU*, TCU DAILY SKIFF (Fort Worth), Oct. 4, 1994, at 5.
[90] *Id*.
[91] Stacy L. Henderson, Letter to the Editor, *Racial Cartoon Misleading*, TCU DAILY SKIFF (Fort Worth), Feb. 14, 1997, at 3.
[92] *Id*.

quickened pace, a misguided assumption;" and "often leaves portions of the campus scarred and divided."[93]

113. Within the report, several racial minorities and women at TCU shared their many experiences with extreme racism, racial profiling and bigotry.[94] Illogically and laughably even, TCU responded that the racially bigoted attitudes conveyed by the students "had been brought in from the outside" to TCU.[95]

114. The reality, however, is that bigotry and racism are common fixtures at TCU.

115. That same year, Pete Radovich, a white student, spoke out against the bigotry and racism he had seen "[t]hroughout [his] time as a TCU student" in the form of casual racist attitudes on campus and "members of the community proudly sporting Confederate flags in their rooms and on their vehicles." [96] In response to condemning the very Confederate Flag bore by TCU's founders, the Clark Brothers, Radovich received five death threats, was called a "mother f—ing nigger lover!" and warned that if he spoke out again, he'd be killed.[97]

## VII. Even TCU's Chancellor, Victor Boschini disapproves of TCU's race relations and diversity.

116. As TCU entered the twenty-first century, its brand of racism and bigotry towards racial minorities and women evolved.

117. In 2000, "several white TCU students celebrated their fourth annual Martin Luther King Jr. birthday party. The group dressed in baggy jeans, wore T-shirts with the words 'talk to

---

[93] Blake Sims, Editorial, *Black & White: A Look at TCU Race Relations*, TCU DAILY SKIFF (Fort Worth), Feb. 25, 1997, at 9.
[94] *Id*.
[95] *Id*.
[96] *Id*.
[97] *Id*.

the hand' on them, and were adorned in shower caps with condoms tucked underneath. They proceeded to watch the film "*Menace II Society*" and ate fried chicken and watermelon."[98]

118. When another group of white TCU students were asked how they were going to celebrate Black History Month they replied: "I'm going to KFC;" "[w]ell, I play football with a black guy;" and "I have relatives in Jasper."[99]

119. In 2002, a group of African-American students were standing outside fixing a disabled car when a group of white students began pummeling the students with water balloons and yelling "niggers!" at them from a nearby building. Bizarrely, despite the white students yelling "niggers," a clear racial epithet, TCU's Associate Dean of Campus Life said that "he ha[d] no basis to judge whether or not the incident was racially motivated."[100]

120. **Even TCU's Chancellor, Victor Boschini disapproves of TCU's race relations and diversity**.

121. When asked directly about racial relations and diversity at TCU in a 2004 *Skiff* article titled, *Integration Now*, Chancellor Victor Boschini said "TCU has a long way to go, but that the commitment is there" and that he "would give [TCU] an 'A' for efforts and intentions and a 'C plus' for actual reality on campus."[101]

122. A decade later, under Chancellor Boschini's leadership, that 'C plus reality' would deteriorate to a solid 'F.'

## VIII. TCU is an institution with layers of back and front of stage racism and sexism from students, faculty and administration.

---

[98] Rusty Simmons, Editorial, *Acts of Racism, Ignorance Not Far from University*, TCU DAILY SKIFF (Fort Worth), Feb. 25, 2000, at 1.
[99] *Id*.
[100] Skiff Staff, Editorial, *Prank Under Investigation*, TCU DAILY SKIFF (Fort Worth), Feb. 22, 2002, at 1.
[101] Nyshicka Jordan & Kelly Morris, *Color Contrast*, IMAGE, March 2004, at 13.

123. Beginning in 2010, the advent of the social media era gave members of TCU's community and particularly racial minorities and women a new and public platform from which to expose and address the persistence of TCU's legacy of hatred and bigotry.

124. In 2014, some TCU students began posting offensive comments about African Americans on the social media app, Yik Yak.[102] "End black entitlement. End black privilege," and "Blacks were unable to get proper educations…but, that's more a result of their busted families and lack of morals…" and "watch the blacks," were among some of the comments made on Yik Yak.[103]

125. The incident once again drew national attention to the racist and bigoted culture that prevails at TCU. A TCU spokesperson called the comments a "reality check that the university is not where it needs to be as a community."[104]

126. In truth, TCU has never been "where it needs to be" with respect to its treatment of racial minorities and women.

127. In another Yik Yak incident that same year, students at a predominately African-American fraternity pool party were called monkeys.[105]

128. The oppressive and isolating experience of racial minorities and women became so pervasive in 2016 that the hashtag #beingaminorityatTCU went viral on popular social media platform, Twitter.[106]

---

[102] Robbie Owens, *TCU Hosts Campus Rally Against Racism*, CBS LOCAL (Apr. 30, 2015, 5:15 PM), https://dfw.cbslocal.com/2015/04/30/tcu-hosts-campus-rally-against-racism/.
[103] *Id.*; Gilma Avalos, *TCU Looks to Change Tone After Racist Comments*, CBS LOCAL (Apr. 30, 2015, 10:07 PM), https://dfw.cbslocal.com/2015/04/30/tcu-looks-to-change-tone-after-racist-comments/.
[104] Gilma Avalos, *TCU Responds to Racist Student Comments on Social Media*, CBS LOCAL (Apr. 29, 2015, 9:53 PM), https://dfw.cbslocal.com/2015/04/29/tcu-responds-to-racist-student-comments-on-social-media.
[105] Garrett Podell, *Boschini Addresses Racial 'Ignorance' at TCU*, TCU 360 (Feb. 1, 2018), https://www.tcu360.com/2018/02/boschini-addresses-racial-ignorance-at-tcu/.
[106] *#Beingaminorityattcu*, TWITTER, https://twitter.com/hashtag/BeingAMinorityAtTCU?src=hashtag_click (last visited Dec. 5, 2019).

129. Racial minorities and women shared their experiences on campus stating that "#BeingAMinorityAtTCU [is] [v]aluing the education that you receive but not feeling valued on campus" and "#BeingaMinorityatTCU is being labelled "negative" and "ungrateful" because you care about issues concerning race/White privilege/oppression" and "#BeingaminorityatTCU [is] having to make a hash tag to let our feelings out because we don't feel safe enough to do so on campus," to name a few.[107]

130. The #BeingaminorityatTCU hashtag and movement it inspired resulted in the "Black Students and Allies of TCU" delivering a list of demands to TCU and the media, together, with a letter calling on administrators to make the campus more inclusive.[108]

131. As the letter poignantly noted for the racial minorities and women on campus, "[f]eeling a sense of alienation along with trying to maintain a high grade point average and remain involved on campus creates unnecessary burdens that can hurt students in the long run."[109]

132. After several weeks of negotiations, TCU responded by (1) creating a "Cabinet Level" position: Chief Inclusion Officer; (2) launching and publishing the creation of a Diversity, Equity & Inclusion ("DEI") committee and accompanying campaign, including an award and fellowship; and (3) resurrected a move from its 1971 playbook, by approving a new major to pacify its racial minority students: Comparative Race & Ethnic Studies ("CRES").[110] Through these late-to-the-party initiatives, TCU represented that it was "a welcoming community that embraces

---

[107] *Id.*
[108] Ryan Osborne, *TCU Plans to Add Diversity Official After Students Send Demand Letter*, FORT WORTH STAR-TELEGRAM (Oct. 19, 2016, 9:17 AM), https://www.star-telegram.com/news/local/fort-worth/article109136667.html.
[109] *Id.*
[110] *Id.*

diversity in all of its forms" and that it had "put in place measures to create a more balanced learning community."[111]

133. In light of its legacy as extensively detailed herein, however, TCU knew or should have known that this was untrue. Though convincing to gullible racial minorities, these ceremonious gestures proved empty, and even CRES—the very degree program approved in response to student outcry over racism and bigotry—is riddled with complaints of bias and disparate treatment.

134. In fact, TCU's Chief Inclusion Officer and Title IX coordinator, Dr. Darron Turner, has received multiple emotional complaints from both current and former faculty and students regarding pervasive discrimination and harassment of racial minorities and women designed to completely undermine their success in CRES and at TCU.

135. Specifically, on or about January 15, 2020, two professors and one student informed Wilson that they filed complaints regarding the discrimination and harassment of racial minorities and women faced at the hands of TCU with Dr. Turner and/or TCU's Title IX office, which have gone unanswered for more than a year. TCU's deliberate indifference has caused and continues to cause real psychological pain and physiological harm to TCU's racial minorities and women, including Plaintiffs.

136. Indeed, TCU's Chief Inclusion Officer and Title IX coordinator, Dr. Turner was recently made aware that hateful classroom and campus treatment of racial minorities and/or women at TCU was so severe and pervasive it caused the development of type 1 diabetes in

---

[111] Victor Boschini, Jr., *Letter from the Chancellor*, TCU, https://inclusion.tcu.edu/about/letter-from-the-chancellor/ (last visited Dec. 6, 2019); *Resources*, TCU, https://inclusion.tcu.edu/resources/ (last visited Dec. 6, 2019).

Coleman. **Rather than offer Coleman guidance, Dr. Turner discouraged her from finalizing her Title IX complaint**.

137. **Dr. Turner even had the effrontery to instruct Sylvester that she must waive and forfeit all of her numerous and ignored Title IX complaints in order to accept an employment position at TCU.** Plaintiffs in this lawsuit have suffered psychological as well as physiological harm as a result of TCU's hateful treatment of racial minorities and women.

138. As if TCU's insincerity in publishing the aforementioned DEI campaign and approving the CRES major was not clear enough, merely one year after starting the CRES program TCU announced that it was moving CRES out of the established AddRan (presumably named for Confederate Officers, and founders Addison and Randolph Clark) College of Liberal Arts to an "interdisciplinary unit." Included in this "interdisciplinary unit" are programs such as Women and Gender Studies, Ranch Management, as well as FrogFolio and the Idea Factory, all programs which, upon information and belief, rank low in priority at TCU.[112]

139. This smacks of TCU's 1971 play in creating a Black Studies minor—a promise which evaporated. One African American and CRES major puts it best, "[f]or them to go move us, from AddRan, which is an established, credible college within TCU, **to move [CRES] into this new interdisciplinary unit, whatever that is, is like a slap in the face**."[113]

## IX. TCU's discriminatory practices in handling reports of discrimination constitute a policy of intentional discrimination that deprives racial minorities and women of the educational opportunities and benefits of TCU and

[112] Elizabeth Campbell, *CRES Negotiates Move to Interdisciplinary Unit Amid Student Resistance*, TCU 360 (May 2, 2018), https://www.tcu360.com/2018/05/cres-negotiates-move-to-interdisciplinary-unit-amid-student-resistance/.
[113] *Id*.

**substantially increases the risk of racial minorities and women being subjected to discriminatory treatment.**

140. Predictably, nothing has changed at TCU. Racism, hate, and bigotry remain fixtures of TCU and pervade every orifice of its existence.

141. Indeed, recently TCU held "student listening sessions" in response to the filing of this lawsuit. Several hundred students attended one such session on January 28, 2020, where "students of color and marginalized groups spoke about the hostility and hatred they experience on campus."[114]

142. "Many of the students who spoke…painted a bleak picture of life at TCU."[115] One student, an African-American woman, recounted that—just like racial minorities of TCU's past—"she had never been called the N-word until arriving at TCU; others spoke of having their presence in the classroom questioned by faculty,"[116] among other discriminatory incidents. "Some suggested the session itself was traumatizing, as students were being asked to share painful experiences."[117]

143. In response, Provost Dahlberg admitted that "it is clear [TCU] ha[s] work to do."[118] Chancellor Boschini responded by sending a letter to the TCU Community on January 31, 2020 admitting that "there is a clear gap between [TCU's] intentions, [TCU's] actions and what underrepresented and underserved members of [TCU'] community experience."[119] But the historical record is clear that TCU's treatment of racial minorities and women and its

---

[114] Alexandra Lang, *Listening Sessions Follow Filing of Lawsuit*, TCU 360 (Jan. 29, 2020), https://www.tcu360.com/2020/01/listening-sessions-follow-filing-of-lawsuit/.
[115] *Id.*
[116] *Id.*
[117] *Id.*
[118] *Id.*
[119] Robbie Vaglio, *Honors Student Says Washington D.C. Trip Was Miserable; Chancellor Calls for Faculty Training*, TCU 360 (Feb. 3, 2020), https://www.tcu360.com/2020/02/honors-student-says-washington-d-c-trip-was-miserable-chancellor-calls-for-faculty-training/.

discriminatory practices in handling reports of the same constitute a policy of intentional discrimination that deprives racial minorities and women of the educational opportunities and benefits of TCU and substantially increases the risk of racial minorities and women being subjected to discriminatory treatment.

144. Unsatisfied with Chancellor Boschini's response a "student-led initiative advocating for the needs of historically marginalized students" named Coalition for University Justice and Equity ("CUJE") was formed at TCU to call for change and "tell stories of racism and discrimination on campus to 'expose the truth behind the billboards.'"[120]

145. On February 4, 2020, CUJE published a letter to Chancellor Boschini, Provost Dahlberg and TCU demanding among other things, (1) "the immediate termination of Dr. [] Snow"; (2) "the immediate demotion and replacement of Dr. Darron Turner"; (3) "the immediate investigation and removal of Drs. [] Mack, [] Garnett, and [] Gooding"; and (4) "that a multicultural center be built and named after Fred Rouse an African American, "**to commemorate his life and publicly acknowledge the violent lynching in which TCU faculty and students partook and supported in 1921**"[121] and demanding a public response from TCU by February 12, 2020.

146. CUJE simultaneously launched a Change.org petition, which has now garnered signatures from over 700 supporters, many of whom shared their own experiences of discriminatory treatment at the hands of TCU on a popular social change platform.[122] CUJE also sparked a Twitter campaign that went viral as several hundreds of students shared their encounters

[120] Drew Mitchell, *Student Coalition Works to Implement Change at TCU*, TCU 360 (Feb. 10, 2020), https://www.tcu360.com/2020/02/student-coalition-works-to-implement-change-at-tcu/.
[121] *Demands.*, CENTER FOR UNIVERSITY JUSTICE AND EQUITY, https://cujenow.weebly.com/demands.html (last visited Apr. 11, 2020); *see also* Mitchell, *supra*.
[122] *Reasons for Signing - to Hold TCU Accountable to Its Commitment Diversity, Equity, & Inclusion*, CHANGE.ORG, https://www.change.org/p/texas-christian-university-administrators-and-board-of-trustees-to-hold-the-university-accountable-to-its-commitment-to-diversity-equity-inclusion/c (last visited Apr. 11, 2020).

with bigotry and discrimination at the hands of TCU "to counter and challenge the false narratives around student experiences portrayed by TCU's marketing" using the hashtag #TellOnTcu[123] and protests on campus. To date, TCU has not publicly responded to CUJE or its demands.

147. On February 12, 2020 several TCU faculty also issued a letter to TCU recognizing that "**the unaddressed transgressions of TCU's past have led to this painful present**" [124] and affirming "**that students of color and students of other marginalized backgrounds HAVE and ARE being underserved and undervalued at TCU**"[125] and assuring students that "**[i]t is not just in [their] head.**"

148. Importantly, the faculty members also admitted that they, "**too, are devastated by [racial minorities and women's] isolation, lack of social and literal physical space, and the infuriating stories [racial minorities and women] have shared with [faculty] during [] office hours and in passing about what [racial minorities and women] experience in the dorms, in class, and while trying to obtain services on campus.**"[126]

149. The faculty admitted that they were "**in awe of [racial minorities and women's] resilience that [they] wish [racial minorities and women] did not have to have in the face of routine micro- and macroaggressions on campus; reinforced white supremacist frameworks**

---

[123] TWITTER (Feb. 6, 2020, 9:00 PM), https://twitter.com/cujenow/status/1225615199748739072.
[124] Call to Action: Stand with TCU Students, Faculty, and Staff of Color, GOOGLE DOCS, https://docs.google.com/forms/d/e/1FAIpQLSd6tiSAmjE0oMT0v6Ly3KAA4Szhyp4SbQhOGXSFGf0HmWPxjw/viewform (last visited Apr. 11, 2020).
[125] *Id.*
[126] *Id.*

**that [racial minorities and women] experience daily at the hands of [TCU] professors and peers**."[127]

150. Over 100 TCU faculty and 100 TCU students signed the letter, which enclosed its own demands aimed at providing equity to racial minority and women faculty.[128] To date, TCU has not publicly responded to the aforementioned faculty letter or its demands.

**X. In every decade since its founding, there has been clear evidence of the pervasiveness of TCU's hatred of racial minorities and women.**

151. In every decade since its founding, there has been clear evidence of the pervasiveness of TCU's hatred of racial minorities and women. Even TCU star athletes are not exempt from the psychological and physiological manifestations of hate toward racial minorities and women on campus.

152. Recently, former TCU wide-receiver Kolby Listenbee, an African American, filed suit against TCU for, among other things, the harassment and humiliation he faced after an on-the-field injury.[129] Listenbee was publicly ridiculed and humiliated by TCU athletic staff who made him switch seats and sit in the back of the plane rather than with his fellow starting seniors in first-class and was told that he would not only be dismissed from the TCU football team, but also from TCU itself if TCU were to lose a football game during his injuries.[130] TCU even suggested he may be lying or "faking it."[131]

153. We now know (as we have always known) that Listenbee, like other racial minorities and women at TCU, are not lying or faking it. The hatred racial minorities and women

---

[127] *Id.*
[128] *Id.*
[129] Micheal McCann, *Breaking Down Kolby Listenbee's Lawsuit Against TCU, Gary Patterson and the Big 12*, SPORTS ILLUSTRATED (Feb. 1, 2018), https://www.si.com/college/2018/02/02/kolby-listenbee-lawsuit-tcu-gary-patterson-legal-analysis.
[130] *Id.*
[131] *Id.*

endure and the harm that results are very real as emphasized by Plaintiffs experience made the basis of this lawsuit.

**XI. TCU's legacy of hatred assails the humanity of racial minorities and women.**

154. Wilson is a twenty-year-old African-American young woman and award-winning honors student at TCU. As the daughter of two veteran United States military officers, hard work, perseverance, truth and justice are a part of Wilson's DNA.

155. Before attending TCU, Wilson excelled academically while being a star high school and collegiate athlete. While still in high school Wilson pursued a rigorous academic program, which included completing college level courses and earning dual credits at her local community college while participating actively in social organizations and athletics. Upon graduation from high school Wilson was offered and accepted a scholarship to a university several hundred miles from home. By all accounts, prior to her experiences at TCU, Wilson was a confident, warm, inviting, and spirited young woman who took great pride in herself, her work and her academic abilities and had no preexisting psychological malady.

156. At her initial university Wilson excelled academically and athletically. As she became more immersed in her academic courses, Wilson decided she no longer wanted to remain a college athlete. Instead, she desired an academic experience that would offer an intellectual challenge within a balanced and welcoming community. In the Fall of 2017 Wilson began searching for a competitive university to which she could transfer to prepare her for a rigorous graduate study program—a goal complicated by acts and omissions of TCU.

157. Wilson's search led her to TCU. Wilson's research included her review of TCU's website and marketing materials, specifically, the representations made via TCU's website about its elaborate DEI initiatives and accompanying incentives. Wilson applied to TCU believing it

offered an egalitarian experience for all students. Through its DEI program, TCU promoted itself as an institution committed to fostering a campus culture that fully supports cultural exchange and diversity.[132] **The DEI strategic plan itself touts that its objective is to attract, teach, reach, and embrace "under-represented students, especially students of color," like Wilson.**[133] TCU's effective marketing, including its DEI initiative did attract Wilson and undoubtedly countless other racial minorities and women. As Wilson would learn soon after her enrollment, however, TCU's promises were not realistic. Indeed, Wilson has experienced none of the core values TCU publicly expressed. Instead, Wilson's collegiate experience has been engulfed by TCU's legacy of bigotry and hatred and marred by a series of hateful and discriminatory acts perpetrated by TCU for over a century and designed to relegate Wilson and other racial minorities and women to the status of second-class citizen.

## XII. TCU continues to endorse relegating racial minorities and women to the status of second-class citizen in its housing practices.

158. Wilson's first experience when she arrived on campus on January 15, 2018, was that her original roommate—a young white woman—had taken all available closet, desk and common space in the room to herself and relegated Wilson and all of her belongings solely to a bed in the corner. Wilson asked her new roommate to remove her belongings from Wilson's closet and make space in shared portions of the room, but her roommate refused. When Wilson complained to TCU that her white roommate had commandeered the entire room, including the closet, desk and lounge space intended for a second roommate; leaving Wilson with only a place to lay her head, TCU responded, "what's wrong with that" and questioned if Wilson really "had that much stuff." Wilson was shocked by this response and demanded that she be moved to a room

[132] *Strategic Plan*, TCU, https://inclusion.tcu.edu/about/strategic-plan/ (last visited Dec. 16, 2019).
[133] *Id*. (emphasis added).

where she would not be bullied into sharing the bed with her belongings. TCU begrudgingly complied.

159. True to form, despite having a student population of approximately over 70 percent whites, Wilson was moved to a room with another racial minority. Ironically, this incident occurred exactly three years before the original filing date of this lawsuit and on Martin Luther King Jr.'s birthday.

**XIII. Racial minorities and women, like Wilson, are admitted but not equal at TCU.**

160. Before transferring to TCU Wilson had maintained a **4.0 GPA** and met other transfer student requirements. Accordingly, she was eligible for a merit-based transfer scholarship, which TCU notified Wilson that she had been awarded in January of 2018. Though already enticed to enroll at TCU the award of the transfer scholarship cemented Wilson's belief that TCU was the place to pursue her academic and professional goals. Because TCU's tuition and living costs are exorbitant—yet another barrier for racial minorities and women—the merit-based transfer scholarship would cover a substantial amount of the fees and costs associated with attending TCU and increased Wilson's excitement about her pending transfer.

161. Unfortunately, Wilson's excitement would be short-lived. After Wilson began her classes, TCU, without explanation, revoked Wilson's merit-based transfer scholarship. TCU's stated excuse was that at the time of application, Wilson failed to meet the merit-based requirements. By way of explanation TCU furnished, via email, the revised requirements to Wilson that differed from the requirements published on TCU's website.[134] Nonetheless, Wilson clearly exceeded the requirements for consideration for a merit-based transfer scholarship both at the time of her application (as evidenced by her initial award) and at the time of the revocation of

[134] *Transfer Academic Scholarships*, TCU, https://financialaid.tcu.edu/types-of-aid/scholarships/transfer-academic-scholarships.php (last visited Dec. 16, 2019).

her scholarship award. To date, Wilson has received no clear answer as to why the merit-based transfer scholarship awarded to her was revoked.

162. When her scholarship was revoked Wilson was already attending classes at TCU. Faced with the burden of paying for TCU without assistance, Wilson was forced to apply her parents' G.I. Bill benefits (the military educational benefits her parents earned for their honorable service as United States military officers) to pay her TCU expenses.

163. **Wilson intended to utilize the G.I. Bill for her graduate studies but because TCU reneged on its merit-based transfer scholarship, Wilson will no longer be able to apply this benefit to pursue her planned professional education.**

164. This was just the beginning of the many hateful experiences of TCU's legacy and enduring culture of bigotry and racism that Wilson would experience.

165. Despite TCU's apparent lack of concern for, and response to Wilson's initial dorm experience and the revocation of her scholarship, Wilson remained undeterred. In pursuit of the academic rigor and social environment promised by TCU, Wilson applied to TCU's John V. Roach Honors College (the "Honors College") during her first semester. Wilson was notified that TCU's policy, in relevant part (which is stated on its website) was that transfer students must have a minimum of 12 graded hours at TCU before admission to the Honors College. Specifically, during a phone call with Renda Williams, the Honors College's academic program specialist, Wilson was informed that though she had the requisite GPA, she did not meet the graded hours requirement and therefore would not be admitted that semester. Accordingly, Wilson was made to wait an additional semester before admission to the Honors College. The following semester, having maintained a stellar academic record, Wilson was admitted to the Honors College. To Wilson's surprise she learned from classmates and faculty that the Honor's College had admitted, and

continues to admit, white transfer students who failed to meet the minimum 12 graded hours at TCU requirement. According to Wilson's Honors College professor, TCU's Honors College's actual transfer student admissions practices during the time of Wilson's enrollment at TCU violates its published policy and imposes unnecessary barriers on racial minorities and women (more specifically, African Americans) designed to prevent or limit their enrollment.

166. For Wilson it began to sink in that at TCU "you are judged by what you look like and not who you are." Nevertheless, Wilson searched for and seized opportunities to be more involved in mainstream college life at TCU.

## XIV. When racial minorities and women decide to become an integral part of TCU, racism rears its head.

167. In the Spring of 2018, Wilson tried-out for and was selected to join TCU's Moot Court team. Wilson was excited at the opportunity to represent TCU in inter-collegiate competitions through the Texas Undergraduate Moot Court Association. As a high school and collegiate athlete, Wilson is experienced in working and training in diverse team settings and knows that equitable coaching and mentorship are required to ensure that each team member is competitive. Based upon her prior experiences outside of TCU, Wilson believed that she would receive equal training, development and access to Moot Court coaching faculty and staff. Wilson, like many other racial minorities and women, had never experienced the brand of bigotry that permeates TCU before her arrival on campus and could not have imagined the disparate treatment she would be subjected to on TCU's Moot Court team. As her reward for attempting to represent TCU as an oral advocate, TCU's Moot Court coach Dr. Samuel Arnold paired Wilson with the only other racial minority and segregated the two young women from the rest of the team. Wilson and her teammate were never given the same attention as their white counterparts and were regularly excluded from and denied the full benefits of training by their Moot Court coach, Dr.

Arnold. In fact, Dr. Arnold regularly provided active, detailed and individualized coaching to the white members of the Moot Court team while ignoring Wilson and her teammate altogether. When Wilson and her teammate made several requests to meet with Dr. Arnold to review their arguments, he refused, but regularly honored the requests of TCU's white Moot Court team members. At competitions, Dr. Arnold would attend the oral arguments of TCU's white Moot Court team members to offer coaching and support and to generally cheer them on. During Wilson and her teammate's oral arguments, however, Dr. Arnold would not even bother to show up. On one occasion, Wilson's mother attended a Moot Court competition to support Wilson and her teammate and observed the disparate and isolating treatment they were subjected to and total lack of support they received, including Dr. Arnold totally ignoring the two racial minority women. When Wilson's mother asked Dr. Arnold if he intended to stay for Wilson and her teammate's argument to support them and help them as he had just done for TCU's white Moot Court team members, Dr. Arnold replied, "No, you are here. You can cheer them on."

168. For Wilson this experience with TCU's mainstream "brought it home" just as it did for Ronnie Hurdle in 1969.[135] As Hurdle stated of racial minority participation in TCU's mainstream culture and as Wilson had experienced, "when [racial-minorities] decided to become an integral part of the system, that's when it (racism) reared its head."[136] This would be but one of many times racism reared its head and Wilson was segregated at TCU and treated disparately from her similarly-situated white colleagues.

### XV. TCU isolates, discriminates and retaliates against racial minorities and women, like Wilson, in its employment practices.

[135] Yvonne Webb, Editorial, *Racism Not New at TCU*, TCU DAILY SKIFF (Fort Worth), Apr. 19, 1988, at 1.
[136] *Id.*

169. Soon after her admission into the Honors College Wilson was offered and accepted a job in the Honors College as a desk assistant making $7.50 per hour. This job was not a federal work study position but rather a TCU support staff position. Much like her other campus experiences, Wilson was the only African-American student worker in the Honors College office. As the only African-American employee in the office, Wilson quickly realized the glaring differences from the treatment she received and the treatment of her white counterparts.

170. Wilson was conveniently scheduled to work during Honors College tours and instructed to sit at or near the reception desk so that she would be visible to prospective students' and their families. Once the tour concluded (even if it concluded while Wilson still had hours left to work) Wilson would be dismissed from her job for the day. Wilson's white counterparts were not scheduled during tours, nor were their hours cut in the same manner as Wilson's. In fact, even when Wilson's white counterparts arrived early or otherwise during Wilson's scheduled work hours, the Honors College regularly forced Wilson to end her shift and leave—so long as a tour was not scheduled—resulting in Wilson receiving shamefully fewer hours than her white counterparts. Though not her expectations, Wilson regularly only worked three hours per week while her white counterparts regularly worked 15 hours per week.

171. When Wilson was not serving as the Honors College showpiece during tours she was regularly scheduled to work after the conclusion of Honors College events. This meant that when Wilson arrived, she was expected to clean up after Honors College staff, including in some instances her own fellow student counterparts. In one incident, after Spring 2019 graduation when Wilson was not even scheduled to work, the Honors College called Wilson into work to break down tables and tents and perform other manual labor while Wilson's counterparts were assigned to hand out programs. Again, Wilson was the only African-American student worker in the Honors

College. Such treatment and conduct persisted while Wilson worked in the Honors College, further continuing a culture that marginalizes and discriminates against racial minorities.

172. TCU would later utilize its authority over Wilson as an employee of the Honors College, among other things, to retaliate against Wilson for filing formal complaints of discrimination and hostile treatment based upon her interactions with TCU faculty and staff during a month-long summer course in Washington, D.C.—the crescendo of multiple hateful encounters Wilson would experience at the hands of the Honors College. **Specifically, on August 16, 2019, after conducting her first video interview with TCU's Title IX coordinator Wilson was informed by Renda Williams, the Honors College academic specialist, that Wilson's work hours had been reduced from the already low average three hours per week, to one hour per week.**

173. The Honors College was not finished. Wilson would later learn that while she was being paid $7.50 per hour, her white counterparts were being paid $9.50 per hour.

174. On Friday August 23, 2019, Wilson was offered a "raise" of $2.00 per hour for the new academic year by the Honors College. Wilson shared the good news that she was now making $9.50 per hour to her counterparts, who revealed to Wilson that they had been making $9.50 per hour all along, including the prior year when Wilson was earning $7.50 but supposedly hired to perform identical duties to her white Counterparts. Again, at the time Wilson was the only African-American student worker in the Honors College. Tellingly, Wilson received news of this "raise" only after she submitted a formal statement and complaint to Title IX and the Campus Life Dean's Office.

175. Wilson had initially wondered why the Honors College offered her a job, for which she did not apply, however, it became clear that she was not an employee but rather a token. Sadly,

this would not be the only time Wilson was used as window-dressing for TCU. TCU's treatment of Wilson as an employee of the Honors College continued to deteriorate as the summer ended and the fall semester began.

**XVI. TCU endorses a separate and unequal method of educating racial minorities and women, like Wilson.**

176. In the Fall of 2018 Wilson enrolled in Introduction to Political Theory to fulfill the requirements of the Honors College. Given TCU's abysmally low enrollment of racial minorities and women, it was not uncommon for Wilson to be the only racial minority in a course, and particularly a course that satisfies Honors College requirements. It is also not uncommon for TCU to promote an environment and culture that constructively segregates racial minorities from their white counterparts in the classroom. On her very first day of class Wilson—like racial minorities of TCU's past—observed that when she sat down next to white students, they moved with a quickness as if she had bitten them. As instruction began Wilson soon realized that she was isolated and alone sitting across the room from her white classmates who refused to interact with her. Wilson thought that her professor, Dr. Arnold—the aforementioned Coach of TCU's Moot Court team—would redistribute seating arrangements to provide all students an egalitarian learning environment. Wilson overestimated TCU's capacity for fair treatment of racial minorities and women.

177. Dr. Arnold made no such adjustments or corrections to the seating arrangement of his classroom and instead would confirm and promote Wilson's segregation and isolation through his acts and omissions during the course. In fact, just as he had done during Wilson's time on TCU's Moot Court team, Dr. Arnold again ignored Wilson altogether. During course instruction, Dr. Arnold only faced the direction of, and spoke to the white students enrolled in the course—leaving Wilson to absorb instruction from the atmosphere. Dr. Arnold also facilitated course

discussions designed to humiliate and demean Wilson and other racial minorities and women. **In one incident, during a class discussion a white student turned to Wilson—on the other side of the room—and stated, "all black people are on welfare" and several other ignorant and baseless comments**. Though one would think a recipient of a Ph.D. in Politics from Princeton should know not only of the falsity of such statements, but also of his obligation as a professor to correct such baseless and racist ideologies, Dr. Arnold did nothing. When Wilson confronted Dr. Arnold about the insensitivity and incorrectness of her white colleagues' racist remarks and how isolated they made her feel, he responded with deliberate indifference; stating that he "didn't think anything was wrong" with the comments and questioned why Wilson, "was making a big deal" of the incident.

178. Unsatisfied with Dr. Arnold's response, Wilson visited her Honors College academic advisor Donna Schonerstedt to report the incident. Rather than focus on the inappropriateness of Dr. Arnold's conduct in isolating and humiliating Wilson, Ms. Schonerstedt also acted with deliberate indifference and suggested that Wilson "maybe should just switch classes" or file a formal complaint. **On a campus as racist and bigoted as TCU, the suggestion that Wilson could avoid TCU's brackish treatment by switching classes is incredible.** At this point Wilson questioned "how can [she] succeed (in this environment) when [she] ha[s] to deal with academic pressure, social pressures and racism?"[137] Ultimately, Wilson, exhausted by the insults and derogatory treatment she endured and believing she was left with no other option, withdrew from Dr. Arnold's course.

179. Wilson was also subjected to hostile treatment from Honors College administration, including chiefly Dr. Diane Snow, Dean of the Honors College, multiple times during Wilson's

[137] Yvonne Webb, Editorial, *Multicultural Illusions Prevail*, TCU DAILY SKIFF (Fort Worth), Apr. 19, 1988, at 1.

academic pursuits at TCU. In the Spring of 2019, Wilson enrolled in another course to fulfill the requirements of the Honors College: Engaging Difference and Diversity; a course designed for the newly minted CRES department. Part of the course requirement was a group research projected related to diversity in the Honors College. Wilson's group decided to examine TCU's efforts to address deficiencies in minority enrollment in the Honors College. According to the Honors College, it had adopted a holistic admissions process, which as of Fall 2019 "considers not only standard indicators, e.g. test scores, GPA, and rigor of high school curriculum, but also broad evidence of curiosity, motivation, fairmindedness, and creativity through additional essays."[138] Wilson's group would gather data relating to current diversity enrollment in the Honors College as well as interview key individuals in the Honors College administration to determine the method and application of the new purportedly holistic admissions criteria. Wilson's group research project topic was presented and approved by the course professor, but when Wilson's group contacted the Honors College in attempts to obtain data they were met with aggression and hostility from Dr. Snow. Specifically, when Wilson and her group members—all racial minorities—contacted the Honors college to ask if they could conduct interviews with certain staff members for their research project, Dr. Snow personally emailed the group lambasting them and telling the students (who had never formally met her before) that she "didn't appreciate them emailing her staff without her knowledge," warning them not to attempt to contact her staff directly and that "everything goes through [her]." Wilson's group was puzzled by the hostility of Dr. Snow's response, but because they needed to complete their group project, they worked to obtain data and schedule interviews with key Honors College staff.

---

[138] *Diversity & Inclusion*, TCU, https://honors.tcu.edu/about/diversity-inclusion/ (last visited Dec. 16, 2019).

180. When Wilson's group was finally authorized to speak with Honors College staff for their research assignment Dr. Snow's hostile temperament towards racial minorities and women surfaced again. Wilson's group scheduled an interview session with the Honors College's all white "Diversity Board"—made up of all white TCU staff, including Dr. Snow—and the Diversity Board proceeded to monopolize the conversation nearly the entirety of the session only leaving Wilson's group time to ask no more than four questions relevant to their extensive honors level research project. When the students began to ask their questions, Dr. Snow became visibly more and more upset. After the group's fourth question, Dr. Snow abruptly and aggressively cut the interview short and then demanded that Wilson send her the entirety of the research project once completed. Dr. Snow also warned Wilson's group that she would attend their presentation in an apparent act of intimidation. Once the project was completed, Dr. Snow aggressively approached Wilson demanding a copy of the final project. Wilson informed Dr. Snow that it was her understanding that because the assignment was a group project, she could not share her group members' work without their permission. Still, Wilson sent Dr. Snow a summary of the project, conclusions and recommendations including the bulk of her contributions to the same. Dr. Snow was unsatisfied and would later continue to harass Wilson about the group project before totally dehumanizing Wilson over the course of four weeks during a TCU sanctioned Honors College trip to Washington, D.C.[139] Curiously, Dr. Snow did not ask Wilson's professor, Snow's subordinate, for a copy of the research project or consult with her over any concerns she had regarding the same. Only Dr. Snow knows why these racial minorities' inquiries regarding the Honors College's diversity efforts offended her so. Dr. Snow's rank hostility toward and disparate treatment of

[139] It is against Honors College practice for the Dean of the Honors College to demand to personally review individual student's course work prior to and following the completion of the same.

Wilson, however, would later confirm that Dr. Snow's actions were driven by racial animosity and bigotry.

## XVII. TCU denies racial minorities and women, like Wilson, the right to happiness and freedom on campus and beyond.

181. Indeed, Dr. Snow and Honors College faculty and staff terrorized and dehumanized Wilson through the entirety of an academic trip the following summer; placing Wilson's health and welfare in jeopardy and constructively denying her rights to happiness and freedom.

182. In the Fall of 2018, Wilson applied for "Honors Explorations" the Honors College's summer study "abroad" program. That year TCU's Honors Explorations program had three one-month summer destinations for Honors College students to choose from: (1) "Cultural Routes," which toured Germany, Switzerland and Italy; (2) "Disaster, Recovery, [sic] & Renewal: Lessons from Japan," which toured various cities across Japan; and (3) "How Washington, D.C. Works," which was not at all a summer abroad, but rather a trip to the nation's capital and for TCU an apparent opportunity to further fraudulently promote itself as an institution concerned with and/or committed to diversity.

183. Though Wilson ranked the Washington domestic study program last, she was assigned to attend. When Wilson expressed her disappointment in her summer assignment to Honors College staff, they offered no explanation as to how Wilson was selected for the domestic program despite having ranked it last. Wilson declined the Washington summer program.

184. In response the Honors College offered to pay for approximately 48 percent of Wilson's fee associated with the domestic program to entice Wilson to go on the trip. Wilson accepted the Honors College's offer and paid the remaining portion of the Honors Explorations program fee. The Honors College would later hold the financial assistance they used to entice Wilson to attend the domestic program over Wilson's head before and during the trip; weaponizing

the grant—among other threats—in order to restrict and exercise control over Wilson. Wilson would later learn that the Honors College made a similar grant of financial assistance to another African-American Honors College student to entice him to attend the domestic program, even though he had already completed the Japanese study abroad program that summer. In line with TCU's legacy of and present conscious contempt for racial minorities, both of these Honors College students—the only African Americans in the program—were segregated and dehumanized for the bulk of their domestic program experience. In reality, Wilson and her African-American classmate were forced to attend the "How Washington, D.C. Works," domestic program so TCU and the Honors College could hold themselves out as a diverse institution to the public and to third parties, including the Osgood Center for International Studies and other reputable individuals and institutions they encountered in Washington. Tellingly, the Honors College and Osgood Center staff followed the two African-American students around taking pictures of just the two of them the entire trip; further tokenizing them.

185. Wilson, having received a grant from the Honors College, paid the remaining program fee and began preparing to attend the Washington program. As part of her preparation Wilson, a meticulous and detailed scholar, reviewed available program materials including the course agenda and syllabus to ensure that she fully understood the requirements of the program and her attendance. Upon review, Wilson noted that a White House visit was scheduled as a part of the program. Wilson was concerned about this visit given the many racist ideologies of the former President of the United States—ideologies provably shared by TCU. So, prior to her departure for Washington Wilson met with Dr. Snow (who was also facilitating the Washington program) and shared with her those concerns. In response, Dr. Snow called Wilson—the daughter of two veteran United States Military officers—"unpatriotic;" told Wilson that she should consider

herself "lucky to go" on the trip; threatened to make her repay the partial program fee grant the Honors College used to induce Wilson to attend; and threatened to dock Wilson's grade points before the course even began; a mantra Dr. Snow repeated and built upon in Washington to exert control over Wilson.

186. Once in Washington, Wilson learned TCU carried its legacy of bigotry and racism beyond campus. When Wilson arrived at her room for the summer at the Avenue Suite's Georgetown on July 7, 2019, Wilson—the only African American female in the Washington program—was greeted as she had been before. Her two assigned roommates had taken all available closet space and commandeered the two available beds in the room; relegating Wilson, who is six feet tall and 180 pounds, to the sofa bed in the open area of the suite, with a small kitchenette. Hotel staff confirmed to Wilson that the sofa beds in guestrooms were not designed for adult or long-term use. When Wilson asked her roommates to make space for her in the closets the women refused and suggested that Wilson purchase containers to store her belongings for the duration of the trip.

187. When Wilson told Dr. Fredrick Gooding (another Washington program facilitator and Honors College professor) that she was being bullied into sharing the sofa bed with her belongings, Dr. Gooding responded that the women would rotate beds and share space with Wilson during the program. Later that same week, on July 11, 2019, however, Dr. Snow informed Wilson that it was optional for Wilson's roommates to rotate beds and share closet space and confirmed that Wilson was to be relegated to the sofa bed and kitchenette combo for the entirety of the trip.

188. Unsurprisingly, the only two African Americans in the Washington program were both made to sleep on sofa beds during the trip while their white counterparts were provided with hotel quality queen beds. Both African-American students suffered physical harm associated with

long-term use of a sofa bed, however, "the psychological barriers facing [these] minority students [were] as limiting and more painful."[140] TCU's conduct left the African American students knowing that "their life at the University [and university sanctioned programs] [was] generally worse than the life of the average white student"[141] and openly relegated Wilson and her African-American colleague to second-class citizen status.

189. To make matters worse, Wilson's roommates also regularly refused to grant Wilson access to the bathroom, located in the hotel suite, through the room with the double queen beds. Wilson's roommates regularly locked the door to their room, segregating Wilson to the sofa bed and kitchenette. This meant that Wilson had no access to a bathtub/shower or toilet at critical times. Wilson was regularly forced to brush her teeth, wash her face, and even groom herself in the kitchenette sink. **When Wilson had to use the toilet, she was regularly made to do so in the hotel lobby restroom—seven floors below—regardless of the hour.**

190. Wilson was so visibly in distress when having to journey from her hotel room to the hotel lobby to relieve herself that hotel staff began to take notice. Indeed, Wilson's trips to the hotel lobby restroom were so frequent that it prompted hotel staff to contact Wilson's mother (whom they had met during the first week of the program) out of concern that Wilson was being abused on the trip.

191. When Wilson complained to Honors College staff including Dr. Gooding about the treatment from her roommates, true to form, Wilson's sincere and legitimate concerns were dismissed. Puzzlingly, Dr. Gooding even suggested that Wilson's treatment was her own fault. TCU did nothing to address Wilson's concerns.

---

[140] Yvonne Webb, Editorial, *Multicultural Illusions Prevail*, TCU DAILY SKIFF (Fort Worth), Apr. 19, 1988, at 1.
[141] Cindy Cook, Editorial, *Black—White: Do Both Have Problems?*, DAILY SKIFF (Fort Worth), Feb. 4, 1977, at 4.

## XVIII. TCU's disdain for racial minorities and women, like Wilson, endangers their health and welfare.

192. TCU's disregard for Wilson's welfare during the domestic program did not stop at the hotel. Though not disclosed in any of the provided materials, Wilson was regularly made to walk several miles in the heat of the day to and from various program activities. It did not matter to TCU that the weather had reached the upper nineties causing a heat wave and prompting heat advisories from the National Weather Service, including a "code orange" air quality alert,[142] or that Washington has one of the more extensive public transportation systems in the Country.

193. Within first few days of walking miles on end in the searing Washington summer heat Wilson began to develop sores and blisters on her feet. After a few more days of rubbing against her shoes and socks, these sores and blisters would burst soaking Wilson's feet in puss and blood and oozing through her socks. Dr. Gooding was informed early on about Wilson's worsening condition and he was even sent the following images of Wilson's feet as evidence:



*Figure 4. Left hallux blistered and swollen.*



*Figure 5. Right hallux blistered, swollen and oozing puss.*

[142] Ian Livingston, *PM Update: Excessive Heat Alert Extending Into Saturday as the Region Roasts Through the Weekend*, THE WASHINGTON POST (July 19, 2019), https://www.washingtonpost.com/weather/2019/07/19/pm-update-excessive-heat-warning-extended-into-saturday-region-roasts-through-weekend/ (Code orange indicates air quality that is unhealthy for sensitive groups.).



*Figure 6. Left fourth phalanx blistered, swollen and full of puss and blood.*



*Figure 7. Left fourth phalanx blister/sore ruptured.*



*Figure 8. Left calcaneus blistered, swollen and full of puss and blood.*



*Figure 9. Right calcaneus blistered, swollen and full of puss and blood.*



*Figure 10. Left hallux blister/sore ruptured.*



*Figure 11. Left plantar blistered and swollen.*

194. Once again, Dr. Gooding did nothing. Wilson has permanent scars and on-going pain resulting from the sores and blisters developed during the Washington program. To add insult to injury, throughout Wilson's podiatric health crisis, Dr. Snow would not miss an opportunity to remind Wilson that she was different from her classmates and treat her with hostility and complete disdain.

195. On Thursday July 11, 2019, during a walking excursion the entire group (except for the other African-American student in the program) left Wilson when she began to slow her pace due to the sores and blisters developing on her feet.

196. When Dr. Snow noticed that the other African-American student had stayed back to walk closely with Wilson and ensure that someone considered her welfare, Dr. Snow became unhinged. Dr. Snow hurried back to the two African-American students and began to walk menacingly behind them; harassing Wilson for walking too slowly. Dr. Snow then aggressively shoved herself between the two African Americans to break them up. But that was not enough, Dr. Snow again publicly assaulted Wilson, this time aggressively placing her hand on Wilson's back and driving her to the front of her peers. Dr. Snow would assault Wilson repeatedly throughout the trip; each time intentionally making contact with Wilson's person without Wilson's consent and causing injury to Wilson. Dr. Snow further knew that her contact with Wilson was unwelcomed and offensive and/or provocative and that Wilson regarded it as such.

197. That same day, Dr. Snow also publicly humiliated Wilson by harassing Wilson's mother while at the hotel; indignantly and loudly asking "what [Wilson's mother] was doing there" and "how she could afford to be there?" Perhaps Dr. Snow, like the students in Dr. Arnold's class, truly believed that "all black people are on welfare." In reality, Wilson's mother, like other TCU parents who visited Washington, had paid to come to support her daughter.

198. The very next day, at the National Museum of African American History and Culture (the "NMAAHC"), Dr. Snow targeted Wilson's mother again; demanding to know why she was there. At lunch, out of the blue, Drs. Snow and Gooding publicly announced to Wilson's mother that Honors College funds would not be used to pay for Wilson's mother's meal, as though Wilson's mother needed charity. She did not.

199. Disturbingly, at the NMAAHC Dr. Snow also felt compelled to laughingly remind Wilson alone, in front of her peers, that she could experience the feeling of being crowded into a slave cargo ship by traveling just a brief elevator ride below. Wilson and her mother were shocked and puzzled by Dr. Snow's conduct, particularly because other TCU parents were present at the hotel and the NMAAHC. Dr. Snow welcomed and treated the other TCU (white) parents with excitement, warmth and respect. Wilson's mother was the only African-American parent present at the hotel and the NMAAHC.

200. On Friday July 12, 2019, the students were again made to walk several miles. Wilson was bleeding through her socks and again slowed her pace. This time Dr. Snow targeted Wilson's sex, gender, physical appearance and weight. Rather than offer some respite to Wilson, Dr. Snow mocked her in front of Wilson's peers saying, "at least [Wilson] would be used to walking" when the trip concluded and suggested that Wilson go on a "low carb diet" and that all the walking would make Wilson "much more healthier [sic]." Throughout the trip, Dr. Snow would also regularly "save" Wilson a seat next to her when the group would go eat, forcing Wilson to sit next to Dr. Snow so that Dr. Snow could monitor Wilson's food consumption. If Wilson hesitated or otherwise indicated that she did not want to sit with Dr. Snow, **Dr. Snow would begin banging on the empty seat to hurry Wilson—like a dog—to her place at Dr. Snow's side.** While Wilson was eating Dr. Snow would stare at Wilson intensely and with disgust.

201. Dr. Snow was relentless. On Tuesday July 16, 2019 Wilson was visibly in pain while walking and was also sweating profusely in the summer heat. Dr. Snow continued publicly harassing Wilson based upon her sex, gender and physical appearance by body shaming and gibing her about her weight and sweating habits and stating (presumably because of Wilson's race, sex, physical appearance, weight, and height) that Wilson, who was still a teenager at the time, looked like Dr. Gooding—an African-American man in his forties. That same day, when the group arrived at Capitol Hill, Wilson was exhausted from the walk and still in pain from the broken sores and blisters on her feet. **Out of nowhere, Dr. Snow assaulted Wilson for the third time**; aggressively pushing Wilson's back causing Wilson to stumble and driving her to the front of the group "so that [Wilson] could see better." At six feet Wilson was one of the taller group members and had no difficulty seeing.

202. The following morning, on Wednesday July 17, 2019, Wilson's body began to shut down as she was experiencing the worst pain she had encountered in her life due to the condition of her feet and her slow breathing resulting from the summer heatwave. Still bleeding through her socks; Wilson decided to plead with Dr. Snow for sympathy and reasonable accommodations. Wilson messaged Dr. Snow that morning but was ignored and received no response. Wilson then left her sofa bed to find Dr. Snow at the hotel. Once she located Dr. Snow, Wilson asked to speak with her privately. The conversation did not go well. When Wilson explained that she was in pain; Dr. Snow responded by questioning Wilson and asking why Wilson had come to the domestic program if she knew she had health issues. Apparently suggesting that because of her disabilities Wilson should be excluded or otherwise denied access to the TCU-sanctioned summer program. Dr. Snow then questioned how Wilson, was capable of getting around TCU. When Wilson explained that she didn't walk several miles a day at TCU; Dr. Snow responded that Wilson knew

there would be walking. Despite the fact that this was untrue, Wilson remained focused on the issues and attempted to offer Dr. Snow images of the sores and blisters on her feet. Dr. Snow responded by putting her hand up to interrupt Wilson, and blamed Wilson's injuries on Wilson.

203. When Wilson explained that the extreme summer heatwave was only exacerbating the health complications that Wilson was experiencing; Dr. Snow questioned if Wilson "now had a problem with the sun." **Wilson is asthmatic, a fact well- known to TCU and its agents as Wilson had registered her condition with TCU's Student Disabilities Services since her enrollment at TCU.** Moreover, Wilson included this information in the health conditions and medications questionnaire TCU required her to fill out prior to her departure for the domestic program. When Wilson again tried to refocus the issues and plead for sympathy and reasonable accommodations from Dr. Snow by explaining that she was experiencing difficulty breathing in addition to the pain of her blistered feet; Dr. Snow replied that "she wished she had a wand to wave and fix" Wilson. Dr. Snow did not need a wand or to "fix" Wilson.

204. Wilson wanted to leave the program due to the pain and hostile treatment she was experiencing. When she mentioned wanting to leave on this and other occasions, Dr. Snow reminded Wilson that she was "lucky to go" on the trip; and threatened to (1) make her repay the partial program fee used to induce Wilson to attend; (2) revoke Wilson's credit for the course; and (3) kick Wilson out of both the Honors College and TCU. Dr. Snow would make good on at least one of her threats.

205. **Left without recourse in Washington, Wilson's grievances were forwarded to Dr. Karen Bell Morgan, TCU's Associate Dean of Campus Life, on July 17, 2019.** Ms. Morgan was also sent the pictures of Wilson's sore and blistered feet, which Ms. Morgan forwarded to

TCU's Health Center professionals. TCU Health Center professionals confirmed that Wilson should seek immediate medical evaluation of her feet.

206. By now, TCU was fully aware of Wilson's declining physical condition, but rather than work to ameliorate Wilson's condition, TCU and its agents doubled down. On Thursday July 18, Dr. Snow tasked Wilson with being the group leader for the day. This meant that Wilson was to help provide other students with directions. When Wilson (who was still in pain but aware that Dr. Snow would not let her leave Washington without making good on the aforementioned threats) briefly struggled with directions, Dr. Snow, in an act of petty aggression, mocked Wilson—publicly calling Wilson a bad leader and belittling her in front of her peers. Wilson had reached her end, but with Dr. Snow's repeated threats in mind and determined not to quit, she pressed on. Wearied from enduring miles of walking with sore and blistered feet while being demeaned along the voyage and offered no reasonable accommodations, Wilson began taking Lyft car service, at her expense, when she could, and sacrificed receiving academic information and course participation. Each time Wilson took Lyft rather than walk on her blistered feet Dr. Snow would scowl and shake her head with clear disgust for Wilson.

207. Dr. Snow's disdain for Wilson was no secret. In addition to the clear verbal and nonverbal conduct Dr. Snow fashioned to harass Wilson, Dr. Snow openly revealed to other students that she "hates [Wilson]." When Wilson later confronted Dr. Snow about whether she told other students she hated Wilson, Dr. Snow smugly laughed in Wilson's face before coldly and indirectly dismissing the claim. And why would Dr. Snow do otherwise? Afterall, the answer to Wilson's inquiry was obvious as the evidence of Dr. Snow's hatred for Wilson is indisputable. Even still, Dr. Snow's hatred for, and reckless behavior toward Wilson had not yet reached its lowest point.

208. On or about July 18, 2019 several students, including Wilson, began to notice bed bugs, spiders and mites in their hotel rooms. When one of Wilson's colleagues—a white male—complained to Dr. Snow about the issue, Dr. Snow did not abruptly place her hand up to interrupt him. Rather, Dr. Snow took seriously the white male student's concern and allowed the student to show her images of the bites on his arm and genuinely examined the same. Though Dr. Snow initially incorrectly diagnosed the white male student's bed bug bites as spider bites, once the hotel confirmed that there was a bed bug infestation, immediate measures were taken to place the white male student in more suitable accommodations. The very next day, on July 19, 2019 when Wilson noticed spiders falling from her ceiling and bed bugs and other mites in her hotel room, she too sought Dr. Snow's aid. Unsurprisingly, Dr. Snow could not be bothered with Wilson or her welfare. Dr. Snow told Wilson that "bugs live inside too" and to "stop talking about it" and did not bother to examine Wilson's pictures of the bug bites on Wilson's legs:



*Figure 12. Left tibia covered in bug bites.*



*Figure 13. Right tibia covered in bug bites.*

209. The bug situation in Wilson's hotel room had gotten so bad that her roommates vacated the room, but not before removing all of their belongs from the infected closets and double queen bedroom and placing them in Wilson's already cramped sofa bed/kitchenette combo. Realizing once again that Dr. Snow would not help Wilson, Wilson herself pleaded with hotel staff, who provided Wilson with bug spray. During the early morning hours of July 20, 2019, Wilson, shaken at the sight of bugs seemingly emerging from every crevice, began fumigating her hotel room with the bug spray provided by the hotel. The fumes from the bug spray triggered Wilson's asthma (which was already agitated by miles long journeys in the summer heatwave); swelling her airways and tightening the muscles that surround them until Wilson had an asthma attack. Wilson tried to reach Dr. Snow or other TCU personnel at the onset of her attack only to learn that no program facilitator was present, and that, upon reliable information and belief, Dr. Snow had taken an impromptu trip to New York for the weekend. Wilson, in tears and in the midst of an asthma attack once again pleaded with hotel staff for help. The hotel staff—not TCU personnel—stayed with Wilson as she implemented the emergency action plan developed by Wilson, her parents and her physician. At all relevant times TCU was aware of Wilson's condition and of her emergency action plan. No TCU personnel were present at the hotel or in Washington at all during Wilson's life-threatening asthmatic episode.[143] Hotel staff communicated with Wilson's mother yet again to inform her of Wilson's condition and state of her hotel room and Wilson's mother booked and paid for a different hotel room for Wilson. Wilson received no assistance from TCU. To the contrary, when Dr. Snow returned from New York to learn Wilson had vacated her hotel room, she told Wilson that it was against TCU policy for her to book her

[143] TCU program facilitators, namely Drs. Gooding and Snow regularly left the student's unattended during late night/early morning hours, and at times, for days during the four-week summer program. Further, Drs. Gooding and Snow were regularly visibly intoxicated in the presence of the students and/or upon arrival back to the hotel at any late night/ early morning hour as evidenced by hotel footage.

own room. Ultimately Wilson was forced to return to the bug infested suite; the very suite already vacated by Wilson's roommates.

**XIX. TCU's present conscious hatred of racial minorities and women is insatiable and life-threatening.**

210. The harrowing extent of Wilson's ordeal during the first two-weeks of the program left her bloodied and bowed. But TCU and its agents, chiefly Dr. Snow, would not rest until Wilson was completely broken. As the program entered its third week, Wilson was still in pain from walking and being in the summer's heat, but alas Wilson, had something to look forward to. The coming Friday, July 26, 2019 would mark the end of Wilson's teenage years. Wilson was excited about her twentieth birthday because when another student celebrated his birthday during the program Dr. Snow spared no expense; treating the entire group to a lavish dinner at an expensive restaurant and allowing the student to pick out his own cake without budget limitations.

211. As Wilson's birthday approached, however, Dr. Snow was mum. When one of the program participants—another racial minority female student—realized that Dr. Snow intended to ignore Wilson's birthday completely, the student herself set out to plan a surprise birthday dinner for Wilson on Friday, July 26, 2019. Prior to making a reservation for the planned surprise dinner for Wilson earlier that week, her colleague checked the group itinerary to ensure there would be no conflict and confirmed that none existed. When Dr. Snow learned of the surprise birthday plans for Wilson on that same Friday afternoon, however, she hurriedly created an all-expense paid "family dinner" and added it to the itinerary for Friday night in honor of Aaron Chimbel, a professor at St. Bonaventure University and Dean of its Jandoli School of Communication. Dr. Snow knew her "family dinner" was in direct conflict with Wilson's surprise birthday plans. Dr. Snow's discriminatory treatment of Wilson was so pervasive and so public that another student even confronted Dr. Snow. The student indicated that she was aware that Dr. Snow and/or the

Honors College had paid for another birthday dinner in addition to paying for another celebratory dinner for a different student on a separate occasion during the program; that she had examined the itinerary to be sure that there were no conflicts on Wilson's birthday prior to making dinner reservations for the same; asked Dr. Snow to reschedule the "family dinner"; and asked Dr. Snow to honor her and/or the Honors College's prior practice and pay for Wilson's birthday dinner as well. Dr. Snow refused to reschedule the last-minute family dinner and responded that Wilson's birthday dinner was "not optimal" and "definitely over budget" all while simultaneously inviting everyone to attend the family dinner, for which the Honors College paid. Dr. Snow also suggested that Wilson accept being celebrated at the family dinner meant to honor Professor Chimbel or in the alternative that Wilson pick a desert that she liked for everyone to share at the hotel after the family dinner. Dr. Snow then texted Wilson (who was unaware of the planned dinner) about the same, to be sure to ruin the surprise. Due to the confusion caused by Dr. Snow's deliberate efforts to create a conflict with Wilson's planned surprise dinner, Wilson's surprise dinner was ultimately cancelled.

212. When Wilson learned of her surprise party and Dr. Snow's deliberate efforts to quash the same, Wilson became deflated. To twist the knife, Dr. Snow returned from the family dinner to the hotel visibly intoxicated, with a random cake with sparklers—sparklers which Dr. Snow had removed from the cake and performed an erratic dance with. When Wilson (visibly distraught by the outcome of her birthday) tried to speak with Dr. Snow about the incident, she was again dismissed by Dr. Snow and lushly told "everything worked out the way it was supposed to" and that it was "no big deal." It was a big deal!

213. That night—when Wilson should have been celebrating her life—Wilson returned to her vacant hotel room in tears and considered suicide. Her birthday would now be a reminder

of the unconscionable depravity to which Dr. Snow would stoop to harm her. But make no mistake, Wilson's hopelessness and life-threatening despair was not about an expensive birthday dinner or a cake. It was about TCU's public displays of hatred, bigotry and racism toward Wilson from the moment she had stepped on its campus. It was about Wilson's inescapable second-class status at TCU and TCU-sanctioned activities. It was about Wilson's revoked merit-based scholarship. It was about TCU endorsing Wilson's segregation in its dorms and at the hotel. It was about the hostility and isolation Wilson experienced on TCU's Moot Court team and throughout TCU. It was about the shame associated with being made a token by TCU's Honors College. It was about the ignorant, racist and isolating ideologies TCU endorsed in Wilson's classes. It was about the apparent lack of concern for Wilson's welfare exhibited by nearly everyone at TCU. It was about the fact that TCU sexualized, body shamed, insulted and belittled Wilson in front of her peers on a daily basis. It was about Wilson being summoned like a lap dog in front of her peers nearly every time she ate. It was about Wilson witnessing TCU publicly insult and belittle her mother all while welcoming Wilson's peer's mother's with open arms. It was about TCU's subtle reminder that in the span of a short elevator ride Wilson could be transformed back to human cargo. It was about the repeated assaults Wilson endured at the hands of TCU. It was about stepping over unimaginable pain each day to earn a credit only to have it ripped away by TCU's indefensible legacy and present conscious contempt of racial minorities and women. It was about the shame Wilson felt for believing TCU's self-aggrandizing DEI campaign in the first place. It was that on her twentieth birthday, because of TCU's acts and omissions, Wilson could no longer recognize herself.

214. Thank God that in the midst of Wilson's sorrow and lamenting over who she had become at TCU, she remembered who she was before arriving on TCU's campus. Wilson

mustered the strength and courage to call the National Suicide Prevention Lifeline for the first time.

215. **Thereafter, on or about July 29, 2019 Wilson informed TCU of her mental state and complained to TCU's "Chief Inclusion Officer" and Title IX Coordinator, Dr. Turner, that she was being subjected to discriminatory treatment at the hands of TCU and intended to file a formal complaint but would wait until the summer program ended to avoid retaliation from Dr. Snow and other agents of TCU**. Rather than assure Wilson that retaliation was strictly prohibited and would not be tolerated by TCU, Dr. Turner—true to form—did nothing. Unfortunately, as Dr. Turner likely knew, retaliation from Dr. Snow was unavoidable.

216. After learning of Wilson's reports to TCU's Campus Life Dean's Office and Title IX coordinator, Dr. Snow became even more hostile toward Wilson. On Wednesday July 31, 2019, while speaking with Wilson, Dr. Snow violently slammed the door in Wilson's face mid-conversation. Later that same day while in public and in the presence of Wilson's peers, Dr. Snow harshly and openly berated Wilson for asking a question about an assignment. Dr. Snow even had the gall to take off her jacket, fold her arms, and advance towards Wilson yet again assaulting Wilson; threatening bodily injury of which Dr. Snow has proven herself capable. Like the other assaults Dr. Snow committed this act in the presence of other students. After weeks of hateful, disparate, and hostile treatment at the hands of TCU and its agents, chiefly Dr. Snow, Wilson was glazed and numb.

217. Miraculously, despite the unwavering hatred visited upon Wilson by TCU and its agents during the Washington program, Wilson remained active and excelled academically throughout. Wilson even earned praise from program facilitators and instructors evidencing her

successful participation in the summer program despite her treatment. Specifically, on July 22, 2019, Professor Russell Mack sent Wilson the following message:

> **Please keep your positive attitude and your interest in government. We need young people like you to be thoughtful and constructive.** Now that you better understand government and how DC works, please use that knowledge to help educate others in a positive, constructive way. That way you will be able to enjoy these priceless freedoms for all of your life.
>
> I enjoyed getting to know you and I hope your next two weeks are also interesting ones. If I can ever offer any career advice, please always feel free to call on me….

218. Sadly, Mack reneged on his praise of Wilson in support of Dr. Snow and TCU's continuing scheme to harass and demean Wilson. Wilson has been proximately damaged as a result of said conduct, including but not limited to the psychological and physiological damage caused to Wilson thereby and, importantly, the loss of credit for the program course in retaliation for her reports of her mistreatment—a threat Dr. Snow ultimately made good on. Dr. Snow committed several extreme and outrages acts designed to torment Wilson in Washington, DC and on or about August 3, 2019, Dr. Snow instructed Professors Gooding, Mack and Chimbel to reexamine Wilson's work and find—though none existed—justifications for her conduct.

219. On August 3, 2019, Dr. Snow summoned Wilson to a "mandatory" one-on-one meeting with her at the hotel. At this meeting Dr. Snow informed Wilson that she had determined that Wilson had plagiarized numerous assignments during the program and submitted them to herself and Professors Mack and Chimbel. Dr. Snow even suggested that Wilson had been plagiarizing all along; accusing Wilson of plagiarizing her Honors College admissions essay—a slap in the face to Wilson who is an award-winning scholar. Wilson, broken by Dr. Snow's conduct including her most recent attacks against Wilson's character elected not to respond to Dr. Snow in

the moment. With this news Dr. Snow once again left Wilson in Washington at the hotel alone. Wilson was distraught.

220. On that day—eight days after Wilson's birthday, when she first contemplated suicide—because of the conduct of TCU and its agents, Wilson once again questioned the value of her life and considered that she would be better off dead. Alone in her hotel room, Wilson visualized her death; she contemplated reaching for the knife in the kitchenette that had become her summer home and ending her persisting psychological and physiological pain. Once again Wilson's prior instincts prevailed, and Wilson summoned the young woman she was before TCU to find the courage to again call the National Suicide Prevention Lifeline. Wilson's psychological and physiological pain was so great that Wilson would have another suicidal episode the next day and have to summon the courage again to call the National Suicide Prevention Lifeline on August 4, 2019. Again, Wilson continues to struggle with suicidal ideations to this very day. To this day, Wilson must keep the National Suicide Prevention Lifeline number close; calling them on several occasions and consulting with clergymen to assist her through her thoughts of self-harm developed as a result of her treatment at TCU and TCU sanctioned activities.

221. When Wilson returned home to her family prior to the start of TCU's Fall 2019 semester, Wilson was noticeably changed. The confident, warm, inviting, and spirited young woman that arrived on TCU's campus on Martin Luther King Jr. Day in 2018 had disappeared. Only a shell of Wilson's former self remained; still in physical and psychological pain, replete with recurring nightmares of Dr. Snow assaulting her and publicly humiliating her and her family. Wilson's family began rotating responsibilities to monitor her. For the first time, Wilson was on suicide-watch; a family burden which continues to this day. Wilson's TCU experience has forever altered herself and her family, including Wilson's (and her family's) day-to-day activities. Indeed,

Wilson struggles with her mental and physical health deficiencies caused by her TCU experiences and receives treatment for the same. Wilson has difficulty focusing at school and at home and her nightmares regularly disrupt her sleep at night. In fact, Wilson's hopelessness and fear caused at the hands of Dr. Snow, among other members of TCU, have caused Wilson to hurry off campus when not in class and move out of her on campus housing and into a hotel room for fear that her presence on campus will inspire additional harassing treatment.

222. Upon her return to campus, due to the severity and pervasiveness of TCU's actions (and at the advice and direction of Dr. Teresa Abi-Nader Dahlberg, TCU's Provost and Vice Chancellor of Academic Affairs, to whom Wilson had reported her summer 2019 and overall TCU experience) Wilson began desperately seeking help from clinicians in TCU's Counseling and Mental Health Center ("CMHC"). Specifically, on August 22, 2019, Wilson first visited TCU's CMHC. Wilson also visited TCU's CMHC several times thereafter including on August 30, 2019, and on September 4, 2019, before locating a mental health professional offsite to continue her treatment. On each visit to TCU's CMHC, TCU's own clinicians diagnosed Wilson with (1) academic issues; (2) depression; (3) anxiety; and (4) suicidal ideation or self-harm: "**onset July 26th when she was on a school trip to Washington [] with the Honors College**." TCU is fully aware of what it has done.

223. Upon her return to TCU's campus Wilson also began working to formalize her complaints of discrimination and hostile treatment with TCU's Title IX coordinator and Campus Life Dean's Office. Specifically, on August 16, 2019, Wilson conducted a video interview with Dr. Turner. Fighting back tears, Wilson recounted her summer experience to TCU's Title IX coordinator. Again, on or about August 26, 2019, Wilson spoke with Leigh Holland, TCU's Title IX investigator and Dr. Turner and emailed them a written Title IX statement and a list of witnesses

to the incidents that took place in Washington that summer. The same correspondence was forwarded to Dr. Morgan in TCU's Campus Life Dean's Office. At all relevant times TCU's Provost, Title IX Coordinator and Dean of Campus Life were aware of Wilson's Washington experience; resulting ideations of suicide; and present resulting requirement of medical treatment relating to the same. On September 23, 2019, at 9:00 a.m. over a month after initiating her formal complaint to TCU's Title IX coordinator, Wilson met with Dr. Turner. At this meeting Dr. Turner indicated that his office had already interviewed the students Wilson had identified as having knowledge of Wilson's experience in the Washington program and would be interviewing the professors the following week. Nevertheless, Dr. Turner seemed to suggest that Wilson should have pressed criminal charges against Dr. Snow for her repeated assaults of Wilson and stated that Wilson "will be seeing some changes in staff." No such changes in staff occurred. In fact, Dr. Turner and TCU did nothing at all.

**XX. TCU's IX Office ignores, discourages and undermines reports of discrimination from racial minorities and women.**

224. It was not until **after** the original filing of this lawsuit that Dr. Turner and/or TCU's Title IX office even bothered to follow-up with Wilson regarding her official complaint. First, On January 16, 2020 Dr. Turner sent Wilson an email "Invitation to Review Investigative Report." Because Dr. Turner's email indicated that TCU had prejudged its findings and because this litigation had already begun, Wilson requested that TCU forward a final copy of the Investigative Report to her attorneys. Next, on March 23, 2020 TCU's Title IX Office—with this litigation in mind, no doubt—*finally* sent Wilson a back-dated "Title IX Decision Letter," which declared that "Dr. [] Snow did not violate [TCU policy] on Prohibited Discrimination, Harassment and Related Conduct" thereby ratifying Dr. Snow's conduct described herein. Bizarrely—and in an apparent attempt to misrepresent the facts to the Court—the "Title IX Decision Letter," authored by Leigh

Holland, states that TCU's Title IX office received Wilson's complaint on August 26, 2019 when, **Ms. Holland contacted Wilson on July 31, 2020, "concerning [Wilson's] incident in DC"** after Dr. Turner had already discouraged Wilson from immediately "formalizing" her discrimination complaint and when Wilson had conducted a formal video interview with Dr. Turner on August 16, 2019. Ms. Holland—like Dr. Turner—regularly manipulates Title IX investigations of reports of discrimination, harassment and assault by racial minorities and women either at her own volition or at the direction of TCU. TCU regularly deploys this tactic when confronted with reports of discrimination and assault from African-American women.

225. As previously demonstrated, TCU's response to Title IX complaints received from racial minorities and women—and particularly African-American women—exhibits deliberate indifference. Even before Wilson's initial report of discriminatory treatment, including assault, TCU's practices in handling reports of discrimination and assault—discouraging victims from reporting their mistreatments and failing to investigate their claims or punish their assailants—constitutes a policy of intentional discrimination that substantially increased Wilson and other racial minorities and women risk of suffering similar treatment. Indeed, on August 13, 2018 and again on May 1, 2019 an African-American woman and professor in the Honors College filed a complaint with TCU, including Dr. Turner, reporting that she was being subjected to both racial and sexual harassment that created a hostile work environment. As of the date of the original filing of this lawsuit, the professor had not received so much as a follow-up response from TCU.

226. On May 22, 2019, another professor—also a racial minority and woman—filed an eleven-page detailed complaint with TCU's Title IX Office reporting that she witnessed targeted discrimination and harassment of African-American students and retaliation by TCU leadership designed to degrade African-American students enrolled in TCU's Honors College and deny them

equal access to educational opportunities and undermine their success. To date—nearly a year later—TCU has failed to respond to the professor's report.

**XXI. TCU's Title IX Office official policy of discrimination heightens the risk that African American women will be harassed and discriminated against.**

227. Indeed, the sexual harassment and assault of Daw—an African-American woman—highlights the truth behind TCU's response to racial minorities and women's reports of mistreatment.

228. Daw is a graduate of TCU's Honors College. Daw was aware of TCU's insidious history and had even been called a monkey by a white male TCU student, however, as a non-traditional student who did not live on campus or frequent typical student activities, Daw largely (and intentionally) attempted to avoid falling full victim to TCU's hateful campus culture. Until Dr. Andrew Schoolmaster, then Dean of the AddRan College of Liberal Arts (the "AddRan College") took notice of Daw.

229. On or about April 16, 2018 Daw was busy preparing for graduation, when she visited Ida Hernandez, TCU's Director of Degree Certification for AddRan College. Ms. Hernandez expressed that she was very proud of Daw's accomplishments and insisted on introducing her to Dr. Schoolmaster. Ms. Hernandez called Dr. Schoolmaster out of his personal office and into the reception area of the AddRan College where she introduced Dr. Schoolmaster to the only soon-to-be graduate with a 4.0 GPA in the entire AddRan College. Daw and Dr. Schoolmaster met and briefly shook hands.

230. About one week later, on April 23, 2018, Daw visited the Political Science Department office at TCU. While there, Daw had a seat and was conversing with Darla Scroggins, an administrative assistant at TCU when Dr. Schoolmaster entered the office and directed Ms.

Scroggins to fetch him budgetary data for the purpose of seizing the Civil Rights Bus Tour budget to "take it away and give the funds to something else."

231. Daw verbally greeted Dr. Schoolmaster (whom she had met the week before) when he entered the Political Science Department office that day. As soon as Ms. Scroggins turned her back to look for the budgetary information, Dr. Schoolmaster advanced toward Daw and when he reached her, Dr. Schoolmaster bent over and began caressing her bare knee and stated, "I am sorry to interrupt your conversation." At the time, Daw was wearing a dress that stopped just before her knee and her right leg was crossed over her left. Daw was frozen in shock that Dr. Schoolmaster caressed her bare leg, but Dr. Schoolmaster was not finished dehumanizing and degrading Daw. As Dr. Schoolmaster continued caressing Daw's knee his fingers would trail downward, to Daw's lower-inner-thigh and then to the crease where Daw's legs crossed before patting and releasing Daw's body (and indeed her humanity) back to her.

232. When Daw finally swallowed her shock, humiliation and shame resulting from these actions, all she was able to say to Dr. Schoolmaster was, "Dean, it is perfectly okay to interrupt our conversation." But Daw, herself, was far from okay.

233. According to TCU's account of the incident, Dr. Schoolmaster's visit to the Political Science Department office took approximately five minutes. That is, for five entire minutes—300 dignity-stripping seconds—Daw shared space with and was sexually harassed and assaulted by her very own Academic Dean.

234. Immediately following this incident Daw disclosed the occurrence to two other TCU women staff members. Both women responded in a manner that led Daw to understand that this was Dr. Schoolmaster's common behavior.

235. A week later Daw was still in shock and troubled about the incident, which she had now been replaying her head. On April 30, 2018, after much deliberation, Daw reported the incident to Andrea Vircks in TCU's Title IX Department but also informed them that she was not immediately comfortable formalizing her complaint because she was aware of TCU's history and feared retaliation from Dr. Schoolmaster from which TCU would not protect her. In an attempt to discourage her from filing her complaint, **TCU's Title IX office confirmed that Daw's fears were valid**, before facetiously stating retaliation was prohibited. Unconvinced by this boilerplate response from TCU's Title IX office, Daw delayed formalizing her complaint several weeks during which time Daw lived and tried to cope with the psychological ramifications of her encounter with Dr. Schoolmaster, including her inability to focus on her schoolwork, while actively modifying her schedule so that she might avoid Dr. Schoolmaster and retaliation in the form of further harassment, including the further denial of educational opportunities. Avoiding Dr. Schoolmaster proved to be impossible when Daw was forced to shake his hand as she received her diploma at graduation.

236. On May 1, 2018, Daw hand delivered a typed statement recounting the incident. The letter was post-dated to May 14, 2018—two days after graduation—when Daw could be sure that she would not have to encounter Dr. Schoolmaster.

237. On or about May 14, 2018, Dr. Turner began his inquiry into Daw's report of sexual harassment and assault by Dr. Schoolmaster by first, doubting and next attempting to villainize and discredit Daw. Specifically, rather than work to provide some recourse for the traumatic encounter suffered by Daw, Dr. Turner contacted TCU staff members to question Daw's character and ask if she were "believable."

238. In late May 2018, having heard nothing from TCU except that Dr. Turner had questioned her character and believability to other TCU staff, Daw feared nothing was being done about her Title IX complaint. So, Daw followed up with TCU's Title IX office regarding progress of her report of sexual harassment and assault by Dr. Schoolmaster. In response, Ms. Vircks informed Daw that Dr. Turner, and Dr. Kathy Cavins-Tull, TCU's Vice Chancellor for Student Affairs, would meet with Dr. Schoolmaster regarding her report on June 5, 2018. TCU and/or Dr. Turner failed to even contact Dr. Schoolmaster regarding Daw's Title IX complaint by that date.

239. On June 12, 2018, Daw again contacted TCU's Title IX office to check on the status of her report and was informed that TCU had still not yet notified Dr. Schoolmaster of her report of sexual harassment and assault.

240. On the morning of June 20, 2018, still unsatisfied with TCU Title IX office's apparent and deliberate indifference toward her report of sexual harassment and assault at the hands of Dr. Schoolmaster, Daw met with then Provost Nowell Donovan and reported the incident again. Upon learning of Dr. Schoolmaster's sexual harassment and assault of Daw, in the form of caressing her knee and inner-lower-thigh Provost Nowell informed Daw that he "wouldn't touch [his] wife in that manner," asked Daw for a copy of her report (which she delivered to him next day) and assured her that he would contact the Title IX office to escalate her report. Specifically, Provost Nowell stated that immediately after his meeting with Daw he would "call Darron and find out why [Title IX is] dragging their feet."

241. After Daw's meeting with then Provost Nowell, Dr. Kavins-Tull informed Dr. Schoolmaster of Daw's Title IX report that same morning.

242. That same afternoon—in an apparent attempt to further harass and intimidate Daw—Dr. Schoolmaster crashed the party held to celebrate Daw's graduation and going-away in

the Political Science Department office. Daw was already uncomfortable returning to the very place that her Academic Dean had violated her, and Dr. Schoolmaster's presence confirmed her worse fears and triggered the stress and anxiety that resulted from Dr. Schoolmaster's sexual harassment and assault. Dr. Schoolmaster achieved his intended result: intimidating Daw.

243. Dr. Schoolmaster feigned ignorance of Daw's party and pretended his visit was to ask a simple question. In reality, however, Dr. Schoolmaster was visibly upset, and it was clear that Dr. Schoolmaster intended to and did intimidate Daw by showing up unannounced and with his arms folded at Daw's going away party, in the very place he sexually harassed and assaulted her.

244. Immediately after this encounter with Dr. Schoolmaster, Daw again contacted TCU's Title IX office. Specifically, Daw called TCU's Title IX office, **where Leigh Holland the so-called "Title IX Investigator" answered Daw's call on speaker**. Daw was shocked by the lack of professionalism, sensitivity and privacy exhibited by Ms. Holland's conduct in answering her call on speaker. Daw expressed her shock and disappointment with Ms. Holland, whom had no prior experience as a Title IX investigator and was apparently learning on-the-job. Thereafter, Ms. Holland—still on speaker—haughtily asked Daw, "is this regarding your matter, is there something I can do for you?" Daw again pleaded with Ms. Holland to remove her from speaker so that the two might speak privately. When Ms. Holland finally took the call off speaker, Daw informed her of her most recent and intentionally intimidating encounter with Dr. Schoolmaster. Though she felt compelled to immediately report the incident, Daw ultimately concluded her conversation with Ms. Holland only feeling violated yet again by TCU. Indeed, Daw was apprehensive about speaking with Ms. Holland altogether due to Ms. Holland's reputation as a gossip.

245. On June 21, 2018—nearly two months after Daw first reported her incident of sexual harassment and assault by Dr. Schoolmaster and only after constant pressure to act from Daw—Ms. Holland sent Daw a Title IX e-mail across TCU's open network rather than via secure/certified mail. In this email, Ms. Holland attached a letter from Dr. Turner indicating that TCU had *finally* concluded that Daw's report contained "enough information to warrant an investigation into the complaint." Worse still, this communication confirmed that Dr. Turner's mid-May conversations with staff regarding Daw were not at all a part of TCU Title IX office's investigation, but rather a failed attempt at throttling Daw's report by calling into question her credibility and character.

246. On July 19, 2018, Daw met with TCU's Title IX office via phone to review TCU's investigative report of her sexual harassment and assault by Dr. Schoolmaster. It is TCU policy not to provide copies of investigative reports to victims and reporters of incidents at TCU or TCU sanctioned events.

247. According to the investigative report, Dr. Schoolmaster admitted that he inappropriately touched Daw but asserted that caressing and patting Daw's knee and lower-inner-thigh was intended to be "respectful or courteous." Dr. Schoolmaster then contradicted himself by asserting the touching was unplanned and spontaneous. Dr. Schoolmaster also asserted that Daw's report was "frivolous and ridiculous." Notwithstanding Dr. Schoolmaster's statements, they are implausible, if not laughable, when considering that Dr. Schoolmaster, who stands over six feet tall could have accidentally caressed and then patted Daw's knee and lower-inner-thigh, while she was seated.

248. On Friday August 3, 2018, Dr. Turner e-mailed Daw (again on TCU's open network rather than via secure/certified mail) and attached a formal letter that, in relevant part,

stated "[a]fter conducting a thorough and impartial investigation, it has been determined that Dr. Schoolmaster inappropriately touched your leg" and that "Dr. Schoolmaster violated TCU's 1.005 Discrimination, Harassment, and Related Conduct Policy." As his punishment for sexually harassing and assaulting Daw—the only student with a 4.0 GPA in the AddRan College of Liberal Arts—Dr. Schoolmaster was made to attend a mere one-hour, in person, one-on-one Title IX training/education and also complete an online Title IX training prior to the start of the following semester. In reality, every professor at TCU was assigned to complete the aforementioned online Title IX training, therefore Dr. Schoolmaster's only true sanction was a mere one-hour conversation—a slap on the wrist; or better still a message to Daw and every racial minority and woman that at TCU sexual harassment and assault will be met with inadequacy. TCU's conduct indeed exhibits that TCU's "policies" and "protections" of racial minorities and women are just lip service to mandated federal law.

249. Shocked and dejected that TCU and/or Dr. Turner had reduced the sexual harassment and assault she suffered to a "touch" on her leg and at the lack of punishment of Dr. Schoolmaster, Daw immediately appealed TCU's finding. Specifically, on August 6, 2018, Daw wrote Dr. Turner expressing her disappointment with the lack of seriousness given her report as evidenced by the non-sanction(s) given to Dr. Schoolmaster and further informed TCU that its response to her report was inadequate. Ultimately, and unsurprisingly, TCU denied Daw's appeal. To date, Daw has not even received an apology from TCU or Drs. Turner and Schoolmaster.

**a. TCU's Title IX Office discourages Coleman from reporting multiple incidents of discriminatory treatment at the hands of TCU, which were severe and pervasive enough to cause Coleman psychological stress and anxiety and trigger type 1 diabetes and then deteriorate her diabetes control.**

250. Coleman is a Chancellor Scholar at TCU, who receives a full **merit-based** scholarship and is enrolled in TCU's Honors College. From the moment Coleman arrived on

campus in the Fall of 2016 she was smacked with TCU's well-preserved legacy of hate. Shortly after she moved into TCU's Honors College dorm Coleman, while studying, was approached by a white male student who announced to Coleman that she "was only [at TCU and the Honors College] to fill the black girl quota." In TCU's Honors dorm Coleman would regularly encounter white students referring to Coleman and other African Americans at TCU as "niggers". Coleman confronted the students, but nothing changed. Coleman was regularly subjected to racist, sexist, and bigoted remarks in the Honors College dorm. The only space where Coleman could escape such treatment was in her shared room, where TCU assigned her to room with two other racial minority women.

251. In class, Coleman was regularly treated to the same conduct. Her professors facilitated racist and bigoted conversation and assigned course work, not intended to educate, but rather to reinforce and/or excuse white supremacy. In fact, Coleman's upper-level courses taught by the Criminal Justice Department and CRES department chairs donned topics like "Are people of color discriminated against or do they just commit more crimes?" and "Everyone is a little bit racist," respectively, to name a few.

252. On campus Coleman's treatment was equally jarring. At one point she sought solace by joining a Christian small group on campus, which was facilitated by Kimber Crumrine, a campus minister at TCU who regularly invited Coleman to her home. Coleman had never visited Crumrine's home and once Ms. Crumrine disclosed to Coleman that "[Crumrine's] dog is racist and does not like when [people of color] come to her home," Coleman was glad she had declined the invitation. Following this and other similar interactions with TCU's religious staff Coleman stopped attending TCU programs facilitated by TCU's Religious and Spiritual Life office.

253. When Coleman attempted to find another distraction from this conduct by serving as an ambassador in her academic department, and as a faculty assistant to her Honors College professor from 2016 to 2019 she was degraded, berated and met with open hostility. Coleman's faculty mentor, for whom she worked as an assistant, would regularly demand that Coleman perform non-academic/TCU- related work at all hours of the day and night. When the faculty mentor believed that Coleman responded untimely, she regularly bombarded her with dozens of harassing and insulting text messages. Coleman's faculty mentor even pilfered resources Coleman had earned and purchased with Honors College grant money to support her own research. Indeed, Coleman's faculty mentor appropriated recording supplies for focus groups, transcription services, as well as gift cards to compensate the participants in her own faculty required research from those resourced purchased via Coleman's grant—all without Coleman's consent.

254. Despite such treatment, TCU regularly solicited Coleman's participation in school activities, because as stated by TCU, as a racial minority and woman, Coleman "can speak eloquently about the impact of receiving a Chancellor's Scholarship." Coleman deeply resents being utilized as yet another minority show piece by TCU. Because she was a scholarship recipient, however, she feels compelled to do so. Without fail after each event, Coleman was approached by white faculty, alumni, and donors and told that she "speaks well" or is "articulate." At one such event on April 26, 2019, after Coleman spoke on behalf of the Honors College, she was approached by a white man that had been drinking heavily, who told her she "spoke well" and reminded him of Oprah. Next, without Coleman's consent and in the presence of TCU faculty and staff, the same drunk white man kissed Coleman. No one said a word or otherwise defended Coleman.

255. The discriminatory and bigoted treatment to which Coleman was subjected was so severe and pervasive that Coleman found herself calling her mother in tears nearly every night as

a result of the foray of hate she experienced at TCU each day. Soon the stress and anxiety of her TCU experience had negatively impacted her mental and physical health. So great was the stress that during her first semester Coleman visited an endocrinologist who diagnosed her with type 1 diabetes, which he stated was triggered by her experiences at TCU and which Coleman must manage for the rest of her life. TCU's continued discriminatory treatment of Coleman has exacerbated her condition and required more stringent measures to control it, including both psychological and physiological treatment.

256. On May 1, 2018, Coleman met with Chancellor Boschini to share her experiences and was candid about the openly hostile racist and sexist environment within her academic department. Chancellor Boschini did not encourage Coleman to file a report with TCU's Title IX office or otherwise direct her to TCU resources.

257. TCU's Student Disability Services was also of no assistance to Coleman when she requested accommodations based upon her diabetes management/control. In January 2019, Coleman reached out to Laurel Cunningham, Interim Leader of Student Disability Services, begging for accommodations as it had become increasingly difficult for her to manage her diabetes and schoolwork amidst the stress and trauma and treatment that goes along with being an African-American woman at TCU as described herein. Ms. Cunningham responded by asking Coleman for more information, specifically, what kind of accommodations Coleman was requesting. Without delay, Coleman relayed her challenges with Ms. Cunningham, stating that since her diagnosis, she faced many challenges with maintaining her studies and diabetes which had become difficult. Coleman conveyed her need for extra time to complete assignments and an option to work from home to enable her to complete the assignments on time and control her diabetes. After

answering Ms. Cunningham's questions and providing her with the aforementioned information Coleman heard nothing from Ms. Cunningham or anyone from Student Disabilities Services.

258. On June 6, 2019, Coleman sent a detailed nine-page written report to TCU's Title IX Coordinator, Dr. Turner detailing some of her harrowing experiences and the physiological and physical injuries that resulted, including type 1 diabetes and/or worsening diabetes control. Puzzlingly, Dr. Turner responded by asking Coleman if she *really wanted* to file a formal complaint, placing emphasis on an investigation as though it would be a hassle, suggesting that she should rather just place her grievances "on record," and hurried her to discuss another unrelated topic in an attempt to discourage Coleman from reporting discriminatory treatment. Other than Dr. Turner's apparent dismissal of her report upon its receipt, as of the original filing of this lawsuit, Coleman has received no response from TCU regarding the hateful and discriminatory experience she has been made to endure.

259. Returning to TCU in the Fall of 2019 was traumatic for Coleman because she knew how difficult it is for an African-American woman to learn, live, and work in TCU's discriminatory environment. Coleman was spiraling emotionally, she struggled to turn assignments in on time, and even to go to class on most days. Coleman also quit her job as an Honors College Faculty Assistant to avoid the harassment from her faculty mentor and campus altogether. Coleman also decided that she was no longer mentally capable of attending graduate school after graduation due to the stress and anxiety that she experienced at TCU so she cut the graduate application process short in late October. Today, Coleman has very little motivation for school and life. Though she thought about leaving TCU, as a recipient of a full scholarship and without the financial resources to attend college elsewhere Coleman remained at TCU. Her Chancellor's Scholarship had become

a noose around her neck. Coleman now seeks therapy outside of TCU as the TCU Counseling Center has a reputation for not being diverse, sympathetic or helpful to African-American women.

**b. TCU's Title IX Office ignores years of complaints of discrimination against racial minorities and women in TCU's Department of English and instructs Sylvester that she must waive and forfeit her complaints in order to accept an on-campus employment position at TCU and offers Okonkwo an on-campus employment position in response to her direct complaints to Chancellor Boschini.**

260. Sylvester is an award-winning African-American woman who was previously enrolled in the PhD program in TCU's Department of English. As a native of Louisiana and a survivor displaced by Hurricane Katrina, who now holds undergraduate and graduate degrees, including a graduate degree from another predominantly white institution in the deep south, Sylvester is no stranger to hard work and perseverance in the face of adversity. But none of the experiences Sylvester previously encountered could have prepared her for the unique brand of hatred and bigotry endorsed by—and to which she was subjected at—TCU.

261. Even prior to her enrollment, Sylvester received a quiet warning against attending TCU. During TCU's Department of English Visit Day in Spring 2015, the only other African-American student enrolled in the PhD program in TCU's Department of English asked if Sylvester really wanted to attend a university that was "very white." **Sylvester had not known of TCU's long history of bigotry and racism, including its failure to graduate even one African-American woman from its English PhD program, to date—and not for want of trying.** During that same visit then professor Dr. Cedric May, an African-American male, also curiously kneeled down to earnestly express to Sylvester that he would be available to help in any way that he could if she attended TCU. Sylvester did not know what to make her interactions on Visit Day, however, she had attended and received adequate education, support and encouragement and was

successful at other "very white" graduate programs, so she believed TCU would be no different. Sylvester was wrong.

262. By the time Sylvester enrolled in the PhD program in TCU's Department of English in the Fall of 2015, the only other African-American PhD student had transferred to the University of Texas at Austin citing racially discriminatory treatment as cause for her departure. To add insult to injury, as a result of TCU's racist environment, Dr. May also resigned from the TCU's Department of English citing concerns regarding the same. And over the next four years Sylvester was subjected to rank hostility and harassment at the hands of her peers and professors.

263. Indeed, Sylvester —like many other racial minorities and women at TCU—learned very quickly that TCU was not a welcoming environment to African-American women. In her classes, Sylvester was subjected to offensive and disgusting racist jokes, commentary and course materials, like "all black men hate gay people and that is why there are so many homeless black gay youths" and equally racist assignments. When Sylvester participated in class discussions or made presentations, she was regularly publicly belittled and berated, if not boldly cut off mid-speech, especially in courses taught by then Chair of the Department of English, Karen Steele, who regularly demeaned Sylvester for simply daring to participate in class. One of Sylvester 's white classmates even violated her person by touching—without permission—Sylvester 's hair. Sylvester 's classmates were no doubt emboldened by the behavior of their professors, who by their conduct, demonstrated that Sylvester was fit to be dehumanized. When Sylvester attempted to address the racist environment to which she was regularly subjected, Sylvester 's professors were often unprepared or seemingly unwilling to address her concerns about the racist conversations, text and conduct entertained in her PhD program. Not surprisingly, TCU did little,

if anything at all to correct Sylvester 's professors and classmates' racist and inaccurate commentary and behavior.

264. Sylvester ended her first year at TCU feeling isolated and shutdown. In fact, in Sylvester 's First Year Review—a requirement of TCU's English PhD program—she made clear her complaints and extensively detailed the anxiety, stress and trauma that resulted from her experiences at TCU. In response, in a letter dated May 7, 2016 Sylvester 's professors acknowledged "the challenges of adjusting to TCU's largely homogenous culture and, at times, racially insensitive—and at times offensive—treatment from her peers" and stated that they were "earnestly concerned about her treatment by other graduate students and attuned to the need for her coursework to include ample, and equitable, opportunities for her scholarly pursuits in a supportive professional environment." Despite commending Sylvester for her "forthright and thoughtfulness in addressing the need for productive spaces of learning and growth in the program", TCU and its agents did nothing to stop the onslaught of hate and racism Sylvester was treated to on campus and in the classroom in the form of "petty behaviors" and "unproductive interactions" by her classmates and professors designed to relegate Sylvester to a status of second class citizen.

265. The anxiety and trauma resulting from Sylvester 's first year at TCU manifested itself in sleeplessness, inability to complete coursework, and a diminished sense of self-worth, **to name a few of the debilitating repercussions of simply existing as an African-American woman on TCU's campus**. Sylvester vowed to TCU's English Department, in writing, that her experience at TCU was not one she would wish on her worst enemy, much less another unknowing African-American woman. So, when Okonkwo, another award-winning African-American woman attended TCU's Visit Day in Spring 2016, Sylvester extended Okonkwo the same quiet

courtesy and warning given to her a year earlier. During 2016 Visit Day, Sylvester —the only African-American student in TCU's English PhD program—warned Okonkwo that her experience at TCU had been very hard because of her race and gender.

266. Armed with this warning Okonkwo visited then Director of Graduate Studies, Dr. Mona Narian and candidly expressed her reservations about attending TCU because of its hateful legacy and its failed attempts at diversity, equity and inclusion. Despite being fully aware of Sylvester 's ongoing distress at the hands of her professors and peers, Dr. Narian touted TCU's recent DEI campaign as evidence that TCU had made the necessary changes to ensure a productive environment for its racial minorities and women and urged Okonkwo to attend TCU and experience and take part in said change. Dr. Narian was wrong. TCU had not changed. In fact, as detailed above TCU's racist fabric has remained unchanged since its founding and throughout its history.

267. Okonkwo knew all too well of TCU's history. Indeed, though she had been married and living in Berlin, Germany for years at the time she applied to TCU, Okonkwo's grandmother was from and lived in Fort Worth's "Stop Six" neighborhood. Okonkwo had learned of TCU and its racist history in Fort Worth through stories of the racist conduct of TCU's students, faculty and staff, which her grandmother and other African-American residents directly experienced. **Okonkwo even recalled vividly that as a child visiting her grandmother, there was a clear line of demarcation where African-Americans were safe or allowed on Berry Street—the street leading directly to TCU from Stop Six**. These stories would become the basis of Okonkwo's research and sadly forecast her own plight at TCU. Having attended predominately white institutions for undergraduate and graduate school and having received adequate support and fair treatment from those institutions, (which facilitated her successful completion of the same)

however, Okonkwo assumed that TCU too was capable of overcoming its past and promoting an equitable learning environment. Okonkwo soon learned that she had incorrectly assumed that TCU was capable of fair and equitable treatment of African-American women.

268. Almost immediately after enrolling in the PhD program in TCU's Department of English, Okonkwo experienced the same racist and isolating treatment other racial minorities and women received at TCU. In class, Okonkwo was treated to insensitive remarks and condescending directives from her professors who regularly casually berated Okonkwo and questioned her intelligence, ability and creativity during class discussions and presentations, especially at the hands of then Chair of the Department of English, Dr. Steele. Okonkwo's treatment by Dr. Steele was so jarring that even her fellow non-African-American classmates took notice of Steele's hostile behavior. By the end of her first year in TCU's English PhD Program, Okonkwo—like Sylvester —was left feeling dejected, isolated and questioned her self-worth because of her experiences at TCU.

269. On the afternoon of December 1, 2016, Okonkwo reached her tipping point. That day—feeling alone and openly attacked solely because of her race—Okonkwo skipped class to visit TCU's Title IX Office to see what recourse she had in making a formal complaint against Dr. Steele for the harassing treatment she was receiving in her Introduction to Graduate Studies course, among other hostile experiences she had encountered in her first semester at TCU. While there, Okonkwo met with Leigh Holland and detailed her experience fully. While Ms. Holland performed what appeared to be empathy towards Okonkwo at the time, she ultimately discouraged Okonkwo from formalizing her complaint and even explicitly instructed Okonkwo to hold off on filing a complaint until grades were issued as that would be the measure of whether Okonkwo was adversely impacted by the obvious racist behavior from Dr. Steele. Okonkwo was shocked by this

response because her reason for visiting the Title IX Office was to report the racist and dehumanizing treatment she had been subject to and not concern for her grades. Apparently, Ms. Holland, and/or TCU believes that discriminatory treatment or impact towards a student may only occur if that student's grades fall below a certain standard. That is, Ms. Holland and/or TCU have determined that complaints of African-American women students to TCU's Title IX Office, regardless of their nature, are not valid or ripe unless said students' grades have been negatively impacted as a result. Ms. Holland and/or TCU could not be more incorrect.

270. Okonkwo left her meeting with Ms. Holland feeling more physically and emotionally drained and let-down than when she had arrived. Ms. Holland was successful in fielding Okonkwo's valid Title IX complaint. Of course, neither Ms. Holland nor anyone from the Title IX office or TCU at all ever followed up with Okonkwo. And of course, Okonkwo's racist encounters worsened.

271. In Spring of 2017, Sylvester and Okonkwo enrolled in a rhetoric and composition course titled Protest and Violence taught by Dr. Brad Lucas. Sylvester and Okonkwo purposefully enrolled in this class because the topic was civil rights, thus they assumed that the course work might shield them from the racist undertones of the Department. Sylvester and Okonkwo were wrong. In fact, said class would become one of the most contentious and hostile environments the pair would experience at TCU.

272. Throughout the course Dr. Lucas not only assigned racist rhetoric but also facilitated racist discussions and presentations. When Sylvester and Okonkwo spoke against the course readings and conduct they were immediately slapped-down. Instead—in a PhD level civil rights course—the onus was on Sylvester and Okonkwo to not make their white classmates uneasy or uncomfortable by discussing race. Where Sylvester and Okonkwo's white classmates did take

comfort, however, was in berating and belittling the work that Sylvester and Okonkwo conducted in the course. On occasion, in this course, Sylvester and Okonkwo found themselves—with no help from Dr. Lucas—explaining and arguing the most basic tenants of how the ramifications of slavery and systematic oppression still impact African Americans today. In another instance, when Sylvester expressed interest in researching and writing about the connection between civil rights and African-American health, Dr. Lucas became irate and berated Sylvester; simultaneously ushering in racist commentary from Sylvester and Okonkwo's classmates, who questioned the value and validity of such a project. At a point, Okonkwo began fielding the onslaught of derogatory questions and remarks from her classmates in order to offer Sylvester, who was becoming visibly shrunken, some reprieve. Dr. Lucas did nothing to stop Sylvester and Okonkwo's classmates from belittling and demeaning Sylvester and Okonkwo's work. During that same class, however, Dr. Lucas shielded and even stopped aggressive discussions of a white student's work in order to defend said student against the commentary.

273. Ultimately, Sylvester and Okonkwo emailed Dr. Lucas expressing concern over their experience in his course, including the overwhelming feeling of having to defend themselves (and indeed the African-American race) in order to contradict the intensely racist course materials featured in class. In response, Dr. Lucas admitted that his course was not doing a good job of engaging with racism in the works assigned, but did nothing to change his or the behavior of Sylvester and Okonkwo's classmates.

274. Later that semester Sylvester visited then Director of Graduate Studies, Dr. Narian to complain about her experience in Dr. Lucas's class and express her concerns that Dr. Lucas was on her exam committee given the experiences she had encountered with him. Dr. Narian warned Sylvester that removing Dr. Lucas from her exam committee would likely result in retaliation

from Dr. Lucas, who was the incoming Director of Graduate Studies for the following academic year.

275. That same semester, Okonkwo also made Dr. Narian aware of the discriminatory treatment she had experience in her first year at TCU. At no time did Dr. Narian or anyone else from TCU direct Sylvester and Okonkwo to Title IX to formalize their many complaints.

276. Sylvester and Okonkwo 5 were also discriminated against for daring to participate in co-curricular activities. In one instance, Okonkwo was unable to attend a Women of Color in the Academy conference because the only way TCU's English PhD program would fund the trip was if she agreed to recruit for TCU. Given the hostile and discriminatory experiences she had survived, Okonkwo's conscience would not allow her to knowingly participate in subjecting another African-American woman to her experience. In another instance, then Chair Dr. Steele, allocated funding for Okonkwo to attend a conference, but not before publicly announcing that "[Okonkwo] doesn't have a credit card that she can put this on" so as to demean Okonkwo in the presence of persons with whom she had to interact with in the Department.

277. When Sylvester and Okonkwo attempted to introduce their colleagues to diverse perspectives in a manner sanctioned by TCU, they were shunned and discriminated against by TCU's Department of English and her students. Specifically, in Fall 2017, Sylvester and Okonkwo co-founded a Reading Group for American and African-American literature. Reading Groups are a required form of participation for PhD students in TCU's Department of English, which students regularly and robustly attend. In fact, as a required exercise, TCU Department of English staff closely monitor the attendance and equitable sharing of ideas that take place in Reading Groups.

278. Prior to Sylvester and Okonkwo's Reading Group, all such groups primarily focused on white and Eurocentric topics. Not surprisingly, despite providing seemingly unlimited

funding to the other reading groups for lunch, snacks and other items for attendees, Sylvester and Okonkwo's Reading Group was given a $75.00 budget to cover the cost of lunch, snacks and other items for attendees for the entire year, leaving Sylvester and Okonkwo to self-fund their Group. Along with being given less funding for the Afrocentric Reading Group, despite the fact that Sylvester and Okonkwo regularly attended other Reading Groups, only two faculty members and few students attended any of the Afrocentric Read Group's meetings the entire year.

279. Sylvester and Okonkwo were discouraged and dismayed but remained committed to promoting accurate depictions of the African and African-American experience to their professors and colleagues to combat the negative, stereotypical, insensitive and inaccurate representations of African Americans promoted by TCU. Sylvester and Okonkwo also continued to report and complain of their experiences with racism and lack of diversity to Dr. Narian.

280. At the end of Fall 2017, rather than sincerely address Sylvester and Okonkwo's concerns, or refer their complaints to TCU's Title IX Office or investigate the same, Sylvester and Okonkwo were instructed to include their complaints on course evaluations and treated to a series of hurried conferences on diversity, which were placating, unproductive and did little more than advance the flawed logic that racial minorities and women, like Sylvester and Okonkwo should change themselves in order to peacefully coexist within TCU's racist environment.

281. Indeed, on December 8, 2017, at one such conference Professor David Colon yelled at Sylvester for asserting that the racial minority faculty had not done enough to address the anti-African-American racism endured by African-American students within the department. Though several members of TCU faculty and staff were present and openly agreed with Sylvester's sentiment, it was not until after said conference that Sylvester was apologized to and told that Dr. Colon was out-of-line. Dr. Colon's conduct in yelling at Sylvester and the tone of the meeting

generally was so oppressive and jarring that many of the racial minority students in attendance, including Sylvester and Okonkwo, left said meeting feeling more isolated than before and psychologically and physiologically unable to return to class and/or complete assignments.

282. At that very meeting, for the first time, a TCU professor informed Sylvester and Okonkwo that they should contact TCU's Title IX Office with their many complaints. Okonkwo recalled her conversation with Ms. Holland two years prior and thus had little hope that doing so would make any difference at all. Okonkwo was right, as was confirmed by Dr. Narian when she informed Sylvester that the reason she had not previously recommended that Sylvester and Okonkwo forward their complaints to TCU's Title IX Office was because she "knew that Title IX would not do anything."

283. But when Okonkwo followed Dr. Narian's instruction to include complaints of discrimination in course evaluations, that too backfired. Specifically, in December of 2017, Okonkwo complained about the unfair treatment she experienced in her Teaching College Composition course taught by Dr. Carrie Leverenz.

284. Upon her return from winter break in January of 2018, Okonkwo learned that Dr. Leverenz had embarked on a witch hunt to publicly identify which racial minority student had given her a negative review. Dr. Leverenz had even tearfully talked to other racial minorities in TCU's Department of English about the review to ask if they agreed. Okonkwo believed, as Dr. Narian had told her, that course evaluations were anonymous and would not be publicly discussed. As a result, Okonkwo was left knowing that there was no real recourse for her treatment at TCU and yet again felt alone, rejected, and as though her life was of little value at TCU. Okonkwo was psychologically drained by her experience at TCU and developed a sense of ambivalence towards her decision to attend TCU in the first place. Soon, Okonkwo's psychological state manifested

physiologically as she began to experience tension headaches and general health decline. To tend to her health, Okonkwo began limiting her participation in, and attendance at TCU, including required program activities.

285. On January 18, 2018, Okonkwo reached her breaking point. On that day, Okonkwo was tired of feeling empty and spurned by the constant onslaught of hate visited upon her at the hands of TCU, and so—in search of some semblance of peace for the first time since her enrollment at TCU—she penned a farewell note for her husband and visualized her own death. Fortunately, this visualization did not materialize.

286. Ironically, on that very same day—January 18, 2018—after submitting a formal complaint, and against the advice of Dr. Narian, Sylvester met with Dr. Turner in TCU's Title IX office to inform him of her and other African-American women's experience at TCU and to plead with him to take seriously the real harm that resulted from the hateful and bigoted practices and disparate racial treatment and impact at TCU. True to form, Dr. Turner did not open an investigation into Sylvester 's complaints.

287. Instead, nearly four months later, and after continued complaints, on April 6, 2018, Dr. Turner and Ms. Holland treated Sylvester and Okonkwo and other racial minorities in the PhD program in TCU's Department of English to lunch, where they again recounted the same hateful experiences and racist classroom and campus environment of which that they first informed his office in Fall 2016. Dr. Turner and Ms. Holland assured Sylvester and Okonkwo they had been heard and that TCU would "work to help rectify the problems" they faced. But again, Dr. Turner and Ms. Holland and/or TCU did nothing.

288. Predictably, Sylvester and Okonkwo experience only continued to worsen. In fact, Sylvester and Okonkwo were also openly and blatantly discriminated against as professors in the

TCU's Department of English. **Specifically, Sylvester and Okonkwo were required to hold office hours in shared space in Reed Hall, where their white colleagues would berate, demean and bully them out of the office. Ultimately, both Sylvester and Okonkwo were forced to hold office hours with their students in the TCU Library, Bookstore or even the hallway outside of classrooms. TCU was aware of this conduct and again did nothing.**

289. On October 4, 2018, when Sylvester was interviewing for an employment position in TCU's Title IX Office, yet another professor in TCU's Department of English joined in on the parade of hatred that encapsulated Sylvester and Okonkwo's experience. That day, Dr. Richard Enos sent an email to the entire English Department belittling Sylvester and—ironically—calling her unprofessional. Sylvester showed the email exchange to personnel in TCU's Title IX office during her employment interview. Ultimately, Dr. Enos begrudgingly apologized for his behavior, but again nothing was done to change the environment of hate and bigotry to which Sylvester and Okonkwo were subjected to daily.

290. On November 8, 2018, after learning of the numerous unanswered complaints of discrimination reported by Sylvester and Okonkwo, Dr. Joddy Murray, the newly appointed Chair of TCU's Department of English tellingly sent an email apology to the Department explaining that:

> **When longstanding injustices have been part of an institutional culture, acknowledging the truth and apologizing for the impact on individuals in the community can be an important step for moving forward**. With that in mind, I write to you all today. Individuals in the department of English, both faculty and students, have behaved in a racist, homophobic, misogynistic, and disrespectful manner both in public and semi-public spaces on campus —TCU compliance officers are aware of these reported complaints. Faculty and students of underrepresented groups have had the burden of first experiencing these behaviors and conversations as microaggressions and outright aggressions, and then, in the reporting or retelling of these behaviors, had to perform

> these traumas and aggressions again. Even now, it is likely that some continue to experience these traumatic events repeatedly, affecting their mental and physical health and, consequently, resulting in having to try and learn and teach in what becomes, for them, a toxic climate in our department.
> **As Chair of the Department of English, I apologize that this happened**. We cannot allow the learning and working environment to continue to be toxic. We must do better, together. **We need to educate ourselves, listen to others, and collectively do the work to both acknowledge these problems and take additional concrete steps to make constructive change. We need to check our own behavior and be aware of our prejudices, our biases, our microaggressions. No one person can do this. We all must do this together**.

291. Dr. Murray was correct and as he poignantly noted; the centuries of racial animosity nurtured at TCU requires immediate and intentional action. Unfortunately, however, Drs. Turner and Boschini do not see the problem as clearly as Dr. Murray.

292. On December 5, 2018, during her final employment interview with TCU's Title IX Office, Ms. Aisha Torrey Sawyer informed Sylvester that **if she accepted the position, she "would have to forfeit all of her prior Title IX complaints of discrimination at TCU."** Sylvester was in disbelief and declined the position. By now, the unyielding racist conduct of TCU and its agents had taken its toll on Sylvester, and she experienced psychological and physiological pain and injuries as a result.

293. Now battling constant bouts of anxiety and stress stemming from the harassment and humiliation being perpetrated against her, and at the advice of her physician, Sylvester decided that she could no longer allow her mind and body to continue to be destroyed as a result of TCU's collective racial immaturity. On January 16, 2019, Sylvester quit TCU's PhD program in the Department of English.

294. With Sylvester 's departure, Okonkwo was left to decide how much more of TCU's racism she could reasonably endure, especially knowing that all African-American women

students before her were constructively removed from the PhD program in the Department of English. Okonkwo's physiological and psychological state also continued to decline as she experienced the stress and resulting emotional breakdowns and panic attacks associated therewith.

295. On March 26, 2019, Okonkwo again visited TCU's Title IX Office and spoke with Ms. Holland to report the onslaught of issues she continued to face in her years at TCU. Ms. Holland again focused on whether or not Okonkwo's grades were impacted, rather than the treatment Okonkwo was experiencing. When Okonkwo noticed that Ms. Holland was recording her latest complaint in pencil and on scrap paper, while seemingly dismissing her complaints, Okonkwo asked directly, "**are they going to have to call me 'nigger' before y'all will do anything.**" Ms. Holland responded by telling Okonkwo that she would need to submit yet another complaint in writing to formalize her complaint. Again, no investigation into Okonkwo's complaints was opened.

296. Instead, on May 3, 2019, Dr. Turner held a meeting with the entire Department of English where he had the effrontery to—without investigation—announce to Okonkwo and other racial minorities that their civil rights had not been violated. At that same meeting Dr. Turner also announced that an external investigation of the racist climate in TCU's Department of English would soon commence. Per usual, this too was a lie.

297. Okonkwo was so frustrated with Dr. Turner's empty promises that on November 1, 2019, she met with Chancellor Boschini to detail her complaints. Bizarrely, rather than work to ameliorate Okonkwo's experience, Chancellor Boschini asked Okonkwo "if there were a job at TCU for you, would you take it?" Okonkwo—like Sylvester —declined the apparent offer to waive her complaints in exchange for a job and presumably compensation.

298. On January 13, 2020—after having been notified of this impending lawsuit—TCU finally commenced its external investigation of the complaints first made by Sylvester and Okonkwo as early as Fall 2016.

299. Okonkwo did not mince any words when challenging Ms. Holland and TCU's failure to address the issues that they were aware of for several years and even correctly informed Ms. Holland that some of the psychological and physiological damage that had been caused by enduring the overt and covert racism and racial oppression at TCU could have likely been quelled by Ms. Holland, Dr. Turner and others at TCU had they taken the complaints of African-American women seriously years ago, when such incidents were initially reported.

300. Even Department of English professors Dr. Narian, Linda Hughes, Charlotte Hogg, Alex Lemon, Jason Helms, Stacie McCormick, Rima Abunasser, Ariane Balizet and Theresa Gaul finally summoned the courage to stand up for their racial minority and women students that were met with deliberate indifference when they submitted their complaints to TCU's Title IX office. On May 29, 2020, the aforementioned professors sent the following collective message to Dr. Turner:

> We are writing as members of the English Department Advisory Committee and department leadership about the delay in concluding the inquiry conducted by Segal Consulting into the English Department's climate and culture regarding bias and discrimination along lines of race, ethnicity, gender, sexuality, age, and ability. This inquiry, which was announced in April of 2019, was deferred until January of 2020. Our understanding was that the consultants' report was to be delivered after spring break. With the upheaval brought about by COVID-19, we have not received that report, and thus the academic year has ended without resolution on this matter. Because we are invested in ensuring a working environment that supports everyone in our department, we urge you to bring this inquiry to a conclusion and move forward towards resolving any open Title IX complains within the English Department as speedily as possible. We understand that the global pandemic has made all processes challenging and difficult in the latter half of the spring

> semester. However, prolonging resolution on matters at the heart of the inquiry only exacerbates collective anxieties and concerns. As members of the department's leadership, we recognize the urgent need to provide an equitable and inclusive departmental climate and culture to sustain a positive learning and working environment for students and faculty. Without resolution of any outstanding complaints, we are substantially hampered in moving forward to take action and make change. Because of confidentiality, we are not informed as to the number, content, or individuals named in any complaints to your office. Based on the fact that the Segal inquiry was initiated, however, we presume that there are students and faculty members who have made complaints and we believe it is possible that some complaints were made as early as 2016. The lack of resolution to any complaints has exacerbated feelings of distrust and disillusionment within our department. The deferral of the inquiry from April to December further heightened concerns among students and faculty in the department. As we conclude this year and move into a new year in August, we urgently need your office to move the process of investigating and resolving these complaints to conclusion. We have undertaken substantial efforts within the department in the last year to address areas of concern. However, students and faculty members who have made complaints deserve to have a definitive response to these complaints and the department needs to be able to either take action based on the complaints or move on from them in order to ensure equitable working and learning conditions and to heal. Ongoing confidentiality constraints related to legality in regards to complaints severely hamper our ability to do this important work in line with the university's Diversity, Equity, and Inclusion goals and mission.

301. Had TCU taken seriously the reports of discrimination and assault it received from other racial minorities and women like Plaintiffs, perhaps they would never have been subjected to the treatment detailed herein. Indeed, had TCU ever responded adequately at all to reports of discrimination and assault of racial minorities and women, Plaintiff would not have had to resort to litigation to remedy TCU's deprivation of educational opportunities and benefits and TCU's policy of intentional discrimination that substantially increased their risk of and exposure to discrimination and assault.

302. Instead, TCU endorses a policy and practice that discourages racial minorities and women from reporting racial and sexual harassment and assault and retaliates against them for daring to speak out against it as it did with Wilson during the 2019-2020 school year.

**XXII. TCU retaliates against Wilson for daring to report mistreatment.**

303. While Wilson was busy working desperately to rehabilitate her physical and mental state resulting from her treatment at TCU and seeking justice for herself and other racial minorities and women relating to the same, Drs. Snow, Mack, Chimbel and Garnett—who were all aware of Wilson's complaints regarding discrimination—were also busy continuing to conspire against Wilson, and directing allegations to TCU administrators in retaliation for speaking out against her treatment. On August 27, 2019—in a conspired act of retaliation—Professor Mack emailed Wilson to inform her that he had determined that she committed plagiarism and was recommending that Wilson receive no credit for the summer course. On September 4, 2019 Dr. Rob Garnett, Associate Dean of the Honors College, sent a follow up email to Wilson indicating that Wilson "had earned a grade of 'no-credit' (NC) for the course, i.e., a grade below 70%" based on Professor Mack's recommended sanctions of "a zero for the two assignments that were [allegedly] plagiarized." Dr. Garnett's correspondence further indicated that:

> The NC grade was based on your performance in all three areas of evaluation for the course, as stated on the syllabus, and based on the assessments provided to me by all four participating instructors. In part it was the result of you earning grades of 0 on three of the four writing assignments (two due to academic misconduct, the third due to your failure to submit a paper); but it was also due to your low scores for "class participation" (58%) and "questions and interaction with guest speakers and tour guides" (61%).

304. Though Wilson was still attempting to recover from the injuries she survived during the Washington summer program and reengage into her normal life and academic course load, Wilson once again had to step over her pain to address the hateful and disparate treatment she

continues to suffer at the hands of the Honors College. Wilson initiated a formal appeal with Dr. Garnett to dispute the NC grade she was given for the Washington program. Besides the fact that, unsurprisingly, TCU blew nearly every protocol relating to its published academic appeal procedures, Wilson focused on the facts. On September 17, 2019, Wilson emailed Dr. Garnett to request a breakdown of the grades she received during the Washington summer program prior to her appeal hearing. On September 19, 2019 Dr. Garnett responded with the following:

> **Grades for [Wilson]**
> Class participation (50% of course grade)
> Dr. Gooding: 90 out of 100
> Dr. [sic] Chimbel: 70 out of 100
> Dr. Mack: 20 out of 100
> Dr. Snow: 60 out of 100
> Average score: 60 out of 100
>
> Written exercises (25% of course grade)
> Dr. Gooding: 90 out of 100
> Dr. [sic] Chimbel: 0 out of 100
> Dr. Mack: 0 out of 100
> Dr. Snow: 0 out of 100
> Average score: 22.5 out of 100
>
> Questions and interaction with guest speakers and tour guides (25% of course grade)
> Dr. Gooding: 94 out of 100
> Dr. [sic] Chimbel: 60 out of 100
> Dr. Mack: 40 out of 100
> Dr. Snow: 60 out of 100
> Average score: 63.5 out of 100
>
> Overall average for the course
> (60*50%) + (22.5*25%) + (63.5*25%) = 51.5%

305. Dr. Garnett also sent statements from each of the aforementioned Honors College faculty members/program facilitators. Of note, Dr. Gooding, finally found his conscience and within his statement admitted the truth of Wilson's academic capabilities and the truth behind Wilson's summer program experience:

> [Wilson's] class participation was commensurate with that of the "Excellent Participation" rating during the first week. During our group discussions she made contributions and always answered when called upon. Of note is that after the first full day, she and three other classmates took advantage of my ability to secure free tickets for an evening performance at the Kennedy Center. The rest of the group declined, citing fatigue.
>
> [Wilson] readily interacted with guest speakers and tour guides during the first week, with the exception of perhaps the more structured Brazilian Embassy visit. Of note was after our group visit with Georgetown University Law Center Professor Anthony Cook, she and [another student] elected to skip the group lunch portion in order to spend additional time engaging this engaging individual. Based upon her possible future law school plans of which she disclosed to me, I thought it prudent for her to take advantage of this window of opportunity so long as she agreed to reunite with the group for the afternoon walking tour (of which, to my knowledge, she did so timely).
>
> In her daily journaling, [Wilson] employs a "stream of consciousness" approach where she will not employ traditional paragraph spacing and thoroughly expresses herself, flowing from one thought to another. While this style may not "answer" all of the sub-questions posed from the reflective writing prompts, they do often reveal a deeper connection to the material on a much more personal level.
>
> Overall, [Wilson] performed well during the first week. Towards the end of the first week I did notice an increase of personal spacing from other members of the general group, especially during transitions, but I interpreted this as a healthy means of "pacing oneself" given the unspoken dynamic of her being the only African American female on the trip. While I personally did not witness anyone of any ill will in an impolite exchange with [Wilson], **I speculated that after the first few days of excitement wore off, the reality of possibly being socially isolated in subtle yet invisible ways was starting to seep in**.

306. Wilson's other professors, however, could not be bothered with the truth. Chimbel provided only four short sentences in support of the failing grades he issued to Wilson. In addition to accusing Wilson of plagiarism and scoring Wilson zero for all written assignments, Dr. Snow

and Professors Chimbel and Mack also heavily docked Wilson for "class participation" and "questions and interactions with tour guides" citing subjective and arbitrary bases for Wilson's grade determination. Wilson was shocked by the grade break down and statements because they were in direct contravention with the praise Professors Chimbel and Mack had given her during the trip. Wilson pointed out this disparity to Dr. Garnett during her appeal hearing on October 22, 2019 and even Dr. Garnett was unable to reconcile the change in his colleagues' attitudes and opinions regarding Wilson's performance, or justify the inadequate responses provided to Wilson regarding her revoked credit. Wilson believed that the allegations of misconduct made against her were as much a sham as the appeals proceeding she had just concluded. In addition, based on conversations with other students, Wilson learned that she had been subjected to discriminatory grading standards that other students were not subjected to that summer and resulting in the events detailed herein. (in conjunction with hostile and welfare-endangering conduct from TCU staff). In fact, shortly after filing this lawsuit another student enrolled in the course informed Wilson that she had submitted pages with incomprehensible doodles—not words—for her written assignments and received credit for the course.

307. On November 5, 2019, Wilson was notified that the Honors College had denied Wilson's grade appeal continuing the retaliatory treatment against her. Still, for a scholar as decorated as Wilson the ongoing hostile treatment and now character assassination of Wilson weighed heavily. On November 6, 2019, left hopeless yet again by the acts and omissions of TCU, Wilson disappeared. When Wilson's family could not reach her for several hours, they panicked and began calling everyone they could think of, including the police to see if a report had been made. Wilson's mother and uncle even began driving from their homes—each respectively hundreds of miles away—towards TCU's campus fearful of the worst. Eventually, Wilson's

family contacted Onstar®, Wilson's remote vehicle location service. Wilson's family found Wilson sitting alone in her car expressionless. Wilson had been sitting in her car for hours after once again calling the National Suicide Prevention Lifeline.

308. TCU's discriminatory conduct is unyielding. And TCU's present conscious disparate treatment of racial minorities and women, like Plaintiffs, is life-altering and life-threatening. In fact, another racial minority student at TCU recently confided in Wilson that she too had suicidal ideations resulting from her treatment as second-class at TCU. Wilson provided said student with the phone number for the National Suicide Prevention Lifeline.

## COUNTS

### COUNT I—TCU's official policy or custom of intentional discrimination against minorities and women violates Title VI of the Civil Rights Act of 1964 and Title IX of the Education Amendments of 1972.

309. Plaintiffs Wilson, Daw, Coleman, Sylvester and Okonkwo reallege and incorporate by reference the allegations contained in the previous paragraphs as if fully set forth herein.

310. At all relevant times TCU faculty, staff, administration, and other employees and/or affiliates ("TCU agents") were acting within the scope of their employment and/or at the direction and under the control of TCU. Moreover, at all relevant times appropriate TCU agents were made aware of and took no action against the conduct of its agents.

311. TCU violated Title VI of the Civil Rights Act of 1964 and Title IX of the Education Amendments of 1972's prohibition against disparate treatment via TCU's official policy of intentional discrimination and by subjecting Plaintiffs to a series of intentional hostile acts and adverse actions designed to deprive them of the benefits of education at TCU and derail their academic pursuit because of their race and gender.

312. Title VI of the Civil Rights Act of 1964 provides: "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d.

313. Title IX of the Education Amendments of 1972 provides, in relevant part, that: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

314. Plaintiffs are African-American young women who were discriminated against because of their sex and race. Accordingly, Plaintiffs are members of a protected class.

315. TCU receives federal financial aid and assistance and is therefore subject to the provisions of Title VI of the Civil Rights Act of 1964 and Title IX of the Education Amendments of 1972.

316. As detailed extensively herein, TCU engaged in a pattern and practice of behavior designed to discourage and dissuade students who have been racially or sexually discriminated against from seeking prosecution and protection and from seeking to have discrimination reports fully investigated.

317. TCU's practices in handling reports of discrimination and assault—discouraging victims from reporting their mistreatments and failing to investigate their claims or punish their assailants—constitutes a policy of intentional discrimination that created a heightened risk of discrimination for Plaintiffs.

318. Plaintiffs have suffered and continue to suffer emotional distress and psychological damage as well as physiological harm as a direct and proximate result of TCU's conduct, including the facts detailed herein.

**COUNT II—TCU's deliberate indifference to reports of discrimination made to officials authorized to institute corrective measures violates Title VI of the Civil Rights Act of 1964 and Title IX of the Education Amendments of 1972.**

319. Plaintiffs Wilson, Sylvester and Okonkwo reallege and incorporate by reference the allegations contained in the previous paragraphs as if fully set forth herein.

320. At all relevant times TCU faculty, staff, administration, and other employees and/or affiliates ("TCU agents") were acting within the scope of their employment and/or at the direction and under the control of TCU. Moreover, at all relevant times appropriate TCU agents were made aware of and took no action against the conduct of its agents.

321. TCU violated Title VI of the Civil Rights Act of 1964 and Title IX of the Education Amendments of 1972's prohibition against disparate treatment via TCU's deliberate indifference to the complaints of discrimination made by Plaintiffs Wilson, Sylvester and Okonkwo to TCU officials authorized to institute corrective measures and by subjecting Plaintiffs to a series of intentional hostile acts and adverse actions designed to deprive them of the benefits of education at TCU and derail their academic pursuit because of their race and gender.

322. Title VI of the Civil Rights Act of 1964 provides: "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d.

323. Title IX of the Education Amendments of 1972 provides, in relevant part, that: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied

the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

324. Plaintiffs are African-American young women who were discriminated against because of their sex and race. Accordingly, Plaintiffs are members of a protected class.

325. TCU receives federal financial aid and assistance and is therefore subject to the provisions of Title VI of the Civil Rights Act of 1964 and Title IX of the Education Amendments of 1972.

326. As detailed extensively herein, as a direct result of TCU's acts or omissions, Plaintiffs were intentionally made to endure hostile and harassing treatment in their educational pursuit, including but not limited to: Wilson's repeated segregation, discrimination and disparate treatment at or in TCU and in TCU-facilitated housing, TCU academic programs, and TCU-sanctioned activities and TCU's deliberate indifference to Wilson's complaints of this discrimination to TCU officials as detailed herein; and

327. TCU's deliberate indifference to Plaintiff Sylvester and Okonkwo's complaints of discrimination at TCU to TCU officials as detailed in herein.

328. Plaintiffs were subjected to a racially hostile educational environment created by TCU's lack of appropriate policies and procedures to remedy the same and its failure to properly investigate and/or address reports of discrimination from racial minorities and women.

329. TCU and its officials had actual knowledge of the discrimination faced by Plaintiffs because of their race and sex and the resulting harm created by TCU's failure to investigate and discipline their attackers and harassers in a timely manner and consistent with federal and state law.

330. TCU failed to take immediate, effective remedial steps to resolve the complaints of racial discrimination and instead acted with deliberate indifference toward Plaintiffs.

331. Plaintiffs have suffered, and continue to suffer emotional distress and psychological damage as well as physiological harm as a direct and proximate result of TCU's conduct, including the facts detailed herein.

**COUNT III—TCU's hostile environment violates Title VI of the Civil Rights Act of 1964 and Title IX of the Education Amendments of 1972.**

332. Plaintiffs Wilson, Coleman, Sylvester and Okonkwo reallege and incorporate by reference the allegations contained in the previous paragraphs as if fully set forth herein.

333. At all relevant times TCU faculty, staff, administration, and other employees and/or affiliates ("TCU agents") were acting within the scope of their employment and/or at the direction and under the control of TCU. Moreover, at all relevant times appropriate TCU agents were made aware of and took no action against the conduct of its agents.

334. TCU violated Title VI of the Civil Rights Act of 1964 by subjecting Plaintiffs Wilson, Coleman, Sylvester and Okonkwo to a series of intentional hostile acts and adverse actions designed to deprive them of the benefits of education at TCU and derail their academic pursuit because of their race.

335. TCU violated Title IX of the Education Amendments of 1972 by subjecting Plaintiffs Wilson, Sylvester and Okonkwo to a series of intentional hostile acts and adverse actions designed to deprive them of the benefits of education at TCU and derail their academic pursuit because of their gender.

336. Title VI of the Civil Rights Act of 1964 provides: "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied

the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d.

337. Title IX of the Education Amendments of 1972 provides, in relevant part, that: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

338. Plaintiffs are African-American young women who were discriminated against because of their sex and race. Accordingly, Plaintiffs are members of a protected class.

339. TCU receives federal financial aid and assistance and is therefore subject to the provisions of Title VI of the Civil Rights Act of 1964 and Title IX of the Education Amendments of 1972.

340. As detailed extensively herein, as a direct result of TCU's acts or omissions, Plaintiffs were intentionally made to endure hostile and harassing treatment in their educational pursuit, including but not limited to: Wilson's repeated segregation, discrimination and disparate treatment at or in TCU and in TCU-facilitated housing, TCU academic programs, and TCU-sanctioned activities as detailed herein; and

341. TCU's repeatedly hostile conduct towards Plaintiffs Coleman, Sylvester and Okonkwo as detailed herein.

342. Plaintiffs Wilson, Coleman, Sylvester and Okonkwo were subjected to a racially hostile educational environment created by TCU's lack of appropriate policies and procedures to remedy the same and its failure to properly investigate and/or address reports of discrimination from racial minorities and women.

343. TCU's hostile environment resulted in Plaintiff Wilson, Coleman, Sylvester and Okonkwo's exclusion from participation in, denial of the benefits of, and further discrimination in TCU's education program in violation of Title VI.

344. TCU's hostile environment resulted in Plaintiff Wilson, Sylvester and Okonkwo's exclusion from participation in, denial of the benefits of, and further discrimination in TCU's education program in violation of Title IX.

345. TCU failed to take immediate, effective remedial steps to resolve the complaints of racial discrimination and instead acted with deliberate indifference toward Plaintiffs.

346. TCU persisted in its actions and inaction even after it had actual knowledge of the harm suffered by Plaintiffs Wilson, Coleman, Sylvester and Okonkwo.

347. Plaintiffs have suffered and continue to suffer emotional distress and psychological damage as well as physiological harm as a direct and proximate result of TCU's conduct, including the facts detailed herein, and namely TCU's deliberate indifference to their rights under Title VI and IX.

**COUNT IV—TCU's retaliation against Plaintiff Wilson violates Title VI of the Civil Rights Act of 1964 and Title IX of the Education Amendments of 1972.**

348. Plaintiff Wilson realleges and incorporates by reference the allegations contained in the previous paragraphs as if fully set forth herein.

349. At all relevant times TCU faculty, staff, administration, and other employees and/or affiliates ("TCU agents") were acting within the scope of their employment and/or at the direction and under the control of TCU. Moreover, at all relevant times appropriate TCU agents were made aware of and took no action against the conduct of its agents.

350. TCU violated Title VI of the Civil Rights Act of 1964 and Title IX of the Education Amendments of 1972's prohibition against retaliation.

351. Title VI of the Civil Rights Act of 1964 provides: "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d.

352. Title IX of the Education Amendments of 1972 provides, in relevant part, that: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

353. Plaintiff Wilson is an African-American young woman who was discriminated against because of her sex and race. Accordingly, Plaintiff is a members of a protected class.

354. TCU receives federal financial aid and assistance and is therefore subject to the provisions of Title VI of the Civil Rights Act of 1964 and Title IX of the Education Amendments of 1972.

355. As detailed extensively herein, as a direct result of TCU's acts or omissions, Plaintiff Wilson was retaliated against for reporting the discrimination she faced at TCU as detailed in herein and in violation of Title VI of the Civil Rights Act of 1964 and Title IX of the Education Amendments of 1972.

356. Plaintiff Wilson has suffered and continues to suffer emotional distress and psychological damage as well as physiological harm as a direct and proximate result of TCU's conduct, including the facts detailed herein, and namely TCU's deliberate indifference to their rights under Title VI and IX.

**COUNT V—TCU's discrimination against Plaintiff Wilson as an employee violates Title VII of the Civil Rights Act of 1964**

357. Plaintiff Wilson realleges and incorporates by reference the allegations contained in the previous paragraphs as if fully set forth herein.

358. At all relevant times TCU faculty, staff, administration, and other employees and/or affiliates ("TCU agents") were acting within the scope of their employment and/or at the direction and under the control of TCU. Moreover, at all relevant times appropriate TCU agents were made aware of and took no action against the conduct of its agents, thereby ratifying their conduct and rendering TCU vicariously liable for the conduct of their agents via the doctrine of Respondeat Superior.

359. TCU violated Title VII of the Civil Rights Act of 1964 by subjecting Wilson to a series of intentional hostile acts and adverse actions designed to derail equal opportunities and equal pay because of her race.

360. Title VII of the Civil Rights Act of 1964 provides: " It shall be an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2.

361. Wilson is African-American young woman who was discriminated against because of her race. Accordingly, Wilson is members of a protected class.

362. As detailed extensively herein, TCU discriminated against Wilson by: (1) failing or refusing to pay that were equal to white female student worker performing the same assignments because of her race and (2) treating her less favorably than her white counterparts. All such actions are in direct violation of Section 703(a)(1) of Title VII, 42 U.S.C. § 2000e-2. Wilson was

intentionally made to endure discriminatory behavior in her working environment, including but not limited to: Wilson's being subjected to overly strenuous physical labor and specifically used to gain African-American students as detailed herein.

363. The effect of the practice of TCU and TCU agents complained of above has been to deprive Wilson of equal opportunities and equal pay and others adversely affected her status as a student worker.

364. The unlawful employment practices complained of herein were intentional or done with malice or reckless indifference to federal protected rights of Wilson.

**COUNT VI—TCU violated Section 504 of the Rehabilitation Act of 1973 and Title III of the Americans with Disabilities Act of 1990**

365. Plaintiff Coleman realleges and incorporates by reference the allegations contained in the previous paragraphs as if fully set forth herein.

366. At all relevant times TCU and TCU agents were acting within the scope of their employment and/or at the direction and under the control of TCU. Moreover, at all relevant times appropriate TCU agents were made aware of and took no action against the conduct of its agents.

367. TCU violated Section 504 of the Rehabilitation Act of 1973 and Title III of the Americans with Disabilities Act of 1990 by excluding Coleman from the participation in, denying her the benefit of, and subjecting her to harassment in a program or activity receiving financial assistance because of Coleman's type 1 diabetes which she reported to TCU and for which she sought and was denied accommodations as detailed herein.

368. Title III provides that "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns… or operates a place of public accommodation." 42 U.S.C. § 12182(a); 28 C.F.R. § 36.201(a).

369. TCU operates an "undergraduate, or postgraduate private school, or other place of education," which is a place of public accommodation pursuant to 42 U.S.C. § 12181(7)(J).

370. The Rehabilitation Act defines "program or activity" to "mean[] all of the operations of…a college, university, or other postsecondary institution." 29 U.S.C. § 794(b)(2)(A); 34 C.F.R. § 104.3(k). TCU is a "college, university, or other postsecondary institution." 29 U.S.C. § 794(b)(2)(A); 34 C.F.R. § 104.3(k). TCU and TCU-sanctioned activities and programs, including the Washington summer program are therefore a "program or activity" of TCU within the meaning of the Rehabilitation Act.

371. TCU has engaged in illegal disability discrimination, as defined by the Rehabilitation Act, including without limitation (1) limiting Coleman in the enjoyment of rights, privileges, advantages, and/or opportunities enjoyed by others receiving TCU's aids, benefits or services; (2) utilizing methods of administration and course instruction, etc. that have the effect of subjecting Coleman to discrimination on the basis of handicap, and that have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of TCU's programs and activities with respect to people with disabilities; (3) failing to provide an auxiliary aid or service where necessary to ensure that students with disabilities, like Coleman are not excluded, denied services or otherwise treated differently than others; and/or (4) failing to make reasonable modifications in policies, practices or procedures where necessary to afford its services, privileges, advantages or accommodations to persons with disabilities.

372. TCU has violated the Rehabilitation Act by, without limitation, failing to provide reasonable alternatives to Coleman who reported her disability and requested accommodations for the same. TCU failed to accommodate Coleman's disability.

373. TCU's violations of Section 504 and Title III have caused and continue to cause psychological and physiological harm to Coleman.

**COUNT VII—Drs. Snow and Schoolmaster, individually Assaulted Plaintiff Wilson and Daw, respectively.**

374. Plaintiffs Wilson and Daw reallege and incorporate all the allegations contained in preceding paragraphs of this Complaint as though fully rewritten herein.

375. Dr. Snow and Schoolmaster's conduct constitutes assault.

376. As detailed in herein, Drs. Snow and Schoolmaster acted intentionally and knowingly in making unwanted physical contact with Plaintiffs Wilson and Daw, resulting in bodily injury to Wilson and Daw as detailed herein.

377. Drs. Snow and Schoolmaster knew or reasonably should have believed that Plaintiffs Wilson and Daw would regard the physical contacts as offensive or provocative and were informed of the same.

378. As a result of said conduct Plaintiffs Wilson and Daw suffered psychological and physiological injury.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests relief against Defendants as follows:

379. A declaration that TCU's conduct as alleged here has violated, and continues to violate Title VI of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d through 2000d-6, Title IX of the Education Amendments Act of 1972, 20 U.S.C. §§ 1681through 1687, Section 504 of the Rehabilitation Act of 1973, 29 U.S.C § 794, and Title III of the Americans with Disabilities Act, 42 U.S.C. §§ 12181 through 12189;

380. Award Plaintiffs actual damages, exemplary damage, pre and post judgment interest, and court costs.

381. Award of Plaintiffs' reasonable attorneys' fees and cost as provided by law;

382. Such other relief, in law and in equity, as the Court finds just and proper.

**JURY DEMAND**

Plaintiffs demand a jury trial in this action.

Dated: January 29, 2021.

Respectfully submitted,

**ANOZIE, LLP**

By: */s/ Nnamdi M. Anozie*
**Nnamdi M. Anozie**
State Bar No. 24087107
nma@anoziellp.com
6120 Swiss Avenue, #140383
Dallas, Texas 75214
T: (214) 606-3440

*/s/ Keron A. Wright*
**Keron A. Wright**
State Bar No. 24075311
Keron.wright@wrightlegalpllc.com
Wright Legal Services PLLC

**ATTORNEYS FOR PLAINTIFFS.**